**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Edward Soto
David N. Griffiths

*Attorneys for*
*Reorganized Westinghouse Electric Company LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>WESTINGHOUSE ELECTRIC COMPANY LLC,<br>*et al.*,<br><br>                              Debtors. | Chapter 11<br><br>Case No. 17-10751 (MEW)<br><br>(Jointly Administered) |
| WESTINGHOUSE ELECTRIC COMPANY LLC, *as reorganized*<br><br>                              Plaintiff,<br><br>v.<br><br>SOUTH CAROLINA PUBLIC SERVICE AUTHORITY<br><br>                              Defendant. | Adv. Proc. No. 19-_____ (MEW) |

## ADVERSARY COMPLAINT

Plaintiff, reorganized Westinghouse Electric Company LLC ("**WEC**"), hereby makes the

following allegations against Defendant South Carolina Public Service Authority ("**Santee**

**Cooper**" or "**Defendant**").[1]

---

[1] In support of this Complaint, WEC submits the Declaration of David Durham ("**Durham Decl.**"), attached hereto as Exhibit A.

## NATURE OF THE ACTION

1.      This adversary proceeding concerns WEC's title to and ownership of certain items of equipment located at the Virgil C. Summer Nuclear Station in Jenkinsville, South Carolina ("**V.C. Summer Site**"), which Defendant has wrongfully withheld from WEC.

2.      In addition to wrongfully withholding the equipment, Defendant's refusal to return WEC's equipment or to allow WEC access to obtain its equipment poses an immediate risk to the equipment's sale value. Potential buyers, including Southern Company ("**Southern**"), have expressed interest in purchasing certain items of the equipment from WEC on an expedited basis. Without access to its equipment, WEC is unable to close on those opportunities and is at risk of losing millions of dollars in potential sale value.

3.      As such, through this adversary proceeding, WEC seeks an order from this Court that WEC has legal title to its equipment and is entitled to recover its equipment from Defendant.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334(a) and the Amended Standing Order of Reference M-431 dated January 31, 2012 (Preska, C.J.). This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.      Pursuant to the *Findings of Fact, Conclusions of Law, and Order Confirming Modified Second Amended Joint Plan Of Reorganization* [ECF No. 2988] (the "**Confirmation Order**"), this Court has exclusive jurisdiction over all matters arising out of, and related to, the

WEIL:\96963841\11\80768.0018

chapter 11 cases, the Plan,[2] the Plan Injunction,[3] and the implementation of the Confirmation Order, including the matters set forth in section 1142 of the Bankruptcy Code. *See* Confirmation Order ¶ 48.

6.      This Court has jurisdiction over this matter because the dispute implicates the Plan and the PFA (as defined below) as it relates to estate property that vested in WEC under the PFA. The PFA is incorporated into and critical to the Plan. Further, as part of the Plan, the Court entered the Plan Injunction that enjoins any party from interfering with the Plan.

7.      Furthermore, Defendant submitted to the jurisdiction of this Court by filing proofs of claim against the Plaintiff's bankruptcy estates, which were filed by SCE&G for itself and as agent for Defendant. *See* Proofs of Claim Nos. 2440, 2444, 3088, and 3089; *see also In re China Fishery Grp. Ltd.*, No. 16-11895 (JLG), 2017 WL 3084397, at *6 (Bankr. S.D.N.Y. July 19, 2017) (finding that the claimant submitted to the jurisdiction of the bankruptcy court by filing a proof of claim); *In re Adelphia Commc'ns Corp.*, 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) (same); *In re Stokes*, 320 B.R. 821, 825 (Bankr. D. Md. 2004) (noting that in filing a proof of claim, the IRS submitted to the personal jurisdiction of the District Court since the proof of claim "is analogous to a complaint filed in the District Court"). As discussed further herein, these proofs of claim assert any and all claims based upon, arising under, on account of, in connection with, or related to the EPC Agreement (as defined herein)—the very contract at issue in this Complaint. This Court's jurisdiction is not limited to adjudication of the proofs of claims themselves, but extends to the adversary proceeding at hand. *See In re Adelphia Commc'ns Corp.*, 307 B.R. at 419 (stating

---

[2] *See Modified Second Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 2986] (the "**Plan**").

[3] *See* Plan, § 11.9 ("**Plan Injunction**"). To the extent Santee Cooper takes actions contrary to the Plan, WEC will seek relief in this Court, including, if necessary, enforcement of the Plan Injunction.

WEIL:\96963841\11\80768.0018

that the claimant could not argue "that the submissions to bankruptcy court jurisdiction that results from the filing of a proof of claim is limited to the adjudication of the claim itself"). Thus, by filing proofs of claim in the Chapter 11 Cases (as defined herein), the Defendant "submitted to the equitable jurisdiction of this Court, especially with respect to the very subject matter of their claims." *Id.* at 418.

8.      In addition, under the EPC Agreement (as defined herein), the parties explicitly consented to "the exclusive jurisdiction of the United States District Court for the Southern District of New York or, if such court does not have jurisdiction … the courts of the State of New York located in the city and County of New York, for any legal proceedings that" arise out of or are in connection with the EPC Agreement. EPC Agreement, § 27.7.

9.      Plaintiff confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure to the entry of a final judgment by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.      Accordingly, this Court is the correct venue to address the ownership of the equipment at issue. The determination of what constitutes property of the estate falls squarely within the authority and expertise of this Court, as does interpretation of the disposition of property of the estate through a Plan confirmed by this Court.

11.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## THE PARTIES

12.      Plaintiff WEC, is a Delaware limited liability company with its principal place of business in Cranberry Township, Pennsylvania. WEC is engaged in the business of designing,

WEIL:\96963841\11\80768.0018

developing, servicing and supplying commercial nuclear facilities and has developed a pressurized

water nuclear power plant known as the AP1000 nuclear power plant.

13.    Defendant Santee Cooper, is a body corporate and politic of the State of South

Carolina created by Act No. 887 of the South Carolina General Assembly in 1934, currently

codified, as amended, at S. C. Code Ann. § 58-31-10 et seq.

## FACTUAL ALLEGATIONS

### I.    The EPC Agreement

14.    Plaintiff and Defendant, along with South Carolina Electric & Gas Company

("**SCE&G**") and Stone & Webster, Inc., are parties to the Engineering, Procurement, and

Construction Agreement dated May 23, 2008 (the "**EPC Agreement**").[4] The EPC Agreement

provided for the design, engineering, procurement, installation of equipment and materials, and

construction and testing of two AP1000 nuclear power plants at the V.C. Summer Site ("**V.C.

Summer Project**").

15.    Under the EPC Agreement, WEC, as Contractor (as defined therein), was obligated,

in part, to place orders and procure equipment from vendors to be used for the V.C. Summer

Project. The EPC Agreement defines "Equipment" as "machinery, computer hardware and its

associated software, apparatus, components, articles, materials, systems and structures, and items

of any kind that shall become a permanent part of the Facility to be provided by Contractor to

Owner under this Agreement, but excluding the Nuclear Fuel." EPC Agreement, art. I.

16.    The EPC Agreement carves out one subcategory of Equipment called "**Major

Equipment**," which includes "steam generators, reactor vessel and reactor vessel head, control

---

[4] A copy of the EPC Agreement is publicly available:
https://www.sec.gov/Archives/edgar/data/91882/000075473717000030/epc201710qacontractexh
ibit.htm

WEIL:\96963841\11\80768.0018

rod drive mechanisms, main turbine, main turbine generator, turbine deaerator, reactor coolant pumps, containment vessel, cooling towers, main turbine condenser, reactor internals, main step-up transformers, pressurizer, diesel generators, feedwater pumps, circulating water pumps, polar crane, core makeup tanks, moisture separator reheaters, and any other equipment for which the contract(s) with the Subcontractor is for an amount in excess of $10,000,000 or that Owner and Contractor agree shall be designated as Major Equipment." *Id.*

17.    The remaining Equipment that does not qualify as Major Equipment is referred to herein as "**Non-Major Equipment**."

18.    Title to all Equipment—whether Major Equipment or Non-Major Equipment—is governed by Article 21.1 of the EPC Agreement. Under Article 21.1, title to Equipment "shall pass to Owner upon payment in full by Owner to Contractor for such item of Equipment."  EPC Agreement, § 21.1.

19.    As for Major Equipment, the EPC Agreement requires that WEC issue separate invoices to Defendant for milestone payments toward Major Equipment. EPC Agreement, § 8.2 ("Invoices for Milestone Payments for Major Equipment shall be issued separately from invoices for other Milestone Payments.").  In accordance with the Milestone Payment Schedule set forth in Exhibit F-1 of the EPC Agreement, WEC maintained detailed records that tracked Defendant's payments towards Major Equipment.

20.    As to the Non-Major Equipment, the EPC Agreement calls for Defendant to make progress payments toward the contract price of the EPC Agreement, which includes procuring Non-Major Equipment. EPC Agreement, § 8.2. The EPC Agreement does not contain a provision instructing WEC how to allocate progress payments toward Non-Major Equipment. Thus, WEC maintained discretion under the EPC Agreement to allocate Defendant's progress payments across

WEIL:\96963841\11\80768.0018

the Non-Major Equipment, and Defendant did not designate progress payments toward specific items of Non-Major Equipment.

21.     According to the Major Equipment invoices and Non-Major Equipment progress payment allocations, Defendant has not paid-in-full for certain items of Equipment ("**WEC Equipment**") and has paid-in-full for certain items of Equipment ("**Santee Cooper Equipment**"). Further, Defendant did not render complete payment to WEC for the contract price of the V.C. Summer Project (and Equipment) procured thereunder. Thus, Defendant cannot own all of the Equipment, as transfer of title did not occur until payment in full by Defendant. *See* EPC Agreement § 21.1.

22.     Accordingly, Defendant does not have legal title to the WEC Equipment under the plain terms of the EPC Agreement. Rather, the Debtors retained title to the WEC Equipment, which vested in Plaintiff on the Effective Date (as defined herein) of the Plan.

## II.    The Bankruptcy, Plan, and Plan Funding Agreement

23.     On March 29, 2017, Westinghouse Electric Company LLC and certain of its affiliates (the "**Debtors**") commenced jointly administered proceedings, styled as *In re Westinghouse Electric Company LLC, et al.*, Case No. 17-10751 (MEW) (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

24.     Prior to the commencement of the Chapter 11 Cases, the Debtors, SCE&G, and the Defendant entered into that certain Interim Assessment Agreement dated March 28, 2017 (as amended and extended, the "**IAA**"), pursuant to which SCE&G and the Defendant agreed to pay the costs of continuing construction at the V.C. Summer Project during an initial "Interim

7

Assessment Period." During the Interim Assessment Period, the Debtors continued to fulfill their obligations under the EPC Agreement (as modified by the terms of the IAA).

25.    On March 30, 2017, the Bankruptcy Court entered the order approving the IAA. *See* ECF No. 68. The IAA was subsequently amended on April 28, 2017 and June 28, 2017. *See Notice of Filing of Amendment No. 1 to V.C. Summer Interim Assessment Agreement* [ECF No. 385]; *Notice of Filing of Amendment No. 2 to V.C. Summer Interim Assessment Agreement* [ECF No. 778].

26.    Soon thereafter, on July 31, 2017, Defendant and its co-owner, SCE&G, publicly announced that it was abandoning construction of the V.C. Summer Project.[5] Contemporaneously therewith, the Defendant also provided the Debtors with a notice of termination of the IAA. After abandonment of the V.C. Summer Project, Defendant only permitted the Debtors limited access to the V.C. Summer Site.

27.    On May 26, 2017, the Debtors filed the schedules of assets and liabilities and statement of financial affairs for their various entities (the "**Schedules and SOFAs**"). *See* ECF No. 567–625. In the Schedules and SOFAs, the Debtors made disclosures related to equipment, disclosing they held "other machinery, fixtures and equipment," "automobiles and trucks," "work in progress," "raw materials," "finished goods, and "various" office equipment and supplies. *See* ECF No. 569 (capitalization omitted). The Schedules and SOFAs aggregate over $500 million for these various categories. *Id.*

---

[5] *See South Carolina Electric & Gas Company to Cease Construction and Will File Plan of Abandonment of the New Nuclear Project*, PR NEWSWIRE (Jul. 31, 2017, 12:59 PM), https://www.prnewswire.com/news-releases/south-carolina-electric--gas-company-to-cease-construction-and-will-file-plan-of-abandonment-of-the-new-nuclear-project-300496644.html; *see also Santee Cooper Suspends Construction of V.C. Summer Units 2 and 3* (July 31, 2017), https://www.santeecooper.com/news/2017/073117-Santee-Cooper-suspends-construction-of-V.C.-Summer-Units-2-and-3.aspx.

WEIL:\96963841\11\80768.0018

28.    The Bankruptcy Court-established deadline to file a proof of claim in the case was September 1, 2017. *See* ECF No. 788. Any holder of a claim who failed to file such claim by the bar date was "forever barred, estopped and enjoined from asserting such a claim against the Debtors, their property, or their estates[.]" *Id.*

29.    On August 31, 2017, SCE&G, for itself and as agent of Defendant, filed identical unsecured and unliquidated proofs of claim in the Chapter 11 Cases. *See* Proofs of Claim Nos. 2440, 2444, 3088, and 3089. The claims are described in a two-page addendum. The addendum states that SCE&G, as agent of the Defendant, "asserts against WEC any and all claims based upon, arising under, on account of, in connection with, or related to, the V.C. Summer Project and the EPC Agreement." *Id.* at ¶ 6. This purports to include "any and all equitable and common law claims against WEC arising from, related to or in connection with its relationship or transactions with Claimant, including but not limited to, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and conversion." *Id.*

30.    During the course of the Chapter 11 Cases, Defendant and SCE&G sold their claims to Citigroup Financial Products, Inc. (*see* ECF Nos. 1411, 1412, 1413, and 1414) (the "**Claims Purchaser**"), which subsequently filed amended proofs of claim numbers 3437, 3438, and 3448. Upon information and belief, Defendant and SCE&G received approximately $2 billion from that claims sale, an amount in excess of the full limit of Plaintiff's total liability under the EPC Agreement.[6]

31.    On January 12, 2018, Brookfield WEC Holdings LLC, Toshiba Nuclear Energy Holdings (UK) Limited and TSB Nuclear Energy Services Inc. executed a Plan Funding

---

[6] The EPC Agreement contains a limitation of liability provision which provides that Westinghouse Electric Company LLC's total aggregate liability shall not exceed an aggregate amount equal to twenty-five percent (25%) of the payments for such unit that have been made to Westinghouse Electric Company LLC. *See* EPC Agreement, §17.2.

WEIL:\96963841\11\80768.0018

Agreement (as amended, the "**PFA**"), pursuant to which Brookfield WEC Holdings Inc. acquired WEC (through the acquisition of newly issued equity in reorganized TSB Nuclear Energy Services Inc.) and Brookfield WEC EMEA Holdings Ltd. (together with Brookfield WEC Holdings Inc., "**Brookfield**") acquired Westinghouse Electric (UK) Holdings Limited. The transaction closed on August 1, 2018 concurrent with WEC's emergence from chapter 11 (the "**Closing**").  Under the PFA (as amended pursuant to an order entered by the Bankruptcy Court on July 27, 2018), (i) all assets owned by the Debtors immediately prior to the Closing, other than those explicitly identified as "Excluded Assets" pursuant to the terms of the PFA, vested in WEC and (ii) all liabilities of the Debtors explicitly designated as "Assumed Liabilities" were assumed by WEC, in each case, upon WEC's acquisition by Brookfield at the Closing. The Excluded Assets and all liabilities of the Debtors (other than the Assumed Liabilities) were transferred by the Debtors to W Wind Down Co, LLC ("**Wind Down Co**") immediately prior to the PFA Closing.[7]

32.    On March 28, 2018, the Bankruptcy Court entered the Confirmation Order confirming the Plan.  The Effective Date of the Plan occurred on August 1, 2018 (the "**Effective Date**"). *See Notice of Occurrence of Effective Date of Debtors' Modified Second Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 3705].

33.    The EPC Agreement was rejected pursuant to the Plan on the Effective Date. In accordance with the Plan, "on the Effective Date, except as otherwise provided in the Plan, each [e]xecutory [c]ontract and [u]nexpired [l]ease not previously rejected, assumed, or assumed and assigned by the Debtors during the Chapter 11 Cases shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.  Plan, § 9.1. The EPC Agreement was

---

[7] Capitalized terms not defined in this paragraph have the meaning ascribed to such term the PFA.

WEIL:\96963841\11\80768.0018

not assumed or assigned during the Chapter 11 Cases and, accordingly, as of the Effective Date, the EPC Agreement was deemed rejected under the Plan.

34.    Rejection of a contract pursuant to section 365 does not alter the rights of the parties under the contract. To determine the parties' contract rights as a result of a statutory breach under section 365 of the Bankruptcy Code, the parties must resort to state law. The EPC Agreement provides that the validity, construction, and performance of the EPC Agreement is to be governed by and interpreted in accordance with New York law. EPC Agreement, § 34.1.

35.    The deadline to submit a proof of claim for the rejection of the EPC Agreement was August 31, 2018.  *See Notice of Occurrence of Effective Date of Debtors' Modified Second Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 3705].  Defendant did not file a proof of claim for rejection of the EPC Agreement, nor did the Claims Purchaser.

36.    Under the Plan and PFA, on the Effective Date, all property of the Debtors' estates, other than Excluded Assets (as defined in the PFA) vested in WEC. The WEC Equipment was not identified as an Excluded Asset in Schedule 2.02(a) of the PFA. As a result, on the Effective Date, the WEC Equipment vested in WEC.

37.    WEC currently has legal title to the WEC Equipment and Defendant has no legal title to the WEC Equipment.

### III.    Plaintiff's Demand for the Property and Defendant's Refusal

38.    In February 2018, the Debtors contacted Defendant to discuss the Equipment. *See* Durham Decl. ¶ 7. The Debtors advised that, under the terms of the EPC Agreement, the Equipment could be segregated into buckets including WEC Equipment and Santee Cooper Equipment. *Id.* Buyers of nuclear safety class equipment in the United States (which is much of the V.C. Summer Site Equipment) are required to obtain from the seller certain nuclear certifications, nuclear quality assurance manufacturing records, and equipment design intellectual

11

property when purchasing such equipment. The Debtors informed Defendant that the Debtors' expertise and credentials in the field of nuclear power plants would allow them to obtain a superior price for the sale of all Equipment. *Id.* The Debtors told Defendant that they were uniquely positioned to sell the Equipment because it owns the Equipment design intellectual property, nuclear quality assurance documentation, nuclear certifications, and export control license. *Id.* The Debtors further had established relationships with their existing AP1000 customers that they could rely on for purposes of sale. *Id.*

39.     Shortly after this meeting, the parties agreed to develop a cooperative strategy and agreement for the sale of all of the Equipment. *Id.* at ¶ 8. In the meantime, Defendant advised that it first needed to execute an agreement whereby its co-owner on the V.C. Summer Project, SCE&G, transferred its ownership rights in any Equipment to Defendant. *Id.* Upon information and belief, Defendant and SCE&G completed that transfer in December 2018 and SCE&G no longer has any ownership interest in the Equipment.

40.     In the fall of 2018, WEC began to contact and negotiate with potential buyers who expressed interest in purchasing a significant portion of the WEC Equipment. *Id.* at ¶ 5. Given the unique nature of most of the WEC Equipment—which is designed specifically for use in a nuclear power plant—and the limited number of nuclear power plants being built, there are few potential buyers. *Id.*

41.     The parties did not discuss the Equipment again until a meeting on March 1, 2019, when the Defendant—for the first time—took the position that it owns all Equipment. Defendant did not provide any substantive explanation supporting this position. *Id.* at ¶ 9.

42.     WEC reached out to Defendant on numerous occasions thereafter, suggesting that WEC—with its nuclear certification—could sell the Equipment on behalf of both parties and share in the proceeds with Defendants. *Id.* at ¶ 11. Defendant refused. *Id.*

WEIL:\96963841\11\80768.0018

43.     In order to capture the Equipment's highest and best value, WEC suggested that the parties enter into a Standstill Agreement. *Id.* at ¶ 11–12. The Standstill Agreement proposed to allow the parties to sell the Equipment, hold the proceeds in an escrow account, and seek a resolution as to the proceeds at a later date. *Id.* Defendant refused to engage in any such process. *Id.*

44.     Instead, on March 18, 2019, Defendant advised—for the first time—that it intended to sell (and is in fact actively attempting to sell) Equipment, which includes the WEC Equipment for which it has no legal title nor the requisite nuclear certifications, nuclear quality assurance manufacturing records, or design intellectual property required to conduct such sales.[8] *Id.* at ¶ 10.

45.     During WEC's attempted negotiations with Defendant, WEC lost out on an $8 million sale opportunity with potential buyer Southern because WEC could not obtain the WEC Equipment from Defendant in order to deliver it within the requested timeframe. *Id.* at ¶ 12. Southern's ongoing AP1000 project in Georgia (the "**Vogtle Project**") is the only remaining nuclear power plant construction project in the United States. *Id.* Should Southern source its future equipment needs from another vendor in the near future—as it did with the $8 million dollar lost opportunity—WEC will have lost the only domestic sale opportunity for much of the WEC Equipment. *Id.* Thus, WEC stands to lose millions of dollars more from Southern if this dispute is not timely resolved. *Id.* at 12–16.

46.     Indeed, Southern informed WEC and Santee Cooper via letter dated April 3, 2019 (the "**Southern Letter**"), that it was interested in purchasing tens of millions of dollars worth of Equipment, including WEC Equipment, that is located at the V.C. Summer Site for use on the Vogtle Project, but that it needed to acquire that WEC Equipment on a schedule that supports the

---

[8] To the extent Defendant engages in such sales, the Plan Injunction prevents it from doing so.

WEIL:\96963841\11\80768.0018

construction timeline of the Vogtle Project.  *Id.* at ¶ 13. Attached to the Southern Letter was a schedule of construction materials that Southern was prepared to purchase immediately, part of which is WEC Equipment. *Id.* Additionally, Southern indicated in the Southern Letter that it had a "substantial strategic budget for spare parts," and "substantial additional procurement budget remaining for equipment and materials," that "could be satisfied in significant part by" the Equipment at the V.C. Summer Site. *Id.*

47.    The Southern Letter envisioned WEC and Santee Cooper providing certain representations and warranties as to the Equipment Southern intends to purchase and agreeing to escrow the proceeds while WEC and Santee Cooper resolve the ownership dispute. *Id.* This proposal was nearly identical to the WEC proposal for a Standstill Agreement that Santee Cooper rejected.  Critically, the Southern offer terminates fourteen days (14) from the April 3, 2019 date of the Southern Letter (*i.e.*, April 17, 2019) because Southern requires the delivery of the Equipment on a schedule that supports the Vogtle Project's construction and operating schedule. *Id.* As Southern set forth in the Southern Letter:  "Time is of the essence."  *Id.*

48.    On April 4, 2019, WEC responded via letter to Southern and Defendant advising that Southern's proposal was acceptable to WEC.  *Id.* at ¶ 14; *see also* Durham Decl., Ex. A. WEC also suggested that the parties meet on Monday, April 8, 2019, to discuss an arrangement to move forward with the proposed purchase. *Id.*

49.    Recognizing that the window to sell certain Equipment required by Southern was quickly closing, WEC continued to attempt to resolve the dispute with Defendant. On April 5, 2019, Dave Durham, WEC's President of Plant Solutions, attempted to contact Michael Crosby, Santee Cooper Senior Vice President of Nuclear Energy, to discuss Defendant's refusal to return the WEC Equipment. *Id.* at ¶ 15.  Mr. Durham could not reach Mr. Crosby and left two voicemail messages.  *Id.*

50.     Immediately following these attempted telephonic discussions, on April 5, 2019, Mr. Durham emailed Mr. Crosby to initiate a discussion regarding Southern's proposal and determine whether Defendant had changed its position on the proposed Standstill Agreement. *Id.* at ¶ 15; *see also* Durham Decl., Ex. B. Mr. Durham also confirmed in writing that Defendant has consistently refused to give WEC access to the WEC Equipment, which has already resulted in the loss of significant sale opportunities. *Id.*

51.     WEC is committed to engaging with Santee Cooper and Southern on the proposal set forth in the Southern Letter on the short timeline provided therein.  However, as each day passes, given the limited market of potential buyers, WEC loses sale opportunities and the value of the WEC Equipment thereby dissipates.

52.     To date, Defendant has refused to return the WEC Equipment or allow WEC access to the V.C. Summer Site to recover it (*id.* at ¶ 18), and it is therefore unlawfully withholding the WEC Equipment from WEC.

53.     Unable to retrieve the WEC Equipment to execute on these potential sales, WEC is left with no other option than to initiate an action in this Court to recover its property.

## <u>COUNT I</u>
### (Recovery of Chattel)

54.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 53 of the Complaint as if stated herein.

55.     Under the EPC Agreement, Plaintiff has title to the WEC Equipment.

56.     Plaintiff has a property interest in the WEC Equipment superior to that of the Defendant.

57.     At the time of the commencement of the above entitled action and at all times hereinafter mentioned, Plaintiff was and still is the owner of the WEC Equipment and entitled to its immediate possession.

15

58.     Defendant is in possession of the WEC Equipment and has wrongfully detained the WEC Equipment from Plaintiff.

59.     Plaintiff has requested access to the property, verbally and in writing, from the Defendant in order to retrieve the WEC Equipment.

60.     The Defendant has wrongfully disregarded Plaintiff's notices and demands and wrongfully prevented Plaintiff from retrieving its WEC Equipment.

61.     Defendant's wrongful refusal to deliver or otherwise provide Plaintiff access to the WEC Equipment constitutes wrongful detention.

62.     For this reason, Defendant is in unlawful possession of the WEC Equipment and Plaintiff must now seek judicial intervention for the recovery of its personal property.

63.     Based on the foregoing, Plaintiff is entitled to relief from the Court pursuant to Section 7101 of the Civil Practice Law and Rules for a determination of its right to possess the chattels (*i.e.*, the WEC Equipment) described herein and an award of money damages in an amount to be determined at trial for the Defendant's wrongful taking and holding of the chattels.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment:

a)     Ordering that Plaintiff is the rightful title owner of the WEC Equipment and entitled to the immediate possession of the WEC Equipment;

b)     Ordering Defendant to allow Plaintiff access to the V.C. Summer Site to recover its WEC Equipment or otherwise deliver the WEC Equipment to Plaintiff;

c)     In case possession thereof cannot be given to Plaintiff, that Plaintiff have judgment against Defendant for the value of the WEC Equipment as it exists today, with interest thereon; and

16

d)    Such other and further relief as may be just and proper together with the costs and

disbursements of this action.

Dated:  April 5, 2019
   New York, New York

        */s/ David N. Griffiths*
        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007
        Gary T. Holtzer
        Gary.holtzer@weil.com
        Edward Soto
        Edward.soto@weil.com
        David N. Griffiths
        David.griffiths@weil.com

        *Attorneys for Reorganized Westinghouse Electric*
        *Company LLC*

WEIL:\96963841\11\80768.0018