**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Edward Soto
Robert S. Berezin
David N. Griffiths

*Attorneys for*
*Reorganized Westinghouse Electric Company LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| WESTINGHOUSE ELECTRIC COMPANY LLC, | Case No. 17-10751 (MEW) |
| *et al.*, | (Jointly Administered) |
| Debtors. | |
| WESTINGHOUSE ELECTRIC COMPANY LLC, *as reorganized* | |
| Plaintiff, | Adv. Proc. No. 19-01109 (MEW) |
| v. | |
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY | |
| Defendant. | |

**WESTINGHOUSE ELECTRIC COMPANY LLC'S**
**OPPOSITION TO SOUTH CAROLINA PUBLIC SERVICE**
**AUTHORITY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 3

    I.     The Chapter 11 Cases .............................................................................. 3

    II.    The EPC Agreement ................................................................................ 4

          A.     The EPC Agreement Governs the Owners' Payments for
                 Equipment ..................................................................................... 5

                 i.     Non-Major Equipment (F.1.3, F.1.5) ............................................ 6

                 ii.    Major Equipment (F.1.1.) ................................................ 6

                 iii.   The Owners' Fixed Price Option Election ..................................... 6

                 iv.    The Owners Did Not Pay in Full For the Equipment at
                      Issue in this Adversary Proceeding ................................................ 7

    III.   Schedules and SOFAs ............................................................................. 8

    IV.   WEC And Santee Cooper Discussed Title to the Equipment and
          Negotiated Regarding its Potential Sale Throughout the Pendency of the
          Chapter 11 Cases ................................................................................... 8

           A.     Negotiations Prior to the PFA and Plan ....................................... 8

    V.    The Plan and PFA Provide for the Transfer of the WEC Equipment—then
          Property of the Estate—to WEC .......................................................... 10

           A.     The Plan Retained Jurisdiction for the Court to Hear This Dispute
                 Related to the Plan, the PFA, the Confirmation Order, and the
                 Implications of the Debtors' Rejection of the EPC Agreement ................ 14

    VI.   WEC Seeks Resolution of the Equipment Ownership Dispute In the
          Proper and  Binding Venue While Santee Cooper Forum Shops By Filing
          a Mirror-Image Action  in South Carolina Over a Month Later .......................... 15

ARGUMENT ...................................................................................................... 17

    I.     The Adversary Complaint and Santee Cooper's Legal Arguments
          Implicate Core  Bankruptcy Issues That the Court Has Jurisdiction to
          Adjudicate ............................................................................................ 17

           A.     Legal Standard ............................................................................ 17

           B.     There is a Close Nexus Between the Complaint, the Plan, and the
                 Bankruptcy Proceedings ............................................................. 18

                 i.     The Complaint, and Santee Cooper's Responses, Raise Key
                     Bankruptcy Issues That This Court Has Jurisdiction to
                      Decide .................................................................................... 18

                 ii.    The Court Retained Jurisdiction to Hear This Dispute in the
                     Plan and Confirmation Order ....................................................... 21

C.    Santee Has Submitted to the Court's Jurisdiction by Filing Proofs
of Claim .................................................................................................... 23

D.    The EPC Agreement's Venue Provision Still Binds the Parties
Post-Rejection and Is Not Being Used to Confer Bankruptcy
Jurisdiction on the Court ........................................................................... 25

**CONCLUSION** ............................................................................................................. 28

WEIL:\97059025\2\80768.0018

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Adelphia Communications Corp.*,
  307 B.R. 404 (Bankr. S.D.N.Y. 2004) ......................................................................... 27

*In re All Am. Semiconductor, Inc.*,
  No. 07-12963-BKC-LMI, 2010 WL 2854153 (Bankr. S.D. Fla. July 20, 2010) ................. 29

*In re Ames Dep't Stores, Inc.*,
  542 B.R. 121 (Bankr. S.D.N.Y. 2015) ........................................................................ 27

*Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*,
  372 F.3d 154 (3d Cir. 2004) ..................................................................................... 20

*In re Chateaugay Corp.*,
  193 B.R. 669 (S.D.N.Y. 1996) ................................................................................... 19

*In re China Fishery Group Limited*,
  No. 16-11895 (JLF), 2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) ...................... 27

*In re Flemings Companies, Inc.*,
  325 B.R. 687 (Bankr. D. Del. 2005) ........................................................................... 29

*In re General Growth Properties, Inc.*,
  460 B.R. 592 (Bankr. S.D.N.Y. 2011) ........................................................................ 28

*Golf Club at Bridgewater, L.L.C. v. Whitney Bank*,
  No. 8:09-BK-10430-CED, 2013 WL 1193182 (M.D. Fla. Mar. 22, 2013) ...................... 24

*Grantham v. Timothy Cory & Assocs.*,
  No. 2:11-cv-01549, 2012 WL 174398 (D. Nev. Jan. 20, 2012) ...................................... 21

*In re Jesup & Lamont, Inc.*,
  No. 10 B 14133 AJG, 2012 WL 3822135 (Bankr. S.D.N.Y. Sept. 4, 2012) .............. 19, 24

*In re Johns-Mansville, Corp.*,
  7 F.3d 32 (2d. Cir. 1993) ......................................................................................... 25

*In re Lavinge*,
  114 F.3d 379 (2d Cir. 1997) ..................................................................................... 28

*In re Lehman Bros. Holdings, Inc.*,
  No. 14 CIV. 7643 ER, 2015 WL 5729645 (S.D.N.Y. Sept. 30, 2015).......................... 28

*In re Lehman Bros. Holdings, Inc.*,
  No. 18-CV-8986-VEC, 2019 WL 2023723 (S.D.N.Y. May 8, 2019) ............................. 25

iii

*In re Manville Forest Prods. Corp.*,
   896 F.2d 1384 (2d Cir.1990) ................................................................................... 26

*Neilson v. Straight–Out Promotions, LLC (In re Michael G. Tyson)*,
   No. 05–02210, 2007 WL 2379624 (Bankr. S.D.N.Y. Aug. 17, 2007) ................................ 20

*In re Olympia Office LLC*,
   585 B.R. 661 (E.D.N.Y. 2018) ............................................................................... 21

*In re Paragon Offshore PLC*,
   588 B.R. 735 (Bankr. D. Del. 2018) ........................................................................ 29

*In re Petrie Retail, Inc.*,
   304 F.3d 223 (2d Cir. 2002) .................................................................................. 26

*In re S.G. Phillips Constructors, Inc.*,
   45 F.3d 702 (2d Cir. 1995). ................................................................................... 27

*Southeastern PA Transp. Authority v. AWS Remediation Inc.*,
   No. Civ. A. 03-695 2003, WL 21994811 (E.D. Pa. Aug. 18, 2003) ................................ 29

*In re Spiegel Inc.*,
   337 B.R. 816 (Bankr. S.D.N.Y. 2006) .................................................................... 22

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
   559 B.R. 563 (Bankr. S.D.N.Y. 2016) .................................................................... 19

*In re Touch Am. Holdings, Inc.*,
   401 B.R. 107 (Bankr. D. Del. 2009) .................................................................. 20, 21

*U.S. Tr. v. Gryphon at Stone Mansion, Inc.*,
   216 B.R. 764 (W.D. Pa. 1997), *aff'd*, 166 F.3d 552 (3d Cir. 1999) ................................ 24

**Statutes**

11 U.S.C. § 502 ................................................................................................ 4, 22

28 U.S.C. § 157 .................................................................................................. 26

28 U.S.C. § 1334 ......................................................................................... 3, 5, 19, 23

**Other Authorities**

Fed. R. Bankr. P. 3002(c)(4) .................................................................................1, 20

Reorganized Westinghouse Electric Company LLC ("**WEC**"), by and through undersigned counsel, respectfully submits this opposition (the "**Opposition**") to South Carolina Public Service Authority's ("**Santee Cooper**") Motion to Dismiss Plaintiff's Complaint filed on May 8, 2019 [ECF No. 5-1] (the "**Motion to Dismiss**" or "**Mot.**").

### PRELIMINARY STATEMENT

1.      WEC is seeking to recover equipment from Santee Cooper that vested in WEC under the terms of the Plan Funding Agreement, Plan of Reorganization, and Confirmation Order entered by this Court, and WEC's ownership of the equipment results directly from the application of federal bankruptcy law and this Court's orders issued thereunder.  For that reason alone, this adversary proceeding raises claims with a close nexus to the bankruptcy proceedings of Westinghouse Electric Company LLC and certain of its affiliates (collectively, the "**Debtors**").[1]  Accordingly, the Court has jurisdiction under 28 U.S.C. § 1334.

2.      As a threshold matter, under the terms of the EPC Agreement, the equipment at issue only became property of Santee Cooper once it was paid for in full.  Santee Cooper has not and cannot show that WEC ever received full payment under the terms of the EPC for the equipment, and WEC has proffered evidence that the opposite is true.  This equipment was property of the Debtors' estates during the Chapter 11 Cases.  WEC also has established that the dispute over title arose during the Chapter 11 Cases, that in light of actual and constructive notice to Santee Cooper of WEC's ownership interest.  If Santee Cooper wanted to preserve any rights or assert any claims as to this equipment, it had ample opportunity to do so during the pendency of the Debtors' chapter 11 cases through, among other things, objections to the PFA, Plan, and Confirmation Order or the filing of a rejection damages claim on the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Adversary Complaint [ECF No. 1] (the "Complaint").

1

Effective Date of the Plan.[2]    The equipment in question can no longer be subject to Santee Cooper's claims because any such claims have been discharged under the terms of the Plan and Confirmation Order.  Thus, in WEC's Complaint its right to the equipment it seeks to recover is directly based on federal bankruptcy law – i.e., Santee Cooper's failure to assert any rights or claims related to the equipment during the Chapter 11 Cases.

3.        While WEC's claim involves state law questions, they are mainly threshold issues to determine whether the equipment at issue was property of the estate in the first place—a core bankruptcy issue.  If the equipment was property of the Debtors' estate, the questions of federal bankruptcy law described above determine whether title to the equipment vested in WEC, and what rights, if any, Santee Cooper has to such equipment.

4.        As the Court knows, Santee Cooper has belatedly asserted a complaint in South Carolina based on claims grounded in the breach of the EPC Agreement.    See Complaint [ECF No. 1, Case No. 2:19-cv-01432-RMG] (the "**South Carolina Complaint**").  Such claims arose at the latest upon rejection of the EPC Agreements in the Chapter 11 Cases (as defined below).  Santee Cooper's complaint is replete with references to the bankruptcy or to events that occurred during bankruptcy.  Underlying Santee Cooper's complaint are the same claims it should have raised during the pendency of the Chapter 11 Cases:  Had WEC not rejected the EPC Agreement, the Owners would have satisfied the contractual requirements to obtain, and would have obtained, title to the equipment.  Santee Cooper also alleges that the WEC Equipment was not specifically listed in the Debtors' Schedules and SOFAs and therefore could not transfer to WEC under the PFA upon the Effective Date of the Plan – a core issue to be

---

[2] *See e.g.,* 11 U.S.C. § 502(b)(9): Confirmation Order; *Notice of Occurrence of Effective Date of Debtors' Modified Second Amended Joint Chapter 11 Plan of Reorganization* [ECF No. 3705] [Case No. 17-10751] (giving creditors notice of the Confirmation Order's terms); Fed. R. Bankr. P. 3002(c)(4).

WEIL:\97059025\2\80768.0018

determined by a bankruptcy court.  In earlier correspondence with WEC and indeed before this

Court, Santee Cooper has also challenged the application of the EPC Agreement to the issues in

dispute, claiming that the Debtors' rejection of that agreement invalidates the applicable terms

therein, and such an argument underlies the South Carolina Complaint, again an issue best

decided by a bankruptcy court.   Santee Cooper's South Carolina action violates the Plan

Injunction and, as WEC also seeks relief under and to enforce this Court's orders, bankruptcy

jurisdiction lies for that reason as well.

        5.        Santee Cooper's Motion to Dismiss further delays both WEC and Santee

Cooper's ability to sell the equipment to a buyer, Southern Company, who stands ready to

purchase such equipment and to put the sale proceeds in escrow pending a resolution to this

ownership dispute.   Despite WEC and Santee Cooper's fundamental disagreement over

ownership of the equipment, once thing is certain: a rapid sale of the equipment to Southern is in

both Santee Cooper and WEC's best interest.  The loss of this sale opportunity due to Santee

Cooper's actions amounts to a frustration of the court-confirmed Plan (an issue with a close

nexus to the bankruptcy proceedings), and will also likely lead to the equipment only having

scrap resale value, which will inevitably lead to WEC filing a damages claim against Santee

Cooper should WEC prevail in this ownership dispute for multiple lost sale opportunities to

Southern.

        6.        Santee Cooper's Motion to Dismiss should be denied.   This Court

clearly has jurisdiction under 28 U.S.C. § 1334.

## **BACKGROUND**

## I.      **The Chapter 11 Cases**

        7.        On March 29, 2017 (the "**Petition Date**"), Westinghouse Electric

Company LLC and certain of its affiliates (collectively, the "**Debtors**") commenced voluntary

cases (the "**Chapter 11 Cases**")  under chapter 11 of title 11 of the United States Code (the

"**Chapter 11 Cases**") in this Court.  The Debtors filed the Chapter 11 Cases as a result of

significant cost overruns at the construction of nuclear power plants in the United States.

## II.    The EPC Agreement

8.    One such construction project was for the design, engineering,

procurement, installation of equipment and materials, and construction and testing of two

AP1000 nuclear power plants (the "**Project**") at the V.C. Summer Site ("**V.C. Summer Site**").

WEC, as contractor, and its affiliate Stone & Webster, Inc., entered into the Engineering,

Procurement, and Construction Agreement dated May 23, 2008 (the "**EPC Agreement**") with

South Carolina Electric & Gas Company ("**SCE&G**") for itself and as agent for Santee Cooper

(collectively, the "**Owners**"), which agreement governed the parties' relationship regarding the

Project at the V.C. Summer Site.  *See* Declaration of David Durham in Support of Opposition

("**Durham Decl.**") at ¶ 2.

9.    Under the EPC Agreement, WEC, as Contractor, was obligated, in part,

to place orders and procure Equipment be used for the V.C. Summer Project.  Durham Decl. at ¶

3.  The EPC Agreement defines "**Equipment**" as "machinery, computer hardware and its

associated software, apparatus, components, articles, materials, systems and structures, and items

of any kind that shall become a permanent part of the Facility to be provided by Contractor to

Owner under this Agreement, but excluding the Nuclear Fuel."  EPC Agreement, attached to the

Durham Decl. as Ex. A, at 4.  A subset of Equipment as defined in the EPC Agreement is

"**Major Equipment**," which includes:

> "steam generators, reactor vessel and reactor vessel head, control rod drive mechanisms, main turbine, main turbine generator, turbine deaerator, reactor coolant pumps, containment vessel, cooling towers, main turbine condenser, reactor internals, main step-up transformers, pressurizer, diesel generators, feedwater pumps, circulating water pumps, polar crane, core makeup tanks, moisture separator reheaters, and any other

4

equipment for which the contract(s) with the Subcontractor is for an amount in excess of $10,000,000 or that Owner and Contractor agree shall be designated as Major Equipment." EPC Agreement, at 8.

10.    Any materials that fall within the definition of Equipment—items specifically listed therein, or "items of any kind that shall become a permanent part of the Facility"—but are not part of the defined subset of "Major Equipment" are described herein as "**Non-Major Equipment**."

11.    Passage of title to Equipment from WEC to the Owners is governed by Section 21.1 of the EPC Agreement. Under Section 21.1, title to Equipment "shall pass to Owner ***upon payment in full*** by Owner to Contractor for such item of Equipment." (emphasis added).

12.    Additionally, the EPC Agreement contained a venue and jurisdiction provision providing for the parties' consent to "the exclusive jurisdiction of the United States District Court for the Southern District of New York or, if such court does not have jurisdiction … the courts of the State of New York located in the City and County of New York, for any legal proceedings that" arise out of or in connection with the EPC Agreement. EPC Agreement § 27.7. This provision specifically provides that "each Party accepts, generally and unconditionally, the jurisdiction of the aforesaid court for legal proceedings arising out of or in connection with this Agreement" and "waives any right to stay or dismiss any action or proceeding … on the basis of forum non-conveniens or improper venue." *Id*. The EPC Agreement also contained a governing law provision designating the laws of the State of New York as those that govern the "validity, construction and performance," of the EPC Agreement. *See* EPC Agreement § 34.1. In the next section, the EPC Agreement provides for the parties' waiver of any right to trial by jury they may have relating to the EPC Agreement. *Id*. § 34.2.

A.    The EPC Agreement Governs the Owners' Payments for Equipment

5

i.  *Non-Major Equipment (F.1.3, F.1.5)*

13.     Pursuant to the EPC Agreement, Non-Major Equipment costs were allocated to the Firm/Fixed price component of the EPC Agreement payment structure.  *See* EPC Agreement, §§ 8.1(a), 8.2; Exhibit F-1.  Specifically, the Debtors would recover costs associated with its multiple cost categories (including Non-Major Equipment), if at all, when it received Project Milestone Payments, or payments under the Fixed/Firm Price category pursuant to the Section F.1.3 and F.1.5 payment schedules of Exhibit F-1 to the EPC Agreement.   These Milestone Payments were made based on general construction progress, covered several categories of the Debtors' costs (e.g. overhead, labor, materials, and Non-Major Equipment), and were not directly correlated to the Debtors' purchases of Non-Major Equipment.  Durham Decl. at ¶ 6, 7.  Supporting invoices for Non-Major Equipment purchases were neither required nor necessary to satisfy Construction Milestone Payments (as part of the Fixed/Firm Price), and therefore were not submitted.  *Id*. at ¶ 6.  The final payment of the Fixed/Firm Price would constitute payment in full for the Non-Major Equipment—even if payment was insufficient to cover WEC's actual procurement costs.  *Id*. at ¶ 7.

ii.  *Major Equipment (F.1.1.)*

14.     The EPC Agreement contained a payment schedule specifically applicable to pieces of Major Equipment, which was Section F.1.1 of Exhibit F-1.  *See* Durham Decl. at ¶ 11.  Under that payment schedule, the Debtors issued separate invoices for payments toward Major Equipment as part of the Fixed/Firm Price component of the EPC Agreement pursuant to Section 8.2.  EPC Agreement, § 8.2, Exhibit F-1.

iii.  *The Owners' Fixed Price Option Election*

15.     The Owners elected to convert the EPC Agreement into a Fixed Price agreement effective November 2016 (the "**Fixed Price Option**").  Durham Decl. at ¶ 8; Ex. 2 to

6

Durham Decl. ("**Fixed Price Option Agreement**").  Pursuant to the Fixed Price Option, the Debtors would only receive payments upon achieving certain Construction Milestones pursuant to the new Construction Milestone Payment Schedule developed by the parties.  *Id.*  The Owners would make payments solely in accordance with this schedule, and the Debtors remained obligated to complete construction of the Project regardless of its costs (and the extent to which they exceeded the Owners' Fixed Price payments).  See Fixed Price Option Agreement § 1.  When the Owners elected the Fixed Price Option, they ensured that so long as they paid the full Fixed Price amount, they would own all Equipment (Major and Non-Major) at the Project, regardless of what it would cost the Debtors to complete construction.  Durham Decl. at ¶ 8.

         iv.   *The Owners Did Not Pay in Full For the Equipment at Issue in this Adversary Proceeding*

16.        Due to significant cost overruns, the Debtors' actual costs for the Project far exceeded the payments made by the Owners.  Durham Decl. at ¶ 9.  For example, as of June 30, 2017, the Owners had paid the Debtors approximately $ 7.1 billion, while the Debtors had incurred approximately $ 7.8 billion in costs.  *Id.*

17.        Even before the Owners' election of the Fixed Price Option, the Owners did not pay the Debtors the full Milestone Payments or otherwise the full amount of the Fixed/Firm Price portion of the Contract Price.  Durham Decl. at ¶ 10.  After the Owners' election of the Fixed Price Option in November 2016, the Owners did not pay the Debtors the full Fixed Price and subsequently cancelled the project prior to doing.  *Id.*

18.        The Owners' payments made towards items of Major Equipment under payment schedule F.1.1 of the EPC Agreement were recorded by the Debtors and reconciled post-cancellation of the Project by the Owners to determine title.  *Id.* at ¶ 12.  By the terms of the EPC Agreement, Santee Cooper owns only the pieces of Major Equipment for which it had paid

7

in full.  *See id.*; EPC Agreement, § 21.1.  As a result, the Debtors retained title to certain pieces of Major Equipment because the Owners did not make full payment.

19.  With regards to the Non-Major Equipment, the Owners at never paid the full amounts due under the EPC Agreement, either before or after exercise of the Fixed Price Option.  Durham Decl. at ¶ 13.  Accordingly, the Owners have not paid in full for the Non-Major Equipment and the Debtors retained title thereto.

### III.  Schedules and SOFAs

20.  On May 26, 2017, the Debtors filed their schedules of assets and liabilities and statement of financial affairs for their various entities.  ECF Nos. 567-625 [Case No. 17-10751] (the "**Schedules and SOFAs**").  In the Schedules and SOFAs, the Debtors made disclosures related to equipment, disclosing that they held "other machinery, fixtures and equipment," "automobiles and trucks," "work in progress," "raw materials," "finished goods," and "various" office equipment and supplies.  *See id.* at ECF No. 569.

### IV.  WEC And Santee Cooper Discussed Title to the Equipment and Negotiated Regarding its Potential Sale Throughout the Pendency of the Chapter 11 Cases

A.  <u>Negotiations Prior to the PFA and Plan</u>

21.  Throughout WEC's negotiations with Santee Cooper (or SCANA, as agent for Santee Cooper) regarding the ownership and disposition of the Equipment, which began in Fall 2017, just months after the Petition Date, and continued through the filing of the Complaint, the Chapter 11 Cases proceeded.  Durham Decl. at ¶ 15.  During that time, various filings and orders were entered implicating Santee Cooper's purported claim to title in the Equipment, giving Santee Cooper over a year to assert any such claims, objections or reservations of rights it had regarding ownership of the WEC Equipment.  *Id.*  In addition, the Debtors took numerous actions during those negotiations making clear their claim that the WEC

8

Equipment was property of the bankruptcy estate (and thus passed to WEC upon the Effective

Date pursuant to the Plan and PFA). *Id*.

22.     On July 31, 2017, Santee Cooper and SCE&G publicly announced that

they were abandoning construction of the V.C. Summer Project. *Id*. at ¶ 17. After their

cancellation of the V.C. Summer Project, Santee Cooper and SCE&G permitted the Debtors only

limited access to the V.C. Summer Site. *Id*. Santee Cooper never paid in full for certain items of

Equipment, including Equipment that remained at the V.C. Summer Site, and Santee Cooper

does not hold legal title to that Equipment under the plain terms of the EPC Agreement, the PFA,

and the Plan. *See id*.

23.     On June 28, 2017 the Court established September 1, 2017 (the "**Bar

Date**") as the deadline to file a proof of claim in the case. *See* ECF No. 788 [Case No. 17-

10751]. Any holder of a claim who failed to file a claim by the Bar Date was "forever barred,

estopped and enjoined from asserting such a claim against the Debtors, their property, or their

estates[.]" *Id*. On August 31, 2017, SCE&G, for itself and as agent of Defendant, filed identical

unsecured and unliquidated proofs of claim in the Chapter 11 Cases. *See* Proofs of Claim Nos.

2440, 2444, 3088, and 3089. The claims are described in a two-page addendum, which states

that SCE&G, as agent of the Defendant, "asserts against WEC any and all claims based upon,

arising under, on account of, in connection with, or related to, the V.C. Summer Project and the

EPC Agreement." *Id*. at ¶ 6. The claims purport to include "any and all equitable and common

law claims against WEC arising from, related to or in connection with its relationship or

transactions with Claimant, including but not limited to, breach of the implied covenant of good

faith and fair dealing, unjust enrichment, and conversion." *Id*. During the course of the Chapter

11 Cases, on or about September 28, 2017, Defendant and SCE&G transferred their claims to

9

Citigroup Financial Products, Inc. ("**Citi**") for approximately $2 billion, which subsequently filed amended proofs of claim. *See* ECF Nos. 1411, 1412, 1413, and 1414 [Case No. 17-10751].[3]

24.     In the fall of 2017, WEC began communicating with SCANA, as agent for Santee Cooper, regarding ownership of the Equipment and the potential disposition and/or sale of the abandoned Equipment. Durham Decl. at ¶ 21. At an October 16, 2017 meeting the Debtors informed SCANA of their position that the Debtors owned the WEC Equipment (due to the Owners' failure to pay in full per the terms of the EPC Agreement) and SCANA set forth its conflicting position. *Id.* Just four days later, and again two weeks subsequently, the parties met again to work towards an agreement regarding the Equipment; the Debtors reiterated their position at each meeting. *Id.* at ¶¶ 22, 23. On November 14, 2017 the Debtors sent SCANA a table listing each piece of Major Equipment and a notation of whether, according to the Debtors' payment records, such piece of Major Equipment was owned by the Debtors or the Owners (depending on whether the Owners paid in full for each such piece of Equipment). *Id.* at ¶ 24.

## V.    The Plan and PFA Provide for the Transfer of the WEC Equipment—then Property of the Estate—to WEC

25.     Santee Cooper has been on notice of the provisions of the PFA, Plan, and Confirmation Order affecting their claims related to the equipment since such documents were initially filed in the Chapter 11 Cases, and has never objected to these filings or any provisions contained herein.

---

[3] Section 17.2 of the EPC Agreement capped the Debtors' liability related in any way to the EPC Agreement at 25% of Owners' total payments towards the Project, and Owners paid a total of $7.8 billion. *See* Durham Decl. at ¶ 20. As such, this payment to Owners of $2 billion exceeded the Debtors' Maximum Total Liability to Owners (including the Defendant) pursuant to the EPC Agreement.

26.    On January 12, 2018, Brookfield WEC Holdings LLC, Toshiba Nuclear Energy Holdings (UK) Limited and TSB Nuclear Energy Services Inc. executed a Plan Funding Agreement (as amended, the "**PFA**"), pursuant to which Brookfield WEC Holdings Inc. acquired WEC (through the acquisition of newly issued stock in reorganized TSB Nuclear Energy Services Inc.) and Brookfield WEC EMEA Holdings Ltd. (together with Brookfield WEC Holdings Inc., "**Brookfield**") acquired existing equity of Westinghouse Electric (UK) Holdings Limited. *See* Durham Decl. at ¶ 25.

27.    On January 28, 2018, the Debtors filed their Joint Chapter 11 Plan of Reorganization (the "**Initial Plan**").  ECF No. 2325 [Case No. 17-10751].  The Initial Plan's provision regarding the rejection of executory contracts mirrors that in the confirmed Plan in providing that "[o]n the Effective Date, except as otherwise provided in the Plan, each [e]xecutory [c]ontract and [u]nexpired [l]ease not previously rejected, assumed, or assumed and assigned by the Debtors during the Chapter 11 Cases shall be deemed *automatically rejected* pursuant to sections 365 and 1123 of the Bankruptcy Code."  Initial Plan, § 9.1 (emphasis added).  Given this provision of the Initial Plan, Santee Cooper was on notice as of January 28, 2018 that the EPC Agreement, which was not assumed by the Debtors prior to the Effective Date, would be rejected as of the Effective Date. *See* Durham Decl. at ¶ 26.

28.    In addition, Section 5.1 of the Initial Plan put Santee Cooper on notice that on "[o]n the Effective Date…all property of the Debtors' Estates other than Excluded Assets…shall vest in the Reorganized Debtors [then owned by Brookfield] free and clear of all Claims, liens, encumbrances, charges and other interests."  Initial Plan § 5.1.  The WEC Equipment was not identified as an Excluded Asset in Schedule 2.02(a) of the PFA.  The Debtors had informed SCANA, the Defendant's agent, repeatedly prior to the filing of the PFA and

11

Initial Plan, of WEC's position that it held title to the WEC Equipment, therefore property of the estate, and as such, pursuant to the terms of the PFA and Initial Plan, such title would vest in the Reorganized Debtors on the Effective Date.  Durham Decl. at ¶ 27.  These terms in the PFA, as amended, and Initial Plan are identical to the corresponding final terms in the confirmed Plan and final PFA.  *See id*.

29.     On February 22, 2018, the Debtors further reiterated their position to the Defendant's executives that under the terms of the EPC Agreement, Initial Plan, and PFA, the Debtors held title to the WEC Equipment as property of the estate.  *Id.* at ¶ 28.  Subsequently, negotiations stalled while the Defendant worked with its former Project co-owner, SCE&G, to enter into an agreement assuming ownership of all the Project Owners' assets.  *Id*.

30.     On March 28, 2018 the Court entered the Confirmation Order confirming the Debtors' Modified Second Amended Joint Chapter 11 Plan of Reorganization (the "**Plan**"), which was filed the same day.  ECF Nos. 2986, 2988 [Case No. 17-10751].  The Plan went effective on August 1, 2018 (the "**Effective Date**").  The Plan contains language describing the automatic rejection of executory contracts identical to that in the Initial Plan, filed two months earlier.  Plan § 9.1.  Given this provision of the Plan (identical to that in the Initial Plan), the Defendant had more than six months' notice that the EPC Agreement, which was not assumed by the Debtors prior to the Effective Date, would be, and was, rejected as of the Effective Date (August 1, 2018).  *See* Durham Decl. at ¶ 31.  In addition, on the Effective Date, the Notice of Effective Date was sent to the Debtors' entire creditor matrix, putting creditors on notice of the occurrence of the Effective Date, the rejection of any contracts by the Debtors that were not otherwise assumed by WEC, and requiring a rejection damages claim to be filed within 30 days.  The Defendant never filed a rejection damages claim.

31.    The PFA transaction closed on August 1, 2018, concurrent with WEC's emergence from chapter 11 (the "**Closing**").  Under the PFA (as amended pursuant to an order entered by the Court on July 27, 2018), (i) all assets owned by the Debtors immediately prior to the Closing (other than those explicitly identified as "Excluded Assets," which did not include Equipment), pursuant to the terms of the PFA, remained assets of WEC and (ii) all liabilities of the Debtors explicitly designated as "Assumed Liabilities" were assumed by WEC, in each case, upon WEC's acquisition by Brookfield at the Closing.  The Excluded Assets and all liabilities of the Debtors (other than the Assumed Liabilities) were transferred by the Debtors to Wind Down Co. immediately prior to the Closing.  Pursuant to the Plan and PFA, on the Effective Date, all property of the Debtors' estates, other than Excluded Assets (as defined in the PFA), and including the WEC Equipment, vested in WEC.  Specifically, under section 5.1 of the Plan:

> On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates other than Excluded Assets and any Cause of Action preserved for the benefit of Wind Down Co under Section 5.12 or Section 11.2 hereof shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to the Plan Funding Agreement, this Plan and the Confirmation Order.  From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

32.    Equipment was not identified as an Excluded Asset in Schedule 2.02(a) of the PFA.  Neither Santee Cooper nor its agent (SCANA) filed a proof of claim based on the Debtors' proposed rejection of the EPC Agreement, or objected or otherwise reserved rights based on the Debtors' asserted ownership interest in connection with the PFA, Plan, or Confirmation Order.  *See* Durham Decl. at ¶ 33.  As a result, on the Effective Date, title to the WEC Equipment vested in WEC and, in accordance with the EPC Agreement, WEC currently

13

has title to the WEC Equipment and Santee Cooper has none.  Nevertheless, Santee Cooper has

prevented WEC from securing its property.

A.    The Plan Retained Jurisdiction for the Court to Hear This Dispute Related to the
Plan, the PFA, the Confirmation Order, and the Implications of the Debtors'
Rejection of the EPC Agreement

33.    Pursuant to the Confirmation Order, the Court has exclusive jurisdiction

over all matters arising out of, and related to, the Chapter 11 Cases, the Plan, the Plan Injunction

(as defined herein), and the implementation of the Confirmation Order, including the matters set

forth in section 1142 of the Bankruptcy Code.  *See* Confirmation Order ¶ 48.  Section 11.9 of the

Plan contains the Plan Injunction (the "**Plan Injunction**"), which provides as follows:

> Except as otherwise provided in the Plan or the Confirmation
> Order, all entities who have held, hold, or may hold Claims or
> interests, obligations, suits, judgments, damages, demands, debts,
> rights, causes of action or liabilities that: (1) are subject to
> compromise and settlement pursuant to the terms of the Plan; (2)
> have been released pursuant to section 11.6 hereof; (3) have been
> released pursuant to section 11.7 hereof; (4) are subject to
> exculpation pursuant to section 11.8 hereof (but only to the extent
> of the exculpation provided in section 11.8); or (5) **are otherwise
> stayed or terminated pursuant to the terms of the Plan**, shall be
> permanently enjoined and precluded, from and after the Effective
> Date, from taking any of the following enforcement actions against
> the Debtors, **the Reorganized Debtors**, the Released Parties or
> any of their respective assets or property on account of any Claims,
> interests, obligations, suits, judgments, damages, demands, debts,
> rights, causes of action or liabilities that have been waived,
> discharged or released pursuant to the Plan: (a) commencing or
> continuing in any manner any action or other proceeding of any
> kind, including on account of any Claims, interests, causes of
> action, or liabilities that have been released, compromised or
> settled; (b) enforcing, levying, attaching, collecting, or recovering
> by any manner or means any judgment, award, decree, or order; (c)
> creating, perfecting, or enforcing any lien, claim, or encumbrance
> of any kind; (d) asserting any right of setoff, subrogation, or
> recoupment of any kind against any debt, liability, or obligation
> due to the Debtors, Reorganized Debtors, or Released Parties; and
> (e) **commencing or continuing any act, in any manner, or in
> any place to assert any Claim, or send any notice or invoice in
> respect of any claim, waived, discharged or released under this**

14

**Plan or that does not otherwise comply with or is inconsistent with the provisions of this Plan**….

Plan, § 11.9 (emphases added).  Under the Plan, the Court explicitly retained jurisdiction:

- "[T]o issue injunctions, enter and implement other orders, and ta**ke such other actions as may be necessary or appropriate to restrain interference by any Person with** the Consummation, **implementation or enforcement of the Plan, the Confirmation Order**, or any other order of the Bankruptcy Court; . . .

- **to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the PFA, the Confirmation Order**, the Plan Oversight Board By-Laws, or any agreement, instrument, or other document governing or relating to any of the foregoing; . . .

- to take any action and issue such orders as may be necessary to **construe, interpret, enforce, implement, execute**, and consummate the Plan or to maintain the integrity of the Plan following Consummation; . . . [and]

- to hear and determine any rights, Claims or Causes of Action held by or accruing to the **Reorganized Debtors pursuant to the Bankruptcy Code** or pursuant to any federal statute or legal theory."

Plan, § 13 (emphases added).

## VI.    WEC Seeks Resolution of the Equipment Ownership Dispute In the Proper and Binding Venue While Santee Cooper Forum Shops By Filing a Mirror-Image Action in South Carolina Over a Month Later

34.    On April 5, 2019, after months of attempted negotiations to resolve the ownership dispute consensually out-of-court, WEC filed the Complaint in this Court, seeking an order requiring Santee Cooper to allow WEC access to the VC Summer Site to recover its property.  *See* Adv. Proc. ECF No. 1.  Santee Cooper's actions leading up to the filing of the Complaint and its refusal to continue negotiations with WEC have already caused WEC to lose significant Equipment sales opportunities, including millions of dollars worth of sales to the only potential customer for the Equipment in the United States. *See* Durham Decl. at ¶ 35.

15

35.     On May 14, 2019, Santee Cooper filed the South Carolina Action, seeking (1) to quiet title to the Equipment, including the WEC Equipment, (2) a declaration that Santee Cooper has rights, title and legal interest to the Equipment and the proceeds from any sale, and (3) that neither WEC nor the Plan Investor have any interest therein. *See* Complaint [ECF No. 1, Case No. 2:19-cv-01432-RMG] (the "**South Carolina Complaint**"). This lawsuit was filed more than a month after WEC filed the Complaint and more than a week after the Motion to Withdraw the Reference was filed.

36.     The South Carolina complaint is replete with references to the bankruptcy[4] and to events that occurred during bankruptcy.[5]  More importantly, Santee Cooper does not allege that it paid in full for the Equipment as required to gain title under the EPC Agreement; rather, it repeatedly alleges that WEC breached the EPC Agreement. *See* South Carolina Compl. at ¶¶ 23, 32, 43.  Santee Cooper's claim, in spite of the labels used, is obviously a breach of contract claim that, but for the Debtors' breach, Santee Cooper would have paid the Debtors in full under the fixed fee and obtained title to the Equipment.  Santee Cooper also alleges that the WEC Equipment was not specifically listed in the Schedules and SOFAs and therefore did not transfer to WEC under the PFA upon the Effective Date of the Plan. *See* South Carolina Compl. at ¶¶ 44-45.  In earlier correspondence with WEC, Santee Cooper has also challenged the application of the EPC Agreement to the issues in dispute, claiming that the

---

[4] *See* South Carolina Complaint ¶ 23 (alleging the Debtors' filing of chapter 11 petition "breach[ed] the EPC and g[ave] Westinghouse [] the option to reject executory contracts, such as the EPC"); *id*. ¶ 43 (alleging that the Debtors' non-assumption of the EPC Agreement, thereby rejecting it as matter of law, constitutes "a Bankruptcy Court-sanctioned breach of the EPC by Westinghouse"); *id*. ¶ 57(contending WEC waived claims to ownership or title of WEC Equipment due to actions in bankruptcy).

[5] *See* South Carolina Complaint ¶ ("As part of the bankruptcy, Westinghouse asked for permission to collect certain identified items that it owned from the VCS Site."); *id*. ¶¶ 24-25 (noting the Court's approval of IAA and actions taken pursuant to IAA).

WEIL:\97059025\2\80768.0018

Debtors' rejection of that agreement invalidates the applicable terms therein, and the same

argument underlies the South Carolina Complaint.  *See*, e.g., South Carolina Compl. ¶ 43.

## ARGUMENT

I.    **The Adversary Complaint and Santee Cooper's Legal Arguments Implicate Core Bankruptcy Issues That the Court Has Jurisdiction to Adjudicate**

A.    Legal Standard

37.    "When challenging jurisdiction under Rule 12(b)(1), evidence outside of

the pleadings, including affidavits, may be considered." *In re Jesup & Lamont, Inc*., No. 10 B

14133 AJG, 2012 WL 3822135, at *2 (Bankr. S.D.N.Y. Sept. 4, 2012) (citing *Kamen v.*

*American Tel. & Tel. Co*., 791, F.2d 1006, 1011 (2d Cir. 1986)).    WEC, as "[t]he party

advocating jurisdiction has the burden of proving its existence by a preponderance of the

evidence." *Id*. (citing Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  To that end,

WEC has attached the Durham Declaration which, in conjunction with the argument set forth

below and the facts as pled in the Complaint, demonstrate that WEC has met its burden of

establishing this Court's jurisdiction.

38.    Title 28 U.S.C. § 1334 provides the statutory basis for bankruptcy

jurisdiction; pursuant to subsection (a), district courts "have original and exclusive jurisdiction of

all cases under title 11," and pursuant to subsection (b), "have original but not exclusive

jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under

title 11." 28 U.S.C. § 1334.  "Section 1334 of title 28 does not distinguish between a court's pre-

confirmation and post-confirmation jurisdiction.  However, if a lawsuit is filed after a business

has reorganized and emerged from bankruptcy the 'conceivable effect' test often gives way to a

more limited 'close nexus' test." *In re Stillwater Asset Backed Offshore Fund Ltd*., 559 B.R.

563, 573 (Bankr. S.D.N.Y. 2016) (quoting *ACE Am. Ins. Co. v. DPH Holdings Corp. (In re DPH*

17

*Holdings Corp.)*, 448 F. App'x 134, 137 (2d Cir. 2011). "Under the 'close nexus' test, 'related to' jurisdiction does not exist unless (a) a dispute has a close nexus to the bankruptcy case (as when a matter requires interpretation or administration of the confirmed plan), and (b) the plan retains jurisdiction over the dispute." *Id.* (quoting *Savoy Senior Hous. Corp. v. TRBC Ministries, LLC*, 401 B.R. 589, 597 (S.D.N.Y. 2009)).[6]

39.     Notably, while the jurisdiction of a bankruptcy court may shrink, it "does not disappear entirely." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004) (noting that all post-confirmation jurisdiction would be barred if courts applied the "effect on the bankruptcy estate" language literally); *see also* Neilson v. Straight–Out Promotions, LLC (*In re Michael G. Tyson*), No. 05–02210, 2007 WL 2379624 at *3 (Bankr. S.D.N.Y. Aug. 17, 2007) ("jurisdiction ... after confirmation of a plan may shrink, but it does not disappear").

B.      <u>There is a Close Nexus Between the Complaint, the Plan, and the Bankruptcy Proceedings</u>

iv.     *The Complaint, and Santee Cooper's Responses, Raise Key Bankruptcy Issues That This Court Has Jurisdiction to Decide*

40.     Santee Cooper's Motion to Dismiss rises and falls on its claim that the Complaint does not bear a "close nexus" to the Plan and bankruptcy. Mot. at 8-10.  In arguing that this Court lacks jurisdiction, Santee Cooper attempts to paint WEC's right to the equipment as being entirely based on state law. *See id.* at 8. This is simply incorrect.

41.     WEC's claim to the WEC Equipment ultimately depends on whether applying federal bankruptcy law and this Court's orders give WEC title to the WEC Equipment. WEC contends that Santee Cooper could have, but did not, preserve its rejection damage claim

---

[6] *Cf. In re Touch Am. Holdings, Inc.*, 401 B.R. at 117 (the close nexus test only applies to non-core proceedings; a proceeding may still be considered core post-confirmation and, if so, the bankruptcy court maintains jurisdiction).

or any other claims to the WEC Equipment as it was required to do during the bankruptcy and, therefore, pursuant to the Plan and PFA, the assets of the Debtors' estates (including the WEC Equipment at issue in the adversary proceeding) vested in WEC upon the Effective Date of the Plan.

42.     Santee Cooper myopically focuses on a state law contract question of whether, under the EPC Agreement, the Debtors had title – or a claim to have such title – to the WEC Equipment during the Chapter 11 Cases.  But that state law issue is a threshold determination, and even it implicates a core issue of whether the WEC Equipment was property of the estates.  As the court recognized in *In re Touch America Holdings, Inc.*, "[v]arious courts have concluded that matters requiring a declaration of whether certain property comes within the definition of 'property of the estate' as set forth in Bankruptcy Code § 541 are core proceedings." 401 B.R. 107, 117 (Bankr. D. Del. 2009); *see also In re Olympia Office LLC*, 585 B.R. 661, 668-69 (E.D.N.Y. 2018) (finding bankruptcy court had post-confirmation jurisdiction because "[d]eciding the rightful owners of the [] Properties 'strikes at the heart of the [] liquidation plan'") (citation omitted); *Grantham v. Timothy Cory & Assocs.*, No. 2:11-cv-01549, 2012 WL 174398, at *2 (D. Nev. Jan. 20, 2012) (referring proceeding to bankruptcy court as plaintiffs' claims were "core proceedings because Plaintiffs challenge whether the real estate was property of the estate at the commencement of the bankruptcy proceedings").

43.     In opposition to the Motion to Dismiss, WEC has submitted evidence to demonstrate that the WEC Equipment was property of the estates and therefore Santee Cooper's assertions that it wholly owned title to the equipment before, during and after the bankruptcy is groundless and unsupported.  Under the EPC Agreement, Santee Cooper was required to pay "in full" for the WEC Equipment, otherwise title remained with the Debtors.  Santee Cooper's

19

failure to pay the full price for certain pieces of Major Equipment as governed by payment schedule F.1.1 to the EPC Agreement, or pay the full Fixed Price portion of the Contract Price, which governed payment for Non-Major Equipment, demonstrate this condition was never achieved. *See* Durham Decl. at ¶¶ 12, 13. Instead, during the bankruptcy, Santee Cooper canceled the projects without paying for the WEC Equipment in full as required under the EPC Agreement.

44.      The remainder of WEC's claim turns entirely on the application of federal bankruptcy law and this Court's orders. First, WEC will demonstrate that the Debtors listed the WEC Equipment in general categories on their Schedules and SOFAS. More importantly, during the bankruptcy and prior to Santee Cooper's receipt of notice that it must file a rejection damages claim and object to the Plan and Confirmation Order or otherwise would its claims would be cancelled vesting WEC with title to the WEC Equipment, the Debtors gave actual notice to the Owners that the WEC Equipment belonged to the estates. *See* Durham Decl. at ¶¶ 15, 21-24, 28-30. As a result, federal law dictates WEC owns the WEC Equipment due to Santee Cooper's inaction. *See* 11 U.S.C. § 502(b)(9); Fed. R. of Bankr. P. 3002(c)(4); *see, e.g.*, *In re Spiegel Inc.*, 337 B.R. 816, 820-21 (Bankr. S.D.N.Y. 2006) (disallowing late filed proofs of claim for rejection damages).

45.      While Santee Cooper may dispute the effects of its failure to file a rejection damages claim against the estates during the pendency of the bankruptcy proceedings, resolution of that question clearly implicates this Court's bankruptcy jurisdiction.[7] *See, e.g., In re Chateaugay Corp.*, 193 B.R. 669, 674 (S.D.N.Y. 1996) (finding matter core where resolution

---

[7] Contrary to Santee Cooper's contention (Mot. at 8-9), the turnover action cases cited by Santee Cooper are inapposite. In those cases, the turnover action under Section 542 was brought post-confirmation, which the courts found to be improper. This is not a turnover action under Section 542. Most importantly, the claims asserted in the complaints in those cases were entirely based on state law, whereas here WEC's right to the equipment turns on the application of federal bankruptcy law and the Court's orders, as well as enforcement of the Confirmation Order.

required determination of when claim arose under the Bankruptcy Code and whether it was discharged).

46.     Santee Cooper's failure to properly preserve its asserted rights or interests in the WEC Equipment by filing a rejection damages claim in the bankruptcy—with any such rights or interests being forever discharged and enjoined under the Plan—and its interference with this Court's Plan, providing for the transfer of the WEC Equipment to WEC under the PFA, are core issues that require enforcement Confirmation Order.  Therefore, WEC's complaint is within the Court's bankruptcy jurisdiction under 28 U.S.C. § 1334.

2.      *The Court Retained Jurisdiction to Hear This Dispute in the Plan and Confirmation Order*

47.     Contrary to Santee Cooper's arguments, the Court explicitly retained broad jurisdiction under the Plan to hear the adversary proceeding, given that it plainly hinges on the Plan, PFA, and Confirmation Order.  *See* Plan, § 13.  More specifically, the Court retained jurisdiction post-Effective Date:

- (b) to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or ***commenced after*** the Confirmation Date;

- (f) to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to ***restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order***, or any other order of the Bankruptcy Court;

- (i) to ***hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Funding Agreement, the Confirmation Order***, the Plan Oversight Board By-Laws, or any agreement, instrument, or other document governing or relating to any of the foregoing;

- (j) to take any action and issue such orders as may be necessary to ***construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan*** following Consummation;

- (k) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

21

- (o) to hear and determine *any other matters related hereto* and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

- (q) to *enforce all orders previously entered* by the Court;

- (r) to *recover all assets of the Debtors and property of the Estates*, wherever located;

*Id.* (emphases added).  These are not "general statements about retention of jurisdiction" (Mot. at 9), but specifically cover the adversary proceeding.  For example, the District Court in *In re Jesup & Lamont, Inc.*, found that a plan's retention of jurisdiction provision substantially similar to section 13(b) was sufficient to satisfy the second prong of the jurisdictional test (*i.e.*, the plan retained jurisdiction over the dispute).  *See* No. 10 B 14133 AJG, 2012 WL 3822135, at *5 (Bankr. S.D.N.Y. Sept. 4, 2012) (finding plan sufficiently retained jurisdiction over post-confirmation dispute based on retention of jurisdiction to "'decide or resolve any … adversary proceedings … and any other Causes of Action that are pending as of the Confirmation Date or that may be commenced in the future.'").

48.    There is no requirement, as Santee Cooper contends, that the Court specifically identify the precise nature of the dispute and the exact parties in its retention of jurisdiction and Santee Cooper cites no cases holding otherwise.[8]  See *In re Jesup*, 2012 WL 3822135, at *5 (rejecting defendants' argument that court lacked subject matter jurisdiction because plan's retention of jurisdiction provision did not specifically preserve causes of action against particular defendants); *U.S. Tr. v. Gryphon at Stone Mansion, Inc.*, 216 B.R. 764, 769 (W.D. Pa. 1997), *aff'd*, 166 F.3d 552 (3d Cir. 1999) ("A retention of jurisdiction provision within

---

[8] *See also Golf Club at Bridgewater, L.L.C. v. Whitney Bank*, No. 8:09-BK-10430-CED, 2013 WL 1193182, at *4 (M.D. Fla. Mar. 22, 2013) ("The Court finds it prudent to adopt the position that, where the bankruptcy court's core jurisdiction is predicated on its power to interpret and enforce its own orders, no such [jurisdiction-retention] provisions are necessary to confer subject matter jurisdiction on the bankruptcy court.").

22

a confirmed plan does not grant a bankruptcy court jurisdiction. Similarly, the absence of a provision retaining jurisdiction in a confirmed plan does not deprive a bankruptcy court of jurisdiction. Hence, the lack of a jurisdiction provision within the confirmed plan does not affect the bankruptcy court's jurisdiction.") (citing *In The Matter of Holly's, Inc.*, 172 B.R. 545, 555 (Bankr. W.D. Mich. 1994)). In fact, the District Court in which Santee Cooper's Motion to Withdraw the Reference [ECF No. 6] is pending held as much in a recent decision in *In re Lehman Bros. Holdings Inc.*, in which it rejected an argument that "the Plan does not provide for jurisdiction over [the] claims because it does not reference the claims in express terms." No. 18-CV-8986-VEC, 2019 WL 2023723, at *7 (S.D.N.Y. May 8, 2019). The District Court found that the argument "lacks merit" stating "[a]s one court stated when rejecting a similar argument, the Movants fail to 'cite any caselaw requiring that the [Plan's] retention of jurisdiction provision include an express reference to the particular cause of action being asserted, and the broad language in the catch-all provision clearly evidences the parties' intent to preserve post-confirmation federal jurisdiction to the maximum extent permissible under the statute.'" *Id*. at 7 n.7 (quoting *Krys*, 2008 WL 4700920, at *9)). The one case Santee Cooper does cite, *In re Johns-Mansville, Corp.*, 7 F.3d 32, 34 (2d. Cir. 1993), simply requires that the Plan provide for retention of jurisdiction over the dispute. Here, section 13 of the Plan does just that.

49.    Accordingly, given the close nexus between the adversary proceeding and the interpretation of the Confirmation Order, Plan, and PFA, as well as the Court's retention of jurisdiction over this dispute, dismissal of the Complaint for lack of jurisdiction is inappropriate.

C.    Santee Has Submitted to the Court's Jurisdiction by Filing Proofs of Claim

50.    Beyond the close nexus between the Complaint and the bankruptcy proceeding, including the Plan, Santee Cooper has submitted to this Court's jurisdiction by filing

23

proofs of claim related to the subject matter of the dispute.  In fact, Santee Cooper concedes that "[u]ndeniably, creditors subject themselves to a bankruptcy court's equity jurisdiction by submitting a claim against the bankruptcy estate."  Mot. at 10 (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59 n.14 (1989)).  Santee Cooper's only response is that: (1) such submission to the Court's jurisdiction by filing a claim is not "dispositive" of this Court's ability to assert bankruptcy jurisdiction over the Complaint; and (2) the Complaint is not concerned with determining Santee Cooper's claim against the estate.  *Id*. at 11.  Santee Cooper's contentions miss the mark.

51.    First, Santee Cooper's filing of proofs of claim in the bankruptcy proceedings is one of the many connections to the bankruptcy and reasons for this Court's clear subject matter jurisdiction over this dispute.  *See, e.g., In re Petrie Retail, Inc*., 304 F.3d 223, 230 (2d Cir. 2002) (dispute in post-confirmation adversary proceeding involve issue previously before bankruptcy court as part of consideration of claim against the estate and, as such, dispute "uniquely affected and was uniquely affected by the core bankruptcy functions as to 'matters concerning the administration of the estate,' 28 U.S.C. § 157(b)(2)(A) (2001), and the 'allowance or disallowance of claims against the estate' 28 U.S.C. § 157(b)(2)(B) (2001)," which were core matters); *see also In re Manville Forest Prods. Corp*., 896 F.2d 1384, 1390 (2d Cir.1990) ("[A] claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy.") (citation omitted).  In *In re Petrie*, like here, the creditor's proof of claim required the bankruptcy court to interpret the contract giving rise to the claim at issue—here the EPC Agreement, in *Petrie*, a lease—in "order to determine what assets of the debtors' estate should be distributed to" the creditor.  *In re Petrie*, 896 F.2d at 1390.  "Thus, the interpretation of the

WEIL:\97059025\2\80768.0018

[contract] was originally raised as part of the bankruptcy court's core function of determining whether to allow [creditor]'s claim in the administration of the estate." *Id.*

52.     Second, the Complaint is clearly concerned with Santee Cooper's bankruptcy claim against the estates.  It sold its original claim, and failed to file a rejection damages claim, which as explained above is integral to WEC's rights to the WEC Equipment. *See* Durham Decl. at ¶ 20.  The treatment and assertion of Santee Cooper's claims in bankruptcy are material and are core issues raised by WEC's complaint.  *See, e.g., In re Ames Dep't Stores, Inc.*, 542 B.R. 121, 138–39 (Bankr. S.D.N.Y. 2015) (finding issues raised in post-confirmation adversary proceeding initiated by debtor "overlap[ped] significantly with the issues raised in" creditors' proofs of claim, such that creditors' filing claim against bankruptcy estate conferred core status to resolution of both the claims themselves and the debtor's responsive claims).

53.     Under the very case Santee Cooper cites, *In re S.G. Phillips Constructors, Inc.*, (Mot. at 11), the Court has jurisdiction: (1) to determine whether Santee Cooper's asserted interests in the Equipment were part of its proofs of claims, (2) whether those claims were satisfied under the Plan and Confirmation Order, and (3) whether those claims were fully discharged in the bankruptcy.  Santee Cooper's attempt to distinguish *In re China Fishery Group Limited* and *In re Adelphia Communications Corp.* (Mot. at 11) falls flat because the courts there asserted jurisdiction for the same reason the Court here should: The party had submitted proofs of claim in the bankruptcy and the dispute at issue related to those proofs of claim, a quintessentially core bankruptcy function.  Thus, Santee Cooper's proofs of claims serve as one of many bases of the Court's jurisdiction in this matter.

D.     <u>The EPC Agreement's Venue Provision Still Binds the Parties Post-Rejection and Is Not Being Used to Confer Bankruptcy Jurisdiction on the Court</u>

54.    Lastly, contrary to Santee's assertion, WEC is not relying upon the EPC

Agreement's venue and jurisdictional provisions (which provide for New York federal or state

court as the exclusive venue of any EPC Agreement-related disputes) to confer subject matter

jurisdiction.  *See* Mot. at 12 (citing Compl. ¶ 12).  That provision, however, clearly shows that

Santee Cooper's South Carolina Action is improper and threatens the Court's jurisdiction and

orders.

55.    In addition, Santee Cooper's insistence that WEC cannot rely on the

EPC Agreement's venue and jurisdictional provisions merely because WEC rejected the EPC

Agreement is incorrect.[9]  Mot. at 12.  Santee Cooper misapprehends the role and effect of a

debtor's section 365 power to reject an executory contract like the EPC Agreement.  That WEC

rejected the EPC Agreement pursuant to the Plan—while such rejection does create an unsecured

damages claim for Santee Cooper as if the EPC Agreement was breached on the day before the

petition was filed—does not mean that the EPC Agreement was terminated and its provisions no

longer control.  "[W]hile rejection is treated as a breach, it does not completely terminate the

contract."  *In re Lavinge*, 114 F.3d 379, 386-87 (2d Cir. 1997).  "Thus, '[r]ejection merely frees

the estate from the obligation to perform; it does not make the contract disappear.'"  *Id*. (quoting

*In re The Drexel Burnham Lambert Group*, 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992)).

---

[9] Santee Cooper has argued otherwise to avoid the provisions in the EPC Agreement where the parties consented to jurisdiction in New York federal or state court and to the application of New York law. *See* Mot. at 12.  Given Santee Cooper's position, the Court must also determine the effect of that rejection on the application of the EPC Agreement to the dispute. *See, e.g.*, *In re Lehman Bros. Holdings, Inc.*, No. 14 CIV. 7643 ER, 2015 WL 5729645, at *6 (S.D.N.Y. Sept. 30, 2015), *aff'd sub nom. In re: Lehman Bros. Holdings Inc.*, 663 F. App'x 65 (2d Cir. 2016) ("The rejection of an executory contract is also considered a fundamental issue of bankruptcy law 'unique to the Bankruptcy Code' and 'challenges to the effects of rejection orders are core proceedings because they are claims that would not exist independent of the bankruptcy case.'") (quoting *In re Great Atl. & Pac. Tea Co., Inc.*, 467 B.R. 44, 58 (S.D.N.Y. 2012), *aff'd sub nom. Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co., Inc.*, 508 F. App'x 63 (2d Cir. 2013); *In re General Growth Properties, Inc.*, 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) ("A bankruptcy court always has jurisdiction to interpret its own orders").  Resolution of this core bankruptcy issue further strengthens the Court's jurisdiction over the Complaint.

56.     As the Court recognized at the initial pretrial conference, "when a venue provision talks about where disputes over breaches are going to be," the fact that a party to the agreement may have breached the agreement is "kind of a given." May 22, 2019 Hr'g Tr. 15:3-6. Here, the fact that WEC rejected the EPC Agreement, potentially giving rise to breach of contract damages, does not invalidate the venue provision. Numerous courts around the country have held as much, finding that other dispute-resolution provisions typically found in agreements, including arbitration provisions, survive rejection under section 365 and continue to control. *See, e.g., In re Flemings Companies, Inc*., 325 B.R. 687, 693-94 (Bankr. D. Del. 2005) (finding rejection of executory contract does not nullify arbitration provision therein); *Southeastern PA Transp. Authority v. AWS Remediation Inc*., No. Civ. A. 03-695 2003, WL 21994811, at *3 (E.D. Pa. Aug. 18, 2003) ("A rejection in bankruptcy does not alter the substantive rights of the parties that formed pre-petition. While a debtor may reject a contract in its 'entirety,' it may not invalidate freely negotiated methods of dispute resolution as they apply to pre-petition acts.") (internal citations omitted)); *In re Paragon Offshore PLC*, 588 B.R. 735, 749 (Bankr. D. Del. 2018) (rejecting argument that arbitration provision was extinguished as part of rejection of contract in bankruptcy proceedings "[f]or the rejection of an executory contract is only 'a breach of a contract, and the terms of the contract still control the relationship of the parties.' In other words, the Court cannot now erase the contractual obligations the parties have agreed to under the Agreements, at least as it relates to the Arbitration Provision") (internal citation omitted)). Thus "[w]hile it is true that a specific provision in an executory contract cannot be held enforceable if the contract as a whole has been rejected [], forum selection clauses and arbitration provisions address the procedural framework pursuant to which a contract dispute will be processed, rather than the substantive provisions that create and define the legal

27

relationships between the parties." *In re All Am. Semiconductor, Inc.*, No. 07-12963-BKC-LMI,

2010 WL 2854153, at *9 (Bankr. S.D. Fla. July 20, 2010), *aff'd sub nom. Sirius Computer Sols.,*

*Inc. v. AASI Creditor Liquidating Tr.*, No. 10-23406-CIV, 2011 WL 3843943 (S.D. Fla. Aug. 29,

2011) ("To argue that a party cannot modify or waive a forum selection provision for a contract

that has been breached would render absurd any venue waiver case since presumably, litigation

over a contract, whether terminated, completed, rejected or ongoing, only occurs when there has

been a breach."). Accordingly, Santee Cooper's forum-shopping attempt to have this dispute

adjudicated in the South Carolina District Court by contending that this Court lacks jurisdiction

to hear this dispute (it does not) and that the venue provision in the EPC Agreement is not

binding anymore by virtue of rejection (also not true) should be rejected.

## CONCLUSION

For the reasons set forth above, WEC respectfully requests that the Court deny the

Motion to Dismiss.


Dated: June 3, 2019
       New York, New York

                                   /s/ David N. Griffiths
                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007
                                   Gary T. Holtzer
                                   Edward Soto
                                   Robert S. Berezin
                                   David N. Griffiths

                                   *Attorneys for*
                                   *Reorganized Westinghouse Electric Company LLC*

28

# EXHIBIT A

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Edward Soto
David N. Griffiths

*Attorneys for*
*Reorganized Westinghouse Electric Company LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| WESTINGHOUSE ELECTRIC COMPANY LLC, | Case No. 17-10751 (MEW) |
| *et al.*, | (Jointly Administered) |
| Debtors. | |
| WESTINGHOUSE ELECTRIC COMPANY LLC, *as reorganized* | |
| Plaintiff, | Adv. Proc. No. 19-01109 (MEW) |
| v. | |
| SOUTH CAROLINA PUBLIC SERVICE AUTHORITY | |
| Defendant. | |

**DECLARATION OF DAVID DURHAM IN SUPPORT OF WESTINGHOUSE
ELECTRIC COMPANY LLC'S OPPOSITION TO SOUTH CAROLINA PUBLIC
SERVICE AUTHORITY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

I, David Durham, hereby declare under penalty of perjury:

1.        I currently serve as the President, Plant Solutions of reorganized Westinghouse

Electric Company LLC ("**WEC**").  In that role, I am responsible for the development of key growth

areas for WEC related to the specific stages of plant lifecycle solutions, including ongoing AP1000

plant projects, new AP1000 plant business development and delivery, plant decommissioning and remediation services, government services, and staffing services. I joined Westinghouse Electric Company LLC in 2015.

**I.    The EPC Agreement**

2.      Westinghouse Electric Company LLC, along with Stone & Webster, Inc., entered into the Engineering, Procurement, and Construction Agreement (the "**EPC Agreement**"), dated May 23, 2008, with South Carolina Electric & Gas Company ("**SCE&G**") for itself and as agent for the South Carolina Public Service Authority ("**Santee Cooper**") (collectively, "**Owners**"). Pursuant to the EPC Agreement, SCE&G would act as agent for Santee Cooper with respect to the Project. The EPC Agreement provided for the design, engineering, procurement, installation of equipment and materials, and construction and testing of two AP1000 nuclear power plants (the "**Project**") at the Virgil C. Summer Nuclear Station in Jenkinsville, South Carolina ("**V.C. Summer Site**").

*a.    EPC Provisions Governing the Definition of Equipment and Passage of Title to Equipment*

3.      Under the EPC Agreement, WEC, as Contractor, was obligated, in part, to place orders and procure Equipment to be used for the Project. The EPC Agreement defines "**Equipment**" as "machinery, computer hardware and its associated software, apparatus, components, articles, materials, systems and Structures, and items of any kind that shall become a permanent part of the Facility to be provided by Contractor to Owner under this Agreement, but

2

excluding Nuclear Fuel." EPC Agreement, at 4, attached hereto as Exhibit 1.[1]  A subset of

Equipment as defined in the EPC Agreement is "**Major Equipment**," which includes:

> a. "steam generators, reactor vessel and reactor vessel head, control rod drive
> mechanisms, main turbine, main turbine generator, turbine deaerator, reactor
> coolant pumps, containment vessel, cooling towers, main turbine condenser,
> reactor internals, main step-up transformers, pressurizer, diesel generators,
> feedwater pumps, circulating water pumps, polar crane, core makeup tanks,
> moisture separator reheaters, and any other equipment for which the contract(s)
> with the Subcontractor is for an amount in excess of $10,000,000 or that Owner
> and Contractor agree shall be designated as Major Equipment." EPC Agreement,
> at 8.

Any materials that fall within the definition of Equipment—items specifically listed

therein, or "items of any kind that shall become a permanent part of the Facility"—but are not part

of the defined subset of "Major Equipment" are described in this declaration as "**Non-Major**

**Equipment**."

4.    The EPC Agreement sets forth the requirements necessary for the Owners to obtain

title to all types of Equipment from WEC: "Except as otherwise expressly provided in this

Agreement, title to an item of Equipment shall pass to Owner *upon payment in full* by Owner to

Contractor for such item of Equipment."  EPC Agreement, § 21.1 (emphasis added).  As such,

under the EPC Agreement, the Owners only obtained title to Equipment from WEC upon paying

WEC in full for that Equipment.  Otherwise, WEC retained title in the Equipment.  The Equipment

at issue in this proceeding comprises that subset of Equipment (including both Major and Non-

Major Equipment) for which Owner did not pay WEC in full ("**WEC Equipment**"), and not

Equipment for which Owners had paid WEC in full ("**Santee Cooper Equipment**," and

collectively with the WEC Equipment, "**Equipment**").

---

[1]  The EPC Agreement is also available publicly as part of one of the Owners' SEC filings at
https://www.sec.gov/Archives/edgar/data/91882/000075473717000030/epc201710qacontractexhibit.htm (last visited
June 3, 2019).

### b. EPC Provisions Governing Payment for Equipment

5.        Pursuant to the EPC Agreement, Non-Major Equipment costs were allocated to the Firm/Fixed Price component of the EPC Agreement payment structure.  EPC Agreement, §§ 8.1(a), 8.2; Exhibit F-1.

6.        Specifically, WEC would recover costs associated with its multiple cost categories (including Non-Major Equipment), if at all, when it received Project Milestone Payments, or payments under the Fixed/Firm Price category pursuant to the Section F.1.3 and F.1.5 payment schedules of Exhibit F-1 to the EPC Agreement.  These Milestone Payments were made based on general construction progress, and were not directly correlated to WEC's purchases of Non-Major Equipment.  Section F.1.3, for example, lists "Westinghouse Milestone Payments" associated with the completion of certain portions of Work on the Project, along with the projected achievement date for such completion and the corresponding amount to be paid once each Milestone was reached for Units 2 and 3 of the Project.  *See* EPC Agreement, Ex. F-1, § F.1.3.  One Milestone listed in Section F.1.3 is "Completion of Stator Core- Unit 2," with a target completion date of October 2011, and "Invoice Amounts" of approximately $3.3 million for Unit 2 and $5.5 million for Unit 3.  *Id.*  Section F.1.5 lists the "Stone & Webster Firm Price Milestone Payment Schedule" for payments associated with the completion of listed "Activities," such as "Plac[ing] Concrete for Unit 2 Nuclear Island Basemat," due to be started on October 3, 2011 with an associated payment of approximately $3.2 million.  *See* EPC Agreement, Ex. F-1, § F.1.5.  Supporting invoices for the Non-Major Equipment purchases were neither required nor necessary to satisfy Construction Milestone Payments (as part of the Fixed/Firm Price), and therefore were not submitted.

7.        Instead, the Owners were obligated to pay WEC according to the applicable schedule under the Fixed/Firm Price component of the Contract Price that covered several

categories of WEC's costs (e.g., overhead, labor, materials, and Non-Major Equipment). As the Project progressed, the Owners would pay the entire amount of the Fixed/Firm Price. The final payment would constitute payment in full for the Non-Major Equipment – even if payment was insufficient to cover WEC's actual costs of procuring the Non-Major Equipment.

8.    Once the Owners elected to convert the EPC Agreement into a Fixed Price agreement, effective in November 2016, WEC would only receive payments upon achieving certain Construction Milestones pursuant to the new Construction Milestone Payment Schedule developed by the parties.[2]  Owners would make payments solely in accordance with the Construction Milestone Payment Schedule, and WEC remained obligated to complete construction of the Project regardless its costs (and the extent to which they exceeded Owners' Fixed Price payments). *See* Fixed Price Option Amendment, § 1 ("***all remaining work*** shall be converted to a Fixed Price…The remaining Contract Price adjustment represents the ***cost to complete the Project***…") (emphasis added). Under EPC Agreement provisions unchanged by the October 2015 EPC Amendment, WEC was required to purchase Equipment as soon as required for the Project.[3] In electing the Fixed Price Option, the Owners also ensured that so long as they paid the full Fixed

---

[2] *See* October 2015 Amendment to the EPC Agreement ("**October 2015 EPC Amendment**"), attached hereto as Exhibit 2, § 2 (setting November 1, 2016 as the "Option Deadline" by which Owners were required to exercise the "Option Amendment"), § 12; Exhibit D to October 2015 EPC Amendment, § 1 ("**Fixed Price Option Amendment**") (providing that once effective, all "Work under the EPC Agreement…shall be converted to a Fixed Price in exchange for the remaining Contract Price being adjusted to $6.082 billion…"). The October 2015 EPC Amendment and Fixed Price Option Amendment are also available publicly as part of one of the Owners' SEC filings at https://www.sec.gov/Archives/edgar/data/91882/000075473715000076/a20150930-exhibit1005.htm (last visited June 3, 2019).

[3] *See* EPC Agreement, § 3.3(a) Project Schedule ("Contractor shall…allocate resources and place Equipment orders in such a manner that will enable Contractor to meet the agreed date for Substantial Completion of the Units as shown in the Project Schedule.").

Price amount, they would own ***all*** Equipment (Major and Non-Major) at the Project, regardless of what it would cost WEC to complete construction.[4]

9.      Due to significant cost overruns, WEC's actual costs for the Project far exceeded the payments made by the Owners.  For example, as of June 30, 2017, the Owners had paid WEC approximately $ 7.1 billion, while WEC had incurred approximately $ 7.8 billion in costs.

10.      Notably, prior to their election of the Fixed Price Option, the Owners did not pay WEC the full Milestone Payments or otherwise the full amount of the Fixed/Firm Price portion of the Contract Price.  After Owners' election of the Fixed Price Option in November 2016, Owners did not pay WEC the full Fixed Price given that Owners cancelled the Project soon after.

11.      The EPC Agreement contained a payment schedule specifically applicable to Major Equipment, which was Section F.1.1 of Exhibit F-1.  Under that payment schedule, WEC issued separate invoices for payments toward Major Equipment as part of the Fixed/Firm Price component of the EPC Agreement pursuant to Section 8.2.  EPC Agreement, § 8.2, Exhibit F-1.

## II.    The Owners' Did Not Pay For In Full For the Major Equipment And Non-Major Equipment At Issue In this Adversary Proceeding

### a.    *Major Equipment*

12.      The Owners' payments made towards items of Major Equipment under payment schedule F.1.1 of Exhibit F-1 of the EPC Agreement were recorded by WEC and reconciled post-cancellation of the Project by Owners to determine title.   By the terms of the EPC Agreement, and given that there was only ***one*** payment schedule governing payments for Major Equipment, Santee Cooper owns only those pieces of Major Equipment for which it paid in full.  *See* EPC Agreement,

---

[4] *See* EPC Agreement, § 21.1 (providing that title to Equipment passes to Owners upon "payment in full by Owner to Contractor"); Fixed Price Option Amendment, § 5 (providing that "[a]ll provisions of the EPC Agreement not modified" by the Fixed Price Option Amendment "remain in full force and effect").

§ 21.1.  As a result, WEC retains title to certain pieces of Major Equipment ("**WEC's Major Equipment**") because the Owners neglected to make full payment.

### b. *Non-Major Equipment*

13.     The Owners at no time paid the full amounts due under the EPC Agreement, either before or after their exercise of the Fixed Price Option.  As a result, Owners have not paid in full for the Non-Major Equipment.

**III.    WEC Put Santee Cooper on Notice Regarding WEC's Claim to Title in the WEC Equipment During the Bankruptcy Proceedings, Santee Cooper Sold its Claim up to the Maximum Damages Provision Under the EPC Agreement, And Santee Cooper Failed to Assert its Purported Interest in the WEC Equipment As Part of Any Rejection Damages Claim**

14.     On March 29, 2017 (the "**Petition Date**"), Westinghouse Electric Company LLC and certain of its affiliates (collectively, the "**Debtors**") commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York.  The Debtors filed the Chapter 11 Cases as a result of significant cost overruns at the construction of nuclear power plants in the United States, including the Project at the V.C. Summer Site.

15.     Throughout WEC's negotiations with Santee Cooper (or SCANA, as agent for Santee Cooper) regarding the ownership and disposition of the Equipment, which began in the fall of 2017, just months after the Petition Date, and continued through the filing of the Complaint, the Chapter 11 Cases proceeded, giving Santee Cooper over a year to assert any claims, objections, or reservations of rights it had regarding the ownership of the WEC Equipment.[5]  In addition, the

---

[5] Santee Cooper appeared in the Chapter 11 Cases through its counsel, Reed Smith LLP, on March 29, 2017, the day after the filing of the Petition.  As such, Santee Cooper has had notice of each and every filing made in the Chapter 11 Cases since the Petition was filed.

Debtors took numerous actions during that time making clear their claim that WEC Equipment was property of the estate.

16.     On May 26, 2017, the Debtors filed their schedules of assets and liabilities and statement of financial affairs for their various entities.  Case No. 17-10751, ECF Nos. 567-625 (the "**Schedules and SOFAs**").  In the Schedules and SOFAs, the Debtors made disclosures related to equipment, disclosing that they held "other machinery, fixtures, and equipment," "automobiles and trucks," "work in progress," "raw materials" "finished goods," and "various" office equipment and supplies.  *See* ECF No. 569.

17.     On July 31, 2017, Santee Cooper's Board of Directors voted to suspend construction of the Project at the V.C. Summer site, and Santee Cooper and its co-owner, SCE&G, publicly announced that they were cancelling the Project. Thereafter, the Owners allowed WEC only limited access to the V.C. Summer Site.  Their actions left a large amount of Equipment sitting idle on the abandoned V.C. Summer Site and raised questions as to both the ownership of this Equipment and the best way for both WEC and the Owners to recoup some portion of the value of the highly specialized Equipment WEC had procured for the Project by finding a suitable buyer.

18.     The Bankruptcy Court-established deadline to file a proof of claim in the Chapter 11 Cases was September 1, 2017, set by Court Order on June 28, 2017 (the "**Bar Date**").  *See* Case No. 17-10751, ECF No. 788.  This filing stated that any holder of a claim who failed to file such claim by the Bar Date was "forever barred, estopped and enjoined from asserting such a claim against the Debtors, their property, or their estates[.]"  On August 31, 2017, SCE&G, for itself and as agent of Santee Cooper, filed identical unsecured and unliquidated proofs of claim in the Chapter 11 Cases.  *See* Proofs of Claim Nos. 2440, 2444, 3088, and 3089.  In the proofs of claim,

SCE&G "asserts against WEC any and all claims based upon, arising under on account of, in connection with, or related to, the V.C. Summer Project and the EPC Agreement." *Id.* at ¶ 6.

19.     On or about September 28, 2017, and during the pendency of the Chapter 11 Cases, Santee Cooper and SCE&G sold these claims for approximately $2 billion to Citigroup Financial Products, Inc. ("**Citi**"). *See* Case No. 17-10751, ECF No. 1411.

20.     As to WEC's Maximum Total Liability to Owners pursuant to the EPC Agreement, Section 17.2 provides that "with respect to a Unit," Contractor's "total aggregate liability under this Agreement, arising out of or in connection with the Work or this Agreement…shall not exceed an aggregate amount equal to twenty-five percent (25%) of the payments for such Unit that have been made to Contractor as of the date of the event or circumstance giving rise to the claim (the "**Maximum Liability Amount**")." EPC Agreement, § 17.2. The Owners paid WEC a total of approximately $7.8 billion for Work performed on the Project; therefore, Citi's payment of approximately $2 billion to Owners for their asserted claims against WEC related to Project was actually in excess of WEC's Maximum Liability Amount to Owners pursuant to the EPC Agreement.

21.     In the fall of 2017, I directed my staff to begin communicating with SCANA, as agent for Santee Cooper, regarding ownership of the Equipment and the potential disposition and/or sale of abandoned Equipment. This was just months after the Owners' decision to cancel the Project. On Monday, October 16, 2017, representatives from my staff at WEC met with leadership at SCANA to discuss developing an inventory of Equipment, documenting cost and payments towards Equipment, the ownership of such Equipment, potential strategies to sell the Equipment, and the allocation of proceeds from any Equipment sales. At this meeting, WEC informed SCANA of its position that WEC owned the WEC Equipment (due to Owners' failure

to pay in full per the terms of the EPC Agreement), and SCANA set forth its conflicting position. In the days after this meeting, members of my staff and SCANA continued to discuss these issues by email and planned to meet again in the next few weeks to further iron out a comprehensive plan to account for, determine ownership of, and dispose of the Equipment. During this time, WEC worked internally to develop a "Framework for Cooperation" on the sale of Equipment and other materials at the V.C. Summer site.

22.    On October 25, 2017, the parties met again to work towards an agreement regarding Equipment inventory, accounting for payments towards Equipment, and determining ownership of the Equipment in preparation for any sale. Following the meeting, members of my staff and SCANA continued to communicate regarding these issues and the scheduling of additional meetings to discuss the same.

23.    On Thursday, November 8, 2017, members of my staff again met with their counterparts at SCANA in Charlotte, NC to discuss issues regarding the Equipment. As part of this discussion, WEC again reiterated its position that SCANA owned only certain Equipment for which it had paid in full, and that WEC retained title to the remainder per the terms of the EPC Agreement.

24.    The following Tuesday, November 14, 2017, my staff sent SCANA a table listing each piece of Major Equipment, payment for which was governed by Section F.1.1 of Exhibit F-1 to the EPC Agreement, and noting whether, according to WEC's payment records, each piece of Major Equipment was owned by WEC or the Owners. The table notes that where WEC marked an item of Major Equipment as owned by SCANA/the Owners it was because SCANA/the Owners had "paid in full" for such item, and conversely where WEC owned an item of Major Equipment, SCANA/the Owners had not paid in full.

25.    On January 12, 2018, Brookfield WEC Holdings LLC, Toshiba Nuclear Energy Holdings (UK) Limited and TSB Nuclear Energy Services Inc. executed a Plan Funding Agreement (as amended, the "**PFA**"), pursuant to which Brookfield WEC Holdings Inc. acquired WEC.

26.    On January 28, 2018, WEC filed its original Joint Chapter 11 Plan of Reorganization ("**Initial Plan**").  Case No. 17-10751, ECF No. 2325.  The Initial Plan's provision regarding the rejection of goexecutory contracts mirrors that in the final, confirmed Plan in providing that "[o]n the Effective Date, except as otherwise provided in the Plan, each [e]xecutory [c]ontract and [u]nexpired [l]ease not previously rejected, assumed, or assumed and assigned by the Debtors during the Chapter 11 Cases shall be deemed ***automatically rejected*** pursuant to sections 365 and 1123 of the Bankruptcy Code."  Initial Plan, § 9.1 (emphasis added).  Given this provision of the Initial Plan and Santee Cooper's appearance in the Chapter 11 Cases, Santee Cooper was on notice as of January 28, 2018 that the EPC Agreement, which was not assumed by the Debtors prior to the Effective Date, would be rejected as of the Effective Date.

27.    In addition, Section 5.1 of the Initial Plan put Santee Cooper on notice that on "[o]n the Effective Date…all property of the Debtors' Estates other than Excluded Assets…shall vest in the Reorganized Debtors [then owned by Brookfield] free and clear of all Claims, liens, encumbrances, charges and other interests."  Initial Plan, § 5.1.  The WEC Equipment was not identified as an Excluded Asset in Schedule 2.02(a) of the PFA.  As described herein, my staff at WEC had informed SCANA, agent for Santee Cooper, repeatedly prior to the filing of the PFA and Initial Plan of WEC's position that it held title to the WEC Equipment, which, pursuant to the terms of the PFA and Initial Plan, would vest in the Reorganized Debtors on the Effective Date.

These terms in the PFA, as amended, and Initial Plan are identical to the corresponding final terms in the confirmed Plan and final PFA.

28.     As discussed in my Declaration in Support of Westinghouse Electric Company LLC's Adversary Complaint, dated April 5, 2019 [ECF No. 2], on February 22, 2018, the Debtors further reiterated their position to Santee Cooper executives that under the terms of the EPC Agreement, Santee Cooper owned certain Equipment and the Debtors owned other Equipment.

29.     At the same time, the Debtors also made clear that their expertise and position as owners of intellectual property, necessary certifications, and an export control license related to the Equipment, combined with the Debtors' established relationship with their existing AP1000 customers (the **only** potential customers for much of the Equipment), would allow the Debtors to obtain a superior price for the sale of all Equipment.  Santee Cooper appeared to agree with the Debtors' assertion regarding the Debtors' unique ability to sell most of the Equipment and began to work with the Debtors on a cooperative strategy to sell the Equipment.

30.     However, subsequent to the February 22, 2018 meeting, negotiations stalled while Santee Cooper worked with its former Project co-owner, SCE&G, to enter into an agreement assuming ownership of all the Project Owners' assets.[6]

31.     Meanwhile, on March 28, 2018 the Debtors filed their Modified Second Amended Joint Chapter 11 Plan of Reorganization (the "**Plan**"), and the same day the Bankruptcy Court entered an order confirming the Plan (the "**Confirmation Order**").  Case No. 17-10751, ECF Nos. 2986, 2988.  On August 1, 2018, the Plan became effective and the Debtors filed their Notice of Occurrence of Effective Date of Debtors' Modified Second Amended Joint Chapter 11 Plan of Reorganization (the "**Notice of Effective Date**").  Case No. 17-10751, ECF No. 3705.  The Plan

---

[6] Santee Cooper assumed ownership of 100% of the Owners' Project interests in December 2018.

contains language describing the automatic rejection of executory contracts identical to that in the Initial Plan, filed two months earlier. Plan, § 9.1. Given this provision of the Plan (identical to that in the Initial Plan), Santee Cooper had more than six months' notice that the EPC Agreement, which was not assumed by the Debtors prior to the Effective Date, would be rejected as of the Effective Date (August 1, 2018). When the Notice of Effective date was sent to all of the Debtors' creditors, it further stated that a rejection damages claim for any such contract had to be filed within 30 days. Santee Cooper never filed a rejection damages claim, e.g., claiming that, but for WEC's alleged breach of the EPC Agreement, Owners would have acquired title to the WEC Equipment or, in light of WEC's alleged breach, should obtain title to it.

32.     Also on August 1, 2018, the PFA transaction closed. Under the Plan and the PFA, on the Effective Date, all property of the Debtors' estates (other than explicitly identified "**Excluded Assets**," which did not include Equipment) vested in the Reorganized Debtors. The Plan, like the Initial Plan filed on January 28, 2018, specifically provides that such property "shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests…" on the Effective Date. Plan, § 5.1.

33.     Despite Santee Cooper's knowledge, for more than six months, of what would occur on the Effective Date, neither Santee Cooper nor its agent (SCANA) filed a proof of claim based on the Debtors' proposed rejection of the EPC Agreement or objected or otherwise reserved rights based on the Debtors' asserted ownership in the WEC Equipment in connection with the PFA, Plan, or Confirmation Order.

34.     On March 1, 2019, I met with Santee Cooper staff regarding the ownership and potential disposition of the Equipment, again asserting WEC's position regarding the pieces of Equipment it owned and those that Santee Cooper owned. At this meeting, Santee Cooper took

the position—for the first time—that it owns **all** of the Equipment. Shortly thereafter, on March 18, 2019, Santee Cooper informed WEC (again, for the first time) that it intended to sell, and was actively attempting to sell, **all** of the Equipment at the V.C. Summer site, including WEC Equipment it does not own. Santee Cooper's actions in March of 2019 were entirely inconsistent with the parties' prior negotiations and Santee Cooper's prior assertions (or lack thereof) regarding its ownership of the Equipment.

35. As I described in my declaration in support of the Adversary Complaint [ECF No. 2, at ¶ 11-18], Santee Cooper's actions during this time and refusal to continue negotiations with WEC have already caused WEC to lose significant Equipment sales opportunities, including sales to the **only** potential customer for the Equipment in the United States. In fact, within the last two weeks, counsel for Southern (owner of the Vogtle AP1000 project in Georgia) has reached out again, to both representatives of WEC and Santee Cooper, providing a list of certain Equipment that Southern needs to order for the Vogtle project. Southern's counsel indicated that Southern would prefer to purchase those items—and additional materials and Equipment in the next three months, worth millions of dollars—from the V.C. Summer Project inventory, but it needed a way to do so in a manner that protected it (Southern) from adverse claims of title or ownership. Santee Cooper's repeated intransigence and interference with WEC's property rights in the Equipment is costing WEC millions of dollars worth of sales.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 3, 2019                    /s/ *David Durham*
                                        David Durham

14

# EXHIBIT 1

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Execution Version**

# ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

## BETWEEN

## SOUTH CAROLINA ELECTRIC & GAS COMPANY, FOR ITSELF AND AS AGENT FOR THE SOUTH CAROLINA PUBLIC SERVICE AUTHORITY, AS OWNER

## AND

## A CONSORTIUM CONSISTING OF WESTINGHOUSE ELECTRIC COMPANY LLC AND STONE & WEBSTER, INC., AS CONTRACTOR

## FOR

## AP1000 NUCLEAR POWER PLANTS

## DATED AS OF MAY 23, 2008

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

# TABLE OF CONTENTS

**Page**

ARTICLE 1– DEFINITIONS ................................................................... 2

ARTICLE 2– INTERPRETATION ........................................................ 16

ARTICLE 3– SCOPE OF WORK ......................................................... 17

    3.1    General ............................................................................ 17

    3.2    Phases of the Work .......................................................... 17

    3.3    Project Schedule .............................................................. 18

    3.4    Not Used ......................................................................... 18

    3.5    Contractor Responsibilities ............................................. 19

    3.6    Owner's Responsibilities ................................................. 21

    3.7    Subcontractors ................................................................. 23

ARTICLE 4– FACILITY LICENSES, PERMITS AND APPROVALS ................ 27

    4.1    Owner Permits ................................................................. 27

    4.2    Contractor Permits ........................................................... 28

    4.3    ITAACs ........................................................................... 28

ARTICLE 5– QUALITY ASSURANCE .................................................. 28

    5.1    Quality Assurance ........................................................... 28

    5.2    Reporting of Defects, Noncompliance, Failures and Breakdowns of QA Programs ...... 29

    5.3    Quality Control and Inspection Activities ....................... 30

    5.4    Access and Auditing at Contractor Facilities .................. 30

    5.5    Access and Audits at Subcontractors' Facilities .............. 30

    5.6    Witness and Hold Points ................................................. 31

    5.7    Owner's Right to Inspect and Stop Work ........................ 32

ARTICLE 6– CONTRACT PRICE ........................................................ 32

    6.1    Components of the Contract Price .................................... 32

    6.2    Most Favored Customer ................................................... 32

    6.3    Future Fuel Agreement and Services Agreement ............. 33

ARTICLE 7– PRICE ADJUSTMENT PROVISIONS ................................ 34

ARTICLE 8– PAYMENTS ................................................................... 34

    8.1    Target Price and Time and Materials Payments .............. 34

-i-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

# TABLE OF CONTENTS
(continued)

Page

| 8.2 | Milestone Payments | 35 |
| 8.3 | Final Payment | 35 |
| 8.4 | Supporting Documentation; Payment Disputes | 36 |
| 8.5 | No Acceptance by Payment | 37 |
| 8.6 | Security for Payment and Performance | 37 |
| 8.7 | Separate Payments for Consortium Members | 38 |
| ARTICLE 9– | CHANGES IN THE WORK | 38 |
| 9.1 | Entitlement to Change Order | 38 |
| 9.2 | Owner-Directed Changes | 39 |
| 9.3 | Effect of Changes | 39 |
| 9.4 | Change Orders | 40 |
| 9.5 | Disputes over Changes | 41 |
| 9.6 | Changes for Contractor's Convenience | 41 |
| 9.7 | Optional Services and Equipment | 42 |
| 9.8 | Changes in Import Fees and Duties | 42 |
| ARTICLE 10– | UNCONTROLLABLE CIRCUMSTANCES | 42 |
| 10.1 | Performance Excused | 42 |
| 10.2 | Notice | 42 |
| ARTICLE 11– | TESTING | 43 |
| 11.1 | Scope and Objective of Testing | 43 |
| 11.2 | Construction and Installation Tests | 43 |
| 11.3 | Preoperational System Tests | 44 |
| 11.4 | Startup Tests Objectives and Protocol | 45 |
| 11.5 | Performance Tests | 47 |
| 11.6 | Net Unit Electrical Output Guarantee | 49 |
| ARTICLE 12– | STAGES OF COMPLETION | 51 |
| 12.1 | Turnover | 51 |
| 12.2 | Preoperational Test Completion | 52 |
| 12.3 | Startup Test Completion | 52 |
| 12.4 | Substantial Completion | 53 |

-ii-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

# TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 12.5 | Punch List | 53 |
| 12.6 | Final Completion | 53 |
| ARTICLE 13– | LIQUIDATED DAMAGES | 54 |
| 13.1 | Delay Liquidated Damages | 54 |
| 13.2 | Performance Liquidated Damages | 55 |
| 13.3 | Performance Bonus | 55 |
| 13.4 | Payment | 55 |
| ARTICLE 14– | WARRANTY | 56 |
| 14.1 | Equipment | 56 |
| 14.2 | Services Warranty | 60 |
| 14.3 | Warranty of Title | 60 |
| 14.4 | Limitations and Disclaimers | 61 |
| 14.5 | Extended Equipment Warranty | 62 |
| 14.6 | Limitation on Warranty Liability | 62 |
| ARTICLE 15– | INDEMNITY | 62 |
| 15.1 | Contractor Indemnity | 62 |
| 15.2 | Owner's Indemnity | 63 |
| 15.3 | Intellectual Property Indemnity | 63 |
| 15.4 | Owner's Nuclear Incident Indemnity | 64 |
| 15.5 | Indemnity Procedures | 65 |
| ARTICLE 16– | INSURANCE | 66 |
| 16.1 | Phase I Insurance Requirements | 66 |
| 16.2 | Phase II Insurance Requirements | 67 |
| 16.3 | Provisions Applicable to all Coverages | 69 |
| ARTICLE 17– | LIMITATION OF LIABILITY | 70 |
| 17.1 | No Consequential Damages | 70 |
| 17.2 | Maximum Total Liability; Time Limitation | 70 |
| 17.3 | Division of Liability | 71 |
| ARTICLE 18– | LIENS | 71 |
| 18.1 | Liens | 71 |

-iii-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 18.2 | Discharge or Bond | 71 |
| ARTICLE 19– PROPRIETARY DATA | | 72 |
| 19.1 | Protection of Owner Proprietary Data | 72 |
| 19.2 | Protection of Contractor's Proprietary Data | 73 |
| 19.3 | Special Procedures Pertaining to Contractor's Proprietary Data | 75 |
| 19.4 | Ownership of Rights in Documentation | 79 |
| 19.5 | Ownership of Invention Rights | 79 |
| 19.6 | Software | 80 |
| 19.7 | Publicity | 80 |
| ARTICLE 20– ENVIRONMENTAL; HAZARDOUS MATERIALS | | 80 |
| 20.1 | Material Safety Data Sheets | 80 |
| 20.2 | Facility Use, Storage Removal | 80 |
| 20.3 | Handling, Collection, Removal Transportation and Disposal | 80 |
| 20.4 | Notice of Discovery | 81 |
| ARTICLE 21– TITLE; RISK OF LOSS | | 81 |
| 21.1 | Transfer of Title | 81 |
| 21.2 | Risk of Loss | 81 |
| 21.3 | Risk to a Party's Property | 82 |
| ARTICLE 22– SUSPENSION AND TERMINATION | | 82 |
| 22.1 | Suspension by the Owner for Convenience | 82 |
| 22.2 | Termination by Owner for Cause | 83 |
| 22.3 | Termination by Owner for Convenience | 84 |
| 22.4 | Suspension and Termination Due to Other Circumstances | 84 |
| 22.5 | Termination by Contractor | 86 |
| 22.6 | Actions Required of Contractor upon Termination | 87 |
| ARTICLE 23– SAFETY; INCIDENT REPORTING | | 87 |
| 23.1 | Environmental, Health and Safety Programs | 87 |
| 23.2 | Designated Contractor Safety Representative | 87 |
| 23.3 | OSHA and Other Laws | 88 |
| 23.4 | Worksite Safety | 89 |

Execution Version                        Confidential Trade Secret Information—Subject to Restricted Procedures

## TABLE OF CONTENTS
(continued)

Page

23.5    Dangerous Materials ...................................................................... 89

23.6    Cooperation in Governmental Investigations and Inspections ........................... 89

23.7    Audit ............................................................................... 89

ARTICLE 24– QUALIFICATIONS AND PROTECTION OF ASSIGNED
            PERSONNEL ............................................................... 90

24.1    Screening Measures ..................................................................... 90

24.2    Contractor's Personnel ................................................................. 90

24.3    Training of Employees .................................................................. 91

24.4    NRC Whistleblower Provision ............................................................ 91

24.5    Respirator Protection .................................................................. 91

ARTICLE 25– RECORDS AND AUDIT ..................................................................... 91

25.1    Technical Documentation ................................................................ 91

25.2    Accounting Records ..................................................................... 92

25.3    Maintenance of Records Generally ....................................................... 92

25.4    Right to Audit ......................................................................... 92

25.5    Sales Tax Records ...................................................................... 92

ARTICLE 26– TAXES .................................................................................. 93

26.1    Employment Taxes ....................................................................... 93

26.2    Sales and Use Taxes on Contractor Tools ................................................ 93

26.3    Sales and Use Tax on Equipment ......................................................... 93

26.4    State Property Taxes ................................................................... 93

26.5    Tax Indemnification .................................................................... 94

26.6    Pollution Control Equipment Information ................................................ 94

26.7    Non-resident Contractor ................................................................ 94

ARTICLE 27– DISPUTE RESOLUTION .................................................................... 94

27.1    Claims ................................................................................. 94

27.2    Change Dispute ......................................................................... 95

27.3    Resolution by Negotiation .............................................................. 95

27.4    Mediation .............................................................................. 96

27.5    Arbitration of Claims Falling Below the Threshold Amount ............................... 96

Execution Version                         Confidential Trade Secret Information—Subject to Restricted Procedures

## TABLE OF CONTENTS
(continued)

                                                                                       **Page**

27.6    Exclusive Resolution Procedures; Equitable Remedies ..................................... 98

27.7    Consent to Jurisdiction ...................................................................... 98

27.8    Continuation of Work .......................................................................... 99

ARTICLE 28– NOTICES ........................................................................................... 99

ARTICLE 29– ASSIGNMENT ................................................................................. 101

ARTICLE 30– WAIVER .......................................................................................... 101

ARTICLE 31– MODIFICATION .............................................................................. 101

ARTICLE 32– SURVIVAL ...................................................................................... 101

ARTICLE 33– TRANSFER ...................................................................................... 101

ARTICLE 34– GOVERNING LAW; WAIVER OF JURY TRIAL; CERTAIN
                FEDERAL LAWS ................................................................................ 102

34.1    Governing Law ................................................................................. 102

34.2    Waiver of Jury Trial .......................................................................... 102

34.3    Certain Federal Laws ........................................................................ 102

ARTICLE 35– RELATIONSHIP OF OWNER AND CONTRACTOR ............................... 102

ARTICLE 36– THIRD PARTY BENEFICIARIES ....................................................... 102

ARTICLE 37– REPRESENTATIONS AND WARRANTIES........................................... 103

37.1    Representations and Warranties of Contractor .............................. 103

37.2    Representations and Warranties of SCE&G and Santee Cooper .................... 103

ARTICLE 38– MISCELLANEOUS PROVISIONS ....................................................... 104

38.1    Rights Exclusive................................................................................ 104

38.2    Severability ...................................................................................... 104

38.3    Entire Agreement ............................................................................. 105

38.4    Counterparts..................................................................................... 105

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

## **EXHIBITS**

| Exhibit | Description of Exhibit |
|---|---|
| A | Scope of Work/Supply and Division of Responsibilities |
| B | Contractor Organization Chart |
| C | Owner and Contractor Permits |
| D | Project Execution Plan Processes |
| E | Project Schedule |
| F-1 | Milestone Payment Schedule |
| F-2 | Payment Plan |
| G | Time and Materials Rates and Charges |
| H | Pricing |
| I-1 | Toshiba Parent Guaranty |
| I-2 | Shaw Parent Guaranty |
| J | Price Adjustment Provisions |
| K | Costs |
| L | Net Electric Guarantee Conditions and Load List |
| M-1 | Software License |
| M-2 | AP1000 Intellectual Property License (WEC) |
| M-3 | AP1000 Intellectual Property License (S&W) |
| N | Industry Codes and Standards |
| O-1 | Proprietary Data Agreement |
| O-2 | List of Intellectual Property Subject to Third Party License Terms |

Confidential Trade Secret Information—Subject to Restricted Procedures

| Exhibit | Description of Exhibit |
|---------|----------------------|
| P-1 | Major Subcontractors |
| P-2 | Subcontractors for Site Construction and Related Field Services |
| Q | Equipment with Owner-Designated Witness and Hold Points |
| R | Description of Site |
| S | EEO and Small Business Regulations |
| T | [Not Used] |
| U | OCIP Description |
| V | Limited Agency Agreement |
| W | Extended Equipment Warranty Special Terms |
|  |  |

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

## ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT

This ENGINEERING, PROCUREMENT AND CONSTRUCTION AGREEMENT (the "Agreement") is entered into as of the 23rd day of May, 2008 (the "Effective Date"), by and between SOUTH CAROLINA ELECTRIC & GAS COMPANY ("SCE&G"), for itself and as agent for the South Carolina Public Service Authority, a body corporate and politic created by the laws of South Carolina ("Santee Cooper") pursuant to the Limited Agency Agreement between SCE&G and Santee Cooper dated May 23, 2008 attached hereto as Exhibit V (the "Limited Agency Agreement"); and a consortium consisting of WESTINGHOUSE ELECTRIC COMPANY LLC, a Delaware limited liability company having a place of business in Monroeville, Pennsylvania ("Westinghouse"), and STONE & WEBSTER, INC., a Louisiana corporation having a place of business in Charlotte, North Carolina ("Stone & Webster"). Except where the context otherwise requires, Westinghouse and Stone & Webster hereinafter are individually referred to as a "Consortium Member" and collectively as "Contractor". Without limiting the authority of SCE&G to act as agent on behalf of Santee Cooper as provided in Section 3.6(a) hereof, references herein to "Owner" shall mean each of SCE&G and Santee Cooper. Owner and Contractor may be referred to individually as a "Party" and collectively as the "Parties".

## RECITALS

**WHEREAS**, Owner desires to develop, license, procure and have constructed a nuclear-fueled electricity generation facility;

**WHEREAS**, Westinghouse is engaged in the business of designing, developing and supplying commercial nuclear facilities and has developed a pressurized water Nuclear Power Plant known as the AP1000 (the "AP1000 Nuclear Power Plant") for which the U.S. Nuclear Regulatory Commission has issued a Standard Design Certification in the form of a rule set forth in Appendix D to 10 C.F.R. Part 52;

**WHEREAS**, Stone & Webster is engaged in the business of designing and constructing industrial and power generation facilities;

**WHEREAS**, Westinghouse and Stone & Webster desire to assist Owner in the licensing of and to design, engineer, procure, construct, and test one or two AP1000 Nuclear Power Plants and related facilities, structures and improvements at the V.C. Summer station;

**WHEREAS**, Owner and Contractor now desire to enter into this Agreement to provide for, among other things, the design, engineering, procurement and installation of equipment and materials, and construction and testing of the Facility;

**NOW, THEREFORE**, in consideration of the recitals, the mutual promises herein and other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties, intending to be legally bound, stipulate and agree as follows:

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

# ARTICLE 1 – DEFINITIONS

For purposes of this Agreement, the following words and expressions shall have the meanings hereby assigned to them, except where the context clearly indicates a different meaning is intended. These definitions may be supplemented by any definitions contained in any of the documents incorporated by reference herein, but in case of any conflict or inconsistencies, the definitions set forth below shall prevail:

"AAA" means the American Arbitration Association.

"Additional Amount" has the meaning set forth in Section 22.4(d).

"AEA" means the Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011 et seq.

"Affiliate" means, with respect to any Party, any other Person that (a) owns or controls, directly or indirectly, the Party, (b) is owned or controlled by the Party, or (c) is under common ownership or control with the Party, where "*own*" means ownership of fifty percent (50%) or more of the equity interests or rights to distributions on account of equity of the Party and "*control*" means the power to direct the management or policies of the Party, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the first paragraph above and shall include all Exhibits, and amendments hereto (including Change Orders).

"Ancillary Facilities" means the facilities, structures and improvements at the Site that are within Contractor's Scope of Work as provided in <u>Exhibit A</u> but are not part of a Unit.

"AP1000 Facility Information" means the information within Contractor's Scope of Work, in the form of electronic databases, documents, and drawings that pertain to Facility design, engineering, licensing, analysis, installation, performance, testing, operation and maintenance and shall be maintained by Contractor.  Collectively, this information, either directly or by reference, shall reflect the current approved AP1000 Nuclear Power Plant associated with Contractor's Scope of Work at any point in time. A portion of this information, as defined in <u>Exhibit A</u>, shall be provided to Owner via an Information Management System (IMS).

"AP1000 Nuclear Power Plant" has the meaning set forth in the Recitals.

"Arbitral Panel" has the meaning set forth in Section 27.5(b).

"Bankruptcy Code" means the United States Bankruptcy Code, Title 11 of the United States Code.

"Business Day" means every calendar day other than Saturday, Sunday or a legal holiday recognized by the State of South Carolina.

"CCIP" has the meaning set forth in Section 16.2(a).

"Chairman" has the meaning set forth in Section 27.5(b).

-2-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

"Change" has the meaning set forth in Section 9.1.

"Change Dispute" has the meaning set forth in Section 27.2.

"Change Dispute Notice" has the meaning set forth in Section 27.2.

"Change in Law" means (a) any adoption or change, after the Effective Date, of or in the judicial or administrative interpretation of any Laws (excluding any Laws relating to net income Taxes), which is inconsistent or at variance with any Laws in effect on the Effective Date, (b) the imposition after the Effective Date of any requirement for a new Governmental Approval or (c) the imposition after the Effective Date of any condition or requirement (except for any conditions or requirements which result from the acts or omissions of Contractor or any Subcontractor) not required as of the Effective Date affecting the issuance, renewal or extension of any Government Approval; that, in each case, is germane to the obligations of the Parties set forth in this Agreement.

"Change Order" means the written agreement regarding a Change contemplated by Section 9.4.

"Claim" has the meaning set forth in Section 27.1.

"Combined License" or "COL" means the combined construction and operating license issued pursuant to 10 C.F.R. Part 52 for the Facility.

"Combined License Application" or "COLA" means the COL application for the Facility at the Site that has been submitted to the NRC, as such application may be updated or changed from time to time.

"Consortium Member" has the meaning set forth in the opening paragraph of this Agreement.

"Construction and Installation Tests" means the tests conducted as provided in Section 11.2.

"Construction Equipment" means equipment, machinery, materials and/or test equipment used in the excavation, civil work, mechanical/electrical installation and/or testing of the Facility, until such equipment is no longer needed for tasks associated with Contractor's Scope of Work, and which shall not become a permanent part of the Facility.

"Contract Price" means the sum of the Firm Price, Fixed Price, Target Price and the Time and Materials Charges as set forth in Exhibit H.

"Contractor" has the meaning set forth in the opening paragraph of this Agreement.

"Contractor Disclosable Information" has the meaning set forth in Section 19.3(a).

"Contractor Interests" means Contractor and its (or their) members, and its (or their) respective Affiliates, successors and assigns, including any tier of the foregoing, its (or their) Subcontractors (including suppliers) of any tier, and employees of all the foregoing, this being limited to any activity connected in any way with this Agreement.

"Contractor Non-Disclosable Information" has the meaning set forth in Section 19.3(a).

"Contractor Permits" means the Governmental Approvals identified as Contractor Permits in Exhibit C.

"Contractor's Project Director" means the Person whom Contractor designates in writing to administer this Agreement on behalf of Contractor.

"Costs" has the meaning set forth in Exhibit K.

"Credit Rating" has the meaning set forth in Section 8.6(b).

"Day" as used in the Agreement means a calendar day and includes Saturdays, Sundays and legal holidays.

"Delay Liquidated Damages" has the meaning set forth in Section 13.1.

"Design Control Document" or "DCD" means the revision of the AP1000 Nuclear Power Plant Design Control Document, APP-GW-GL-700, that is in effect as of the Effective Date.

"Documentation" means the documents that Contractor has agreed to provide in its Scope of Work as set forth in Exhibit A.

"DOE" means the U.S. Department of Energy and its staff.

"Effective Date" means the date of this Agreement first above written.

"Employment Taxes" has the meaning set forth in Section 26.1.

"Equipment" means machinery, computer hardware and its associated software, apparatus, components, articles, materials, systems and structures, and items of any kind that shall become a permanent part of the Facility to be provided by Contractor to Owner under this Agreement, but excluding the Nuclear Fuel.

"Equipment Warranty" has the meaning set forth in Section 14.1(a)(i).

"Exhibit" means each one of the documents Exhibit A through W annexed to this Agreement.

"Existing Confidentiality Agreement" has the meaning set forth in Section 19.2(c)(i).

"Extended Equipment Warranty" has the meaning set forth in Section 14.5.

"Extended Equipment Warranty Period" has the meaning set forth in Section 14.5.

"Facility" means the Unit or Units and the Ancillary Facilities, and is more fully described in Exhibit A.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

"Facility Documentation" means the Documentation of the applicable Consortium Member plus, if not included within the Documentation, material and information within the possession or control of such Consortium Member or its Subcontractors and that Consortium Member has the right to transfer, sublicense or pass-through, that is reasonably necessary for a Qualified Entity to engage in the Unit Completion Purposes required to achieve the equivalent of Substantial Completion in relation to the Facility, including, without limitation, any listing and/or description of the AP1000 Nuclear Power Plant's functional, operational and performance capabilities, all user, operator, system administrator, technical, support and other manuals, and listings of functional specifications, help files, flow charts, logic diagrams, accepted and as built plans, if any, blueprints, architectural and engineering drawings; in each case whether written, printed, electronic, or other format.  Facility Documentation does not include software or its associated documentation that is the subject of Exhibit M-1, Software License.

"Facility Manuals" means those manuals provided by Contractor for use by the Operator in connection with the operation and maintenance of the Facility.

"Facility Purposes" has the meaning set forth in Section 19.2(b)(i).

"Field Change" means a non-material change made to support installation that does not require a change to P&IDs, one-line electrical diagrams or the equipment arrangement drawings.  Field changes are not contrary to the COL or the DCD, and are determined through a technical evaluation not to adversely affect the form, fit or function of the system, structure or component.

"Final Completion" means that a Unit has achieved all the conditions set forth in Section 12.6.

"Final Completion Punch List" has the meaning set forth in Section 12.5.

"Final Payment Invoice" has the meaning set forth in Section 8.3.

"Firm Price" means the portion of the Contract Price that is identified as Firm Price in Exhibit H as adjusted pursuant to Articles 7 and 9 and Exhibit J.

"First Wave Customers" means Owner, Southern Company and its Affiliates, Duke Energy Corporation and its Affiliates, and Progress Energy, Inc. and its Affiliates.

"Fixed Price" means the portion of the Contract Price that is identified as Fixed Price in Exhibit H, as adjusted pursuant to Article 9, but which is not subject to adjustment pursuant to Article 7.

"Full Notice to Proceed" means the written notice that Owner gives to Contractor authorizing Contractor to proceed with the remainder of the Work, subject to the limitations set forth in Section 3.2(b).

"G&A" means Stone & Webster's general and administrative costs as set forth in Exhibit G.

"Good Industry Practices" means any of the practices, methods, standards and acts engaged in and generally acceptable to the nuclear power industry in the United States that, at a particular time, in the exercise of reasonable judgment in light of the facts known at the time a decision

was made could have been expected to accomplish the desired result consistent with good business practices, reliability, economy and safety.

"Government Approval" means any authorization, consent, approval, clearance, license, ruling, permit, tariff, certification, exemption, filing, variance, order, judgment, no-action or no-objection certificate, certificate, decree, decision, declaration or publication of, notices to, confirmation or exemption from, or registration by or with any Government Authority relating to the design, engineering, procurement, construction, testing, financing, completion, ownership or operation of the Facility.

"Government Authority" means any federal, state, county, city, local, municipal, foreign or other government or quasi-governmental authority or any department, agency, subdivision, court or other tribunal of any of the foregoing that has jurisdiction over Owner, Contractor, the Facility or the activities that are the subject of this Agreement.

"Guaranteed Substantial Completion Date" for a Unit means the date set forth for such event in the Project Schedule as such date may be extended due to a Change or otherwise pursuant to the terms hereof.

"Hazardous Materials" means any substance or material regulated or governed by any Governmental Authority, or any substance, emission or material now or hereafter deemed by any court or Government Authority having jurisdiction to be a "regulated substance", "hazardous substance", "toxic substance", "pesticide", "hazardous waste", or any similar classification, including by reason of deleterious properties, ignitability, corrosivity, reactivity, carcinogenicity, or reproductive toxicity, and shall include those substances defined as a "source", "special nuclear" or "by-product" material pursuant to Section 11 of the AEA (42 U.S.C. Section 2014 et seq.) and those substances defined as "residual radioactive material" in Section 101 of the Uranium Mill Tailings Radiation Control Act of 1978 (42 U.S.C. Sections 7901 et seq.).

"Hold Point" means a critical step in a manufacturing or testing process beyond which Contractor or a Subcontractor cannot proceed except pursuant to the provisions in Section 5.6.

"House Loads" means those loads which receive power from the low voltage side of the main step-up transformer and the unit auxiliary transformers.

"Industry Codes and Standards" means the codes and standards set forth in Exhibit N.

"Insolvent" means, with respect to a Person, that such Person (i) makes any general assignment or any general arrangement for the benefit of creditors, (ii) files a petition or otherwise commences, authorizes, defaults as to or acquiesces in the commencement of a case, petition, proceeding or cause of action under any bankruptcy, insolvency or similar law for the protection of debtors or creditors, or has such a case, petition, proceeding or cause of action involuntarily filed or commenced against it and such case, petition, proceeding or cause of action is not withdrawn or dismissed within sixty (60) Days after such filing, (iii) otherwise becomes adjudicated a debtor in bankruptcy or insolvent (however evidenced), (iv) is unable (or admits in writing its inability) generally to pay its debts as they become due, (v) is dissolved (other than pursuant to a consolidation, acquisition, amalgamation or merger), (vi) has a resolution passed

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

for its winding-up, official management or liquidation (other than pursuant to a consolidation, acquisition, amalgamation or merger), (vii) seeks, or becomes subject to the appointment of an administrator, provisional liquidator, conservator, assignee, receiver, trustee, custodian or other similar entity or official for all or substantially all of its assets, (viii) has a secured party take possession of all or substantially all of its assets or has a distress, levy, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all of its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within sixty (60) Days thereafter, (ix) causes or is subject to any event with respect to which, under the applicable laws of any jurisdiction, said event has an analogous effect to any of the events specified in clauses (i) to (viii) (inclusive); or (x) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

"Invitees" means, with respect to a Person, such personnel or other Persons as have been permitted entry onto the Site by such Person.

"ITAAC" means the NRC inspections, tests and analyses and their associated acceptance criteria which are approved and issued for the Facility pursuant to 10 C.F.R. § 52.97(b)(1).

"Joint Test Working Group" has the meaning set forth in Section 11.1(b).

"Labor Shortage" means that the number of appropriately skilled, qualified, trained and experienced personnel sufficient to maintain the Project Schedule is not available at cost acceptable to Owner where the Work is to be completed.

"Law" means (a) any constitution, statute, law, rule, regulation, code, treaty, ordinance, judgment, decree, writ, order, concession, grant, franchise, license, agreement, directive, requirement, or other governmental restriction or any similar form of decision of or determination by, or any binding interpretation or administration of any of the foregoing by, any Government Authority, whether now or hereafter in effect or (b) any requirements or conditions on or with respect to the issuance, maintenance or renewal of any Government Approval or applications therefore, whether now or hereafter in effect.

"Licensing Basis" means the NRC requirements applicable to the Facility as set forth in, until such time as the COL is issued, the DCD and, upon its issuance, the COL.

"Lien" means any lien, mortgage, pledge, encumbrance, charge, security interest, option, right of first refusal, other defect in title or other restriction of any kind or nature.

"Limited Agency Agreement" has the meaning set forth in the opening paragraph of this Agreement.

"Limited Notice to Proceed" means the written notice that Owner gives to Contractor authorizing Contractor to proceed with the Work in a limited manner in accordance with Section 3.2(a).

"Long Lead Material Payment" means the initial payment equal to seventy million dollars (($70,000,000) received by Contractor from Owner for the reactor vessel, reactor vessel

internals, steam generators, reactor coolant pumps, pressurizer, accumulator tanks, core make-up tanks, passive RHR heat exchanger, reactor coolant loop hot leg, squib valves, control rod drive mechanisms, integrated head package, containment vessel and CA 20 modules.

"Maintenance Procedures" means the procedures, written or electronic, required to perform predictive, corrective, and preventive maintenance of the Facility systems, components and structures, and those procedures required for calibration and testing of instrumentation and measurement systems and other components that are required for operation and maintenance of the Facility.

"Major Equipment" means the following equipment: steam generators, reactor vessel and reactor vessel head, control rod drive mechanisms, main turbine, main turbine generator, turbine deaerator, reactor coolant pumps, containment vessel, cooling towers, main turbine condenser, reactor internals, main step-up transformers, pressurizer, diesel generators, feedwater pumps, circulating water pumps, polar crane, core makeup tanks, moisture separator reheaters, and any other equipment for which the contract(s) with the Subcontractor is for an amount in excess of $10,000,000 or that Owner and Contractor agree shall be designated as Major Equipment.

"Major Equipment Purchase Order" has the meaning set forth in Section 3.7(c)(i).

"Major Equipment Vendor" has the meaning set forth in Section 3.7(c)(i).

"Major Subcontract" means a contract with a Major Subcontractor.

"Major Subcontractor" means the Subcontractors (or category of Subcontractors) identified on Exhibit P-1. For the avoidance of doubt, Major Subcontractors may include, but are not limited to, suppliers of Major Equipment.

"Mandatory Spare Parts" means those items to be identified in Exhibit A as Mandatory Spare Parts and required to support initial plant startup and to perform routine maintenance of the Equipment during the first two (2) years of plant operation.

"Maximum Liability Amount" has the meaning set forth in Section 17.2.

"Member" has the meaning set forth in Section 27.5(b).

"Milestone" means an event or series of events in the execution of the Work as set forth in Exhibit F-1.

"Milestone Payment" means the payment due with respect to a completed Milestone.

"Milestone Payment Schedule" means the Milestone Payment Schedule set forth in Exhibit F-1.

"Net Unit Electrical Output" means the electrical power of the Unit measured at the high side of the step-up transformer, with the conditions as stated in Exhibit L.

"Net Unit Electrical Output Guarantee" has the meaning set forth in Section 11.6.

"Net Unit Electrical Output Test" has the meaning set forth in Section 11.5(b).

"NRC" means the U.S. Nuclear Regulatory Commission and its staff.

"Non-Standard Plant" means the portions of the Facility that are not part of the Standard Plant.

"Nuclear Fuel" means fabricated nuclear fuel and services meeting the principal design requirements referenced in the DCD.

"Nuclear Incident" means any occurrence that causes bodily injury, sickness, disease or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source material, special nuclear material, or by-product material which is used in connection with the operation of the Facility. "Source material", "special nuclear material", and "by-product material", as applicable to this Agreement shall have those meanings assigned by the AEA.

"NuStart" means NuStart Energy Development, LLC.

"OCIP" has the meaning set forth in Section 16.2(a).

"Operating Procedures" means the procedures, written or electronic, required to operate the AP1000 Nuclear Power Plant under normal, abnormal, emergency, shutdown, or startup conditions.

"Operational Cycle" means, as to the first such cycle, the time period from the first fueling of a Unit until the Unit has achieved the conditions required to be met for performance of the Net Unit Electrical Output Guarantee after the first Nuclear Fuel reload, and for subsequent cycles, the time period from the end of an Operational Cycle until the beginning of the next one. For the avoidance of doubt, the foregoing does not mean that the Net Unit Electrical Output Test shall be re-performed at the end of an Operational Cycle.

"Operator" means Operator of a Unit and/or the Facility, it being understood that Contractor shall not be deemed to be the Operator of a Unit and/or the Facility under any circumstances.

"Optional Spare Parts" means those items that may be required to perform major maintenance of the Equipment, such as periodic overhaul, or that could fail based on industry experience and for which replacement parts may require longer lead times to obtain from the original equipment manufacturers.

"OSHA" has the meaning set forth in Section 23.3.

"OSHA Standards" has the meaning set forth in Section 23.3(b).

"Other Customer" has the meaning set forth in Section 6.2.

"Owner" has the meaning set forth in the opening paragraph of this Agreement.

"Owner Letter of Credit" has the meaning set forth in Section 8.6(d).

Confidential Trade Secret Information—Subject to Restricted Procedures

"Owner Permits" means the Government Approvals identified as Owner Permits in <u>Exhibit C</u>.

"Owner's Engineer" means the Person(s) designated by Owner to perform services for Owner in connection with the Facility and solely for Facility Purposes, who is (are) subject to the prior written approval of Contractor (such approval not to be unreasonably withheld, conditioned or delayed) and who has entered into a non-disclosure agreement with Owner relative to Facility Documentation, substantially on the terms of <u>Exhibit O-1</u>.   Notwithstanding the above, no written approval is required from Contractor for Owner to designate an Owner's Engineer in the event of a termination of the Agreement under Section 22.2(a).

"Owner's Project Director" means the Person who Owner designates in writing to act on behalf of Owner under this Agreement.

"P&IDs" means piping and instrumentation diagrams.

"Party" and "Parties" has the meaning set forth in the opening paragraph of this Agreement.

"Payment Plan" has the meaning set forth in Section 8.1(a).

"Performance Bonus" has the meaning set forth in Section 13.3.

"Performance Liquidated Damages" means the liquidated damages paid pursuant to Section 13.2 for failure to meet the Net Unit Electrical Output Guarantee.

"Performance Liquidated Damages Cap" has the meaning set forth in Section 13.2.

"Performance Test" means the tests conducted as provided in Section 11.5.

"Person" means any individual, corporation, company, partnership, joint venture, association, trust, unincorporated organization or Government Authority.

"Personnel" means, with respect to a Person, such Person's employees, officers, directors, agents, personnel, representatives, subcontractors of any tier (including, for Contractor, its Subcontractors), vendors and any other third party independent contractors with whom such Person has contracted.

"Phase I" means the portion of the Work described in Section 3.2(a).

"Phase II" means the portion of the Work described in Section 3.2(b).

"PQAP" has the meaning set forth in Section 5.1(a).

"PQAPIP" has the meaning set forth in Section 5.1(a).

"Preoperational Test Completion" has the meaning set forth in Section 12.2(b).

"Preoperational Test Group" has the meaning set forth in Section 11.3(b).

"Preoperational Tests" means the tests conducted as provided in Section 11.3.

"Price Adjustment Provisions" means the terms set forth in Article 7 and Exhibit J.

"Prime Rate" means, as of a particular date, the prime rate of interest as published on that date in The Wall Street Journal, and generally defined therein as "the base rate on corporate loans posted by at least 75% of the nation's 30 largest banks." If The Wall Street Journal is not published on a date for which the interest rate must be determined, the prime interest rate shall be the prime rate published in The Wall Street Journal on the nearest-preceding date on which The Wall Street Journal was published. If The Wall Street Journal discontinues publishing a prime rate, the prime interest rate shall be the prime rate announced publicly from time to time by Bank of America, N.A. or its successor.

"Pro Rata Profit" means the portion of the Profit that is associated with a specific portion of the Work.

"Profit" means the aggregate of the Profit for each Consortium Member for each element of the Contract Price as determined pursuant to Section H.2.7 of Exhibit H as of the Effective Date.

"Project Execution Plan" means the plan to be developed by Contractor and approved by Owner as provided in Section 3.5(h) setting forth the processes and procedures that shall enable the Work to be managed in an effective and efficient manner and in accordance with the requirements of this Agreement.

"Project Schedule" means the schedule of key dates for completion of the Work as set forth in Exhibit E.

"Proprietary Data" means the terms of this Agreement and any and all information, data, software, matter or thing of a secret, confidential or private nature relating to the business of the disclosing Party or its Affiliates, including matters of a technical nature (such as know-how, processes, data and techniques), matters of a business nature (such as information about costs, profits, markets, sales, customers, suppliers, the Parties' contractual dealings with each other and the projects that are the subject-matter thereof), matters of a proprietary nature (such as information about patents, patent applications, copyrights, trade secrets and trademarks), other information of a similar nature, and any other information which has been derived from the foregoing information by the receiving Party; provided, however, that Proprietary Data shall not include information which: (a) is legally in possession of the receiving Party prior to receipt thereof from the other Party; (b) the receiving Party can show by suitable evidence to have been independently developed by the receiving Party or its employees, consultants, affiliates or agents; (c) enters the public domain through no fault of the receiving Party or others within its control; (d) is disclosed to the receiving Party, without restriction or breach of an obligation of confidentiality to the disclosing Party or (e) is legally required to be disclosed; provided that the receiving Party subject to such a requirement uses its reasonable best efforts to notify the other Party of any request or subpoena for the production of any Proprietary Data and provides such Party with an opportunity to resist such a request or subpoena.

"Qualified Entity" has the meaning set forth in Exhibit M-2.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

"Quality Assurance Program" has the meaning set forth in Section 5.1(a).

"Ready for Performance Test Date" has the meaning set forth in Section 11.5(c).

"Ready for Startup Test Date" has the meaning set forth in Section 11.4(c).

"Recipient" has the meaning set forth in Section 19.2(c)(i).

"Recoverable Costs" has the meaning described in Exhibit K.

"Sales Tax" means any sales, use or similar tax imposed on Contractor, any Subcontractor or Owner with respect to the Work by any Government Authority.

"Santee Cooper" has the meaning set forth in the opening paragraph of this Agreement.

"SCE&G" has the meaning set forth in the opening paragraph of this Agreement.

"Scope of Work" means the scope of work and supply and division of responsibilities between Owner and Contractor set forth in Exhibit A.

"Screening Measures" has the meaning set forth in Section 24.1.

"Services" means all labor, transportation, packaging, storage, designing, drawing, creating, engineering, demolition, Site preparation, manufacturing, construction, commissioning, installation, testing, equipping, verification, training, procurement, Documentation, licenses to intellectual property or otherwise and other work, services and actions (including pursuant to any warranty obligations) to be performed by Contractor hereunder (whether at the Site or otherwise) in connection with, or relating to, the Facility (or any component thereof, including any Equipment).

"Services Warranty" has the meaning set forth in Section 14.2.

"Services Warranty Period" has the meaning set forth in Section 14.2.

"SGA" means Westinghouse's sales, general and administrative costs developed as provided in Section H.2.5 of Exhibit H.

"Shaw" means The Shaw Group, Inc.

"Site" means the premises (or portion thereof) owned or leased by Owner on which the Facility shall be located, and including any construction laydown areas, as more specifically described in Exhibit R.

"Software" has the meaning set forth in Exhibit M.

"Specifications" means the design specifications and drawings, and changes thereto, prepared by Contractor or its Subcontractors for the design, engineering and construction of the Facility.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

"SSDs" has the meaning set forth in Section 19.3(b)(viii).

"Standard Equipment Warranty Period" has the meaning set forth in Section 14.1(a)(ii).

"Standard Plant" means the plant design features and buildings or structures in the scope of the AP1000 Nuclear Power Plant certification as shown in the DCD Site Plan, Figure 1.2-2.

"Startup Test Completion" has the meaning set forth in Section 12.3(b).

"Startup Test Group" has the meaning set forth in Section 11.4(b).

"Startup Tests" means the tests conducted as provided in Section 11.4.

"Stone & Webster" has the meaning set forth in the opening paragraph of this Agreement.

"Stone & Webster Bond" has the meaning set forth in Section 8.6(b).

"Subcontract" means any contract, purchase order or other writing between Contractor and any Subcontractor under which the Subcontractor performs or provides any portion of the Work.

"Subcontractor" means (a) any Person other than Contractor performing or providing any portion of the Work, whether hired directly by Contractor or by a Person hired by Contractor and including every tier of subcontractors, sub-subcontractors and so forth, and (b) any Person providing or supplying all or a portion of the equipment or materials and supplies required by any Person performing or providing any portion of the Work to perform or provide the Work, whether or not incorporated into the Facility, including, any materialman, vendor or supplier, whether hired directly by Contractor or by a Person hired by Contractor and including every tier of subcontractors, sub-subcontractors and so forth.

"Substantial Completion" means that a Unit shall have achieved all the conditions set forth in Section 12.4.

"Substantial Completion Date" means the date on which Substantial Completion has occurred.

"Target Price" means the portion of the Contract Price identified as Target Price as set forth in Exhibit H, and as such amount is adjusted pursuant to the terms hereof.

"Target Price Basis" means that Contractor shall be compensated for the charges for Personnel, Services and Equipment, materials and other expenses pursuant to Section H.2.2. of Exhibit H.

"Target Price Work" means Work performed on a Target Price Basis.

"Taxes" means all present and future license, documentation, recording and registration fees, all taxes (including income, gross receipts, unincorporated business income, payroll, sales, use, personal property (tangible and intangible), real estate, excise and stamp taxes), levies, imports, duties, assessments, fees (customs or otherwise), charges and withholdings of any nature whatsoever, and all penalties, fines, additions to tax, and interest imposed by any Government Authority.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

"Technical Support" includes providing qualified manpower and furnishing of technical guidance, advice and counsel with respect to Owner or its Personnel at the Site, and includes recommending a course of action with respect to Owner's operation of a Unit or the Facility based upon current design, engineering, construction and testing practices, but does not include or require any supervision, regulation, control, arbitration or measurement of Owner's Personnel.

"Termination Costs" means with respect to a termination under Section 22.3, 22.4, or 22.5, the aggregate of the following costs: (a) for Westinghouse, (i) the Recoverable Costs, not yet paid, that were incurred by Westinghouse prior to the date of notice of termination and (ii) the Recoverable Costs incurred by Westinghouse to bring the Work to an orderly conclusion, including the costs to demobilize and cancel Equipment or material orders placed, and including but not limited to cancellation charges paid by Westinghouse to third parties plus (iii) SGA and Pro Rata Profit on the amounts in (i) and (ii), and (b) for Stone & Webster, (i) any amounts, not yet paid, that are due for Work performed by Stone & Webster prior to the date of notice of termination and (ii) charges on a Time and Materials Basis incurred by Stone & Webster to bring the Work to an orderly conclusion, including the costs to demobilize and cancel Equipment or material orders placed, and including but not limited to cancellation charges paid by Stone & Webster to third parties. All such expenses, proceeds and payment shall be substantiated by documentation reasonably satisfactory to Owner and subject to audit as set forth in Article 25.

"Third Party Claim" means any claim, demand or cause of action of every kind and character by any Person other than Owner or Contractor.

"Threshold Amount" means (i) for a monetary Claim, that a Party has in good faith alleged that such Claim involves an amount in controversy of greater than Twenty-Five Million Dollars ($25,000,000) and/or (ii) for a Claim involving an adjustment to the Project Schedule, that a Party has in good faith alleged that such Claim involves an adjustment to the Project Schedule in excess of seventy-five (75) Days. If a Claim alleges both an amount and adjustment to the Project Schedule in controversy, such Claim will fall below the Threshold Amount only if both (i) the amount in controversy is equal to or less than Twenty-Five Million Dollars ($25,000,000) and (ii) the adjustment to the Project Schedule in controversy is equal to or less than seventy-five (75) Days.

"Time and Materials Basis" means that Contractor shall be compensated for the charges for Personnel and Equipment, materials and other expenses pursuant to Section H.2.3 of Exhibit H, using the rates and charges in Exhibit G.

"Time and Materials Charges" means the portion of the Contract Price identified as Time and Materials Charges, as set forth in Exhibit H.

"Time and Materials Work" means Work performed on a Time and Materials Basis.

"Toshiba" means Toshiba Corporation.

"Turnover" has the meaning set forth in Section 12.1(a).

Execution Version                        Confidential Trade Secret Information—Subject to Restricted Procedures

"Uncontrollable Circumstance" means any event or condition beyond the reasonable control of a Party despite its reasonable efforts to prevent, avoid, delay or mitigate such acts, events or occurrences, which prevents, impacts or delays a Party from performing its obligations under this Agreement, including but not limited to the following:

(a)    An act of God, including landslide, lightning, earthquake, fire, explosion, storm, flood, unusual or severe weather conditions, including hurricanes, tornadoes; and any precautionary actions taken in connection therewith;

(b)    Acts of a public enemy, war, blockade, embargo, insurrection, riot or civil disturbance, sabotage or similar occurrence or any exercise of the power of eminent domain, police power, any act of terrorism, epidemic, condemnation or other taking by or on behalf of any public, quasi-public or private entity; any strike or other concerted labor actions; and any precautionary action or evacuation taken in connection with any of the foregoing;

(c)    The suspension, termination, interruption, denial, delay in obtaining or failure of renewal or issuance of any Government Approval relating in any way to the Work or operation of the Facility that is not the result of willful or negligent action by the Party claiming the Uncontrollable Circumstance;

(d)    An order or other action by a Government Authority that is not the result of willful or negligent action by the Party claiming the Uncontrollable Circumstance;

(e)    Labor Shortage; provided; however, the circumstances described in the definition of Labor Shortage shall not be considered a "Labor Shortage" to the extent they are the result of Contractor's failure to take commercially reasonable steps to plan for the needed work force in advance of the project staffing (e.g., prepare estimates of the labor requirements and advertise, recruit and train in accordance with industry practices); or

(f)    Delays due to accidents in shipping or transportation provided that such accidents are not the result of negligence or willful misconduct by the Party claiming Uncontrollable Circumstance.

Westinghouse's obligations under those certain "Preferential Rights Agreements", each of which requires that Westinghouse give preference to the completion date for an AP1000 Nuclear Power Plant facility of another customer upon the occurrence of certain procedures as set forth therein, shall not constitute an Uncontrollable Circumstance.

"Unit" means each AP1000 Nuclear Power Plant to be constructed hereunder at the Site. "First Unit" or "Unit 2" refers to the first such Unit to be constructed and "Second Unit" or "Unit 3" refers to the second such Unit to be constructed.

"Unit Completion Purposes" has the meaning set forth in Exhibit M-2.

"Unit Mechanical Completion" has the meaning set forth in Section 12.2(a).

"Warranties" means the obligations of Contractor under Article 14.

Confidential Trade Secret Information—Subject to Restricted Procedures

"Warranty" refers to either the Equipment Warranty or the Services Warranty, as the case may be.

"Warranty Period" means the Standard Equipment Warranty Period or Extended Equipment Warranty Period, as applicable.

"Westinghouse" has the meaning set forth in the opening paragraph of this Agreement.

"Westinghouse Bond" has the meaning set forth in Section 8.6(c).

"Whistleblower Provisions" has the meaning set forth in Section 24.4.

"Witness Point" means a critical step in a manufacturing or testing process that is subject to witnessing by Owner or its authorized representative in accordance with the procedures set forth in Section 5.6.

"Work" means the supervision, labor, Services, material, equipment, tools, vehicles, transportation, storage, design, engineering, procurement, site preparation, construction, installation, equipping, testing, and other things and actions to be supplied by or through Contractor necessary to furnish and install the Facility at the Site consistent with Contractor's Scope of Work and necessary to bring the Unit(s) to Final Completion subject to and in accordance with the terms of this Agreement.

## ARTICLE 2 – INTERPRETATION

A.      Titles, headings, and subheadings of the various articles and paragraphs of this Agreement are used for convenience only and shall not be deemed to be a part thereof or be taken into consideration in the interpretation or construction of this Agreement.

B.      Words importing the singular only shall also include the plural and *vice versa* where the context requires.  Words in the masculine gender shall be deemed to include the feminine gender and *vice versa*.

C.      Unless the context otherwise requires, any reference to a document shall mean such document as amended, supplemented or otherwise modified and in effect from time to time.

D.      Unless otherwise stated, any reference to a party shall include its successors and permitted assigns, and any reference to a Government Authority shall include any entity succeeding to its functions.

E.      Wherever a provision is made in this Agreement for the giving of notice, consent or approval by any person, such notice, consent or approval shall be in writing, and the word "notify" shall be construed accordingly.

F.      This Agreement and the documentation to be supplied hereunder shall be in the English language.

Execution Version                         Confidential Trade Secret Information—Subject to Restricted Procedures

G.    Unless the context requires otherwise, with regard to general oversight of the Work, review of the drawings and Specifications and other documents, access to the Site and Work and other similar rights of Owner, the term Owner shall mean the Owner's Project Director or his designee.   Unless the context requires otherwise any reference contained herein to this Agreement or any other agreement or any schedule, Exhibit or attachment hereto or thereto shall mean this Agreement or such other agreement or such schedules, Exhibits and attachments, as they may be amended or supplemented, unless otherwise stated.

H.    Words and abbreviations not otherwise defined in this Agreement which have well-known nuclear industry meanings in the United States are used in this Agreement in accordance with those recognized meanings.

I.    Neither Contractor nor Owner shall assert or claim a presumption disfavoring the other by virtue of the fact that this Agreement was drafted primarily by legal counsel for the other, and this Agreement shall be construed as if drafted jointly by Owner and Contractor and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

J.    In the event the due date for any payment falls on a day that is not a Business Day, payment shall be due on the next Business Day.

## ARTICLE 3 – SCOPE OF WORK

3.1    General.    Contractor shall perform the Work identified as Contractor's responsibility in the Scope of Work (Exhibit A).  The Work shall be performed in two phases, as more fully described in Section 3.2.  Owner, as licensee under the COL, shall be ultimately responsible for the execution of all obligations and responsibilities under such COL; provided, however, that the Parties agree and acknowledge that Owner's responsibility under the COL does not relieve Contractor of any its obligations and responsibilities in the performance of Contractor's Work under the Agreement as described more fully herein.

3.2    Phases of the Work.

(a)    Phase I.  Phase I of the Work shall consist of Contractor's engineering support and other services required by Owner to support Owner's licensing efforts for the Facility (including receipt of approvals from the Public Service Commission of the State of South Carolina), continuation of design work (other than design work performed under the NuStart program), project management, engineering and administrative support to procure long lead time Equipment, the procurement of long lead time Equipment, construction mobilization and Site preparation work, all as more specifically described in Exhibit A. Phase I shall commence upon the Effective Date and shall continue until the earlier of issuance of the Full Notice to Proceed or termination of this Agreement in accordance with Article 22; provided, however, that Phase I Site Work must be authorized by Owner pursuant to one or more Limited Notices to Proceed. By mutual agreement of the Parties as set forth in a Change Order issued pursuant to Article 9, additional Site Work identified as part of Phase II in the Scope of Work may be moved to Phase I and authorized by Owner to proceed by means of an additional Limited Notice to Proceed.  In the event that any Phase I Work that was commenced under separate

-17-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

purchase orders between Owner and one or both of the Consortium Members (the "Purchase Orders") remains to be completed as of the Effective Date, then as of June 1, 2008, the Purchase Orders shall be terminated and the remaining work thereunder will be subsumed by this Agreement.

(b)    Phase II.  Phase II of the Work shall consist of the remainder of the Work as described in Exhibit A, to commence upon issuance of a notice (the "Full Notice to Proceed") and to continue until Final Completion unless the Agreement is earlier terminated in accordance with Article 22.  The Parties acknowledge that the Full Notice to Proceed will not be issued unless and until the COL is received.

3.3    Project Schedule.

(a)    A Project Schedule is attached to this Agreement as Exhibit E.  The Project Schedule includes milestones for key activities, such as the placement of orders for long lead-time Equipment. Contractor shall update the Project Schedule quarterly prior to the commencement of on-Site construction work and monthly thereafter to reflect the most current information concerning the scheduled Milestones and provide the updated Project Schedule to Owner for its review and comment.  Contractor shall, to the extent such matters are within its reasonable control, allocate resources and place Equipment orders in such a manner that will enable Contractor to meet the agreed date for Substantial Completion of the Units as shown in the Project Schedule. Except as otherwise permitted hereunder, Contractor shall not take any action to give priority to the requested completion date of another customer for an AP1000 Nuclear Power Plant required under a contract between Contractor and such customer if, by taking such action to give priority to such other customer, Contractor shall not be able to meet the Guaranteed Substantial Completion Date of a Unit. Subject to the preceding sentences, Changes to the Guaranteed Substantial Completion date(s) shall be in accordance with Article 9 of this Agreement.

(b)    If Owner desires to cancel the Second Unit, it shall provide written notice of such intent to Contractor on or before issuance of the Full Notice to Proceed. The Guaranteed Substantial Completion Dates of the First Unit and Second  Unit are April 1, 2016, and January 1, 2019, respectively.  The nuclear island concrete basemat shall be poured prior to December 31, 2013 on both Units. The Guaranteed Substantial Completion Dates are based on a Full Notice to Proceed being received no later than fifty-four (54) months prior to the Guaranteed Substantial Completion Date for the First Unit, at which time first safety-related concrete must be placed. Prior to placing the first safety-related concrete, preparatory work, including the mud mat and rebar placement must be performed. Should the NRC review schedule for the COLA not support this schedule, Contractor shall be entitled to a Change Order pursuant to Article 9. In preparing such Change Order, the Parties will work toward the goal of maintaining the Guaranteed Substantial Completion Dates as stated above.

3.4    Not Used.

Execution Version                              Confidential Trade Secret Information—Subject to Restricted Procedures

    3.5    <u>Contractor Responsibilities</u>.

    (a)    <u>Industry Standards</u>.  Subject to Article 9, Contractor shall perform and complete its obligations under this Agreement in accordance with applicable Laws, this Agreement, Industry Codes and Standards, and Good Industry Practices.  In the event of any conflict between any of the authorities in the foregoing sentence, applicable Laws shall control over the terms of this Agreement, Good Industry Practices and Industry Codes and Standards; the terms of this Agreement shall control over Good Industry Practices and Industry Codes and Standards; and Industry Codes and Standards shall control over Good Industry Practices.

    (b)    <u>Contractor's Key Personnel</u>.  <u>Exhibit B</u> contains a chart of Contractor's intended organization for its performance under this Agreement, including those positions to be designated as "key" management for the performance of the Work. For such key management positions, Contractor shall provide Owner with the resumes of the persons filling such positions for Owner's approval, which shall not be unreasonably withheld.  Once Owner has approved any such person, Contractor shall not remove such person for its key management position described in <u>Exhibit B</u> without Owner's consent, which shall not be unreasonably withheld.  If at any time during the performance of the Work, any of Contractor's personnel becomes, for any reason, unacceptable to Owner, then, upon notice from Owner, Contractor shall replace such unacceptable individual with an individual reasonably acceptable to Owner. Contractor's Project Director shall act as Contractor's liaison with Owner and shall have the authority to administer and manage this Agreement on behalf of Contractor, subject to any limitations on such authority notified by Contractor to Owner in writing.

    (c)    <u>AP1000 Facility Information</u>.  The AP1000 Facility Information shall be controlled and maintained by Contractor for such period of time as is required pursuant to Contractor's Quality Assurance Program or, for information not covered by such Quality Assurance Program in accordance with Contractor's document retention procedures.  The AP1000 Facility Information shall contain Facility deliverable documents and information, either directly or by reference. A means to access and print out documentation and information in the AP1000 Facility Information shall be made available to Owner through an information management system. Documentation required to be provided to Owner as set forth in <u>Exhibit A</u> shall be provided in accordance with the Project Schedule.

    (d)    <u>Control of Work</u>.  Contractor shall be solely responsible for all construction means, methods, techniques, sequences, procedures, safety and quality assurance, and quality control programs in connection with the performance of Contractor's Work. Under the conditions stated in Section 3.1 of this Agreement, Owner, as licensee under the COL, shall be ultimately responsible for the execution of all obligations and responsibilities under such COL. As such and under this Agreement, Owner has delegated to Contractor the overall control and implementation of all aspects of the Work. Accordingly, Contractor will develop a Project Execution Plan as provided in Section 3.5(h) which will identify all necessary interfaces between Contractor and Owner to assure that each Party can adequately fulfill its respective responsibilities under this Agreement and the applicable regulatory requirements.

    (e)    <u>Emergencies</u>.  In the event of any emergency endangering life or property, Contractor shall take all actions as may be reasonable and necessary to prevent, avoid or mitigate

Execution Version                      Confidential Trade Secret Information—Subject to Restricted Procedures

injury, damage or loss and shall promptly report each such emergency, and Contractor's responses thereto, to Owner. In any event, Contractor shall use commercially reasonable efforts to report an emergency to Owner in sufficient time to allow Owner to make any required reports to any Government Authority in accordance with applicable Laws.

      (f)   <u>Office Facilities</u>. During construction, Contractor shall provide Owner with office facilities on the Site as specified in <u>Exhibit A</u>.

      (g)   <u>Periodic Reports and Meetings</u>.

      (i)   <u>Status Report</u>. On a monthly basis, Contractor shall submit to Owner a written status report covering the prior month. The report shall be prepared in a format reasonably acceptable to Owner, and, for Work performed on a Time and Materials Basis or Target Price Basis, shall be based on a time phased budget, at the cost account level, against which program performance can be measured. The report also shall include (w) a description of the progress of the Work, (x) a statement of any significant issues which remain unresolved and Contractor's recommendations for resolving the same, (y) a summary of any significant Facility events which are scheduled or expected to occur during the following interval, and (z) additional information reasonably requested by Owner. The monthly report may be delivered electronically.

      (ii)   <u>Attendance and Participation</u>. From the Effective Date until Final Completion, Contractor shall attend and participate in regular meetings with Owner which shall occur monthly (or upon such other interval as the Parties agree) for the purpose of discussing the status of the Work and anticipating and resolving any problems. Such meetings may be held by conference call or video conference. Contractor shall prepare and promptly deliver to Owner written minutes of each meeting, to which Owner shall respond in writing within a reasonable time if it has any comments.

      (iii)   <u>Schedule Requirements; Updates</u>. Contractor shall prepare and make available to Owner following the Effective Date, at the Site or such other location mutually agreed upon by the Parties, a current Project Schedule depicting critical path activities and illustrating the progress which has been made on the Work against such schedule, including critical path activities interconnected by schedule logistics, for Owner's review and comment. Unless otherwise mutually agreed upon by the Parties, Contractor shall revise and update the Project Schedule quarterly prior to the commencement of on-Site construction work and monthly thereafter and shall provide a copy to Owner, which may be provided electronically; provided, however, that the Guaranteed Substantial Completion Dates for the Units shall not be revised other than pursuant to Article 9. Portions of the schedule may be updated weekly to provide information necessary to support weekly invoices (if applicable). Such partial updates shall not be deemed to imply an update to the entire Project Schedule.

      (h)   Within sixty (60) Days following the Effective Date, Contractor shall provide a Project Execution Plan as described in <u>Exhibit D</u> to Owner for its review and approval.

      (i)   Contractor shall provide Owner with documentation to support Owner's compliance with Federal Energy Regulatory Commission and South Carolina Public Service

-20-

Execution Version                        Confidential Trade Secret Information—Subject to Restricted Procedures

Commission cost reporting requirements. The detailed process to provide this documentation shall be included in the Project Execution Plan, using the guidelines provided in Exhibit H.

      3.6    Owner's Responsibilities.  Owner shall perform the responsibilities set forth in this Article and elsewhere in this Agreement, including Exhibit A, at its own expense and at those times as may be required by this Agreement for the successful completion of the Work in accordance with the Project Schedule.

      (a)    Appointment of Agent.  Santee Cooper has appointed SCE&G as its agent pursuant to the Limited Agency Agreement, which is attached hereto as Exhibit V, for all purposes under this Agreement, with the power and authority to bind Santee Cooper to its obligations herein, subject to the limitations specifically set forth in the Limited Agency Agreement.  Owner shall notify Contractor promptly in writing if there is any change in the limits of SCE&G's authority set forth in the Limited Agency Agreement.  Contractor shall have the right to rely on any representation by SCE&G that it has the authority to act on behalf of Santee Cooper with respect to any and all matters pertaining to this Agreement, except with respect to those matters where Santee Cooper's prior written consent is required under the Limited Agency Agreement.  With respect to those matters set forth in the Limited Agency Agreement, where Santee Cooper's prior written consent is required, SCE&G shall provide Contractor with evidence of Santee Cooper's written consent to any actions taken by SCE&G in connection with such matters.

      (b)    Owner's Representative.  Owner shall appoint Owner's Project Director (and shall have the right to appoint any successor or replacement Project Director) with whom Contractor may consult at all reasonable times, and whose instructions, requests and decisions shall be binding upon Owner as to all matters pertaining to this Agreement.

      (c)    Access.  From and after the time the Project Schedule indicates that Contractor is required to have access to the Site, Owner shall provide Contractor, at no additional cost to Contractor, rights of access to such portions of the Site as Contractor may reasonably require for the construction of the Facility and for Contractor's office, warehouse, shop buildings, welding facilities, Contractor's equipment storage, laydown area, and employee parking. Owner shall cooperate with Contractor so as to minimize disruption by Owner of Contractor's performance of the Work, and Contractor shall cooperate with Owner so as to minimize disruption of operation of the Units and the existing unit at the Site.

      (d)    Site Conditions and Site Parameters. Owner is responsible for all investigations required to determine the suitability of the Site for the Facility. This information has been furnished to Contractor.  Contractor has conducted a reasonable visual inspection of the Site at Owner's expense and has notified Owner that there are no Site conditions that were evident or readily discernible that shall affect the cost or schedule for the construction of the Facility. Any subsurface or other site conditions subsequently discovered at the Site or changes in the Site parameters that do not conform to the information provided by Owner or were not evident or readily discernible upon Contractor's inspection shall entitle Contractor to a Change Order pursuant to Article 9.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

(e)    <u>Utilities, Consumables and Services</u>. Owner shall provide the electrical interconnect for power to be exported from the Facility at the interconnection points identified or to be identified in <u>Exhibit A</u>. The Scope of Work specifies the division of responsibilities between Owner and Contractor for utilities during construction and for the supply of certain consumables and services by Owner during construction and testing of the Facility. All such items to be supplied by Owner shall be supplied at the times required pursuant to the Project Schedule. Owner shall provide all Nuclear Fuel.

(f)    <u>Spare Parts</u>.

(i)    <u>Mandatory Spare Parts</u>. Within eighteen (18) months after finalization of the AP1000 Nuclear Power Plant design as specified in the then current Project Schedule, Contractor shall provide Owner with a list of spare parts for the Facility referred to as "Mandatory Spare Parts." The Parties shall determine a mutually agreeable price for such Mandatory Spare Parts, an estimate for which has been provided in <u>Exhibit H</u>. Mandatory Spare Parts will be provided on a Time and Materials Basis unless otherwise agreed by the Parties. As part of Contractor's Scope of Work, Contractor shall provide such Mandatory Spare Parts to Owner by the completion of the Startup Tests or as otherwise agreed to in the Project Schedule. All of the foregoing spare parts shall be considered to be parts supplied to Owner under this Agreement, and title thereto shall pass to Owner in accordance with Section 21.1. During the Warranty Period, Owner shall use commercially reasonable efforts to maintain an inventory of spare parts equivalent to the Mandatory Spare Parts and shall make such spare parts available to Contractor.

(ii)    <u>Optional Spare Parts</u>. Within eighteen (18) months after finalization of the AP1000 Nuclear Power Plant design as specified in the then current Project Schedule, Contractor shall provide Owner with a list of Optional Spare Parts that are recommended by Contractor and vendors of Equipment comprising the Facility. At least two (2) years prior to the scheduled completion of the Startup Tests or as otherwise agreed to in the Project Schedule, Owner shall identify to Contractor the Optional Spare Parts which Owner wants Contractor to procure. Contractor shall be entitled to a Change Order pursuant to Article 9 to cover the additional costs of such Optional Spare Parts. Owner shall make such procured Optional Spare Parts available to Contractor for use during its performance of the Work (as supplements for the Mandatory Spare Parts procured by Contractor pursuant to Section 3.6(f)(i)).

(iii)    <u>Use and Replacement of Spare Parts</u>. Contractor shall have the right to use spare parts that are in Owner's inventory specifically during the performance of the Work or to remedy a Warranty item; however, prior to Substantial Completion of the Second Unit (or if there is no Second Unit, the First Unit) or in response to the use of a spare during a Warranty repair, Contractor shall repair, replace and/or pay for (as consented to by Owner, such consent not to be unreasonably withheld) the replacement cost for such spare parts used by Contractor, plus expediting fees if expediting is deemed necessary by the Parties. Contractor shall coordinate with Owner concerning the delivery and storage of spare parts.

(g)    <u>Operation and Maintenance Staff</u>. For those activities supported and/or conducted by Owner under Articles 11 "Testing" and 12 "Stages of Completion", Owner shall provide fully trained and qualified operation and maintenance personnel for testing and operation

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

and maintenance of a Unit or the Facility consistent with Contractor's requirements as determined during Phase I and as set forth upon such determination in Exhibit A. If as a result of circumstances encountered during testing, Contractor determines that additional operation and maintenance personnel are needed (and provided that such determination has been made in accordance with Good Industry Practices), Contractor shall have the right to require that additional operation and maintenance personnel be provided by Owner upon reasonable advance notice to, and following discussions with, Owner.

(h)    Job Site Rules.  From the Effective Date until Final Completion of the Second Unit (or if there is no Second Unit, the First Unit), each Party, its representatives and agents shall abide by the Site safety rules promulgated by the other Party.

3.7    Subcontractors.

(a)    Selection of Subcontractors.  Contractor shall have the right to have portions of the Work performed by Subcontractors. Subcontractors designated as Major Subcontractors are identified in Exhibit P-1.  After the Effective Date, Contractor shall provide periodic updates to the Exhibit P-1 list and shall submit the updated list to Owner for review. Owner shall identify to Contractor any added Major Subcontractors that are unacceptable to Owner and provide to Contractor a reasonable basis for Owner's rejection of any such added Major Subcontractors. Exhibit P-2 contains a list of potential Subcontractors that may be used for Site construction and related field services.  Contractor shall work proactively with Owner to choose acceptable Subcontractors for performance of the Work that is not part of the Standard Plant.  In the event Contractor desires to use any Subcontractors that are not listed in Exhibit P-2 to conduct its Scope of Work on Owner's property with respect to both the Standard Plant and on work that is not part of the Standard Plant, Contractor shall notify Owner and, within five (5) Business Days of such notice, Owner shall notify Contractor if such proposed Subcontractor is not acceptable to Owner (such acceptance not to be unreasonably withheld). If Owner rejects any such selected Subcontractor and the use of a different Subcontractor would affect Contractor's costs for performance of the Work or the Project Schedule, Contractor shall be entitled to a Change Order pursuant to Article 9. If, however, Owner fails to provide such notice to Contractor within the five (5) Business Day period, then Owner shall be deemed to have approved such proposed Subcontractor. Subject to the prior provisions of this Section 3.7(a) with respect to Major Subcontractors, Contractor is not obligated to consult with Owner on its selection of Subcontractors not working on Owner's property.  Owner shall have the right to recommend additions to Exhibit P-1 and P-2 from time to time, subject to Contractor's approval. Contractor shall be responsible for the actions and omissions of all Subcontractors.

(b)    Affiliated Subcontractors. If Contractor enters into a Subcontract with an Affiliate of either Consortium Member, Contractor agrees that such Subcontract shall reflect terms no less favorable than would be available from a Person who is not an Affiliate.  In the event that after the Effective Date, Contractor selects any Affiliate of either Consortium Member as a Subcontractor for Target Price Work or Time and Materials Work, Contractor shall notify Owner and Owner shall have the right to review such information as is reasonably necessary to assure Owner that the Subcontract reflect terms no less favorable than would be available from a

Confidential Trade Secret Information—Subject to Restricted Procedures

Person who is not an Affiliate. If any such Affiliate has been selected on a sole source basis, Contractor shall provide a justification for such selection.

(c)    Performance by Contractor and Major Equipment Vendors; Owner's Cure Rights.

(i)    Contractor warrants and represents that it shall in good faith fully and promptly perform and observe all of the agreements, terms, covenants and conditions required to be performed and observed by the Contractor under any material provision of a Subcontract for Major Equipment (a "Major Equipment Purchase Order").  Upon demand, Contractor shall furnish to Owner a certification that Contractor has paid all sums that each Major Equipment Purchase Order requires Contractor to pay, subject to Contractor's dispute rights under any such Major Equipment Purchase Order, and Owner may request verification from Contractor regarding the payment information related to such Major Equipment Purchase Order. Such rights of verification of payment are in addition to Owner's right to request additional documentation under Section 8.4(a) and audit rights under Section 25.4 herein. In the event that Contractor, despite acting in good faith, potentially does not satisfy this section as a result of a legitimate dispute with a Subcontractor of Major Equipment ("Major Equipment Vendor"), Contractor shall (a) notify Owner in writing of the issue and (b) if requested by Owner, tender any disputed amounts to Owner to be held in escrow, pending resolution of the issue.

(ii)    Upon Contractor's receipt of the first payment from Owner for the purpose of procuring an item of Major Equipment, Contractor shall designate the schedule reservation for such item of Major Equipment to Owner and thereafter may not designate such schedule reservation to any third party without Owner's prior written consent.

(iii)    Contractor shall promptly notify Owner in writing of: (a) any default, alleged default, notice claiming default, or event that, with the giving of notice or lapse of time, or both, would constitute a default by Contractor or the Major Equipment Vendor in the performance or observance of any of the material terms, covenants or conditions on the part of Contractor or the Major Equipment Vendor to be performed or observed under the Major Equipment Purchase Order; (b) the receipt by Contractor of any notice from the Major Equipment Vendor of any termination of the Major Equipment Purchase Order pursuant to the terms thereof or otherwise, (c) any action, proceeding, motion or notice commenced or filed in respect of a Major Equipment Purchase Order under the Bankruptcy Code or other insolvency proceeding, and (d) any claim, action or proceeding (including, but not limited to, any request for arbitration or institution of such arbitration) made by any party to a Major Equipment Purchase Order, and the progress thereof and any determination made by the court and/or arbitrators thereunder.  Contractor shall promptly provide Owner with a copy of each such notice. In the event that Contractor fails to pay a Major Equipment Vendor all undisputed sums due and owing within thirty (30) Days after the applicable due date, Owner thereafter shall have the right to participate in any claim, action or proceedings relating to such payment default as an interested party until such time when Contractor has made such payment.

(iv)    If Contractor is in default of a payment obligation pursuant to a Major Equipment Purchase Order, Owner may make the applicable payment due and owing

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

under such Major Equipment Purchase Order in order to cure such payment default; provided, however, that Owner shall not make such payment if, and so long as (a) Contractor shall take all steps necessary to challenge or take any action to cure such payment default; and (b) during such challenge or cure: (i) the interests of Owner may not be materially adversely affected, (ii) no time limits or grace periods under the Major Equipment Purchase Order would expire which would give Major Equipment Vendor any right or option to terminate the Major Equipment Purchase Order, and (iii) no additional right or remedy would become available to the Major Equipment Vendor by reason of the deferral by Owner of any action to effect a cure of the payment default.  All such payments shall be offset and applied to all obligations under this Agreement.

(d)    Owner's Consent for Termination or Modification of Major Equipment Purchase Orders.

(i)    In the event that Contractor fails to pay a Major Equipment Vendor all undisputed sums due and owing within forty-five (45) Days after the applicable due date, without providing advance notice to Owner demonstrating to Owner's satisfaction that any Major Equipment provided under such Major Equipment Purchase Order shall be timely delivered at no additional charge and at terms that are no less favorable to Owner, Contractor shall not (A) terminate, cancel, release or assign such Major Equipment Purchase Order (nor permit any of the foregoing to occur), whether under Section 365 of the Bankruptcy Code (or any successor provision) or under any similar law or right of any nature, or otherwise; nor (B) modify, abridge, change, supplement, alter or amend any material provision of such Major Equipment Purchase Order, either orally or in writing, and no agreement seeking to modify, abridge, change, supplement, alter or amend a material provision of such Major Equipment Purchase Order shall be valid or binding without the prior written consent of Owner; nor (C) waive any of its material rights against the Major Equipment Vendor under such Major Equipment Purchase Order; nor (D) agree to or acquiesce in any rejection or termination of such Major Equipment Purchase Order by such Major Equipment Vendor or such Major Equipment Vendor's trustee in bankruptcy, whether under Section 365 of the Bankruptcy Code (or any successor provision) or under any similar law or provision, and any such abandonment, termination, cancellation, release, modification, change, supplement, alteration, amendment, waiver, agreement or acquiescence that negatively impacts Owner (i.e., increased cost or delayed delivery) shall be ineffective as against Owner.  Such provisions shall apply until such time when Contractor has made the payments described above.

(ii)    To the extent Owner has paid at least one-third of the total price of any Major Equipment Purchase Order, Contractor shall not, without the prior written consent of Owner, which consent shall not be unreasonably withheld: (a) terminate, cancel, release or assign such Major Equipment Purchase Order (nor permit any of the foregoing to occur), whether under Section 365 of the Bankruptcy Code (or any successor provision) or under any similar law or right of any nature, or otherwise; nor (b) modify, abridge, change, supplement, alter or amend any material schedule, performance, or payment requirements under such Major Equipment Purchase Order, either orally or in writing, and no agreement seeking to modify, abridge, change, supplement, alter or amend a material schedule, performance, or payment requirements under such Major Equipment Purchase Order shall be valid or binding without the prior written consent

-25-

Execution Version                            Confidential Trade Secret Information—Subject to Restricted Procedures

of Owner; nor (c) waive any of its material rights against the Major Equipment Vendor under such Major Equipment Purchase Order; nor (d) agree to or acquiesce in any rejection or termination of such Major Equipment Purchase Order by such Major Equipment Vendor or Major Equipment Vendor's trustee in bankruptcy, whether under Section 365 of the Bankruptcy Code (or any successor provision) or under any similar law or provision, and any such abandonment, termination, cancellation, release, modification, change, supplement, alteration, amendment, waiver, agreement or acquiescence without Owner's prior written consent shall be ineffective as against Owner.

(e)    <u>Bankruptcy or Insolvency Proceedings Affecting Major Equipment Purchase Orders</u>.  If there shall be filed by or against Contractor a petition under the Bankruptcy Code, and Contractor shall determine to reject the Major Equipment Purchase Order pursuant to Section 365 of the Bankruptcy Code, Contractor shall give the Owner not less than ten (10) Days' prior written notice of the date on which Contractor shall apply to the bankruptcy court for authority to reject such Major Equipment Purchase Order.  Owner shall have the right, but not the obligation, to serve upon Contractor within such ten (10) Day period a notice stating that (A) Owner demands that Contractor assume and assign such Major Equipment Purchase Order to the Owner pursuant to Section 365 of the Bankruptcy Code and (B) Owner covenants to cure (or provide adequate assurance of prompt cure of) all defaults and provide adequate assurance of future performance under such Major Equipment Purchase Order.  If Owner serves upon Contractor the notice described in the preceding sentence, Contractor shall not seek to reject such Major Equipment Purchase Order and shall comply with the demand provided for in clause (A) of the preceding sentence within thirty (30) Days after the notice shall have been given, subject to the performance by Owner of the covenant provided for in clause (B) of the preceding sentence.

(f)    <u>Subcontract Terms</u>. Contractor shall use commercially reasonable efforts to include in each Major Equipment Purchase Order provisions in substantially the following form for the protection of Owner. If Contractor is unable to obtain such agreement in advance from a Major Equipment Vendor, it shall promptly notify Owner; however, in the event that this Agreement is terminated, Contractor shall work cooperatively with Owner to obtain the agreement of the Major Equipment Vendor to assignment of its Subcontract or the relevant portion thereof at that time. It should be noted that the Subcontracts that Contractor will have with ABB Ltd. and Emerson Process Management for the supply of instrumentation and control related equipment associated with the Work will not be directly assignable to Owner in the event of termination of this Agreement.

(i)    Major Equipment Vendor agrees that upon termination of the Agreement between Contractor and Owner for any reason other than Owner's default or Owner's termination for convenience, Owner, or its nominee, shall have the option to succeed automatically, without the necessity of further action by Contractor, to all rights and obligations of Contractor under this Major Equipment Purchase Order related to Owner scope of supply.

(ii)    Subject to Section 3.7(c)(iv), Owner shall have the right, in its sole discretion, to make any late payment due and owing by Contractor hereunder in order to cure a

-26-

default by Contractor of a payment obligation hereunder, and Major Equipment Vendor shall accept such payment by the Owner with the same force and effect as if made by Contractor.

(iii)    Prior to exercising any right to terminate a Major Equipment Purchase Order for default or breach by Contractor, Major Equipment Vendor shall give Owner at least ten (10) Business Days notice of Major Equipment Vendor's intent to terminate the Major Equipment Purchase Order and shall not terminate the Major Equipment Purchase Order if Owner, or its nominee, shall cure all defaults of Contractor with respect to the Facility which are susceptible of being cured by Owner within such extended cure periods, and if Owner, shall not itself be subject to any bankruptcy or other proceedings which would entitle Major Equipment Vendor to terminate the Major Equipment Purchase Order, then Major Equipment Vendor shall not have the right to terminate the Major Equipment Purchase Order by reason of the existence of default of the Contractor or bankruptcy or other proceedings relating to the Contractor.

(iv)    Notwithstanding any other provision of the Major Equipment Purchase Order to the contrary, if the Major Equipment Purchase Order is terminated by reason of a default of Contractor, or as a result of the rejection or deemed rejection of the Major Equipment Purchase Order in a bankruptcy proceeding of Contractor, and if, within a reasonable period of time after such termination, the Owner by written notice to Major Equipment Vendor, requests Major Equipment Vendor to enter into a new contract directly with the Owner, then Major Subcontractor shall enter into a new contract directly with the Owner (or its nominee) within a reasonable period of time after such notice by the Owner.  Such new contract shall commence as of the date of termination of the Major Subcontract and shall be upon all of the terms, covenants, conditions and agreements which were in force and effect on the date of termination of the Major Subcontract.  Owner, simultaneously with the delivery of the new contract, shall pay to Major Subcontractor all sums then due and owing to Major Subcontractor under the Major Subcontract, plus all costs and expenses incurred by Major Subcontractor in connection with such termination, less the amount of any pending claim by Major Subcontractor under any lien bond, payment bond or third party undertaking or indemnity.

(v)    Title to an item of Major Equipment shall pass to Contractor upon payment in full by Contractor to the Major Equipment Vendor for such item of Major Equipment.

## ARTICLE 4 – FACILITY LICENSES, PERMITS AND APPROVALS

4.1    <u>Owner Permits</u>.  Owner shall be responsible for obtaining, maintaining and paying for Owner Permits (including the COL) and for all communications with any Government Authorities regarding such Government Approvals.  Contractor shall provide support to Owner in connection with such Government Approvals, including making personnel available to testify at formal and informal government proceedings, and providing all documents and information reasonably requested by Owner, including review and comment to sections prepared by others, and any amendments thereto, to address formal NRC licensing questions on a schedule that supports the Project Schedule and licensing support services.  Contractor shall be compensated for such services on a Time and Materials Basis.  Owner shall provide as much advance notice as practical for the testimony of Contractor's Personnel at proceedings before

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

Government Authorities. Contractor provides no assurance or guarantee that the COL or any other Owner Permit required to be obtained by Owner shall be obtained by Owner.

    4.2    <u>Contractor Permits</u>.  Contractor shall be responsible for obtaining, maintaining and paying for the Contractor Permits. Owner shall provide Contractor reasonable cooperation and assistance in obtaining and maintaining Contractor Permits.

    4.3    <u>ITAACs</u>.

    (a)    Contractor shall be responsible for those ITAACs associated with each Unit as are set forth in the Design Control Document. Any new or additional ITAAC, or any changes or modification to the ITAAC contained in the Design Control Document that Owner proposes be added to Contractor's Scope of Work shall be subject to agreement by Contractor and Owner pursuant to Section 9.1(a) and, upon such agreement, shall entitle Contractor to a Change Order pursuant to Article 9.

    (b)    Contractor shall be responsible for conducting, or causing to be conducted the inspections, tests and analyses associated with each Unit's ITAAC within Contractor's Scope of Work. Upon completion of such inspections, tests and analyses, Contractor shall be responsible for preparing and delivering to Owner the Documentation or other deliverables to demonstrate and confirm that the related acceptance criteria associated with such inspections, tests and analyses as applicable to each Unit within Contractor's Scope of Work have been met.

## ARTICLE 5 – QUALITY ASSURANCE

    5.1    <u>Quality Assurance</u>.

    (a)    Contractor has sole responsibility for the quality assurance and quality control of the Work. Contractor has provided to Owner its quality assurance program consisting of each Consortium Member's Quality Assurance Program that has been approved by the NRC ("Quality Assurance Program"). The Quality Assurance Program and any changes thereto shall meet the requirement of 10 C.F.R. Part 50, Appendix B and ASME NQA-1 – 1994 and be accepted by the NRC and accepted by Owner. Contractor's Quality Assurance Program is subject to review and audit by Owner for compliance with 10 C.F.R. Part 50 Appendix B and ASME NQA-1 - 1994. Contractor has prepared AP1000 Project-specific clarifications and modifications with respect to the Quality Assurance Program and has set forth such items in the Project Quality Assurance Program Interface Plan ("PQAPIP"). The PQAPIP will be included in the Project Execution Plan and shall be delivered to Owner for its review and approval. Owner's review and acceptance of the PQAPIP shall not relieve Contractor from its obligations to comply with the requirements of this Agreement and 10 C.F.R. Part 50, Appendix B. The Quality Assurance Program and the PQAPIP will collectively be the "Project Quality Assurance Program" or "PQAP". Contractor shall provide Owner with five (5) copies of the PQAP and Quality Assurance Program or make them available electronically. Contractor shall follow the PQAP throughout its performance of the Work. The PQAP and associated policies and procedures shall address Contractor's Scope of Work, including, without limitation, systems, structures and components in a manner consistent with their classification with respect to their importance to nuclear safety (i.e., safety related, important to safety, non-safety related) or their

-28-

Execution Version                      Confidential Trade Secret Information—Subject to Restricted Procedures

importance to the capacity, operability and reliability of the Facility as classified in the DCD. The PQAP shall support Owner's compliance with 10 C.F.R. Part 50, Appendix B and ASME NQA-1 – 1994 and shall be subject to review and audit by the Owner at the Owner's request. For purposes of the American Society of Mechanical Engineers (ASME) Code, Contractor shall be designated as Owner's agent.

(b)    Subcontractor Quality Assurance.    In accordance with the PQAP, Contractor shall also require Major Subcontractors to establish, implement and maintain appropriate quality assurance programs (which may either be the PQAP or such other quality assurance program capable of being audited to the requirements of the PQAP) for their respective portions of the Work consistent with the nuclear safety quality classification of their portion of the Work. Such programs shall be made available for review by Owner. Major Subcontractor audit reports shall be made available for review by Owner or its authorized representative. At its own cost, Owner or its authorized representative may participate in scheduled audits of Subcontractors performed by Contractor.

5.2    Reporting of Defects, Noncompliance, Failures and Breakdowns of QA Programs. Contractor shall comply with the provisions of 10 C.F.R. Part 21, "Reporting of Defects and Noncompliance," and 10 C.F.R. Part 50.55, "Conditions of construction permits, early site permits, combined license, and manufacturing licenses," in the performance of its obligations under this Agreement. Without limiting the foregoing, Contractor shall act as the "dedicating entity," as defined in 10 C.F.R. § 21.3 and 10 C.F.R. § 50.55(e)(1), and comply with the requirements of 10 C.F.R. § 21.21(c) and 10 C.F.R. § 50.55(e)(4). Contractor shall comply with the posting requirements of 10 C.F.R. § 21.6 and 10 C.F.R. § 50.55 at the Site and shall permit, and cause each Subcontractor to permit, the NRC to inspect records, premises, activities and basic components as necessary to accomplish the purposes of 10 C.F.R. Part 21, including permitting the NRC the opportunity to inspect records pertaining to basic components that relate to the identification and evaluation of deviations, and the reporting of defects and failures to comply, including any advice given to purchasers or licensees on the placement, erection, installation, operation, maintenance, modification, or inspection of a basic component. Contractor shall comply with the provisions of 10 C.F.R. § 50.55(e)(1)(iii)(C) for reporting any significant breakdown in any portion of the Contractor's or Subcontractor's quality assurance program conducted under the requirements of Appendix B to 10 C.F.R. Part 50 which could have produced a defect in a basic component. Contractor shall require in each contract with its first tier Subcontractors to perform any of the Services or to furnish any Equipment, at the Site or elsewhere, and that are subject to the provisions of 10 C.F.R. Part 21 and 10 C.F.R. 50.55, that such Subcontractor shall comply with the provisions of 10 C.F.R. Part 21 and 10 C.F.R. Part 50.55. Additionally, Contractor shall require that each Subcontractor include in each contract with its first tier Subcontractors to perform any of the Services or to furnish any Equipment, at the Site or elsewhere, and that are subject to the provisions of 10 C.F.R. Part 21 and 10 C.F.R. Part 50.55 a provision stating that such Subcontractor shall comply with the provisions of 10 C.F.R. Part 21 and 10 C.F.R. Part 50.55. Contractor shall, and shall require that each of its first tier Subcontractors, provide Owner with copies of all notices and other documentation that Contractor or such Subcontractor, as applicable, may disclose to the NRC pursuant to 10 C.F.R. Part 21 or 10 C.F.R. Part 50.55 concurrently with such disclosure to the NRC (or, if concurrent disclosure is not practical, as soon as reasonably practicable following such disclosure).

-29-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

Additionally, each Subcontractor shall require that each of its first tier Subcontractors provide Owner with copies of all notices and other documentation that such Subcontractor or its Subcontractors, as applicable, may disclose to the NRC pursuant to 10 C.F.R. Part 21 or 10 C.F.R. Part 50.55 concurrently with such disclosure to the NRC (or, if concurrent disclosure is not practical, as soon as reasonably practicable following such disclosure).

      5.3   <u>Quality Control and Inspection Activities</u>.  Contractor shall be responsible to perform the quality control and inspection activities in accordance with the PQAP.  The quality control and inspection activities shall be consistent with the nuclear safety quality classification of the system, structure or component under evaluation.  The Persons performing quality assurance and control functions for Contractor shall have sufficient authority and organizational freedom to identify quality problems; to initiate, recommend, or provide solutions; and to verify implementation of solutions.  Such Persons performing quality assurance and control functions shall report to a management level such that this required authority and organizational freedom, including sufficient independence from cost and schedule when opposed to safety considerations, are provided.

      5.4   <u>Access and Auditing at Contractor Facilities</u>.  Contractor shall provide Owner and its authorized representatives with reasonable access during normal working hours to the Work at Contractor's facilities, and all pertinent documentation relating to the Work, for observation and inspection, including auditing of activities for conformance with the requirements of the PQAP and all requirements of this Agreement.  Inspections and audits of Contractor shall be coordinated with Contractor.

      5.5   <u>Access and Audits at Subcontractors' Facilities</u>.  Contractor shall include in its Subcontracts with Major Subcontractors the right of Owner to have access to such Subcontractors' facilities as follows. During working hours, Owner and its authorized representatives shall have the right of access to Contractor's and Major Subcontractors' premises and working facilities for quality assurance and quality control activities.  Contractor shall provide Owner and its authorized representatives with necessary information and assistance to carry out Owner's quality assurance and quality control activities.  Quality assurance and quality control activities at Major Subcontractors shall be limited to participation in scheduled audits and execution of Witness Points identified as the Witness Points and Hold Points in the manufacturing and fabrication plans for the Equipment, such as in-process testing and final product review for acceptance. Quality assurance and quality control activities at Major Subcontractors include activities necessary to address quality issues which may arise at sub-suppliers. In cases where Contractor incurs additional cost or delay in the Project Schedule from its Major Subcontractors due to Owner's request to perform additional quality assurance and quality control activities beyond these activities, Contractor shall be entitled to a Change pursuant to Article 9.  Contractor shall implement, and require its Major Subcontractors to implement measures necessary to be taken to ensure compliance with this Agreement where such measures are identified as a result of a quality assurance audit or surveillance carried out by Owner's authorized representatives.  The rights of access described above are subject to restrictions which may be identified by a Major Subcontractor related to access to proprietary information, additional costs for access beyond routine audits and Witness Points, reasons of national security or access by foreign nationals.

Execution Version                Confidential Trade Secret Information—Subject to Restricted Procedures

5.6     Witness and Hold Points.

(a)     Following the selection of a specific vendor for Equipment identified in Exhibit Q that is part of the Standard Plant and for which there are contractual Witness Points and Hold Points, Contractor shall identify the associated Witness Points and Hold Points via inclusion of the Witness Points and Hold Points in the manufacturing and fabrication plans for the Equipment.  After review, Owner may identify additional Witness Points and Hold Points and Owner shall notify Contractor of any Owner-designated Witness Points or Hold Points that they shall attend.  In cases where Contractor incurs additional cost or delay in the Project Schedule from its Major Subcontractors due to Owner's request to add additional Witness Points and/or Hold Points beyond those identified by Contractor, Contractor shall be entitled to a Change Order pursuant to Article 9. Contractor shall provide Owner access to or copies of these manufacturing and fabrication schedules for Equipment identified in Exhibit Q and the regular updates to these schedules, such that Owner has advance notice of approaching scheduled Witness Points and Hold Points.  Owner shall be notified in writing by Contractor of Owner-designated Witness Points and Hold Points as soon as practicable but no later than ten (10) Business Days prior to the scheduled activity.  Owner shall acknowledge the notification of Owner-designated Hold Points within five (5) Business Days and indicate whether or not it intends to attend the activity that is the subject of the Hold Point.

(b)     Work may proceed with and beyond Owner-designated Witness Points in the absence of Owner's or its authorized representative's participation without a written waiver. Work may not proceed with or beyond Owner-designated Hold Points without a written waiver from Owner.  If proper notification has been given and Owner has responded that it intends to attend the activity that is the subject of the Owner-designated Hold Point, but Owner or its authorized representative is unavailable at the designated time, or Owner does not respond as to whether or not it intends to attend the activity that is the subject of the Owner-designated Hold Point, the work shall not proceed, Contractor shall be entitled to a Change Order pursuant to Article 9.  Requests by Owner to witness tests or conduct surveillance after the scheduled point in time designated for a Witness Point or Hold Point shall be accommodated by Contractor only if technically feasible, shall entitle Contractor to a Change Order pursuant to Article 9.

(c)     Witnessing of tests or other surveillance by Owner shall be at Owner's expense. If Owner performs the surveillance or elects not to perform a surveillance, such surveillance or waiver shall not relieve Contractor of its obligations under this Agreement.

(d)     Any nonconformance or deviation from design requirements for the Equipment listed in Exhibit Q which results in "repair" or "accept as is" dispositions to design requirements shall be submitted to Owner for its written approval, which shall not be unreasonably withheld. Repaired and reworked items shall be re-inspected to verify conformance to the requirements specified by the disposition. A nonconformance which represents significant conditions adverse to quality submitted for Owner's approval shall include the identification of the cause of the nonconformance and the corrective action to prevent recurrence.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

5.7    Owner's Right to Inspect and Stop Work.

(a)    Owner's Right to Inspect.    Owner shall have the right to have its authorized representatives inspect the Work in order to assure that the Work complies with the requirements of this Agreement, including Contractor's PQAP. Inspection by Owner shall not be deemed to be supervision by Owner of Contractor and shall not relieve Contractor of any responsibility for performing the Work in accordance with this Agreement. Any acceptance or approval by Owner shall not be deemed to constitute final acceptance of same by Owner, but shall be only for the purpose of assuring that the Work complies with this Agreement. Owner may report to Contractor any unsafe or improper conditions or practices observed at the Site for action by Contractor in correction or enforcement.

(b)    Defective Work.    If Owner's inspection reveals any non-compliance or any other defects in any portion of Work, then Contractor shall, promptly upon its receipt of notice from Owner, take such actions as are required with respect to such defective Work in accordance with its Quality Assurance Program.  If Contractor is not taking the actions required with respect to defective Work in accordance with the PQAP, Owner shall have the right to cause Contractor to take corrective action.

(c)    Right to Stop Work for Cause.    If Contractor fails to take corrective action for defective Work as required under Section 5.7(b), then Owner, by written order, may order Contractor to stop performance of the portion of the Work affected thereby, until the cause of such order has been eliminated.  In addition, Owner, by written order, may order Contractor to stop performance if the activities of Contractor at the Site reasonably appear to Owner to cause or threaten to cause danger to life or damage to property. Contractor shall not be entitled to a Change Order for stop Work orders properly issued pursuant to the terms of this Section 5.7(c).

(d)    Uncovering of Work. Prior to the commencement of the Warranty Period, in the event Owner requests that any Work be uncovered to determine whether it is deficient, Contractor shall be entitled to a Change Order pursuant to Article 9 unless the Work is found to be deficient.  If the Work is found to be deficient, Contractor shall repair or replace it or take other appropriate corrective action. During the Warranty Period, the provisions of Article 14 shall apply to any Work that does not conform to the Warranties.

## ARTICLE 6 – CONTRACT PRICE

6.1    Components of the Contract Price.    The Contract Price is divided by Unit and by Consortium Member, as further described in Exhibit H.  In accordance with the procedures set forth in Exhibit H, and by agreement of the Parties, portions of the Target Price may be moved to the Fixed Price or Firm Price during the performance of the Work.

6.2    Most Favored Customer.    In the event that a First Wave Customer other than Owner (such Person, an "Other Customer") enters into a contract with Contractor for the engineering, procurement and construction of an AP1000 Nuclear Power Plant after the Effective Date but prior to December 31, 2008, and such Other Customer's contract (as of the date the price of such contract is finalized in accordance with the terms thereof, but not including subsequent adjustments to such price due to escalation, changes in target prices or change orders)

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

provides for a lower contract price on a $/KWe basis than the Contract Price hereunder as such price is determined as of the Effective Date, and without regard to subsequent adjustments made to the Contract Price pursuant to Exhibit J or as a result of Changes, increases in the Target Price or increases in the Time and Materials Charges as such charges are estimated as of the Effective Date, and after adjustment for differences in scope, Site characteristics, technical requirements, the schedule for completion of the Other Customer's project, and other quantifiable factors that create price differentials between the Facility and the Other Customer's facility, Contractor shall offer to Owner a reduction in the Contract Price to a price equivalent to that provided to the Other Customer, after adjustment, as stated, for differences in scope, Site characteristics, technical requirements, the schedule for completion of the Other Customer's project, and other quantifiable factors that create price differentials between the Facility and the Other Customer's facility.   Within a reasonable period of time following the execution of an engineering, procurement and construction contract with an Other Customer, Contractor shall furnish to Owner a letter stating that Contractor has performed the comparison required to determine if the provisions of this Section 6.2 are applicable and that, as a result thereof, either (i) that no reduction in the Contract Price hereunder is applicable or (ii) offering Owner a reduction in the Contract Price as provided for in this Section 6.2.

6.3    Future Fuel Agreement and Services Agreement.

(a)    Westinghouse and Owner intend to enter into negotiations for establishing a long term services agreement and a fuel fabrication agreement, as provided below:

(i)    The services agreement would be typical of existing alliance agreements that Westinghouse holds with its existing customers and would be tailored to both Parties' specific needs and business objectives.  The contract structure would contain provisions for agreed upon exclusive scopes and preferred vendor scopes, and include provisions for price protections and performance incentives based on Westinghouse and overall Unit performance. The initial agreement would be for future services on Units 1, 2 and 3, starting on a mutually agreeable schedule.

(ii)    The intent of the fuel fabrication agreement would provide Westinghouse the fuel fabrication for a period through year 2033, for Unit 1 fuel reloads beyond the current contract and the fuel fabrication for the first core and future reloads on Units 2 & 3 through 2033.

(iii)    Throughout the development and negotiation of these agreements, each of Owner and Contractor will evaluate its individual business case to determine the prudency of entering into long term agreements.  At any point during this period, either Party may terminate negotiations. In the event that Westinghouse and Owner have not, on or before December 30, 2008, entered into (x) services agreement for long term services, and/or  (y) a fuel fabrication agreement for long term fuel fabrication for Owner's existing nuclear power plant at the V.C. Summer station and the Units, (each such agreement to be on mutually agreed terms and conditions) the Contract Price shall be increased pursuant to a Change Order by the amount of fifty million dollars ($50,000,000) or a lesser amount based on the scope of any negotiated services.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

(b)    Owner shall use best efforts to engage Shaw to perform certain maintenance services for Owner, provided that Shaw and Owner mutually agree to commercially reasonable terms and conditions to govern Shaw's performance of such maintenance services.

## ARTICLE 7 – PRICE ADJUSTMENT PROVISIONS

The amounts payable to Contractor under this Agreement (other than the Fixed Price portion of the Contract Price) shall be subject to the Price Adjustment Provisions described in Exhibit J. The Price Adjustment Provisions apply uniquely and separately for the Firm Price, Target Price and Time and Materials Charges as well as uniquely and separately for the individual Consortium Members. The specific indices will be selected to provide a representative price adjustment for the applicable items addressed in each cost category as set forth in Exhibit J. For the Firm Price, each of the payments is adjusted using the procedure set forth in Exhibit J. For the Target Price, payments are based on the actual charges incurred and the Price Adjustment Provisions are used to adjust the Target Price. For Time and Materials Charges, the rates will be adjusted as set forth in Exhibit J. In the event that any of the indices in Exhibit J are found by either Party to not be appropriately tracking inflation or other changes in costs, the Parties shall negotiate in good faith to determine substitute indices and/or an equitable adjustment to the Contract Price. If the Parties cannot agree on substitute indices and/or such equitable adjustment, either Party may refer the matter to dispute resolution in accordance with the provisions of Article 27.

## ARTICLE 8 – PAYMENTS

8.1    Target Price and Time and Materials Payments.

(a)    Payment for Target Price.  Prior to the commencement of any Target Price Work, Contractor shall provide to Owner a projected payment plan, broken down by calendar quarter, for the remainder of 2008, and monthly thereafter, for the Target Price portion of the Contract Price (the "Payment Plan", to be appended to this Agreement as Exhibit F-2).  By Monday, 5:00 p.m. Eastern time of each week, Contractor shall deliver to Owner an invoice (in electronic form) for the Target Price Work based on costs invoiced to Contractor or incurred by Contractor due to hours worked or otherwise during the prior week.  Payment shall be due in the form of an electronic transfer of funds from Owner to Contractor's account by Thursday, 5:00 p.m. Eastern time of such week.  On at least a monthly basis, the Parties shall review the Payment Plan and the actual documented costs incurred to determine whether changes are required to the Payment Plan to account for any amounts over or under invoiced by Contractor. The Payment Plan shall be revised and resubmitted to Owner by Contractor as a result of such review.  In addition, cost and schedule performance shall be evaluated on a monthly basis, the results of which shall be provided to Owner, and corrective actions shall be developed to remedy deficiencies identified by this review.

(b)    Payment for Time and Materials Charges.  Unless otherwise agreed by the Parties, billings for Time and Materials Work shall be subject to the same procedures and payment processes as set forth in Section 8.1(a). Time and Materials Charges shall be set forth in separate invoices from invoices for the Target Price Work.  In addition, cost and schedule performance shall be evaluated on a monthly basis, the results of which shall be provided to

-34-

Execution Version                           Confidential Trade Secret Information—Subject to Restricted Procedures

Owner, and corrective actions shall be developed to remedy deficiencies identified by this review.

8.2     Milestone Payments.  Contractor shall be paid for the portion of the Contract Price constituting the Firm Price and Fixed Price in accordance with the Milestone Payment Schedule in Exhibit F-1. The applicable portion of the Firm Price and Fixed Price shall be invoiced by Contractor upon the completion (or substantial completion as provided below) of each Milestone. Invoices for Milestone Payments for Major Equipment shall be issued separately from invoices for other Milestone Payments. The Milestone Payment due upon Substantial Completion of a Unit shall be two percent (2%) of the Firm Price and Fixed Price for the Unit. Submittal of each invoice by Contractor for a Milestone Payment shall constitute a representation by Contractor that it has performed and provided the Work required for such payment in accordance with this Agreement or otherwise covered by such invoice. Payment shall be due from Owner within twenty (20) Days for Milestone Payments for Major Equipment and within thirty (30) Days for other Milestone Payments, in each case, following receipt of the invoice. Milestones are not required to be completed in the sequence set forth in Exhibit F-1, nor must invoices for completed Milestones be submitted in the sequence set forth in Exhibit F-1, and Milestones may be performed and invoiced ahead of the time for the performance of such Work under the Project Schedule, provided that Contractor may not submit an invoice for a Milestone performed out of sequence or ahead of time to the extent that the total invoiced for Milestones during any calendar month would exceed the aggregate of the Milestones for such calendar month as set forth in Exhibit F-1 plus (a) twenty-five million dollars ($25,000,000) or less, unless Owner has agreed to such out of sequence or early Milestone Payment, such agreement not to be unreasonably withheld; (b) more than twenty-five million dollars ($25,000,000) but not more than fifty million dollars ($50,000,000), Contractor has notified Owner at least ninety (90) Days in advance of submission of an invoice that would cause such amount to be exceeded, and Owner has agreed to such out of sequence or early Milestone Payment, such agreement not to be unreasonably withheld; and (c) more than fifty million dollars ($50,000,000), Contractor has notified Owner at least one hundred eighty (180) days in advance of submission of an invoice that would cause such amount to be exceeded, and Owner has agreed to such out of sequence or early Milestone Payment. If agreed by Owner, Contractor shall have the option to invoice for substantially completed Milestones on a pro rata basis. The agreement between Owner and Contractor shall be set forth in a Change Order, provided, however, that the provisions pertaining to Change Disputes shall not apply to the request by Contractor to invoice for a Milestone on a pro rata basis or the Change Order resulting therefrom.

8.3     Final Payment.  Upon achievement of Final Completion for each Unit, Contractor shall submit to Owner an invoice for the final Milestone Payment for such Unit and other payments due under this Agreement (the "Final Payment Invoice") which shall set forth the remaining amounts due to Contractor pursuant to this Agreement (minus any amounts that are still being held for Final Completion Punch List items for such Unit that cannot be completed until the next Nuclear Fuel re-load, as provided in Section 12.5).  Payment of the Final Payment Invoice shall be due from Owner within thirty (30) Days of its submission to Owner.  When submitting the Final Payment Invoice for a Unit, Contractor shall: (i) submit a written discharge, in form and substance reasonably satisfactory to both Parties, confirming that the total of the

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

Final Payment Invoice (minus any such Final Completion Punch List items) represents full and final settlement of the monies due to Contractor for the performance of the Work under this Agreement with respect to such Unit, (ii) include a waiver against any mechanic's and materialman's liens; provided that the waiver shall be conditioned on Contractor receiving payment pursuant to the Final Payment Invoice and (iii) with the Final Payment Invoice for the Second Unit, return all Sales Tax exemption certificates issued to Contractor and Subcontractors to Owner or provide a statement that all such certificates have been destroyed or have expired.

      8.4    <u>Supporting Documentation; Payment Disputes</u>.

      (a)    Contractor shall submit invoices in a format agreed to by Owner. Contractor shall make available such documentation and materials as Owner may reasonably require substantiating Contractor's right to payment of any invoice. If any invoice is deficient in any material respect, Contractor may be required by Owner to resubmit that invoice in proper form; provided, however, that Owner shall pay any portion of it that is not deficient or subject to dispute. Owner shall review each invoice and shall make exceptions, if any, by providing Contractor with written notice by the earlier of (i) such date the invoice is paid by Owner or (ii) fifteen (15) Days after Owner receives the invoice along with evidence which reasonably documents the contractual basis of such exceptions. If Owner provides no exceptions within such time, Owner shall pay Contractor within the time specified for payment above.

      (b)    Payment shall not waive Owner's right to dispute an invoice. Any amount of an invoice that Owner disputes shall be resolved in accordance with Article 27.

      (i)    Should such dispute not be settled within thirty (30) Days of the due date, Owner shall pay all disputed amounts including, without limitation, amounts disputed with respect to a Change (except Owner may hold back ten percent (10%) of disputed amounts which exceed one million dollars ($1,000,000)).

      (ii)    Once the dispute is resolved, Owner shall pay any additional amount due or Contractor shall refund any amount by which it was overpaid, as applicable, within thirty (30) Days after the date of the final resolution, together with interest at a rate equal to the Prime Rate plus one percent (1%) per annum, applied from (i) the original due date of the payment for Firm Price or Fixed Price payments and Time and Materials Charges or (ii) the original due date for Target Price payments, until paid (or in the case of any overpayment, from the date paid until refunded by Contractor).

      (c)    If for any reason Owner fails to pay Contractor for all undisputed sums due and owing by the due date or, for disputed amounts, by the date required as set forth in (b)(i) above, Contractor shall notify Owner of the overdue payment, and a late payment charge shall accrue at a rate equal to the Prime Rate plus one percent (1%) per annum. If Owner fails to make payment of any undisputed amount due within seven (7) Days following the due date or fails to make payment of any disputed amount within seven (7) Days following the date set forth in (b)(i) above, Contractor shall provide a second notice to Owner in writing. If Owner fails to make payment of the undisputed amount due within fifteen (15) Days following its receipt of this second notice, Contractor has the right to suspend performance of the Work as if Owner had ordered a suspension in accordance with Section 22.1.

Confidential Trade Secret Information—Subject to Restricted Procedures

(d)    Owner may take advantage of any discount identified in Contractor's invoice for prompt payment.

8.5    <u>No Acceptance by Payment</u>.  Owner's payment of any invoice does not constitute approval or acceptance of any item or cost in that invoice nor shall Owner's payment be construed to relieve Contractor of any of its obligations under this Agreement.

8.6    <u>Security for Payment and Performance</u>.

(a)    Simultaneously with the execution of this Agreement, (i) Westinghouse agrees to supply to Owner a parent company guaranty from Toshiba in the form set forth as <u>Exhibit I-1</u> and (ii) Stone & Webster agrees to supply to Owner a parent company guaranty from Shaw in the form set forth as <u>Exhibit I-2</u>.

(b)    Following the Effective Date, and upon Owner's request, Stone & Webster shall provide a payment and performance bond in the name of Stone & Webster from an issuer having a long-term senior unsecured debt rating of A- or higher by Standard & Poor's or A3 or higher by Moody's, with total assets of at least ten billion dollars ($10,000,000,000) to secure Stone & Webster's obligations hereunder through Substantial Completion (the "Stone & Webster Bond") as soon as reasonably practicable but in no event later than sixty (60) Days after Contractor's receipt of a written notice from Owner requiring Contractor to provide the Stone & Webster Bond. If Stone & Webster procures the Stone & Webster Bond pursuant to this Section, Owner shall be responsible for the cost of the Stone & Webster Bond which shall be a direct pass-through to Owner, without any markups whatsoever, including without limitation overhead or profit.  The value of the Stone & Webster Bond shall be adjusted on an annual basis to be equal to fifteen percent (15%) of the highest, projected three (3) months billing for Stone & Webster's portion of the Work during the applicable year as set forth in <u>Exhibit F-2</u> but, under no circumstances, shall the value of the bond be less than ten million dollars ($10,000,000) or such lower amount as mutually agreed by the Parties, or greater than one hundred million dollars ($100,000,000).  Stone & Webster shall not be required to continue to maintain the Stone & Webster Bond in the event that either of Shaw's Standard & Poor's or Moody's senior unsecured credit rating (or issuer rating in the absence of a senior unsecured debt rating) ("Credit Rating") is equal to BBB (by Standard and Poor's) or Baa2 (by Moody's), or higher.  Conversely, subject to the provisions of this Section, such requirement of Stone & Webster to provide the Stone & Webster Bond shall be renewed if Shaw's Credit Rating subsequently drops below those ratings.

(c)    Following the Effective Date, and upon Owner's request, if the Credit Rating of Toshiba is below both of BBB (by Standard and Poor's) and Baa2 (by Moody's), Westinghouse shall provide a payment and performance bond in the name of Westinghouse from an issuer having a long-term senior unsecured debt rating of A- or higher (by Standard & Poor's) or A3 or higher (by Moody's), with total assets of at least ten billion dollars ($10,000,000,000) to secure Westinghouse's obligations hereunder through Substantial Completion (the "Westinghouse Bond") as soon as reasonably practicable but in no event later than sixty (60) Days after Contractor's receipt of a written notice from Owner requiring Contractor to provide the Westinghouse Bond. If Westinghouse procures the Westinghouse Bond pursuant to this Section, Owner shall be responsible for the cost of the Westinghouse Bond which shall be a direct pass-through to Owner, without any markups whatsoever, including without limitation

Execution Version                   Confidential Trade Secret Information—Subject to Restricted Procedures

overhead or profit.  The value of the Westinghouse Bond shall be adjusted on an annual basis to be equal to fifteen percent (15%) of the highest, projected three (3) months billing for Westinghouse's portion of the Work during the applicable year as set forth in Exhibit F-1 but, under no circumstances, shall the value of the bond be less than ten million dollars ($10,000,000) or such lower amount as mutually agreed by the Parties, or greater than one hundred million dollars ($100,000,000).   In the event that Westinghouse provides the Westinghouse Bond pursuant to this Section, and subsequently Toshiba's Credit Rating is equal to or greater than either of BBB (by Standard and Poor's) or Baa2 (by Moody's), Westinghouse shall not be required to continue to maintain the Westinghouse Bond.  Conversely, subject to the provisions of this Section, such requirement of Westinghouse to provide the Westinghouse Bond shall be renewed if Toshiba's Credit Rating subsequently drops below those ratings.

(d)     Following the Effective Date, if at any time the Credit Rating of SCE&G or Santee Cooper, as applicable, is below both of BBB (by Standard and Poor's) and Baa2 (by Moody's), then SCE&G or Santee Cooper, as applicable, shall be required to provide Contractor with an irrevocable, standby letter of credit in form and substance acceptable to Contractor ("Owner Letter of Credit") from a bank having a long-term senior unsecured debt rating of A- or higher (by Standard & Poor's) or A3 or higher (by Moody's), with total assets of at least ten billion dollars ($10,000,000,000) as soon as reasonably practicable but in no event later than sixty (60) Days after Owner's receipt of a written notice from Contractor. The value of the Owner Letter of Credit shall be adjusted on an annual basis to be equal to fifteen percent (15%) of the highest, projected three (3) months billing for the Work during the applicable year as set forth in Exhibit F-1 and Exhibit F-2 but, under no circumstances, shall the value of the Owner Letter of Credit be less than ten million dollars ($10,000,000), or greater than one hundred million dollars ($100,000,000).  In the event that Owner provides the Owner Letter of Credit pursuant to this Section, and subsequently the Credit Rating of SCE&G and/or Santee Cooper, as applicable, is equal to or greater than either of BBB (by Standard and Poor's) or Baa2 (by Moody's), Owner shall not be required to continue to maintain the Owner Letter of Credit. Conversely, subject to the provisions of this Section, such requirement of Owner to provide the Owner Letter of Credit shall be renewed if SCE&G or Santee Cooper's, as applicable, Credit Rating subsequently drops below those ratings.  If the Parties agree to reduce the value of the Stone & Webster Bond or the Westinghouse Bond pursuant to Section 8.6(b) or (c), then such reduction shall also be applied to the Owner Letter of Credit.

8.7    Separate Payments for Consortium Members.  Each Contractor invoice shall designate the amount of the payment due to each Consortium Member. Owner shall make payment to each Consortium Member as indicated.

## ARTICLE 9 – CHANGES IN THE WORK

9.1    Entitlement to Change Order.  The following, to the extent that they impact the obligations of Contractor under this Agreement (each, a "Change"), shall entitle Contractor to a Change Order in accordance with the provisions of this Article 9:

(a)    any addition to, deletion from, or modification of the Facility or any change in the Work, that is agreed by the Parties or that arises as a result of the issuance of the COL;

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

    (b)    an Uncontrollable Circumstance;

    (c)    a Change in Law;

    (d)    issuance of new ITAAC or revisions to ITAAC in existence as of the Effective Date;

    (e)    Contractor encountering conditions at or affecting the Site not made known to Contractor or are not evident or readily discernible upon Contractor's inspection of the Site as provided in Section 3.6(d) and/or encountering Hazardous Materials for which it is not responsible;

    (f)    the circumstances that entitle Contractor to a Change Order as provided for in Section 5.6;

    (g)    uncovering of the Work (unless the Work is found to be deficient) as provided for in Section 5.7(d);

    (h)    any breach of this Agreement by Owner of its obligations under this Agreement (including, without limitation, the obligations under Section 3.6) or delay or other demonstrable adverse impact on Contractor's or a Subcontractor's activities under this Agreement resulting from delay by Owner in giving any required approvals or in performing any of Owner's responsibilities under Section 3.6 (other than any delay for which Contractor is responsible) or interference by Owner or Owner's Personnel or Invitees (other than Contractor or its Subcontractors or their Personnel or Invitees);

    (i)    suspension of the Work pursuant to Article 22 except to the extent that it arises as a result of Contractor's act, omission or default;

    (j)    failure of Owner to issue the Full Notice to Proceed or Limited Notices to Proceed in time to support Contractor's required activities to maintain the Project Schedule as further described in Section 3.3;

    (k)    an instruction by Owner to Contractor to accelerate the performance of the Work accepted by Contractor; or

    (l)    any other event or circumstance specifically identified in this Agreement as constituting a Change or entitling Contractor to a Change Order.

    9.2    <u>Owner-Directed Changes</u>.  It is the intent of the Parties to preserve the design of the Standard Plant, including the approach to the supply chain, construction, licensing, operation and maintenance. However, Owner may request any Change, provided it is technically feasible, with the understanding that such Change may cause the Facility to no longer qualify as a Standard Plant, subject again to Sections 9.3 through 9.5.

    9.3    <u>Effect of Changes</u>.  To the extent that a Change adversely affects Contractor's or its Subcontractors' ability to perform the Work, increases the costs for the Work, affects

Execution Version    Confidential Trade Secret Information—Subject to Restricted Procedures

Contractor's ability to achieve the Net Unit Electrical Output Guarantee or Warranties or its other obligations under this Agreement, or causes a delay in the Project Schedule, Contractor shall be entitled to an equitable adjustment as appropriate to the Contract Price, the Project Schedule, the Milestone Payment Schedule, the Guaranteed Substantial Completion Dates, the Scope of Work and/or such other parts of this Agreement as may be affected by such Change.  Similarly, to the extent that a Change enhances Contractor's or its Subcontractors' ability to perform the Work, reduces the cost of the Work or its other obligations under this Agreement, or shortens the Project Schedule, Owner shall be entitled to an equitable adjustment as appropriate to the Contract Price, the Project Schedule, the Milestone Payment Schedule, the Guaranteed Substantial Completion Dates, the Scope of Work and/or such other parts of this Agreement as may be affected by such Change. Any increase or decrease in the Contract Price resulting from a Change shall be determined and shall be payable as follows:

        (i)     by fixed or firm price in an amount proposed by Contractor and accepted by Owner (to be payable as the Parties may agree); or

        (ii)    if Owner does not accept the fixed or firm price amount proposed by Contractor, on a Time and Materials Basis, using the rates in Exhibit G, provided that for any such Change, Contractor shall have the right to make a Claim for the costs of Work affected by the Change that are not covered in the Time and Materials Charges for the Change. Such additional costs shall be subject to audit in accordance with the terms of Section 25.4.

    9.4    Change Orders.  Contractor shall submit written notice of a Change to Owner as soon as reasonably practicable under the circumstances after becoming aware of the Change. Such notice shall include (or where not possible, be followed by) notice of the following as such information becomes available:

        (a)    details of the effect of the Change on the provisions of the Agreement;

        (b)    options to mitigate the costs or delays or enhance the savings associated with the Change;

        (c)    an evaluation of the impact on the Licensing Basis as of the date of the Change;

        (d)    a written proposal for executing the Work insofar as it has changed; and

        (e)    changes that are needed to the Milestone Payment Schedule so that it reflects the changes to the Project Schedule.

Change Orders shall be agreed to in writing by the Parties.  Each Change Order shall show the adjustments agreed to by the Parties.  If Owner requests a proposal for a Change in the Work from Contractor or should Contractor submit a notice for a Change under Section 9.1, a Change Order shall be issued to reimburse Contractor for any charges incurred, or to compensate Owner for any resulting savings, including but not limited to charges for or savings in estimating services, design services or preparation of proposed revisions to the Agreement. Any changed

Execution Version    Confidential Trade Secret Information—Subject to Restricted Procedures

Work performed by Contractor prior to the execution of a Change Order shall be at Contractor's risk.

9.5    <u>Disputes over Changes</u>.  In the event the Parties are unable to agree on any aspect of a Change Order, the dispute shall be resolved in accordance with the provisions of Article 27.

9.6    <u>Changes for Contractor's Convenience</u>.

(a)    Contractor shall have the right to take any action at its own expense that is generally consistent with this Agreement and that is reasonably necessary to meet the requirements of this Agreement, including performing its obligations in accordance with Good Industry Practices.  With respect to Equipment or materials or aspects of the Work that are part of the Standard Plant, Contractor shall have the right to make substitutions of Equipment or materials set out in the Specifications, or deletions from or modifications to the Facility or the Work as described in the Scope of Work or the Licensing Basis, so long as such substitutions, deletions or modifications are equivalent or better as to function and reliability on a life cycle basis and do not cause the Equipment or materials or aspects of the Work to no longer conform to the Standard Plant. Contractor shall provide notice of and the rationale for any such Change to Owner.

(b)    In the event that Contractor desires to make substitutions of Equipment or materials set out in the Specifications, or deletions from or modifications to the Facility or the Work as described in the Scope of Work or the Licensing Basis and such action (i) would cause the Equipment or materials or such aspect of the Work (following the finalization of the design of the applicable system, component or structure) to no longer conform to the Standard Plant, or (ii) would be contrary to the COL or the DCD, Contractor shall obtain Owner's written approval prior to undertaking such Change.

(c)    In the event that Contractor desires to make material modifications to the Non-Standard Plant that are contrary to the COL or Contractor's issued station P&IDs, one-line electrical diagrams or the equipment arrangement drawings, Contractor shall obtain Owner's written approval thereof.  Changes to Facility drawings and other documentation shall be documented and documents controlled in accordance with Contractor's PQAP and shall be submitted or made available to Owner for its review, but such Changes shall not be subject to Owner's approval.

(d)    Owner's prior written approval shall not be required for a Field Change that is made in accordance with Contractor's PQAP.

(e)    Contractor shall provide its design change and configuration control procedure(s) to Owner for its review and comment.

(f)    Contractor shall not be entitled to any adjustment to the Contract Price, Guaranteed Substantial Completion Date, Net Unit Electrical Output Guarantee, Warranties or any other term or condition of this Agreement in respect of any Change permitted pursuant to this Section 9.6. The provisions of this section 9.6(f) do not limit any of Contractor's rights to such adjustments for Changes that are made pursuant to Sections 9.1 or 9.2.

Execution Version                        Confidential Trade Secret Information—Subject to Restricted Procedures

    9.7    Optional Services and Equipment.   The Parties acknowledge and agree that Exhibit A sets forth certain additional Services and Equipment, one or more of which, at the option of Owner, shall be included in the Work. If Owner desires to exercise such option, it shall provide Contractor written notice thereof, in which case such item shall be included in the Work and the Firm Price and/or Fixed Price and such other provisions shall be modified as set forth in Exhibit A.

    9.8    Changes in Import Fees and Duties. In the event that there is a Change in Law after the Effective Date that results in a reduction of the import fees or duties on the Equipment to be paid by Contractor, Owner shall be entitled to a Change Order for a reduction in the Contract Price to reflect such reduction in import fees or duties in accordance with the provisions of this Article 9.

## ARTICLE 10 – UNCONTROLLABLE CIRCUMSTANCES

    10.1    Performance Excused. No Party shall be considered to be in default or in breach of its obligations under this Agreement to the extent that performance of such obligations is prevented, impacted or delayed by any Uncontrollable Circumstance which arises. Amounts due and payable for Work performed shall not be excused due to an Uncontrollable Circumstance. Without limiting Contractor's right to seek a Change Order, to the extent the Work is affected by an Uncontrollable Circumstance, Contractor shall work diligently to cure, remove, otherwise correct, minimize and contain costs and expenses attendant on or arising from each Uncontrollable Circumstance. In the event that an Uncontrollable Circumstance affects the Work and such Uncontrollable Circumstance has affected work for other AP1000 Nuclear Power Plant customers in the same manner and to the same extent as the Work hereunder, and the actions to be taken by Contractor to mitigate the effects of such Uncontrollable Circumstance and to resume full performance of Work using commercially reasonable efforts are the same for Owner and such other customers, Contractor shall not alter the priority between the Guaranteed Substantial Completion Dates set forth in the Project Schedule and the guaranteed substantial completion dates of such other customers as a result of such Uncontrollable Circumstance. Contractor shall provide information to Owner to explain its determination of the manner in which the Uncontrollable Circumstance has affected Owner and such other customers.

    10.2    Notice. If a Party's performance of its obligations under this Agreement is prevented, impacted or delayed by an Uncontrollable Circumstance, then it shall notify the other Party of the obligations, the performance of which is prevented, impacted or delayed, and the nature and cause of the event in writing within thirty (30) Days after the notifying Party or its Project Director becomes aware of the Uncontrollable Circumstance. The Party affected by an Uncontrollable Circumstance shall provide the other Party with weekly updates (i) estimating its expected duration, the cost of any remedial action, and the probable impact on the performance of its obligations hereunder, (ii) of the actions taken to remove or overcome the Uncontrollable Circumstance and (iii) of the efforts taken to mitigate or limit damages to the other Party. The Party affected by an Uncontrollable Circumstance shall also provide written notice to the other Party when it ceases to be so affected.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

# ARTICLE 11 – TESTING

11.1    <u>Scope and Objective of Testing</u>.

(a)    The scope of testing associated with this Article covers that testing which takes place for each Unit at the Site.  The testing that shall be performed on-Site consists of Construction and Installation Tests, Preoperational Tests, Startup Tests and the Performance Test, each as described in this Article 11.  Contractor shall provide on a Time and Materials Basis the assistance to Owner during the Preoperational Tests, the Startup Tests and the Performance Test (including without limitation Technical Support) required hereunder.

(b)    The "Joint Test Working Group" consists of an organizational group of representative personnel from each Party performing testing services, technical supervision and/or field support working with Owner's operating organization.  The Joint Test Working Group shall oversee the implementation of the Preoperational Tests program and the Startup Tests program, including planning, scheduling and performance of all Preoperational Tests and Startup Tests.  Owner shall delegate to Contractor the implementation and direction of the Joint Test Working Group. Contractor shall have overall responsibility and authority for technical direction of the initial test program, consisting of the Construction and Installation Tests, and Preoperational Tests for conducting those tests in accordance with the Project Schedule, and will act as the chairman of the Joint Test Working Group.  Upon Unit Mechanical Completion, the Joint Test Working Group chairman will continue to have overall responsibility and authority for the technical direction of the Start-up Test program, but operation and control of the Unit shall reside entirely with Owner.  Owner shall be responsible for conducting the Startup Tests and the Performance Tests in accordance with the Project Schedule and any delay in performance of the tests not due to the fault of Contractor or its Personnel shall entitle Contractor to a Change Order pursuant to Article 9.  The Joint Test Working Group shall review and evaluate Construction and Installation Tests, Preoperational Tests and Startup Tests results and test turnover packages and recommend acceptance of the Turnover to Owner.   Owner is responsible for a startup administrative manual and administrative procedures that provide detailed requirements and govern the execution of activities associated with the conduct of the test program, including the organization, structure and functional relationships of the Joint Test Working Group and the startup organization.   The startup administrative manual shall provide direction for interface control of the internal and external transfer of information, design data, test results and other documents from one organization to another and the Turnover of systems and Equipment from Contractor to Owner.  The startup administrative manual shall be prepared by Contractor for Owner on a Time and Materials Basis.

11.2    <u>Construction and Installation Tests</u>.

(a)    The adequacy of construction and installation of components and systems shall be verified by construction inspection and installation tests.  During the construction period, Contractor erects the structure, installs plant equipment and performs construction verification and inspection tests.   All of these activities are executed, controlled, and documented in accordance with Contractor's approved procedures.

Execution Version                        Confidential Trade Secret Information—Subject to Restricted Procedures

During construction, Contractor completes the Construction and Installation Test program in which various electrical and mechanical tests are performed including but not limited to the following:

- Cleaning and flushing

- Hydrostatic testing

- Checks of electrical wiring

- Valve testing

- Energization and operation of equipment

- Calibration of instrumentation

(b)    During construction, Contractor completes the building of components associated with the various systems. The associated piping, wiring, equipment, and controls are verified to be installed in accordance with approved final design drawings. Construction and Installation Tests are performed and all appropriate documentation and exceptions to construction verification or tests, or incomplete tests shall be recorded as Turnover exceptions. On a system basis, completion of this program demonstrates that the system is ready for preoperational testing. The system shall be turned over to the Joint Test Working Group.

11.3    Preoperational System Tests. Following the Construction and Installation Tests of the particular components and systems, the preoperational system tests are conducted. Activities during the Preoperational Tests are conducted in accordance with a Startup Administrative Manual as provided in the Project Execution Plan. Initially, the Joint Test Working Group prepares the system/components for dynamic testing. Systems are flushed, tuned, and prepared for preoperational and acceptance testing. The Joint Test Working Group, while coordinating any remaining functional testing, shall typically direct Owner's operations personnel in the initial starting and operation of the various systems.

(a)    Preoperational Tests shall be performed to demonstrate that the components and systems perform in accordance with selected design requirements so that initial Nuclear Fuel loading, initial criticality, and subsequent power operation can be safely undertaken in accordance with Law and applicable Government Approvals. Preoperational Tests at elevated pressure and temperature are referred to as hot functional tests. Contractor shall provide ten (10) Days advance notice to Owner of the scheduled testing dates via updates to the Project Schedule.

The general objectives of the Preoperational Test program are the following:

- Demonstrate that essential plant components and systems, including alarms and indications, meet appropriate requirements based on the design.

-44-

Execution Version                              Confidential Trade Secret Information—Subject to Restricted Procedures

- Provide documentation of the performance and condition of the components and systems.

- Provide baseline test and operating data on equipment and systems for future use and reference.

- Operate Equipment for a sufficient period to demonstrate performance in accordance with the Preoperational Test procedures.

- Demonstrate that the systems operate on an integrated basis.

Abstracts for the Preoperational Tests for portions of systems/components that perform safety-related functions; perform defense-in-depth functions; contain, transport, or isolate radioactive material; and for other applicable systems are specified in Chapter 14 of the Design Control Document.

(b)     Contractor shall develop the Preoperational Test procedures consistent with its procedures for the Standard Plant and shall provide the Preoperational Test procedures to Owner in advance of the testing. A team referred to as the "Preoperational Test Group" shall be established by the Joint Test Working Group and be manned by each Party's personnel as mutually agreed by the Parties.  The Preoperational Test Group shall consist of engineering test leads and test personnel.  The Preoperational Test Group is responsible for conducting the Preoperational Tests in accordance with the Project Schedule.

(c)     Facility equipment used in the performance of Preoperational Tests shall be operated by Owner in accordance with appropriate operating procedures, thereby giving Owner's operating staff an opportunity to gain experience in using these procedures and demonstrating their adequacy prior to plant initial criticality.

(d)     Contractor shall review the results of the Preoperational Tests with the Preoperational Test Group and notify Owner when it may proceed with the Startup Test program.

11.4    <u>Startup Tests Objectives and Protocol</u>.

(a)     The Startup Test program begins with initial Nuclear Fuel loading after the Preoperational Tests necessary for Nuclear Fuel loading have been successfully completed. Startup Tests can be grouped into four broad categories:

- Tests related to initial Nuclear Fuel loading.

- Tests performed after initial Nuclear Fuel loading but prior to initial criticality.

- Tests related to initial criticality and those performed at low power (less than five percent (5%)).

- Tests performed at power levels greater than five percent (5%)

Confidential Trade Secret Information—Subject to Restricted Procedures

During performance of the Startup Test program, Owner's operating staff shall have the opportunity to obtain practical experience in the use of appropriate operating procedures while a Unit progresses through heatup, criticality, and power operations.

        (b)     The general objectives of the Startup Test program are to:

- Install the Nuclear Fuel in the Unit reactor vessel in a controlled and safe manner.

- Verify that the Unit reactor core and components, equipment, and systems required for control and shutdown have been assembled according to design and meet specified performance requirements.

- Achieve initial criticality and operation at power in a controlled and safe manner.

- Verify that the operating characteristics of the Unit reactor core and associated control and protection equipment are consistent with design requirements and accident analysis assumptions.

- Obtain the required data and calibrate equipment used to control and protect the Facility.

- Verify that the Unit responds to the transient tests as described in the Design Control Document.

- Verify the operating characteristics of the Unit secondary plant equipment (turbine, generator, isophase bus duct and main power transformer, heater balance, main steam, extraction steam, steam dump, condenser, condensate, feedwater, make-up water, cooling tower, main feedwater pumps, etc.) and associated control equipment.

Abstracts of the Startup Tests are provided in Chapter 14 of the Design Control Document. Contractor shall develop the Startup Test procedures per the guidelines documented in Chapter 14 of the Design Control Document, in accordance with its procedures for the Standard Plant and shall provide the Startup Test procedures to Owner in advance of the testing. A team referred to as the "Startup Test Group" shall be established by the Joint Test Working Group and be manned by each Party's personnel as mutually agreed by the Parties. The Startup Test Group shall consist of engineering test leads and test personnel. The Startup Test Group is responsible for conducting the Startup Tests in accordance with the agreed upon Project Schedule. Contractor shall provide Technical Support to Owner during these tests.

        (c)     Contractor shall give notice to Owner of the date (the "Ready for Startup Test Date") when the Unit is ready, or would have been ready within the next ninety (90) Days except for a delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance, for the Startup Tests on such Unit to begin; provided, however, that such notice shall not be given until the Construction and Installation Tests are completed and the

Confidential Trade Secret Information—Subject to Restricted Procedures

Preoperational Tests are underway such that the Unit will be ready for Startup Tests within ninety (90) Days from such notice.

        (i)      In the event of any such delay, the provisions of Article 9 shall apply. If the Work is suspended as a result of the delay, the Parties shall determine as part of the Change Order process such matters as (A) maintenance procedures for the Unit to be followed by Owner until the Startup Test can occur, (B) whether or not Contractor should demobilize its forces for the duration of the suspension, (C) if demobilization is to occur, Contractor Personnel that shall either remain on the Site and/or be permitted to examine the Unit and Owner's maintenance records on a routine basis to determine whether the agreed maintenance procedures are being followed and (D) validation procedures to be undertaken on the Unit to re-determine its readiness for the Startup Test prior to conducting the Startup Test.

        (ii)     To the extent that a delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance delays any Startup Test by more than one hundred eighty (180) Days from the Ready for Startup Test Date, Contractor shall be entitled to the Milestone Payments that would be due upon or prior to Startup Test Completion, minus the direct costs attributable to the Technical Support to have been provided by Contractor for such Startup Test(s).

        (iii)    At such time as Owner is ready for the Startup Test to be conducted, Contractor shall (if applicable) re-mobilize at the Site on a mutually agreed date and shall proceed to provide the Technical Support required for the Startup Test, followed by the Performance Test and the other activities required to achieve Substantial Completion and Final Completion. Prior to initiating the Startup Test, Contractor shall have the right, pursuant to the agreed validation procedures determined as described in clause (i) above, to determine whether any degradation of the Unit has occurred. If degradation of the Unit has occurred, Contractor shall be entitled to a Change Order pursuant to Article 9 for the costs and time required to perform corrections to the Unit to return it to a state ready for the Startup Test.

        (iv)    If the delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance delays any Startup Test by more than one (1) year from the Ready for Startup Test Date, then (x) the Startup Test shall be deemed to have been completed and Substantial Completion shall be deemed to have occurred for purposes of the Warranties, Section 22.2 and any other provisions of the Agreement pertaining to the Guaranteed Substantial Completion Date; (y) Contractor shall be entitled to the remaining Milestone Payments; and (z) Final Completion shall be deemed to have occurred provided that Contractor completes such other Work that can be completed notwithstanding the inability to conduct the Startup Test and Performance Test. At such time, if any, as Owner is ready for the Startup Test to be conducted, Contractor's sole responsibility hereunder with respect to such Startup Test shall be to provide Technical Support for the testing on a Time and Materials Basis.

    11.5    <u>Performance Tests</u>.

        (a)    Contractor shall develop the Performance Test procedures consistent with its procedures for the Standard Plant and shall provide the Performance Test procedures to Owner six (6) months in advance of the testing for review. Performance Test procedures must

Execution Version    Confidential Trade Secret Information—Subject to Restricted Procedures

be approved by Owner, such approval not to be unreasonably withheld. Owner shall provide all consumables, semi-skilled and skilled labor, fully trained and licensed operators and any other material or services required for the tests. Contractor shall maintain a minimal construction staff and labor on Site to support the testing process.

(b)    A test (the "Net Unit Electrical Output Test") shall be run to determine whether the Unit meets the Net Unit Electrical Output Guarantee. The Net Unit Electrical Output Test for the Unit shall be conducted in general compliance with Power Test Code 46 (PTC-46) with the NSSS power no less than 99.5% of rated power measured using the Secondary Calorimetric Methodology and for the periods and duration discussed below. The test shall consist of four test runs at least 2 hours in duration. If upon evaluation of the data more than two of the test runs are found unacceptable for reasons of equipment failure or environmental instability, additional runs will be made. Test run duration may be extended if necessary to reduce the random uncertainty in the test results to less than 0.25%. Data collected within each test run will be averaged and the results corrected to guarantee reference conditions. The final Net Unit Electrical Output shall be the average of the corrected net electrical output for all of the successful test runs.

Corrections shall be applied to the measured net electrical output for NSSS power, electrical power factor at the high side of the main step-up transformer, ambient wet and dry bulb temperature and temperature of the makeup water to the cooling tower.

The Net Unit Electrical Output Test for the Unit shall be determined during a period of continuous operation of one hundred (100) hours. Such Net Unit Electric Output Test shall be satisfactorily completed when the Unit has demonstrated its capability of meeting the Net Unit Electrical Output Guarantee as described above. The measurement frequency shall be in compliance with PTC-46 throughout the test.

(c)    Contractor shall give notice to Owner of the date (the "Ready for Performance Test Date") when the Unit is ready, or would have been ready within the next ninety (90) Days except for a delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance, for the Performance Test on such Unit to begin; provided, however, that such notice shall not be given until the Construction and Installation Tests and the Preoperational Tests are completed and the Startup Tests are underway and would be completed within the next ninety (90) Days unless there has been a delay as described in Section 11.4(c). In the event that there has been a delay in conducting the Startup Test due to a delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance, then the Ready for Performance Test Date shall be one hundred eighty (180) Days after the Ready for Startup Test Date *plus* the number of Days of performance of the Performance Test if performed pursuant to the original schedule for the test *plus* the number of Days of any delay incurred in performance of the Startup Test that results from circumstances other than a delay caused (i) by Owner or its Personnel or (ii) resulting from an Uncontrollable Circumstance.

(i)    In the event of any such delay, the provisions of Article 9 shall apply. If the Work is suspended as a result of the delay, the Parties shall determine as part of the Change Order process such matters as (A) maintenance procedures for the Unit to be followed by Owner until the Performance Test can occur, (B) whether or not Contractor should

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

demobilize its forces for the duration of the suspension, (C) if demobilization is to occur, Contractor Personnel that shall either remain on the Site and/or be permitted to examine the Unit and Owner's maintenance records on a routine basis to determine whether the agreed maintenance procedures are being followed and (D) validation procedures to be undertaken on the Unit to re-determine its readiness for the Performance Test prior to conducting the Performance Test.

(ii)    To the extent that a delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance delays any Performance Test by more than one hundred eighty (180) Days from the Ready for Performance Test Date, Contractor shall be entitled to the Milestone Payment that would be due upon Substantial Completion, minus the direct costs attributable to the Technical Support to have been provided by Contractor for such Performance Test.

(iii)    At such time as Owner is ready for the Performance Test to be conducted, Contractor shall (if applicable) re-mobilize at the Site on a mutually agreed date and shall proceed to conduct the Performance Test, followed by the other activities required to achieve Substantial Completion and Final Completion of the Unit. Prior to initiating the Performance Test, Contractor shall have the right, pursuant to the agreed validation procedures determined as described in clause (i) above, to determine whether any degradation of the Unit has occurred. If degradation of the Unit has occurred, Contractor shall (without duplication of Changes to which Contractor is entitled under Section 11.4(c)(iii)) be entitled to a Change Order pursuant to Article 9 for the costs and time required to perform corrections to the Unit to return it to a state ready for the Performance Test.

(iv)    If the delay caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance delays the Performance Test by more than one (1) year from the Ready for Performance Test Date, then (x) the Performance Test shall be deemed to have been completed and Substantial Completion shall be deemed to have occurred for purposes of the Warranties, Section 22.2 and any other provisions of the Agreement pertaining to the Guaranteed Substantial Completion Date and the Net Unit Electrical Output Guarantee; (y) Contractor shall be entitled to the remaining Milestone Payments; and (z) Final Completion will be deemed to have occurred provided that Contractor completes such other Work that can be completed notwithstanding the inability to conduct the Performance Test. At such time, if any, as Owner is ready for the Performance Test to be conducted, Contractor's sole responsibility hereunder with respect to such Performance Test and the Net Unit Electrical Output Guarantee shall be to provide Technical Support for the testing on a Time and Materials Basis.

(v)    Except as provided in Section 11.5(c)(iv), should a Unit when tested be assessed to have not fully met the Net Unit Electrical Output Guarantee, Contractor shall proceed as provided below in Section 11.6. Contractor shall promptly notify Owner of the Unit's readiness for any required retest, specifying the time and date of such test, such date being not less than seven (7) Days from the date of notification.

11.6    Net Unit Electrical Output Guarantee.  Subject to the limits of liability set forth in Section 13.2, and subject to the provisions of this Agreement and in accordance with the Operating Procedures and Maintenance Procedures and Facility Manuals, Contractor guarantees

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

that the Net Unit Electrical Guarantee for a Unit, when loaded with the Nuclear Fuel, shall be 1101 MWe (the "Net Unit Electrical Output Guarantee") determined using the conditions and calculation as set forth in <u>Exhibit L</u> based on mechanical draft cooling towers and measured at the high side of the main transformer including designated House Loads pursuant to <u>Exhibit L</u>, as evidenced by the Net Unit Electrical Output Test. Meeting the Net Unit Electrical Output Guarantee demonstrates that the Unit shall be capable of producing an average annual Net Unit Electrical Output of 1,117 MWe.

(a)    In the event a Unit does not meet the Net Unit Electrical Output Guarantee as of the Guaranteed Substantial Completion Date, Contractor shall, at its sole option, (i) perform, at its own expense, such repair, replacement or adjustment or modification to enable such Unit to produce the guarantee or (ii) subject to the provisions below in this Section 11.6(a), pay the applicable Performance Liquidated Damages. The decision to repair, replace, adjust or modify shall be made by Contractor, after consultation with Owner. Contractor also shall provide to Owner an analysis of the cause that led to the failure of the Unit to meet the Net Unit Electrical Output Guarantee and an estimate of the efforts that would be needed to effect the repair, replacement, adjustment or modification. Contractor's repair, replacement, adjustment or modifications to a Unit shall not interfere with Owner's commercial operation of such Unit. The time period during which Contractor shall have this right to repair, replace, adjust or modify the Unit to improve performance shall terminate at the end of the first Operational Cycle; provided, however, if the equipment or component required to remedy the problem has long lead requirements that preclude the remedy in this time period, Contractor shall have until the end of the second Operational Cycle to remedy the problem.  If Contractor has not already paid the Performance Liquidated Damages pursuant to the terms hereof and, (subject to the proviso in the preceding sentence) as of the end of the first Operational Cycle, the Net Unit Electrical Output Guarantee has not been met, Contractor shall pay the applicable Performance Liquidated Damages. Contractor also shall have the right to terminate its efforts to improve the performance of the Unit and pay the applicable Performance Liquidated Damages at any time during the first Operational Cycle. If Contractor has previously paid Performance Liquidated Damages and, as a result of Contractor's efforts, as of the end of the first Operational Cycle (or the second Operational Cycle if long lead equipment or components are involved in the remedy) the Unit is able to meet the Net Unit Electrical Output Guarantee or Contractor has been able to increase the Net Unit Electrical Output from the level at which the Performance Liquidated Damages were previously paid, in each case as demonstrated by a Net Unit Electrical Output Test, Contractor shall be entitled to a refund of all or the applicable portion of the Performance Liquidated Damages paid by Contractor, calculated as provided in Section 13.2.  Amounts expended by Contractor in its efforts to meet the Net Unit Electrical Output Guarantee shall not limit or affect Contractor's obligation to pay Performance Liquidated Damages.

(b)    The Net Unit Electrical Output Guarantee is subject to the conditions stated in Section 14.4(c) and to the following:

(i)    Owner has provided access to the electrical grid and sufficient electrical load to perform the test; and

Execution Version                         Confidential Trade Secret Information—Subject to Restricted Procedures

(ii)    The Net Unit Electrical Output Guarantee is based upon the conditions specified in <u>Exhibit L</u>.  If conditions during the test differ from those specified, adjustments shall be made accordingly to the Net Unit Electrical Output using graphs, tables and other data as prepared by Contractor, after consultation with Owner, to establish the Net Unit Electrical Output to compare to the Net Electric Output Guarantee.

(c)    Necessary auxiliary equipment for producing the Net Unit Electrical Output shall include only the Equipment loads provided in <u>Exhibit L</u>.

(d)    The Net Unit Electrical Output Guarantee shall be demonstrated by the Net Unit Electrical Output Test to be conducted at the times and subject to the conditions set forth herein. Satisfactory completion of such test or re-test, or the payment of Performance Liquidated Damages to Owner shall relieve Contractor of any further obligation with respect to the Net Unit Electrical Output Guarantee.

# ARTICLE 12 – STAGES OF COMPLETION

12.1    <u>Turnover</u>.

(a)    Turnover refers to the sequential mechanical completion of each system and structure of a Unit.  "Turnover" of a system or structure shall occur upon the satisfaction of the following conditions:

(i)    Such system, structure or component (A) shall be mechanically and electrically sound; (B) shall have been cleaned out as necessary to perform the Construction and Installation Tests for such system or structure; and (C) the subsystems comprising such system, structure or component shall have been checked for alignment, lubrication, and electrical continuity and hydrostatic and pneumatic pressure integrity; and

(ii)    the Construction and Installation Tests for such system or structure shall have been completed such that Owner can confirm that the criteria for the Construction and Installation Tests have been met; and

(iii)    Structures, systems and components or portions thereof shall be completed, necessary coatings applied, and the area cleaned; and

(iv)    The Preoperational Test has validated compliance with the design specifications to the extent permitted under the Unit's configuration status. (For example, some design requirements cannot be validated until after Nuclear Fuel loading.)

(b)    <u>Notice and Acceptance of Turnover</u>.  When Contractor believes the provisions of Section 12.1(a) have been satisfied with respect to each system or structure, Contractor shall deliver a written notice of such determination through the Joint Test Working Group to Owner with sufficient detail to enable Owner to determine whether Contractor has achieved such requirements. Turnover of such system or structure shall be deemed to have occurred within ten (10) Business Days following delivery of such determination to Owner, unless within such ten (10) Business Days period, Owner has notified Contractor in writing of

why it disagrees that Turnover has occurred, in which case (and without prejudice to Contractor's right to submit a Claim) Contractor shall take such corrective actions as are necessary and resubmit its written notice of determination to Owner in accordance with this Section 12.1(b). Upon Turnover of a system or structure, Contractor shall turn over risk of loss and care, custody, control and operation of such system, structure or component to Owner in accordance with Section 21.2.

12.2    Preoperational Test Completion.

(a)    Unit Mechanical Completion.  "Unit Mechanical Completion" shall be achieved when the conditions as stated in Section 11.4(a) for the commencement of Nuclear Fuel loading the Unit have been achieved.  When submitting its written notice of determination for such Unit Mechanical Completion, Contractor shall include notice that Turnover has occurred.

(b)    "Preoperational Test Completion" for a Unit shall be deemed to have occurred upon satisfactory completion of the Preoperational Tests for the Unit.

(c)    Contractor shall notify Owner when the provisions of Section 12.2(b) have been satisfied. Owner shall accept such Unit as having achieved Preoperational Test Completion, by delivering to Contractor notice of that acceptance within ten (10) Business Days following receipt of Contractor's notice that Preoperational Test Completion has occurred; alternatively, Owner may disagree that Preoperational Test Completion has occurred by notifying Contractor in writing of why it disagrees that Preoperational Test Completion has occurred. If no notice is issued by Owner within the required time period, Owner shall be deemed to have accepted that Preoperational Test Completion has occurred. The date of Preoperational Test Completion shall be the date the Unit has achieved Preoperational Test Completion and not the date of Owner's acceptance.

12.3    Startup Test Completion.

(a)    Prior to commencing the Startup Tests, the Parties shall have jointly determined and agreed upon a punch list of the remaining Work for each Unit.  The items on the punch list that are required to be completed before the commencement of the Startup Tests for reasons of safety or compliance with applicable Laws shall have been completed prior to the commencement of the Startup Tests.

(b)    "Startup Test Completion" for a Unit shall be deemed to have occurred upon satisfactory completion of the Startup Test for the Unit or the deemed completion of a Startup Test pursuant to Section 11.4(c)(iv).

(c)    Contractor shall notify Owner when the provisions of Section 12.3(b) have been satisfied. Owner shall accept such Unit as having achieved Startup Test Completion, by delivering to Contractor notice of that acceptance within forty-five (45) Days following receipt of Contractor's notice that Startup Test Completion has occurred; alternatively, Owner may disagree that Startup Test Completion has occurred by notifying Contractor in writing of why it disagrees that Startup Test Completion has occurred. If no notice is issued by Owner within the required time period, Owner shall be deemed to have accepted that Startup Test Completion has

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

occurred. The date of Startup Test Completion shall be the date the Unit has achieved Startup Test Completion and not the date of Owner's acceptance.

12.4    Substantial Completion.

(a)    "Substantial Completion" for a Unit shall have occurred upon satisfactory completion of a Performance Test, the deemed completion of a Performance Test pursuant to Section 11.5(c)(iv), or the payment of applicable Performance Liquidated Damages by Contractor.

(b)    Contractor shall notify Owner when the provisions of Section 12.4(a) have been satisfied. Owner shall accept such Unit as having achieved Substantial Completion, by delivering to Contractor notice of that acceptance within sixty (60) Business Days following receipt of Contractor's notice that Substantial Completion has occurred; alternatively, Owner may disagree that Substantial Completion has occurred by notifying Contractor in writing of why it disagrees that Substantial Completion has occurred. If no notice is issued by Owner within the required time period, Owner shall be deemed to have accepted that Substantial Completion has occurred. The date of Substantial Completion shall be the date the Unit has achieved Substantial Completion and not the date of Owner's acceptance.

12.5    Punch List.  Prior to Substantial Completion of a Unit, the Parties shall jointly determine and agree upon a comprehensive list of remaining Work, which shall be of a minor nature and not prevent commercial operation of the Unit (the "Final Completion Punch List"). Owner shall have the right to withhold from the Milestone Payment due upon Substantial Completion of a Unit an amount of money equal to one hundred twenty-five percent (125%) of the expected cost of completion of the Final Completion Punch List, which amount shall be released to Contractor upon Final Completion of the Unit. In the event that any items on the Final Completion Punch List cannot be performed until the next Nuclear Fuel re-load, Final Completion of a Unit shall be deemed to have been achieved for purposes of this Agreement provided that Contractor agrees in writing with Owner to return to complete such Work at the time of the next Nuclear Fuel re-load, and Owner shall have the right to continue to retain one hundred twenty-five percent (125%) of the expected cost of completion of such items until such Work is completed. In lieu of the retention described in this Section 12.5, Contractor shall have the right to provide a letter of credit or a bond, in form and substance reasonably satisfactory to Owner, for the completion of the Final Completion Punch List, in which case the amount retained for the Final Completion Punch List shall be released to Contractor.

12.6    Final Completion.

(a)    Subject to 12.5, "Final Completion" of a Unit shall be deemed to have occurred upon the completion of the Final Completion Punch List and the other Work required under the Agreement with the exception of obligations under the Warranties.

(b)    Contractor shall notify Owner when the provisions of Section 12.6(a) have been satisfied. Owner shall accept the Unit as having achieved Final Completion by delivering to Contractor notice of that acceptance within thirty (30) Days following receipt of Contractor's notice that Final Completion has occurred; alternatively, Owner may reject the Unit as having

Confidential Trade Secret Information—Subject to Restricted Procedures

achieved Final Completion by notifying Contractor in writing of why it disagrees that Final Completion has occurred. If no notice is issued by Owner within the required time period, Owner shall be deemed to have accepted that Final Completion has occurred. The date of Final Completion shall be the date the Unit has achieved Final Completion and not the date of Owner's acceptance.

(c)    In the event that Contractor is unable to achieve Final Completion within six (6) months following Substantial Completion of the Second Unit (or if there is no Second Unit, the First Unit) due to the fact that Owner limits Contractor's access to the Facility or otherwise does not allow Contractor to take the necessary actions to achieve Final Completion, Final Completion shall be deemed to have occurred; provided that the foregoing shall not apply with respect to Final Completion Punch List items that cannot be completed until the next Nuclear Fuel re-load as provided in Section 12.5.

## ARTICLE 13 – LIQUIDATED DAMAGES

13.1    <u>Delay Liquidated Damages</u>.  The Parties agree that it would be extremely difficult and impracticable under presently known and anticipated facts and circumstances to ascertain and fix the actual damages Owner would incur if a Unit does not achieve Substantial Completion by the Guaranteed Substantial Completion Date for such Unit and, accordingly, if a Unit does not achieve Substantial Completion by such Unit's Guaranteed Substantial Completion Date due to Contractor's fault, Owner's remedy for such delay shall be to recover from Contractor as liquidated damages, and not as a penalty, liquidated damages ("Delay Liquidated Damages") as follows:

| Number of Days After Guaranteed Substantial Completion Date: | Delay Liquidated Damages (per Day or portion thereof): |
|---|---|
| 1-30 | $100,000 |
| 31-90 | $150,000 |
| 91-150 | $200,000 |
| 151-365 | $250,000 |
| 366 or beyond | $0 |

If a delay in achieving Substantial Completion of a Unit continues beyond three hundred sixty-five (365) Days after the Guaranteed Substantial Completion Date for such Unit, no additional Delay Liquidated Damages shall be due. Payment of the Delay Liquidated Damages shall be Owner's sole and exclusive remedy for Contractor's failure to achieve Substantial Completion of a Unit on or before the Guaranteed Substantial Completion Date for such Unit; however, Delay

Confidential Trade Secret Information—Subject to Restricted Procedures

Liquidated Damages are intended only to cover damages suffered by Owner as a result of delay and shall not affect the right of Owner to terminate the Agreement pursuant to Section 22.2(a)(iii) or its remedies provided for in Section 22.2 as a result of such termination.

13.2    <u>Performance Liquidated Damages</u>.    If the Unit does not meet the Net Unit Electrical Output Guarantee due to Contractor's fault, Owner's remedy for such failure shall be to recover from Contractor Performance Liquidated Damages of two thousand dollars ($2,000) for each whole KWe that the Net Unit Electrical Output, as demonstrated by a Net Unit Electrical Output Test, is below the Net Unit Electrical Output Guarantee. The Parties agree that it would be extremely difficult and impracticable under presently known and anticipated facts and circumstances to ascertain and fix the actual damages Owner would incur in the event that the Unit fails to meet the Net Unit Electrical Output Guarantee, and, accordingly Owner's remedy for such failure shall be to recover from Contractor as liquidated damages, and not as a penalty, the Performance Liquidated Damages. In the event that Contractor has paid the Performance Liquidated Damages and as of the end of the first Operational Cycle (or the second Operational Cycle if long lead equipment or components were involved in the remedy) has been able to achieve the Net Unit Electrical Output Guarantee or has improved the Net Unit Electrical Output, Contractor shall be entitled to receive a refund of all or the applicable portion of the Performance Liquidated Damages paid, based on the difference between the Performance Liquidated Damages paid and the Performance Liquidated Damages due following Contractor's repair, replacement, adjustment or modifications to the Unit as demonstrated by a Performance Test, minus seven hundred fifty dollars ($750) per MW below the Net Unit Electrical Output Guarantee for each Day that the Unit operated below the Net Unit Electrical Output Guarantee. In no event shall the total Performance Liquidated Damages due under this Agreement exceed seven and one-half percent (7.5%) of the Contract Price per Unit (the "Performance Liquidated Damages Cap").

13.3    <u>Performance Bonus</u>.    Following Substantial Completion, the Net Unit Electrical Output for the Unit will be measured when the Unit is at one hundred percent (100%) reactor power to determine an average Net Unit Electrical Output.  If, as of the completion of the second Operational Cycle (a) the Unit capacity factor is above eighty percent (80%); and (b) the average Net Unit Electrical Output achieved by a Unit exceeds the Net Unit Electrical Output Guarantee, then Owner shall pay to Contractor a bonus (the "Performance Bonus") of five million dollars ($5,000,000) for each whole MWe the Unit achieves above 1,117 MWe. For the purposes of the foregoing, "capacity factor" shall mean the ratio of the megawatt-hours produced compared to the megawatt-hours the Unit is capable of producing at rated power during an Operational Cycle, stated as a percentage, and any hours that the Unit is not producing megawatt-hours that are not attributable to the fault of Contractor shall be included as hours of production.

13.4    <u>Payment</u>.    Delay Liquidated Damages and Performance Liquidated Damages, if due for a Unit, shall be due and payable by Contractor to Owner within thirty (30) Days following agreement by the Parties that such amount is due. The Performance Bonus, if due for a Unit, shall be paid within thirty (30) Days following the end of the second Operational Cycle of such Unit.  If the payment of any such amount is disputed, then once the dispute is resolved, the additional amount due, if any, shall be paid, or the excess amount paid, if any, shall be refunded, by the applicable Party, within thirty (30) Days after the date of the final resolution, together

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

with interest at a rate equal to the Prime Rate plus one percent (1%) per annum, applied from the original due date of the payment, until paid (or in the case of any overpayment, from the date paid until refunded by the Party).

## ARTICLE 14 – WARRANTY

14.1    Equipment.

(a)    Equipment Warranty.

(i)    Contractor warrants that the Equipment and each Unit shall be free from defects in design, workmanship and material and shall conform to the Specifications (the "Equipment Warranty").

(ii)    The Equipment Warranty shall commence upon the date scheduled for Substantial Completion of a Unit in the Project Schedule as of October 1, 2008 plus the number of Days of delay caused by Contractor and shall expire on the date that is twenty-four (24) months after that date for such Unit (the "Standard Equipment Warranty Period"); provided, however, if Owner exercises its option in Section 14.5 for any item of Equipment, the Warranty Period for such item of Equipment shall be the applicable Extended Equipment Warranty Period (as defined in Section 14.5).

(iii)    In the event that after the pouring of first safety-related concrete for the Unit but prior to Substantial Completion of such Unit, there is any delay in the performance of the Work caused by Owner or its Personnel or resulting from an Uncontrollable Circumstance, Contractor shall use commercially reasonable efforts to obtain an extension of the equipment warranty(ies) from Subcontractors for that Equipment designated by Owner so that Contractor can extend the Standard Equipment Warranty Period. The cost to Owner of such extended Equipment Warrant(ies), if obtained, shall be included in the Change Order to which Contractor shall be entitled as a result of such delay(s). For such Change Order, Contractor shall only markup the amount charged by the Subcontractor for such extended Equipment Warranty(ies) for Westinghouse's SGA and Stone & Webster's G&A and multipliers set forth in Exhibit G, and shall not include a markup for Pro Rata Profit. Any Contractor costs to administer such extended Equipment Warranties or for Contractor to provide the extended warranty without Subcontractor backing shall include Westinghouse's SGA and Stone & Webster's G&A and multipliers set forth in Exhibit G, and Pro Rata Profit consistent with the Profit applicable to the Consortium Member providing the Equipment.

(iv)    The Equipment Warranty does not apply to consumables and Equipment and material such as, but not limited to, gaskets, seals, filters, electronic tubes, packing, fuses, transistors and light bulbs which, by normal industry practices would be expected to be replaced during the Standard Equipment Warranty Period.

(v)    For Equipment which is placed into service prior to Substantial Completion, the Equipment Warranty shall commence upon such date when an item is placed into service and shall expire on the date that is twenty four (24) months after such date. If, however, any such item of Equipment is placed into service prior to Substantial Completion and

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

used by Contractor to support its performance of the Work, the Equipment Warranty shall commence upon the Substantial Completion Date of the First Unit and shall expire on the date that is twenty four (24) months after such date.  Contractor shall give notice to Owner within five (5) Business Days after such an item has been placed into service.

(b)    Remedy.  If, for non-conforming Equipment discovered during the applicable Warranty Period, Owner promptly notifies Contractor, Contractor shall perform such repair or replacement as required to meet the Equipment Warranty.  The repaired or replaced part shall be further warranted to be free from defects in workmanship and material for a period of one (1) year from the date of repair or replacement, until the end of the then-current Operational Cycle (for items that cannot be verified during normal operations) or until the expiration of the Standard Equipment Warranty Period, whichever is later; provided that in no event shall such warranty extend beyond five (5) years from the commencement of the Standard Equipment Warranty Period and provided further that the terms of the Extended Equipment Warranty shall govern with respect to such matters for each item of Equipment covered by an Extended Equipment Warranty.  The decision to repair or replace shall be made by Contractor.  Removal and reinstallation of the non-conforming Equipment shall be performed by Contractor at its expense; provided that, Owner shall provide working access to the Equipment (which shall include removing, disassembly, replacing and/or reinstalling adjacent or interfering Equipment, components, materials, systems or structures in the Unit to the extent necessary to permit Contractor to perform its warranty obligation on the non-conforming Equipment), it being understood that such removal, disassembly, replacing and/or reinstalling shall not adversely affect any warranties and, at the request of Contractor, shall furnish, without cost to Contractor, plant support personnel and facilities to assist in the removal, reinstallation, repair and other activities occasioned by this warranty as specified in Section 14.1(e).  Should investigation by Contractor reveal that a defect is not covered by the Equipment Warranty, Owner agrees to reimburse Contractor for its expenses in connection therewith.

(c)    Warranty Work Deferral.  At Owner's option, Warranty Work that impacts operation of the Facility may be deferred until the time of the Unit's next regularly scheduled maintenance outage and the Warranty provisions hereunder shall apply notwithstanding that such outage occurs after the end of the Standard Equipment Warranty Period. If Contractor advises Owner that deferral of the Warranty Work can reasonably be expected to result in damage to the Unit and/or Equipment which occurs after Contractor's advice and results from deferral of such Warranty Work, Owner may elect to use the Unit and/or Equipment at its risk. In no event may Owner defer the Warranty Work beyond eighteen (18) months from the date it would have been performed by Contractor without Owner's deferral.

(d)    Additional Owner Obligations.  As long as any Equipment supplied hereunder is subject to warranty, Owner shall:

(i)    Afford Contractor an opportunity to review Owner's system of developing and recording data related to Facility performance;

(ii)    Provide, without cost to Contractor, any required decontamination to reasonable limits that shall allow Contractor to perform its obligations under this Article 14

-57-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

and all necessary personnel and facilities for the removal, reinstallation, repair and other Site activities that may be occasioned by the presence of radioactive contamination;

        (iii)    Provide authorized personnel of Contractor and its Subcontractors reasonable access to the Facility should Contractor decide to observe the manner in which the Facility is operated and maintained;

        (iv)    Provide authorized personnel of Contractor and its Subcontractors reasonable access to operation and maintenance records of Owner; and

        (v)    Afford Contractor at its expense the opportunity to attend and be heard during the presentations to any Government Authority relating to the Facility and Equipment performance.

Should Owner not provide such of the foregoing as are required by Contractor, such action shall cause Contractor's obligations to terminate with respect to the particular claimed defect to the extent that Owner's failure caused prejudice to Contractor.

        (e)    Working Access to Equipment and Plant Support Activities to be Provided by Owner.  The plant support personnel and facilities to be provided by Owner in accordance with Section 14.1(b) are as follows:

        (i)    operations support to establish the required plant conditions for the repairs;

        (ii)    make the plant systems, structures, and components available and placed in the proper configuration;

        (iii)    provide the valve clearances and tag-outs necessary;

        (iv)    provide the necessary licensed operators in the control room and containment as required by the COL;

        (v)    establish and maintain appropriate and acceptable industrial safety conditions in accordance with Laws, Good Industry Practices, and utility policy such that reasonably unencumbered access to the required work areas is enabled for all personnel;

        (vi)    as appropriate, provide body harnesses and/or personal flotation devices in sufficient quantities such that reasonably unencumbered access to the required work areas is enabled for all personnel;

        (vii)    provide safe scaffolding meeting applicable OSHA standards (as required);

        (viii)    provide suitable ambient lighting;

-58-

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

(ix)    provide free and unobstructed access to the Site, including maintained storage areas and roadways.  Floor conditions shall be suitable for crane and truck operation;

(x)    provide access such as remove/reinstall cubicle plugs and other related plant facilities, such as piping, ductwork, cable trays, platforms, insulation, etc.;

(xi)    provide logistics support and labor for moving equipment/materials into and out of the plant and shipping;

(xii)    provide lay down area(s) for equipment storage, set-up, staging and operation.  Area requirements shall depend on the scope of services performed;

(xiii)    provide areas for storage of low specific activity and clean equipment boxes and/or cargo containers.  The area(s) shall vary depending on storage configurations and scope of services;

(xiv)    establish and maintain appropriate and acceptable radiological conditions in accordance with Laws, Good Industry Practices, and utility policy such that reasonably unencumbered access to the required work areas is enabled for all personnel;

(xv)    provide anti-contamination clothing, lockers, change area, dosimetry, health physics and radiation protection service and badging for Site access as typically required;

(xvi)    provide official whole body exposure data for Contractor personnel upon personnel departure from the Site;

(xvii)    provide Gamma isotopic analysis to determine radioactivity of waste;

(xviii)    provide breathing air and respiratory protection as necessary;

(xix)    provide plant compressed air as required;

(xx)    provide air for ventilation;

(xxi)    provide 110V, 220V and 480V power as required;

(xxii)    provide plant and deionized water;

(xxiii)    make available to Contractor, and maintain in an operable condition those hand tools, special tools, and calibrated equipment necessary;

(xxiv)    allow access to machine shop and welding facilities, and hot tool crib access, as required;

Execution Version             Confidential Trade Secret Information—Subject to Restricted Procedures

(xxv)   provide crane operators, including polar crane availability on an as scheduled basis, and any other personnel necessary to complete the tasks outside of Contractor scope;

(xxvi)  provide for consumables such as wipes and rags, and disposal of all contaminated materials;

(xxvii) provide QA/QC coverage as required in the Site approved procedures; and

(xxviii) provide outside phone lines, sanitation facilities and drinking water.

(f)    <u>Conditions</u>. Such repair or replacement shall constitute complete fulfillment of Contractor obligation under the Equipment Warranty, and upon the expiration of the applicable Warranty Period, all such obligations shall terminate.

14.2   <u>Services Warranty</u>. Contractor warrants that the Services shall be performed by qualified persons and using competent professional knowledge and judgment and shall conform to Good Industry Practices and the requirements of this Agreement (the "Services Warranty"). If any portion of the Services fails to comply with this Services Warranty and Owner promptly notifies Contractor of such non-conformance along with evidence which reasonably demonstrates Contractor's culpability, Contractor shall promptly re-perform the non-conforming Services and any additional Work required under the Equipment Warranty without additional compensation from Owner. The Services Warranty Period shall be concurrent with the Standard Equipment Warranty Period (the "Services Warranty Period").

At Owner's option, Warranty Work may be deferred until the time of the Unit's next regularly scheduled maintenance outage and the Warranty provisions hereunder shall apply notwithstanding that such outage occurs after the end of the Services Warranty Period. If Contractor advises Owner that deferral of the Warranty Work can reasonably be expected to result in damage to the Unit and/or Equipment which occurs after Contractor's advice and results from deferral of such Warranty Work, Owner may elect to use the Unit and/or Equipment at its risk. In no event may Owner defer the Warranty Work beyond eighteen (18) months from the date it would have been performed by Contractor without Owner's deferral.

14.3   <u>Warranty of Title</u>. Contractor represents and warrants that the Work, including the Equipment furnished by it and its Subcontractors that become part of the Facility or are furnished to Owner as spare parts shall be legally and beneficially owned by Owner free from any Liens (other than Liens created by the actions of Owner, including non-payment). In the event of any nonconformity with this warranty, Contractor, at its own expense, upon written notice of such failure, shall indemnify, defend and hold harmless Owner from the consequences of such defect in title and such obligations shall survive the expiration, cancellation or termination of this Agreement.

14.4    <u>Limitations and Disclaimers</u>.

(a)    THE WARRANTIES AND GUARANTEES AND RELATED REMEDIES SET FORTH IN THIS ARTICLE 14 ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND RELATED REMEDIES WHETHER STATUTORY, EXPRESS OR IMPLIED (INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE IN TRADE) AND WHETHER CLAIMS BY OWNER ARE BASED IN CONTRACT OR IN TORT (INCLUDING FAULT, NEGLIGENCE OR STRICT LIABILITY).

(b)    Any warranties not expressly made herein are expressly waived by Owner.

(c)    Notwithstanding the foregoing provisions of this Article 14, Contractor shall have no liability hereunder for non-conformance or failure of Equipment, or material, or performance, that results, in whole or in part, from:

(i)    Operation of the Equipment outside of the design basis of the Equipment or integrated system.

(ii)    Following Turnover of a system or structure, improper use, or abnormal handling, storage, operation or maintenance of the Equipment or material therein, or operation outside the guidelines of the Specifications, including employment at any time for purposes other than those for which such Equipment and material are intended, or under other abnormal conditions or incompetent supervision.

(iii)    Alteration, abuse or misuse of the Equipment by persons other than Contractor, its Subcontractors and the employees and agents of either.

(iv)    Any operation or maintenance of the Equipment that is not in accordance with the Unit Operating Procedures and Maintenance Procedures.

(v)    Operation by personnel not qualified in accordance with Section 3.6(g).

(d)    Contractor shall be relieved from fulfilling its warranty obligations as specified in this Article 14 if:

(i)    A Nuclear Incident occurs through no fault of Contractor and gives rise to the non-conformance, and

(ii)    All the consequences, including radiation, of such Nuclear Incident preventing Contractor from performing such warranty obligations are not removed within the applicable Warranty Period.

Confidential Trade Secret Information—Subject to Restricted Procedures

14.5    <u>Extended Equipment Warranty</u>.  No later than six (6) months following issuance of the Full Notice to Proceed, Contractor shall provide to Owner an option for extended warranties for the steam generator, reactor vessel head, reactor cooling pumps, pressurizer, main turbine, main turbine generator and main step-up transformers. At the time of providing the option, Contractor also shall provide information as to the duration of such warranties, the price for such extended warranties (which shall be developed using the same pricing methodology as the pricing for the Equipment to which such extended warranties apply) and any special terms applicable to such extended warranties (each, an "Extended Equipment Warranty"). Owner shall have the right to exercise its option for any such Extended Equipment Warranty within the time period specified for the exercise of the option by the Equipment vendor. The terms of such Extended Equipment Warranties shall be set forth in <u>Exhibit W</u>. The time period beyond the Standard Equipment Warranty Period to which each such Extended Warranty applies is referred to as the "Extended Equipment Warranty Period" for such piece of Equipment.

14.6    <u>Limitation on Warranty Liability</u>.    Contractor's total liability under or in connection with the liabilities in this Article shall not exceed the amount provided in Section 17.2; provided, that such limitation shall not apply to Contractor's warranty of title under Section 14.3.

## ARTICLE 15 – INDEMNITY

15.1    <u>Contractor Indemnity</u>.  Except with respect to a Nuclear Incident, Contractor shall indemnify, defend and hold harmless Owner, its Affiliates, and their respective partners, shareholders, officers, directors, and lenders from and against Third Party Claims and costs and expenses associated therewith (including attorneys' fees) from any injury of or death to natural persons, or damage to or destruction of third party property (i.e., property other than the Facility or other property belonging to Owner) to the extent arising from (i) the negligent or willful acts or omissions of Contractor or its Personnel or Invitees acting within the scope of their employment or for which applicable Law would otherwise hold Contractor liable for such acts or omissions, (ii) any Liens arising from nonpayment to any Subcontractor in connection with the Work, provided that Contractor has been paid in accordance with this Agreement, or (iii) the release on or from the Site of any Hazardous Materials, but only to the extent such release is due to Contractor's or a Subcontractor's or their Personnel's or Invitees' negligence or willful misconduct while acting within the scope of their employment or for which applicable Law would otherwise hold Contractor liable for such acts or omissions.  Contractor's obligations in this Section 15.1 are limited to the proceeds of the insurances required to be provided hereunder, provided that if the insurance program is a Contractor controlled insurance program, the limit shall be the amount of the proceeds from such insurance (or the proceeds which would have been received, if Contractor had not failed to obtain such insurance).  Contractor's obligations in this Section 15.1 are further conditioned upon Owner giving Contractor prompt notice of any known claims for which it seeks indemnity hereunder (along with documentation which reasonably evidences Contractor's responsibility thereof) and Owner providing such assistance and cooperation in the defense of indemnified claims as Contractor shall reasonably request as set forth in more detail in Section 15.5. In the event that Owner or Owner Interests incur any cost, loss, damage or expense arising out of or resulting from any Third Party Claim for which

Confidential Trade Secret Information—Subject to Restricted Procedures

Contractor is required to indemnify Owner or Owner Interests pursuant to this Section 15.2, Contractor shall promptly reimburse Owner for such cost, loss, damage or expense.

15.2    <u>Owner's Indemnity</u>.  Except with respect to a Nuclear Incident, and subject to limitations on Santee Cooper's obligations as a matter of South Carolina law, Owner shall indemnify, defend and hold harmless Contractor and Contractor Interests from and against Third Party Claims and costs and expenses associated therewith (including attorneys' fees) from any injury of or death to natural persons, and damage to or destruction of third-party property (i.e., property other than that belonging to Contractor and Contractor Interests) to the extent arising from (i) the negligent or willful acts or omissions of Owner or its Personnel or Invitees (other than Contractor or its Personnel or its Invitees) acting within the scope of their employment or for which applicable Law would otherwise hold Owner liable for such acts or omissions; and (ii) any contamination of the environment or injury to natural resources as a result of any Hazardous Materials on, at or under the Site to the extent such contamination or injury occurs through the fault, negligence, willful misconduct or strict liability of Owner or its Personnel or Invitees (other than Contractor or Contractor's Personnel or Invitees) acting within the scope of their employment or for which applicable Law would otherwise hold Owner liable for such acts or omissions. Owner obligations in this Section 15.2 are limited to the proceeds of the insurances required to be provided hereunder, provided that if the insurance program is an OCIP, the limit shall be the amount of the proceeds from such insurance (or the proceeds which would have been received, if Owner had not failed to obtain such insurance). Owner's obligations in this Section 15.2 are further conditioned upon Contractor giving Owner prompt notice of any claims for which it seeks indemnity hereunder (along with documentation which reasonably evidences Owner's responsibility thereof) and Contractor providing such assistance and cooperation in the defense of indemnified claims as Owner shall reasonably request as set forth in more detail in Section 15.5.  In the event that Contractor or Contractor Interests incur any cost, loss, damage or expense arising out of or resulting from any Third Party Claim for which Owner is required to indemnify Contractor or Contractor Interests pursuant to this Section 15.2, Owner shall promptly reimburse Contractor for such cost, loss, damage or expense.

15.3    <u>Intellectual Property Indemnity</u>.  Contractor shall assume at its sole option and expense, the settlement or defense of any and all claims, demands, costs, suits, actions, proceedings, fines and penalties (and interest thereon) brought against Owner to the extent based on a Third Party Claim that any Facility, Unit, Work and/or Equipment furnished by Contractor results in an infringement, or claim of infringement by Contractor, of any patent, trademark, copyright or any other similar intellectual property protection issued by a duly authorized Government Authority of the United States, Canada, a European Union country, or another country where the Equipment was manufactured in connection with the Facility, a Unit, the Work and/or Equipment furnished by Contractor hereunder, except where the same resulted from following directions, specifications, drawings, plans or procedures prepared by Owner or by third parties for Owner and selected by Owner.  If a suit is brought against Contractor based on any Facility, Unit, Work and/or Equipment supplied by Contractor which implements any such Owner directions, specifications, drawings plans or procedures, Owner shall protect Contractor to the same extent that Contractor has agreed to protect Owner hereunder.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

In the event any Facility, Unit, Work and/or Equipment so defended is held to constitute infringement or its use is enjoined, Contractor shall, at its own expense and option, either: (a) procure for Owner the right to continue to use such Facility, Unit, Work and/or Equipment; (b) re-perform the Work or replace the Facility, Unit and/or Equipment with substantially equivalent noninfringing Facility, Unit, Work and/or Equipment; or (c) modify the Facility, Unit, Work and/or Equipment so that it becomes noninfringing; provided, however, that such Work re-performed and Facility, Unit and/or Equipment replaced or modified conforms to the requirements of this Agreement.

THIS IS AN EXCLUSIVE STATEMENT RELATING TO INTELLECTUAL PROPERTY RIGHTS AND ALL THE REMEDIES OF THE PARTIES RELATING THERETO.

        15.4    Owner's Nuclear Incident Indemnity.

        (a)    Notwithstanding any other provision to the contrary, Owner shall, without cost to Contractor Interests, obtain and maintain "financial protection" and an "indemnification agreement", for protection against liability for Nuclear Incidents (including master worker coverage), both in such form and amount as shall satisfy the requirements of Section 170 of the Atomic Energy Act of 1954, as amended. In the event that the nuclear liability protection contemplated by Section 170 of the Atomic Energy Act of 1954, as amended, is repealed, changed, or is not renewed, Owner shall maintain in effect, to the extent available on commercially reasonable terms, liability protections through governmental indemnity, limitation of liability and/or insurance of comparable coverage which shall not result in a material impairment of the protection afforded Contractor Interests by such nuclear liability protection which is in effect as of the Effective Date, taking into account the availability and cost of such coverage, customary practice in the United States commercial nuclear utility industry for plants of similar size and character of the Facility and other relevant factors in light of the then existing conditions. To the extent available on commercially reasonable terms, Owner shall ensure that Contractor Interests are included in the omnibus definition of "insured" under such alternate insurance coverage or are otherwise included as an additional insured at no cost to Contractor Interests.

        (b)    Owner shall prior to the initiation of Work at the Site and without cost to Contractor, obtain and maintain property insurance for protection against liability for Nuclear Incident on the Facility and the existing adjacent nuclear generation facility in a form and amount required by the Nuclear Regulatory Commission and the current customary industry practice from time to time, providing protection against loss or damage to the Facility and the existing adjacent nuclear generation facility.  Such insurance shall cover Contractor Interests, as their interests may appear. Owner hereby waives all rights of recovery and subrogation on behalf of itself and its insurers against Contractor Interests for any loss or damage covered by such property insurance during the Work and thereafter, including the deductibles under any insurance policy.

        (c)    None of Contractor Interests shall be liable to Owner or its insurers or any other party for (i) any on-Site property (and existing nuclear facility at the V.C. Summer Station) loss or damage due to any nuclear energy hazard, and (ii) losses or damages caused by reason of unavailability of the nuclear power and existing adjacent nuclear station, or by reason of

shutdowns of the station or other facilities or service interruptions (including loss of profits or revenue, inventory or use charges, cost of replacement power, cost of capital or claims by customers) or for any other indirect, special, incidental, punitive or consequential loss, damage or injury, whether or not based on any claim or a negligent or faulty act or strict liability due to any nuclear energy hazard. To the extent Owner or its insurers recover damages from a third party for damage due to the nuclear energy hazard to which the foregoing waivers apply, Owner shall indemnify Contractor Interests against any liability which such third party recovers over from Contractor and/or its Subcontractors for any such loss or damage. In the event that Contractor Interests incur any cost, loss, damage or expense arising out of or resulting from a claim by a third party based on Owner's recovery of such damages, Owner shall promptly reimburse Contractor for such cost, loss, damage or expense.  As used in this Section 15.4, the term "nuclear energy hazard" shall mean radioactive, toxic, explosive or other hazardous properties of "source material", "special nuclear material", or "by-product material" as such terms are defined in the Atomic Energy Act of 1954, as amended.  Owner on behalf of itself and its insurers, hereby waives any right of recovery and subrogation against Contractor and Contractor Interests for any loss or damage (whether direct, indirect, consequential or otherwise) whether or not based on any claim or a negligent or faulty act or strict liability, due to any nuclear energy hazard, during the performance of the Work and thereafter.

(d)    As used in this Section 15.4, the term "on-Site property" means any property at the site of a nuclear facility as defined in the nuclear liability policy for the Site for nuclear liability and indemnity purposes; the term "damage" means loss, damage or loss of use; the term "liable" or "liability" means liability of any kind at any time, whether in contract, tort (including negligence) or otherwise.

(e)    The provisions hereof providing for limitations of or protection against Contractor's liability shall survive termination of this Agreement or completion of the Work hereunder.

15.5    Indemnity Procedures.

(a)    The indemnifying Party shall have the right to conduct and control, through counsel of its own choosing, reasonably acceptable to the indemnified Party, any Third Party Claim, provided that, upon acceptance of the indemnity obligations hereunder, the indemnifying Party shall waive any right to protest or challenge its indemnity obligations.  The indemnifying Party shall keep the indemnified Party fully informed in the conduct of the proceeding.  The indemnified Party shall be entitled to participate at its cost in any such action.

(b)    The indemnified Party may, at its election, participate in the defense thereof at its sole cost and expense; provided, however, that if (i) the indemnifying Party shall fail to defend any Third Party Claim, (ii) the Parties mutually agree in writing to allow the indemnified Party to assume the defense of such Third Party Claim and forego any indemnity claimed under this Article, (iii) in the reasonable opinion of legal counsel for the indemnified Party, such Third Party Claim involves the potential imposition of a criminal liability on the indemnified Party, its directors, officers, employees or agents, or (iv) in the reasonable opinion of legal counsel for the indemnified Party, an actual or potential conflict of interest exists where it is advisable for such indemnified Party to be represented by separate counsel, then the

Confidential Trade Secret Information—Subject to Restricted Procedures

indemnified Party shall be entitled to control and assume responsibility for the defense of such Third Party Claim, at the cost and expense of the indemnifying Party (except in the case of (ii) above, in which the indemnified Party agrees to forego the indemnity). The indemnifying Party may, in any event, participate in such proceedings at its own cost and expense. The indemnified Party shall not have the right to settle without the written consent of the indemnifying Party (which consent shall not be unreasonably withheld), unless, in the written opinion of the indemnified Party's legal counsel, such claim is meritorious.

(c)    The indemnifying Party, in the defense of any such litigation, other proceeding or other claim, shall have the right in its sole discretion to settle such Third Party Claim only if (i) settlement involves only the payment of money and execution of appropriate releases of the indemnified Party, (ii) there is no finding or admission of any violation of Law or violation of the rights of the indemnified Party, and (iii) the indemnified Party shall have no liability with respect to such compromise or settlement. Otherwise, no such Third Party Claim shall be settled or agreed to without the prior written consent of the indemnified Party, which shall not be unreasonably withheld.

(d)    The indemnified Party and the indemnifying Party (i) shall fully cooperate in good faith in connection with such defense and shall cause their legal counsel and accountants to do the same; (ii) shall make available to the other Party all relevant books, records, and information (in such Party's control) during normal business hours; and (iii) shall furnish to each other, at the indemnifying Party's expense, such other assistance as the other Party may reasonably require in connection with such defense, including making employees of the indemnified Parties available to testify and assist others in testifying in any such proceedings.

## ARTICLE 16 – INSURANCE

16.1    Phase I Insurance Requirements.

(a)    Except as otherwise provided hereunder, Contractor agrees to furnish and maintain at all times during the course of the Phase I Work to be performed hereunder, Worker's Compensation, liability and other insurance coverage required hereunder and in the amounts as follows:

(i)    Worker's Compensation – Statutory. Coverage shall include U.S. Longshoremen's and Harbor Workers Act coverage where applicable. The insurance purchased pursuant to this Section 16.1(a)(i) shall include an "All States" endorsement.

(ii)    Employer's Liability, including an "All States" endorsement – one million dollars ($1,000,000). Coverage shall include U.S. Longshoremen's and Harbor Workers Act coverage where applicable.

(iii)    Commercial General Liability, (excluding professional liability) including Contractual, Independent Contractors, - Bodily Injury and Property Damage Combined Single Limit – two million dollars ($2,000,000) Each Occurrence, two million dollars ($2,000,000) Aggregate, Personal Injury – two million dollars ($2,000,000). Products and Completed Operations – two million dollars ($2,000,000).

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

(iv)    Automobile Liability coverage including owned, hired, and non-owned automotive equipment used in connection with the insured operation - Bodily Injury and Property Damage Combined – two million dollars ($2,000,000) Each Occurrence.  Owner shall provide similar coverage for any of its owned, hired and non-owned automotive equipment.

(v)    Contractor's Equipment Coverage – in the amount of the value of the equipment through insurance or self insurance.

(vi)    Pollution Liability on a project basis, which includes the sudden or accidental release of any material that may be considered a pollutant at or around the Site, as a result of the Work done by Contractor or any tier Subcontractor – one million dollars ($1,000,000) Each Occurrence, two million dollars ($2,000,000) Aggregate.  Notwithstanding the foregoing, this coverage shall be taken out within ninety (90) Days after the Effective Date.

(vii)    Open Cargo Insurance must be obtained on materials and equipment to be transported to the Site.

(viii)    Umbrella Form Excess Liability Insurance with a coverage limit of ten million dollars ($10,000,000).

(ix)    Professional Liability on a project basis with a coverage limit of ten million dollars ($10,000,000) per claim and aggregate for the Work.  Notwithstanding the foregoing, this coverage shall be taken out within ninety (90) Days after the Effective Date.

(b)    Builder's Risk Insurance, if needed, as determined by Owner in consultation with Contractor, shall be purchased by Owner at limits and coverages and other provisions as enumerated in Section 16.2(a)(ii), naming Owner, Contractor, and Subcontractors as additional insureds.  The liability of Contractor for any loss or damage to any equipment or materials, Work, completed Facility and surrounding Owner property shall be as provided in Section 16.2(a)(ii). Should Owner decide not to procure such coverage until the commencement of Phase II, Contractor's liability for any loss or damage during Phase I, whether based on contract, tort (including fault, negligence and strict liability) or otherwise, shall not exceed one hundred thousand dollars ($100,000) for any occurrence as if Owner had procured a standard Builder's Risk policy subject to the limitations in Section 16.2(a)(ii).  Contractor's liability for the payment of such amount shall not be reimbursable hereunder.  Owner shall reimburse Contractor on a Time and Materials Basis to remedy such loss or damage that exceed such amount, whether based on contract, tort (including fault, negligence and strict liability) or otherwise.

16.2    Phase II Insurance Requirements.

(a)    For Phase II, Owner shall have the option of implementing an Owner Controlled Insurance Program ("OCIP"), as set forth in Exhibit U. If Owner decides not to implement the OCIP, Contractor will have the right to implement a Contractor-Controlled Insurance Program ("CCIP"), implementing the provisions of Exhibit U.  Contractor shall be reimbursed for the CCIP by Owner on a Time and Materials Basis. The Parties recognize that Exhibit U is written for an OCIP, and will need to be modified accordingly if a CCIP is to be

-67-

Confidential Trade Secret Information—Subject to Restricted Procedures

implemented. If neither an OCIP or a CCIP is implemented, each of Owner and Contractor, as applicable, shall maintain the coverages specified in Section 16.1, with the following exceptions, such coverages to be reimbursed by Owner on a Time and Materials Basis:

(i)      the coverage limit for the Umbrella Excess Liability shall be increased to one hundred million dollars ($100,000,000) per occurrence and aggregate.

(ii)     Builder's Risk Insurance, if not already obtained, shall be obtained at limits determined appropriate by the Parties.  Such Builder's Risk policy shall (A) name Contractor and all Subcontractors as additional insureds (without having any liability for the payment of premiums); (B) cover all risks of loss or damage to the Facility (I) during construction, and (II) if not covered by the Open Cargo Insurance, during transportation of any materials and equipment, and (III) during storage, (IV) during the Work, and (V) until replaced by Owner's Operating Property coverages, and (VI) with limits of coverage equal to the maximum credible loss to the Facility as agreed to by the Parties; and (C) provide coverage for resultant damage due to any error in design, defects in equipment or material or faulty workmanship; and (D) provide delay in start-up coverage (subject to a commercially reasonable deductible), if available on a commercially reasonable basis.  Any recovery under the delay in start-up coverage resulting from an event that gives rise to a covered claim under this policy shall reduce any Delay Liquidated Damages by the same amount.  Notwithstanding any other provision to the contrary, Owner on behalf of itself and the insurer hereby waives all rights of recovery and subrogation against Contractor and its Subcontractors, and their Affiliates and Personnel, including any losses within the deductibles and any excess losses; provided that Contractor shall be liable for Owner's deductible under its property insurance policy(ies); provided further, and notwithstanding any other provision to the contrary, that the liability of Contractor and Contractor Interests for any loss or damage to any equipment, materials, Work, completed Facility and surrounding Owner property shall be limited to claims arising to the extent of Contractor's negligence and shall in no event exceed one hundred thousand dollars ($100,000) for any occurrence.  Contractor's liability for the payment of such amount shall not be reimbursable hereunder.  Owner shall reimburse Contractor on a Time and Materials Basis to remedy such loss or damage that exceed such amount, whether based on contract, tort (including fault, negligence and strict liability) or otherwise; provided, however, should any such loss or damage not be covered by the builder's risk coverage provided hereunder and such coverage would have been in effect but for the dishonest, criminal or fraudulent acts of Contractor or its Personnel (for which Contractor is liable under applicable Law) which cause such coverage to be denied to Owner due to a violation of such policy conditions, Owner shall not be obligated to reimburse Contractor for such corrective work.  Any such denial of insurance coverage that allegedly results from any such insurance condition may be disputed and/or appealed by Contractor at law or in equity, and Owner shall reasonably cooperate with Contractor in connection with any such dispute or appeal. The foregoing provisions are for the sole benefit of Owner, and the Parties do not intend such provisions to be for the benefit of any third party, including without limitation any insurer.

(b)      Regardless of whether Owner or Contractor adopts an OCIP or CCIP, as applicable, Contractor shall be responsible for maintaining the following insurance coverages during Phase II:

Confidential Trade Secret Information—Subject to Restricted Procedures

(i)     <u>Professional Liability</u>: Contractor shall continue to carry Professional Liability Insurance described under Section 16.1(a)(ix).

(ii)     <u>Pollution Liability</u>: Contractor shall continue to carry Pollution Liability Insurance described under Section 16.1(a)(vi) with an increased coverage limit of two million dollars ($2,000,000) per occurrence and four million dollars ($4,000,000) in the aggregate.

(iii)     <u>Employment Practices Liability</u>:     Contractor shall carry Employment Practices Liability on a project basis with a coverage limit of five million dollars ($5,000,000) per occurrence and in the aggregate.

16.3    <u>Provisions Applicable to all Coverages</u>.

(a)     After the execution of this Agreement and prior to the commencement of any Work, each Party shall have on file with the other party (and in the case of Owner, Owner's Supplier Relations Department) the applicable insurance certificate(s).  Such certificate(s) shall provide that thirty (30) Days written notice be given to the other Party prior to any material change or cancellation of the insurance.  Other than the OCIP or CCIP, as applicable, the Builder's Risk Insurance and Owner's Operating Property coverages, each Party shall name the other Party, its subsidiaries and their successors and assigns, as additional insured (except for Worker's Compensation and Professional Liability and Pollution Liability coverage) for their vicarious liability arising out of such Party's negligent operations or such Party shall be covered under the omnibus provisions thereof. For the OCIP or CCIP, as applicable, and Owner's Operating Property coverage, each Party and Contractor Interests shall be named as an additional insured thereon, at no cost to Contractor. All policies shall be written to include a waiver of subrogation in favor of the other Party and its Affiliates and Contractor Interests during the performance of the Work and thereafter.  Owner's policies for Builder's Risk Insurance and other coverages obtained pursuant to the OCIP shall be subject to the Contractor's review and approval, which shall not be unreasonably withheld.  Contractor's policies procured under this Agreement shall be subject to Owner's review, in the event of a claim seeking damages from Contractor and/or Owner in excess of one million dollars ($1,000,000).

(b)     All such insurance shall be with sound insurance companies which have an AM Best Rating of A- VII as the minimum and authorized to do business in the state where the Work is to be performed. None of the liability policies shall have any "other insurance" clause or language which would jeopardize the primacy of Contractor's insurance with respect to Owner's self-insured retention or excess insurance.  The above Contractor requirements may be met by both Consortium Members providing separate certificates.  Any such limits of coverages may be met in one or more layers of coverage.

(c)     Neither a failure of a Party to provide the required certificate of insurance nor such Party's submission of a certificate of insurance not in conformance with the insurance requirements stated herein shall relieve such Party from the obligation to have in force the required insurance coverages.

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

(d)    Each Party is responsible for any deductibles associated with its policies of insurance or its self-insured retentions, except as otherwise provided hereunder.

(e)    Contractor understands that Owner may have an administrator on-Site at all times in which Contractor or its Personnel are at the Site.  Contractor shall interface and cooperate with Owner's administrator.    Additionally, Contractor shall follow any recommendations made by the NRC, Nuclear Electric Insurance Limited ("NEIL"), the Institute of Nuclear Power Operators ("INPO") and American Nuclear Insurers ("ANI").

## ARTICLE 17 – LIMITATION OF LIABILITY

17.1    <u>No Consequential Damages</u>.  EXCEPT TO THE EXTENT THE PAYMENT OF LIQUIDATED DAMAGES COULD OTHERWISE BE DEEMED TO BE SUCH DAMAGES, IN NO EVENT SHALL CONTRACTOR OR CONTRACTOR INTERESTS BE LIABLE, WHETHER BASED ON CONTRACT (INCLUDING BREACH, WARRANTY, INDEMNITY, ETC.) OR TORT (INCLUDING FAULT, NEGLIGENCE AND STRICT LIABILITY), UNDER ANY WARRANTY OR OTHERWISE, RELATING TO OR ARISING OUT OF THE WORK OR THIS AGREEMENT, FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, PENAL, OR INCIDENTAL LOSS, DAMAGE OR INJURY, INCLUDING ANY SUCH DAMAGES WHICH RESULT FROM LOSS OF USE OF PROPERTY, EQUIPMENT OR SYSTEMS, LOSS BY REASON OF FACILITY SHUTDOWN OR SERVICE INTERRUPTION, COSTS OF CAPITAL OR EXPENSES THEREOF, LOSS OF PROFITS OR REVENUES OR THE LOSS OF USE THEREOF, OR COST OF PURCHASED OR REPLACEMENT POWER (INCLUDING ADDITIONAL EXPENSES INCURRED IN USING EXISTING POWER FACILITIES) OR FROM CLAIMS OF CUSTOMERS.

17.2    <u>Maximum Total Liability; Time Limitation</u>.  WITH RESPECT TO A UNIT, NOTWITHSTANDING ANY OTHER PROVISION TO THE CONTRARY, CONTRACTOR'S AND CONTRACTOR INTERESTS' TOTAL AGGREGATE LIABILITY UNDER THIS AGREEMENT, ARISING OUT OF OR IN CONNECTION WITH THE WORK OR THIS AGREEMENT, WHETHER BASED ON CONTRACT (INCLUDING BREACH, WARRANTY, INDEMNITY, ETC.), TORT (INCLUDING FAULT, NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE, SHALL NOT EXCEED AN AGGREGATE AMOUNT EQUAL TO TWENTY-FIVE PERCENT (25%) OF THE PAYMENTS FOR SUCH UNIT THAT HAVE BEEN MADE TO CONTRACTOR AS OF THE DATE OF THE EVENT OR CIRCUMSTANCE GIVING RISE TO THE CLAIM (THE "MAXIMUM LIABILITY AMOUNT").  FOR THE PURPOSE OF DETERMINING WHETHER THE MAXIMUM LIABILITY AMOUNT HAS BEEN MET, INSURANCE PROCEEDS RECEIVED FROM THE INSURANCE POLICIES REQUIRED TO BE MAINTAINED UNDER THIS AGREEMENT SHALL NOT BE INCLUDED.  THE MAXIMUM LIABILITY AMOUNT SHALL NOT APPLY TO A BREACH OF THE WARRANTY OF TITLE SET FORTH IN SECTION 14.3; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL CONTRACTOR'S LIABILITY FOR A BREACH OF THE WARRANTY OF TITLE EXCEED THE AMOUNT OF THE CONTRACT PRICE PAID TO CONTRACTOR AS OF THE DATE OF SUCH BREACH. IN NO EVENT MAY ANY CLAIM BY OWNER AGAINST CONTRACTOR ARISING OUT OF OR IN CONNECTION WITH THE WORK OR THIS AGREEMENT,

Execution Version    Confidential Trade Secret Information—Subject to Restricted Procedures

WHETHER BASED ON CONTRACT (INCLUDING BREACH, WARRANTY, INDEMNITY, ETC.), TORT (INCLUDING FAULT, NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE BE BROUGHT, WITH RESPECT TO A UNIT, MORE THAN TWO (2) YEARS AFTER THE END OF THE STANDARD EQUIPMENT WARRANTY PERIOD (EXCEPT FOR ANY LIABILITY ASSOCIATED WITH BREACH OF AN EXTENDED EQUIPMENT WARRANTY, WHICH MUST BE BROUGHT NO LATER THAN SIX (6) MONTHS AFTER THE END OF THE EXTENDED EQUIPMENT WARRANTY PERIOD APPLICABLE TO SUCH ITEM OF EQUIPMENT).

17.3    Division of Liability.

(a)    The Consortium Members agree that they are jointly and severally liable for Contractor's performance obligations hereunder, except that in no event shall Stone & Webster have or assume any loss, damage or liability for or in connection with the supply, design, analyses or operation of the reactor vessel, reactor vessel head, reactor internals, reactor coolant pumps, steam generators, pressurizer, squib valves, or main reactor coolant loop piping, whether arising in contract (including breach, warranty, indemnity or otherwise) and however caused, including fault, negligence, strict liability or otherwise.

(b)    SCE&G and Santee Cooper agree that they are jointly and severally liable for Owner's obligations hereunder, to the extent such joint and several liability does not conflict with South Carolina Law applicable to Santee Cooper. To the extent the prior sentence conflicts with South Carolina Law, then notwithstanding that both SCE&G and Santee Cooper are named in this Agreement as "Owner", as between Contractor and Owner, SCE&G shall be solely liable for the obligations and liabilities of Owner hereunder.

## ARTICLE 18 – LIENS

18.1    Liens.    Contractor shall keep the Facility, the Site and the Equipment free from Liens (other than liens arising from acts of Owner or Owner's failure to pay amounts due to Contractor), and shall promptly notify Owner of any known Liens filed against the Facility, the Site, or the Equipment and any structures comprising the Facility or located on the Site.  If Owner seeks Contractor's indemnification for any Lien, Owner shall:

(a)    Give Contractor prompt written notice of any Lien of which it has knowledge; and applicable documentation regarding the Lien;

(b)    Cooperate in the defense of litigation relating to the Lien; and

(c)    Give Contractor sole control of the defense and settlement, to the extent of Contractor's liability, for the Lien if Contractor confirms in writing an obligation to indemnify Owner with respect to the Lien.

18.2    Discharge or Bond.    Contractor shall take prompt steps to discharge or bond any Lien filed against the Facility, any Equipment, and any structures comprising the Facility or located on the Site by any Subcontractor based on a claim for payment by Contractor in connection with the Work. Contractor shall have the option of providing an indemnity to Owner

Confidential Trade Secret Information—Subject to Restricted Procedures

in lieu of discharging or providing a bond, for up to a nine (9) month period to allow Contractor a reasonable time to resolve the cause of the filing of the Lien. If Contractor fails to indemnify, discharge or promptly bond any Lien, Owner shall have the right, upon notifying Contractor in writing and providing Contractor reasonable time to indemnify, discharge or bond the Lien, to take any and all reasonable actions and steps to satisfy, defend settle or otherwise remove the Lien at Contractor's expense, including reasonable attorneys' fees, costs and expenses. Owner shall have the right to recover these expenses from Contractor. Contractor shall have the right to contest any Lien, provided it first provides to Owner the indemnity provided for above or it may provide the lien holder, a court or other third Person, as applicable, a bond or other assurances of payment necessary to remove the Lien related to the Work from the Site and the Facility in accordance with the Laws of the State of South Carolina.

## ARTICLE 19 – PROPRIETARY DATA

19.1    <u>Protection of Owner Proprietary Data</u>.

(a)    Any Proprietary Data of an Owner disclosed to Contractor shall be marked "Proprietary" or the like on each page in which the respective party claims a proprietary or confidential interest therein (or for electronic data, on the opening screen of such data). If Contractor receives information which it recognizes as being Proprietary Data, but which has not been marked as such, it shall promptly notify Owner and mark the information as Proprietary Data.

(b)    In the use of any Owner Proprietary Data by Contractor for the purpose of providing required information to, and/or securing Government Approvals from, any Government Authority, Owner and Contractor shall cooperate to minimize the amount of such information furnished consistent with the interests of Owner and the requirements of the Government Authority involved.

(c)    Contractor agrees that it shall not, during or after the term of this Agreement, disclose any Proprietary Data of Owner and its Affiliates, which is provided to Contractor during the performance of Work under this Agreement, including but not limited to, their costs, charges, rates, records, operating procedures, and methods of doing business, to any Person (other than Subcontractors as required for the performance of the Work), or to the general public for any reason or purpose whatsoever without the prior written consent of Owner, and that such Proprietary Data received by Contractor shall be used by it exclusively in connection with the performance of its responsibilities relating to the Work. However, nothing herein shall prevent Contractor from disclosing Proprietary Data of Owner or its Affiliates as required by Law or an order of a Government Authority; provided that Contractor shall, if Contractor has adequate advance notice, give Owner reasonable notice so as to allow Owner to seek a protective order or similar protection, and nothing herein shall prevent Contractor from disclosing to the appropriate Government Authority any noncompliance with or violation of laws, rules, regulations, or orders within the jurisdiction of such Government Authority. If, in the opinion of its legal counsel and in the absence of a protective order or waiver, Contractor is legally compelled to disclose Owner's Proprietary Data, Contractor will disclose only the minimum amount of such information or data as, in the opinion of its legal counsel, is legally required. In addition, Contractor shall have the right to receive and use Proprietary Data of Owner (but

excluding any financial information) for the purposes of performing or assisting in the performance of Startup, commissioning, licensing and Startup maintenance services for other AP1000 Nuclear Power Plant owners, and to disclose such Proprietary Data of Owner to such owners or Subcontractors for such purposes under provisions of confidentiality including an agreement substantially similar to Exhibit O-1, it being understood that in such instances, Owner does not warrant such data and Contractor shall indemnify Owner for any claims arising from the use of such data.  Nothing herein grants the right to Contractor (or implies a license under any patent) to sell, license, lease or cause to have sold, licensed or leased, any Proprietary Data supplied by Owner under this Agreement.

(d)    Title to Proprietary Data provided by Owner to Contractor and all copies made by or for Contractor in whole or in part from such Proprietary Data remains with Owner. Contractor shall include Owner's confidential or proprietary markings as provided by Owner on all copies thereof and excerpts made therefrom except with respect to excerpts made or used internally by Contractor for Facility Purposes; provided, however, that Contractor shall destroy any such excerpts which do not include Owner's confidential or proprietary markings when no longer needed for the purpose for which they were made.

19.2    Protection of Contractor's Proprietary Data.

(a)    Any Proprietary Data of Contractor disclosed to Owner shall be marked "Proprietary" or the like on each page in which the respective party claims a proprietary or confidential interest therein (or for electronic data, on the opening screen of such data). If Owner receives information which it recognizes as being Proprietary Data, but which has not been marked as such, it shall promptly notify Contractor and mark the information as Proprietary Data.

(b)    Owner's Use.

(i)    Owner agrees not to use Proprietary Data provided by Contractor or copies thereof unless such use is solely for the purposes of the Facility (and associated simulator), in connection with design, construction and installation of the Facility, the simulator, and ancillary facilities, trouble-shooting, response to plant events, inspection, evaluation of system or component performance, scheduling, investigations, initial fuel loading, refueling, operation, maintenance, management, procurement, testing, training, repair, licensing, modification, decommissioning, ensuring the safety of the Facility, simulator and ancillary facilities and compliance with Laws or Government Authorities (collectively, the "Facility Purposes").  Nothing herein grants the right to Owner (or implies a license under any patent) to sell, license, lease, or cause to have sold any Proprietary Data supplied by Contractor under this Agreement.

(ii)    Title to Proprietary Data provided by Contractor to Owner and all copies made by or for Owner in whole or in part from such Proprietary Data remains with Contractor.  Owner shall include Contractor's confidential or proprietary markings as provided by Contractor on all copies thereof and excerpts made therefrom except with respect to excerpts made or used internally by Owner for Facility Purposes; provided, however, that Owner shall destroy any such excerpts which do not include Contractor's confidential or proprietary markings

when no longer needed for the purpose for which they were made. Except as otherwise provided under this Section 19.2 or Section 19.3, Owner agrees to keep such Proprietary Data confidential, to use such Proprietary Data only for the Facility Purposes and not to sell, transfer, sublicense, disclose or otherwise make available any of such Proprietary Data to others (other than Affiliates). However, nothing in this Article 19 shall prevent Owner from disclosing Proprietary Data of Contractor or its Affiliates as required by Law or an order of a Government Authority (including, without limitation, the COL); provided that Owner shall, if Owner has adequate advance notice, give Contractor reasonable notice so as to allow Contractor to seek a protective order or similar protection. If, in the opinion of Owner's legal counsel and in the absence of a protective order or waiver, Owner is legally compelled to disclose Proprietary Data, Owner will disclose only the minimum amount of such information or data as, in the opinion of Owner's legal counsel, is legally required. In any such event, Owner agrees to use good faith efforts to ensure that Proprietary Data that is so disclosed will be accorded confidential treatment.

(iii)    Contractor hereby grants to Owner and its Affiliates, officers, directors, employees or attorneys who have a need for access to know such Proprietary Data reasonably related to the exercise of any rights of the Owner hereunder a transferable (but only as part of the sale or transfer of the Facility or the operating responsibilities related thereto), royalty-free, fully paid up, perpetual and irrevocable (unless terminated for the reasons set forth in Sections 22.3, 22.4, or 22.5), nonexclusive license to use and copy Contractor's Proprietary Data but only for the Facility Purposes (and for the associated simulator).

(iv)    Owner may designate one or more entities as an Owner's Engineer. Contractor understands and recognizes that Owner intends to utilize a Third Party or parties as Owner's Engineer(s) for Facility Purposes in the day-to-day overall operations, maintenance and service of the Facility and each Unit. Upon such designation by Owner and written approval from Contractor, which shall not be unreasonably withheld, delayed or conditioned and, provided such grant is not explicitly prohibited in Contractor's existing Subcontracts, Contractor shall be deemed to have granted to the Owner's Engineer a fully paid-up, royalty-free, non-exclusive, nontransferable and nonassignable right and license to use the applicable deliverable portion of the AP1000 Facility Information (including the categories of information described on Table 2-1 of Exhibit A) and any released AP1000 Facility Information solely during the term that Owner's Engineer performs services for Owner in connection with the Facility and solely for the Facility Purposes. In the event a Contractor's Subcontractor does not permit Contractor to sublicense Subcontractor information for this purpose, Contractor agrees to employ commercially reasonable efforts to jointly negotiate with Owner and said Subcontractor to attempt to secure a license for Owner's Engineer. Notwithstanding the above, no written approval is required from Contractor in the event of a termination of the Agreement under Section 22.2(a).

(c)    Owner's Disclosure to Third Party Recipients.

(i)    Owner may disclose Contractor's Proprietary Data to third parties (hereinafter referred to as "Recipients" or "Recipient") in accordance with the procedures and subject to the limitations set forth in this Section 19.2 and Section 19.3, provided that such disclosure is exclusively for the Facility Purposes. . Notwithstanding the foregoing, disclosures

of Contractor's Proprietary Data (other than Contractor Non-Disclosable Information) may be made to Recipients for the purpose of evaluating the potential purchase of power from the Facility or in the exercise of the rights of such purchasers to review Owner's generation expansion plans and such disclosures shall be governed exclusively by the provisions of the existing Non-Disclosure Agreement among SCE&G, Santee Cooper and the Consortium Members dated September 11, 2007, as amended (the "Existing Confidentiality Agreement").

(ii)    Owner shall enter into a proprietary data agreement with the Recipient substantially on the terms set forth in Exhibit O-1; provided, however, that the Owner may disclose such Proprietary Data without entering into such agreements to those persons to which access is required by any Government Authority or as necessary in order to comply with Law.

(iii)    Should Owner discover a breach of the terms and conditions of a proprietary data agreement with a third party, Owner will promptly notify Contractor of such breach and provide to Contractor necessary information and support pertaining to any suit or proceeding contemplated or brought by Contractor against Recipient for such breach.

(iv)    Contractor shall not be responsible to Owner for the consequence of the use or misuse of Contractor's Proprietary Data by third parties. Contractor makes no warranties, express or implied, to the extent of any such use or misuse of Contractor's Proprietary Data by third parties.

(v)    Nothing herein shall prevent Owner from disclosing to the appropriate Government Authority any noncompliance or violation of Laws within the jurisdiction of such Government Authority.

(d)    Owner's Export of Technical Information.  Owner agrees to comply with relevant United States Government regulations concerning the export of technical information, with respect to Contractor's Proprietary Data provided to Owner by Contractor under this Agreement.  This provision shall also apply to any technical information developed by Owner using Contractor's Proprietary Data. Irrespective of any other provisions in this Agreement, the obligations set forth in this Section 19.2(d) shall be binding so long as the relevant United States Government regulations remain in effect.

19.3    Special Procedures Pertaining to Contractor's Proprietary Data.

(a)    Categories of Contractor Proprietary Data.  The Parties acknowledge and agree that certain Proprietary Data of Contractor delivered to Owner under this Agreement in accordance with Table 2 of Exhibit A may be disclosed on a confidential basis without the prior consent of Contractor ("Contractor Disclosable Information", as described in Section 19.3(b)), and that certain other Proprietary Data of Contractor may not be disclosed by Owner to any third parties without the prior consent of Contractor ("Contractor Non-Disclosable Information", as described in Section 19.3(d)). Owner agrees to abide by the provisions of this Section 19.3 governing the disclosure of Contractor's Proprietary Data.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

(b)    <u>Contractor Disclosable Information</u>.  Contractor Disclosable Information consists of the following Proprietary Data that has been developed by Contractor, to the extent such Proprietary Data does not include Contractor Non-Disclosable Information as described in Section 19.3(d) below:

(i)    Descriptions of the plant, its components, or its systems (physical characteristics, general outline drawings, equipment lists, termination drawings, general arrangement drawings, electrical drawings, and basic schematic drawings);

(ii)    Plant, component, or system data that can be measured by plant sensors;

(iii)    Information that may be acquired by physical measurement, such as location, dimensions, weight and material properties;

(iv)    Contractor operating and maintenance manuals, and QA documentation;

(v)    Erection and commissioning documentation such as installation and layout drawings, and control room panel assembly and location drawings;

(vi)    Information or calculations directly developed using publicly available methods or data;

(vii)    Final results of calculated information or input assumptions to calculated information such that calculations could be recreated by a third party using the third party's own then-existing methods (excluding Contractor-developed test or experience-based data, methodologies, correlations and models, which Contractor will not release to Owner); and

(viii)    Design specifications for non-safety related equipment and system specification documents ("SSDs") for non-safety related systems except the following:  (A) all design specifications for non-safety Instrumentation & Control (I&C) systems, and (B) SSDs identified for the systems listed below:

(1)    Chemical and Volume Control System

(2)    Data Display and Processing System

(3)    Diverse Actuation System

(4)    Incore Instrumentation System

(5)    Operation and Control Centers

(6)    Plant Control System

(7)    Main Turbine Control and Diagnostics System

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

(8)    Main Generation System

(9)    Special Monitoring Systems

(c)    <u>Information</u>. Contractor Disclosable Information may be disclosed by Owner to third parties without prior notice to Contractor, provided that such disclosure is exclusively for the Facility Purposes and provided that:

(i)    Owner shall take reasonable steps to minimize the disclosure of Contractor's Proprietary Data to only that information necessary for a Recipient to perform its contracted functions;

(ii)    Owner shall execute an agreement with the Recipient governing the disclosure of Contractor's Proprietary Data consistent with Section 19.2(c)(ii);

(iii)    Contractor has the right to audit Owner's records and the contents of any agreements (subject to Owner's right to protect Proprietary Data of Owner and third parties) executed between Owner and a Recipient governing the disclosure of Contractor's Proprietary Data (Owner shall have the right to redact portions of such agreements not relevant to confidentiality); and

(iv)    The provisions of Section 19.2(c)(iii), (iv) and (v) shall apply to such disclosure.

(d)    <u>Contractor Non-Disclosable Information</u>.    Contractor Non-Disclosable Information consists of the following information that has been developed by Contractor:

(i)    Calculation for safety related equipment and systems, except those meeting the conditions set forth in Section 19.3(b)(vi) and (vii);

(ii)    Plant Design Model;

(iii)    I&C functional, system, software and interface requirements and functional logic diagrams;

(iv)    Design specifications and qualification reports for safety related equipment;

(v)    SSDs for safety related systems;

(vi)    I&C architecture diagrams, I&C software verification and validation documentation, I&C testing procedures and test results;

(vii)    Component data packages which include Manufacturing Deviation Notices, Certified Material Test Reports (CMTR) and Quality Releases (will typically be provided to the Owner in the final data package if the deviations exceed the official design/fabrication specifications); and

(viii)   Information which contains confidential intellectual property of Contractor's Subcontractors or other Contractor utility customers which is licensed to Contractor and which Contractor has the right to sub-license to Owner, or confidential intellectual property of Contractor's Subcontractors licensed directly to Owner.  Exhibit O-2 contains the list of such confidential intellectual property identified as of the Effective Date, and these items are subject to the separate contractual or license agreements and limitations on copying and use, and Owner agrees to and shall be bound by the terms of any such third-party contractual or license agreements provided or identified. The list in Exhibit O-2 will be updated by Contractor during the Work as such additional third party license agreements are identified and required as part of the Work and to update the list for any newer versions or replacements of the software or other confidential information, as applicable.  Contractor shall not remove an item from Exhibit O-2 without Owner's mutual agreement.  For license agreements with such third-parties necessary for maintenance or operation of the Facility for items such as those identified in Exhibit O-2 but not previously executed, Contractor agrees to make commercially reasonable efforts to negotiate terms consistent with the provision of this Article 19 permitting Contractor to sub-license to Owner confidential information received by Contractor from Contractor's Subcontractors or other contractor utility customers.

(e)   Procedures Pertaining to Contractor Non-Disclosable Information.  Upon written request by Owner, Contractor shall consider the release of Contractor Non-Disclosable Information. The request shall identify the information requested to be disclosed, the work that is to be performed and the name of the intended Recipient. The request shall be reviewed by Contractor for acceptability for disclosure based on the principle, agreed to by Owner and Contractor, that Contractor has the right to protect its proprietary information in which it has made a substantial investment and which required substantial innovation, balanced against whether such disclosure would jeopardize such proprietary rights of Contractor and the principle that Owner has the right to assure that services associated with maintenance and operation of the Facility are in all respects prudent, including cost, and thus may need to be performed by third party service providers. The determination of whether or not to disclose the information shall be made by Contractor in its discretion based on the above principles. Contractor shall make commercially reasonable efforts to respond within five (5) Business Days of receipt of a written request from Owner to release specific Contractor Non-Disclosable Information. If, at the end of fifteen (15) Business Days following such receipt by Contractor of a written request from Owner to release specific Contractor Non-Disclosable Information, Contractor has not rejected the request to release specific Contractor Non-Disclosable information, such request shall be deemed accepted by Contractor. If Contractor agrees to the disclosure of such information, the specific information to be provided to the Recipient (subject to Owner's right to protect Proprietary Data of Owner and Recipient) shall be subject to review and approval by Contractor and shall be governed by the terms of the confidentiality agreement with the Recipient substantially in the forms set forth in Exhibit O-1.

(f)   Documents Containing Combined Information. Where a document marked "Proprietary" or the like contains Contractor Disclosable Information and Contractor Non-Disclosable Information, Owner shall not disclose any Contractor Non-Disclosable Information without Contractor's prior written consent.  Owner shall have the right to:

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

(i)       request Contractor to prepare and verify the accuracy of a version of such document containing only Contractor Disclosable Information;

(ii)      request Contractor to prepare and verify the accuracy of a document which contains the specific information requested by the third party service provider; or

(iii)     itself extract the Contractor Disclosable Information from such document and provide the Disclosable Information to the third party service provider in accordance with the procedures set forth in Section 19.3(c).  Owner shall make commercially reasonable efforts to give notice to Contractor's currently-assigned designated contact of the proposed disclosure of any extract of Contractor Disclosable Information and, at least five (5) Business Days prior to such disclosure, shall provide such extract to Contractor for review. All right, title and interest in Contractor Disclosable Information contained in such document or material prepared by Owner remains with Contractor and, for the avoidance of doubt, is hereby assigned to Contractor.

(iv)      Contractor shall be reimbursed on a Time and Materials Basis for the preparation and verification of documents for Owner under Section 19.3(f)(i) and (ii) above. Contractor shall assume no liability for, and will not warrant the accuracy or validity of, any version of a document containing Disclosable Information prepared by Owner pursuant to Section 19.3(f)(iii) above.

(g)       Additional Procedures.  Owner and Contractor shall each designate a contact person for the purposes of administering the disclosure of Contractor's Proprietary Data. Owner's designated contact shall be responsible for (i) ensuring that an agreement is executed with the Recipient governing the disclosure of Contractor's Proprietary Data consistent with Section 19.2(b)(ii) before the information is released, and (ii) making formal requests to Contractor for the release of information designated as Contractor Non-Disclosable Information. Contractor's designated contact shall be responsible for (i) handling and expediting responses to Owner's requests for release of information not specifically designated as disclosable and (ii) conducting periodic reviews of Owner's records listing the Recipients and purposes of disclosure of Contractor Proprietary Data.

19.4     Ownership of Rights in Documentation.  The rights, title and interests in and to the copies of Documentation provided to Owner shall be owned by Owner, provided that all rights, title and interests in and to Contractor's or third party's Proprietary Data within the Documentation shall remain with Contractor or the applicable third party, subject to the provisions of this Article 19. The types of Documentation to be received by Owner are listed in Table 2 of Exhibit A.

19.5     Ownership of Invention Rights.  Contractor shall retain the ownership rights in any and all discoveries and inventions (patentable or unpatentable) that Contractor or any of its Subcontractors makes, creates, develops, discovers or produces in connection with the design, manufacture, testing, analysis, maintenance or construction of the Facility or performance of the Work; provided, however, that Contractor hereby grants to Owner a transferable (but only as part of the sale or transfer of the Facility), royalty-free, fully paid up, irrevocable, nonexclusive

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

license to use such discoveries and inventions for the purposes of Facility (and associated simulator) maintenance, operation, training, repair, decommissioning and compliance with Laws.

19.6    Software.  Software provided to Owner by Contractor shall be subject to the software license provisions set forth in Exhibit M-1.

19.7    Publicity.  Each Party shall use commercially reasonable efforts to consult with the other Party before issuing any press releases or other public announcements involving any details of this Agreement other than that the Parties are or have had discussions with the other, except that the foregoing shall not be required if necessary to comply with Law or in the case of an emergency.

## ARTICLE 20 – ENVIRONMENTAL; HAZARDOUS MATERIALS

20.1    Material Safety Data Sheets.    To the extent required by applicable Law, Contractor shall provide to Owner Material Safety Data Sheets covering Hazardous Materials to be furnished, used, applied, or stored by Contractor, or any of its Subcontractors, at the Site in connection with the Work.  Contractor shall coordinate with Owner's Project Director to provide a listing of such Hazardous Materials and their quantities at the Site for purposes of chemical inventory reporting pursuant to 40 C.F.R. Part 370 and similar state regulations.

20.2    Facility Use, Storage Removal.  When the use or storage of explosives or other Hazardous Materials or equipment is necessary for the performance of the Work, Contractor shall exercise the utmost care and shall carry on its activities under the supervision of properly qualified personnel in accordance with applicable Laws.  Before Unit Mechanical Completion of the Second Unit (or if there is no Second Unit, the First Unit), Contractor shall remove from the Site in accordance with applicable Laws any explosives and other Hazardous Materials that Contractor or its Subcontractors used, stored or located at the Site or any neighboring property, unless the same have been permanently incorporated into the Facility, provided that, if any such explosives and other Hazardous Materials are necessary for completion of the Work, Contractor shall be permitted to retain such explosives and other Hazardous Materials at the Site or any neighboring property but only if, and to the extent, in compliance with the COL and applicable Laws.

20.3    Handling, Collection, Removal Transportation and Disposal.

(a)    Unless otherwise agreed by the Parties, Contractor shall be responsible for the proper handling, treatment, collection, containerizing and removal of Hazardous Materials brought onto the Site or created by Contractor or Subcontractors or spilled or introduced into or at the Site by Contractor or any Subcontractor, including any such Hazardous Materials furnished, used, applied or stored at the Site by Contractor or any Subcontractor, including used oils, greases, and solvents from flushing and cleaning processes performed under the Agreement. Prior to Unit Mechanical Completion of a Unit, Contractor shall be responsible for the proper handling, storage, transportation, and disposal of any Hazardous Materials brought onto the Site or created by Contractor or Subcontractors. Contractor shall be liable for any fines or penalties imposed for its or its Subcontractors' failure to comply with applicable Laws with respect to Hazardous Materials for which it is responsible pursuant to this Section 20.3(a).

Execution Version                               Confidential Trade Secret Information—Subject to Restricted Procedures

(b)      At all times during the performance of the Work, Owner shall be responsible for the prompt and proper handling, storage, transportation and disposal of Hazardous Materials existing at, on or under the Site that were not brought onto the Site or created by Contractor or Subcontractors. After Unit Mechanical Completion of a Unit, Owner shall be responsible for the prompt and proper handling, storage, transportation and disposal of Hazardous Materials used or generated with respect to such Unit or remaining at the Site (after proper handling, collection and containering by Contractor). As between the Parties, Owner shall be considered the generator for Hazardous Materials existing at, on or under the Site that were not brought onto the Site or created by Contractor or Subcontractors, and shall retain all responsibility and liability with respect to such Hazardous Materials.  Subject to limitations on Santee Cooper's obligations as a matter of South Carolina law and subject to Contractor's obligations under Section 20.3(a), Owner shall indemnify Contractor against any penalties levied by any Government Authority for allowing any collected and containerized waste remaining in storage for more than the period allowed by applicable Laws without permit.

(c)      Activities performed by each Party in connection with the handling, storage, collection, containerizing, transportation and disposal of Hazardous Materials shall be performed in accordance with the requirements of all Government Authorities and all applicable Laws.

20.4    <u>Notice of Discovery</u>.  Contractor shall provide prompt written notice to Owner of any suspected Hazardous Materials that Contractor finds during performance of the Work not previously identified by Owner to Contractor.  Owner shall be responsible for any further action required after the discovery. To the extent any such action causes an increase in Contractor's costs or a delay in the performance of the Work, Contractor shall be entitled to a Change Order pursuant to Article 9.

## ARTICLE 21 – TITLE; RISK OF LOSS

21.1    <u>Transfer of Title</u>.  Except as otherwise expressly provided in this Agreement, title to an item of Equipment shall pass to Owner upon payment in full by Owner to Contractor for such item of Equipment.  The passage of title to Owner shall not be deemed an acceptance or approval of such Equipment (or any Work), affect the allocation of risk of loss, or otherwise relieve Contractor or Owner of any obligation under this Agreement to provide and pay for transportation and storage in connection with the Equipment.

21.2    <u>Risk of Loss</u>.

(a)      Whether or not title has passed to Owner, the risk of loss for each system or structure of a Unit shall remain with Contractor until, and shall pass to Owner upon Turnover of such system or structure. Contractor shall be obligated to replace, repair or reconstruct the Equipment that is lost, damaged, or destroyed before the risk of loss of the Equipment is transferred to Owner, provided that Contractor is reimbursed for performing such replacement, repair, or reconstructions, as applicable, from the Builder's Risk insurance described in Sections 16.1(b) and 16.2(a)(ii) or as otherwise provided herein.  Notwithstanding the foregoing, and notwithstanding any provision of this Agreement that requires a Party to bear the risk of loss to its own property, during the Turnover process, and until Unit Mechanical Completion and

Execution Version                         Confidential Trade Secret Information—Subject to Restricted Procedures

thereafter, (i) if Owner or any of its Personnel or Invitees damages any part of a system or structure of a Unit that has not yet achieved Turnover, Owner shall reimburse Contractor on a Time and Materials Basis to the extent of the negligence of Owner, its Personnel or Invitees, for any amounts not reimbursed by the applicable insurance policy, including the insurance deductibles related to such loss and (ii) if Contractor or any of its Personnel or Invitees damages any part of a system or structure of a Unit that has achieved Turnover, Contractor shall be liable for the insurance deductibles related to such loss subject to and limited by Section 16.2(a)(ii).

(b)    Risk of loss to Equipment that Contractor removes from the Facility or from the Site for repair, replacement or refurbishment under the Warranty shall transfer to Contractor at the time of its loading on the carrier at the Facility. Owner shall reassume the risk of loss upon completion of the unloading of the Equipment from the carrier at the Facility upon completion of such replacement, refurbishment or repair services.

21.3    Risk to a Party's Property. Each Party is responsible for insuring its own property (including the Facility and surrounding property) during the Work and thereafter, and each Party shall extend the benefit of such property insurance to the other. Each Party on behalf of itself and its insurers hereby waives all rights of recovery (including subrogation rights) against the other Party (including Contractor Interests) for any loss or damage to its property during the Work and thereafter, including the deductibles under any insurance policy. Notwithstanding the foregoing, however, should a Party cause damage to the other Party's property (including the Facility and surrounding property), such Party shall be responsible for the other Party's deductible under its insurance policy, up to (and limited to) one hundred thousand dollars ($100,000). For the avoidance of doubt, Contractor's liability for the payment of such amount shall not be reimbursable hereunder. Owner shall reimburse Contractor on a Time and Materials Basis for its work to remedy such loss or damage that exceeds such amount, whether based on contract, tort (including fault, negligence and strict liability) or otherwise. The foregoing shall apply notwithstanding any other provision to the contrary.

## ARTICLE 22 – SUSPENSION AND TERMINATION

22.1    Suspension by the Owner for Convenience.

(a)    Owner may, without cause, order Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as Owner may determine. Any such suspension of the Work shall entitle Contractor to a Change Order pursuant to Article 9.

(b)    Owner shall continue to meet the payment obligations to Contractor during any suspension, delay or interruption for Work actually performed.

(c)    During any suspension, Contractor shall take reasonable precautions to protect, store and secure the Equipment against deterioration, loss or damage and to minimize the charges for the suspension.

(d)    Contractor shall resume any suspended Work promptly following receipt of notice from Owner to do so.

Execution Version          Confidential Trade Secret Information—Subject to Restricted Procedures

22.2    Termination by Owner for Cause.

(a)    Without limiting any other rights that it may have hereunder, Owner may terminate the Agreement upon notice to Contractor if:

(i)    Contractor is in breach of a material provision of this Agreement and fails to cure the breach within ninety (90) Days following written notice of such breach or, if such breach is not capable of being cured within such ninety (90) Day period, such longer period as is reasonably necessary so long as Contractor has commenced the cure within such ninety (90) Day period and thereafter diligently pursues the cure;

(ii)    Contractor has failed within sixty (60) Days after receiving written notice of a Lien to (x) remove, (y) bond over or (z) provide a written indemnity for any Liens filed against the Facility, the Site or any other property of Owner by any of its Subcontractors (provided that all of Contractor's invoices have been paid in accordance with the Agreement) and has continued to fail to take any of such action within five (5) Business Days following Owner's notice of its intent to terminate for such failure;

(iii)    unless due to an Uncontrollable Circumstance, Substantial Completion of a Unit is delayed by more than one hundred eighty (180) Days past the Guaranteed Substantial Completion Date for such Unit and Contractor is not, in the reasonable opinion of Owner, exercising due diligence to correct same; or

(iv)    a Consortium Member is Insolvent.

(b)    When Owner terminates the Agreement for one of the reasons stated in Section 22.2(a), Contractor shall not be entitled to receive further payment until the Work is finished subject to the provisions set forth in Section 22.2(c)(iii).

(c)    Upon any termination pursuant to this Section 22.2, Owner may at its option elect to: (i) assume responsibility for and take title to and possession of the Facility and Work and Equipment remaining at the Site and Equipment located outside the Site for which payment in full or in part has been made by Owner; (ii) succeed automatically, without the necessity of any further action by Contractor, to the interests of Contractor in any or all Subcontracts entered into by Contractor with respect to the Work (if such Subcontracts permit), and shall be required to compensate such Subcontractors if acceptable to such Subcontractors only for compensation becoming due and payable to such parties for goods and services provided under the terms of their Subcontracts with Contractor from and after the date Owner elects to succeed to the interests of Contractor in such Subcontracts and (iii) request that Contractor continue to perform the Work or any portion thereof pursuant to a separate agreement.  In the event of any termination pursuant to this Section 22.2, Owner may, at its option, finish the Work and other work by whatever method Owner may deem expedient.

(d)    If the unpaid balance of the Firm Price and Fixed Price exceeds the costs of finishing the Firm Price and Fixed Price portion of the Work (including all reasonable administrative and other direct costs incurred as a result of such termination), such excess shall be paid to Contractor. If the cost of finishing the Firm Price and Fixed Price portion of the Work

Execution Version                                Confidential Trade Secret Information—Subject to Restricted Procedures

(including all reasonable direct costs for Owner to administer the completion of the Work and other direct costs incurred by Owner as a result of such termination) exceeds the unpaid balance of the Firm Price and Fixed Price, Contractor shall pay the difference to Owner.

(e)    To enable Owner to exercise its rights upon termination, each of Westinghouse and Stone & Webster has granted Owner an intellectual property license on the date hereof, as set forth in Exhibit M-2 and Exhibit M-3, respectively.

22.3    Termination by Owner for Convenience.

(a)    Owner may, at any time, terminate the Agreement for Owner's convenience and without cause.

(b)    In the event of termination for Owner's convenience prior to the issuance of the Full Notice to Proceed, Contractor shall be entitled to receive payment for its Termination Costs.

(c)    If Owner terminates for its convenience after the issuance of the Full Notice to Proceed, Contractor shall be entitled to receive payment for its Termination Costs and Owner shall pay to Contractor a termination fee of (i) in the first year after issuance of the Full Notice to Proceed, fourteen percent (14%) of Contractor's Profit; (ii) in the second year after issuance of the Full Notice to Proceed, ten percent (10%) of Contractor's Profit; (iii) in the third year after issuance of the Full Notice to Proceed, six percent (6%) of Contractor's Profit; (iv) in the fourth year after issuance of the Full Notice to Proceed, four percent (4%) of Contractor's Profit; and (v) in the fifth year after issuance of the Full Notice to Proceed, two percent (2%) of Contractor's Profit. Thereafter, no termination fee shall be required. In each instance, "Contractor's Profit" refers to Profit to the extent not already received in the payments made of the Contract Price prior to the date of such termination. In the event that Owner has exercised its right under Section 3.3(b) to cancel the Second Unit prior to issuance of the Full Notice to Proceed and, subsequent to issuance of the Full Notice to Proceed but within one (1) year following the cancellation of the Second Unit, terminates this Agreement for its convenience, the Profit shall be determined as if both Units were cancelled after issuance of the Full Notice to Proceed. The one (1) year period described in the preceding sentence shall be extended by the duration of any period of suspension of the Work pursuant to Section 22.1 that is initiated during such one (1) year period.

(d)    Upon such termination and payment, the Parties shall have no further liability to one another other than any liability that arose prior to the termination of this Agreement pursuant to this Section 22.3 and the Parties' obligations under Section 22.6.

22.4    Suspension and Termination Due to Other Circumstances.

(a)    In the event that Owner does not issue the Full Notice to Proceed as established in Section 3.3(b), Contractor shall have the right to suspend its Work, demobilize its forces and take such other actions as are reasonably needed to address the consequences of a delay in the Work, including the suspension or cancellation, as applicable of the Work being performed under Subcontracts. Prior to initiating such suspension, Contractor shall issue a notice

Confidential Trade Secret Information—Subject to Restricted Procedures

to Owner stating the basis for such suspension. Once the event that allowed Contractor to suspend Work under this Section 22.4(a) has occurred, Owner and Contractor shall negotiate a Change in the Contract Price, Project Schedule (including the Guaranteed Substantial Completion Date(s)), and such other applicable terms and conditions of this Agreement to reflect the effect of such event, including, without limitation, the suspension of the Work, and the demobilization and remobilization of Contractor's and the Subcontractors' forces, as applicable. Contractor shall incorporate agreed upon changes in a Change Order, or, in the absence of agreement, shall prepare a proposed Change Order reflecting the changes it deems necessary to reflect the effect of such event. Within sixty (60) Days following receipt of the requested Change Order from Contractor, Owner shall notify Contractor whether it (i) accepts the Change Order as proposed by Contractor, (ii) desires to have disputed issues in the Change Order resolved under the terms of Article 27; provided, however, that Owner shall not have the right to refer a proposed Change in the Project Schedule to dispute resolution; or (iii) desires to terminate this Agreement. If Owner does not (x) accept the Change Order as proposed by Contractor, (y) notify Contractor of its desire to have disputed issues (which, as stated above, may not include a dispute over the Project Schedule) resolved under Article 27 or (z) issue notice of termination within such sixty (60) Day period, Contractor shall have the right to terminate this Agreement upon thirty (30) Days notice to Owner.

(b)     Either Party may terminate this Agreement in the event that DOE fails to fund all NuStart AP1000 Nuclear Power Plant COL activities and AP1000 Nuclear Power Plant design finalization substantially on the schedule set forth in Exhibit E, and within six (6) months following such failure, the Parties have not agreed, pursuant to good faith negotiations, on an alternative funding method satisfactory to the Parties;

(c)     In the event that through no act or fault of Contractor or a Subcontractor, one or more suspensions, delays or interruptions of the Work by Owner or due to an Uncontrollable Circumstance constitute in the aggregate more than seven hundred thirty (730) Days or more than one hundred eighty (180) Days out of any three hundred sixty-five (365) Day period, or (unless due to a breach by Contractor of its obligations under this Agreement or a failure by Contractor to comply with applicable Law) an order of a Government Authority having jurisdiction over the Facility which requires the Work to be permanently stopped (or stopped for greater than one year), Contractor shall have the right to notify Owner that it intends to terminate the Agreement. If Owner does not agree to such termination within thirty (30) Days following Contractor's notice, Owner and Contractor shall negotiate a Change in accordance with Article 9 to reflect the effect of suspension, delay or interruption of the Work. Contractor shall incorporate agreed upon changes in a Change Order or, in the absence of agreement, shall prepare a proposed Change Order reflecting the changes it deems necessary to reflect the effect of the suspension, delay or interruption. Within thirty (30) Days following receipt of the requested Change Order from Contractor, Owner shall notify Contractor whether it (i) accepts the Change Order as proposed by Contractor, (ii) desires to have disputed issues in the Change Order resolved under the terms of Article 27 or (iii) desires to terminate this Agreement. If Owner does not (x) accept the Change Order as proposed by Contractor, (y) notify Contractor of its desire to have disputed issues resolved under Article 27 or (z) issue notice of termination within such thirty (30) Day period, Contractor shall have the right to terminate this Agreement upon thirty (30) Days notice to Owner.

Confidential Trade Secret Information—Subject to Restricted Procedures

(d)      In the event that the Agreement is terminated within ten (10) months immediately following the Effective Date, Contractor shall pay to Owner, within thirty (30) days following the date of termination, an amount equal to the Long Lead Material Payment. Moreover, if during the ten (10) month period immediately following the Effective Date, Owner terminates the Agreement solely due to the failure of the South Carolina Public Service Commission to approve SCE&G's Base Load Review Filing, Contractor shall pay to Owner an amount (in addition to the Long Lead Material Payment) (the "Additional Amount") equal to (i) the aggregate payments made by Owner for the Equipment identified with the Long Lead Material Payment as of the date of termination minus (ii) the Long Lead Material Payment. Payments of the Additional Amount will be made in three equal installments at intervals of twelve (12) months, twenty-four (24) months and thirty-six (36) months following the date of termination. In such circumstances, and notwithstanding the last paragraph of Section 22.6, Contractor shall retain ownership of the rights in the Equipment upon any such termination.

(e)      In the event of termination pursuant to this Section 22.4, Contractor shall be entitled to receive payment for its Termination Costs; however, if the events in 22.4(a) or (b) occur as a result of Contractor's breach of its obligations under this Agreement, the Termination Costs shall be determined without overhead or profit for Contractor (whether such overhead or profit are incorporated into the rates charged by Contractor or are separately stated).

22.5    Termination by Contractor.

(a)      Contractor may terminate this Agreement for any of the following reasons:

(i)      Owner fails to make payment to Contractor in accordance with the Agreement for a period exceeding forty-five (45) Days after an undisputed invoice has become due, or Owner fails to make payment to Contractor of disputed amounts in accordance with the provisions of Section 8.4(b)(i) for a period exceeding forty-five (45) Days following the date provided for in Section 8.4(b)(i), provided, in either case, that Contractor has provided the notices of overdue payment as required under Section 8.4(c);

(ii)      Owner is in breach of a material provision of this Agreement and fails to cure the breach within ninety (90) Days following written notice of such breach or, if such breach is not capable of being cured within such ninety (90) Day period, such longer period as is reasonably necessary so long as Owner has commenced the cure within such ninety (90) Day period and thereafter diligently pursues the cure; or

(iii)      Either SCE&G or Santee Cooper is Insolvent unless the other of SCE&G or Santee Cooper has provided security for payments that would be due from such Insolvent Person in accordance with Section 8.6 and no other changes to this Agreement have resulted from proceedings involving the Person that is Insolvent.

(b)      Upon termination of this Agreement pursuant to this Section 22.5, Contractor shall be entitled to receive payment from Owner as if it were a termination for Owner's convenience under Section 22.3.

Execution Version                        Confidential Trade Secret Information—Subject to Restricted Procedures

22.6    <u>Actions Required of Contractor upon Termination</u>.  Upon receipt of a notice of termination from Owner or the issuance of a notice of termination by Contractor, Contractor shall:

(a)    in an orderly manner and consistent with safety considerations, cease operations as directed by Owner in the notice;

(b)    take actions necessary, or that Owner may direct, for the protection and preservation of the Work (wherever located); and

(c)    except for Work directed to be performed prior to the effective date of termination stated in the notice, enter into no further contracts and purchase orders.

Upon receipt of a notice of termination for convenience from Owner, a notice of termination for cause from Owner pursuant to Section 22.2, or a notice of termination from Owner or Contractor, as applicable, pursuant to Section 22.4, Contractor shall use commercially reasonable efforts for a commercially reasonable time to sell to a third party the Equipment for which Owner has made Milestone Payments or to cancel such Equipment orders. Contractor shall consult with Owner with respect to such sale or cancellation to determine which is the preferred course of action. If Contractor sells the Equipment to a third party, then the net sales price for the Equipment paid to Contractor shall be remitted to Owner when received by Contractor. If Contractor determines that it is able to use the Equipment for another customer, the price to be charged to the other customer for such Equipment shall be refunded to Owner as such payments are received from the other customer.  If Equipment for which Owner has made Milestone Payments cannot be sold, cancelled or designated for another customer, then, at Owner's request, Contractor shall assign to Owner, and Owner shall assume, all rights and obligations under such Subcontract. Owner shall pay Contractor for such activities on Owner's behalf as follows: (i) for Westinghouse, its Recoverable Costs plus SGA and Pro Rata Profit on such costs and (ii) for Stone & Webster, its costs and expenses on a Time and Materials Basis.  In each instance under this Article 22 in which Termination Costs are due from Owner, such Termination Costs shall be determined following the performance of the undertakings of Contractor pursuant to this paragraph (other than the obligation to refund to Owner amounts received from a third party or another customer as provided above).

## ARTICLE 23 – SAFETY; INCIDENT REPORTING

23.1    <u>Environmental, Health and Safety Programs</u>.  Contractor shall be responsible for initiating, maintaining and supervising the safety precautions and programs in connection with its performance of its Work under the Agreement, including necessary precautions and programs for the Site and any areas adjacent to the Site under its supervision and/or control.  Contractor shall comply with applicable workplace safety Laws governing the Work and/or Site.

23.2    <u>Designated Contractor Safety Representative</u>.  Contractor shall designate a responsible, qualified person in Contractor's organization at the Site whose duty shall be the prevention of incidents and injuries and addressing unsafe and undesirable conditions and behavior for each of the following three (3) areas: environmental matters (U.S. Environmental Protection Agency and any applicable state agency), health matters (industrial hygiene and

employee health hazard prevention/mitigation) and safety matters, as each area relates to construction activities generally and the Work specifically.  One individual may be designated for more than one of these three areas if the individual is qualified in the relevant areas.

23.3    OSHA and Other Laws.  Contractor shall provide notices and comply with applicable workplace safety Laws, including the Occupational Safety and Health Act ("OSHA") and provisions of the Americans with Disabilities Act relevant to workplace safety. Contractor shall maintain the logs required under OSHA.

(a)    Contractor represents that it is familiar with the Site, the Work to be performed, the Equipment to be provided, the hazards of the Work, and, if applicable, the Material Safety Data Sheets for, and the hazards of, the Hazardous Materials that Contractor is expected to provide. Contractor represents that it is familiar with the labeling system used in the workplace.

(b)    Contractor acknowledges that OSHA and regulatory standards or state plan equivalent (collectively, the "OSHA Standards") require that its employees be trained in various subjects, such as, but not limited to, the hazards of, and standards applicable to, the Work (29 C.F.R. § 1926.21(b)(2)) (applicable to construction work), lockout/tagout (29 C.F.R. § 1910.147), confined space entry (29 C.F.R. §§ 1926.21(b)(6) or 1910.146), and asbestos (29 C.F.R. §§ 1910.1001 or 1926.1101).   Prior to performing Work on the Site, Contractor's employees and their supervisors shall, as required, have been trained in accordance with all applicable OSHA Standards relating to the duties they perform or supervise, and they shall have been trained to recognize and avoid any hazards related to the Work, and to perform the Work safely and without danger to any employee or to any property.

(c)    Contractor represents that its employees are or shall be equipped with the personal protective equipment required by applicable OSHA Standards in 29 C.F.R. Parts 1926 and 1910, and with the personal protective equipment required to protect its employees against other serious health or safety hazards.  Contractor agrees that it shall discipline its employees who violate any OSHA Standards or applicable Laws in accordance with its own policies and procedures.

(d)    Contractor shall comply with all OSHA Standards applicable to the Work, including those requiring pre-employment testing of employees, such as, but not limited to, pulmonary testing, blood testing, urine testing, hearing testing, respirator fit testing, drug screening, and/or applicable medical surveillance testing.

(e)    Contractor shall comply with its safety programs and/or any Site specific safety plans which Owner has reviewed and accepted.

(f)    Within a reasonable time following a specific request by Owner, and to the extent permitted by applicable Law, Contractor shall provide to Owner copies of training materials for its employees concerning a particular safety and health standard and/or particular substantive or technical training requirement of the job.

Execution Version             Confidential Trade Secret Information—Subject to Restricted Procedures

23.4    <u>Worksite Safety</u>.

(a)    Contractor shall take reasonable precautions for the safety of, and shall provide reasonable protection to prevent damage, injury or loss to Persons and property resulting from the Work, including:

(i)    Contractor or Subcontractor employees and other Persons performing the Work and any Persons who may be affected by the performance of the Work;

(ii)    the Equipment to be incorporated into the Facility, whether in storage on or off the Site or under the care, custody or control of Contractor or Subcontractors; and

(iii)    other property at or adjacent to the Site, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities.

(iv)    Contractor shall erect, maintain or undertake, as required by existing conditions and the performance of the Agreement, reasonable safeguards for the safety and protection of Persons and property, including posting danger signs and other warnings against hazards, promulgating safety regulations, and notifying Owner and users of adjacent sites and utilities.  Those precautions may include providing security guards.

(v)    Contractor agrees to provide to Owner the name, title, and phone number of its emergency contact person prior to the commencement of the Work.

23.5    <u>Dangerous Materials</u>.  When the use or storage of explosives or other dangerous materials or equipment or unusual methods are necessary for the Work, Contractor shall exercise utmost care and carry on its activities only under the supervision of properly qualified personnel. Contractor shall notify Owner's Project Director prior to bringing any explosives onto the Site.

23.6    <u>Cooperation in Governmental Investigations and Inspections</u>.  Contractor and its Subcontractors shall provide reasonable assistance to Owner in responding to requests and inspections by any Government Authority for information in connection with the Work involving Contractor or its Subcontractors.  Contractor shall provide the NRC the facilities, furnishings, conveniences and access set forth in 10 C.F.R. § 50.70 and shall take good faith efforts to keep confidential the presence of any representative of the NRC at the Site as provided in 10 C.F.R. § 50.70(b)(4).

23.7    <u>Audit</u>.  To the extent permitted by applicable Law, and in response to specific and identifiable concerns, Contractor shall permit Owner to review and copy Contractor's documents related to those specific and identifiable safety and health concerns at the Site.

Confidential Trade Secret Information—Subject to Restricted Procedures

## ARTICLE 24 – QUALIFICATIONS AND PROTECTION OF ASSIGNED PERSONNEL

24.1    <u>Screening Measures</u>.    A fitness for duty and security screening program ("Screening Measures") shall be established for all Contractor and Subcontractor employees for the Work. This program shall comply with the regulations set forth in the Laws governing new nuclear build construction. This program shall contain:

- Prohibition of the use, transportation, sale, or possession of illegal drugs

- Prohibition of the use or possession of alcohol beverages on the Site

- Requirement that employees be fit for duty at all times while on the Site

- Requirement that employees submit to drug and alcohol testing during preaccess screening, for-cause testing, and post event testing, as necessary

- Requirement that all employees must immediately report known, suspected, or potential violations of this policy to supervisory personnel or management

- Requirement that a subset of workers who perform important safety functions be subject to random testing

- Protection of information and records to assure confidentiality

- Requirement that employees consent to a search or inspection of the individual's property while on the Site.

In addition to pre-access screening for drugs and alcohol an identity check and screening for criminal history shall be performed.  A law enforcement criminal records check on all potential employees that shall include:

- Verification of identity

- A criminal history check of the individual shall be performed

- Prior to a final adverse determination, the applicant shall be informed of the basis for potential denial of access to the Site to assure the accuracy of the basis for such denial.

During preaccess screening a probationary period of not to exceed thirty (30) Days shall be granted to allow for the testing and prescreening to be performed while the employee is put to work.

24.2    <u>Contractor's Personnel</u>.    Contractor shall comply with applicable labor and immigration Laws that may impact Contractor's Work under this Agreement, including the Immigration Reform and Control Act of 1986 and Form I-9 requirements.  Contractor shall perform the required employment eligibility and verification checks and maintain the required employment records.  Contractor acknowledges and agrees that it is responsible for conducting

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

adequate screening of its employees and agents prior to starting the Work. By providing an employee or Subcontractor under this Agreement, Contractor warrants and represents that the Screening Measures with respect to such employee or Subcontractor have been completed and that such Screening Measures did not reveal any information that could adversely affect such employee's or Subcontractor's suitability for employment or engagement by Contractor or competence or ability to perform duties under this Agreement. If in doubt whether a suitability, competence or ability concern exists, Contractor shall discuss with Owner the relevant facts and Owner shall determine, in its sole discretion, whether such Person should be allowed to perform the Work. Owner, in its sole discretion, shall have the option of barring from the Site any person whom Owner determines does not meet the qualification requirements set forth above. In all circumstances, Contractor shall ensure that the substance and manner of any and all Screening Measures performed by Contractor pursuant to this Section conform fully to applicable Law. Contractor shall submit to Owner for approval a set of work rules that applies to all Contractor and Subcontractor employees. This set of work rules shall establish Contractor's and Subcontractor's disciplinary action policy and hiring and termination policy. This policy shall detail the actions to be taken by Contractor and Subcontractors for acts of misconduct, negligence and incompetence of their employees. The disciplinary action program shall be progressive up to termination and the barring of employee from future employment.

24.3    Training of Employees.    Contractor represents that all Contractor and Subcontractor personnel shall as required be trained regarding environmental, OSHA and NRC requirements and any other matters required by applicable Laws and relevant to the Work.

24.4    NRC Whistleblower Provision.    Contractor and its Major Subcontractors shall comply with the requirements of Section 211, "Employee Protection," of the Energy Reorganization Act of 1974, 42 U.S.C. § 5851, as amended; 10 C.F.R. § 50.7, "Protection of Employees Who Provide Information" and 29 C.F.R. § 24 (collectively, the "Whistleblower Provisions"). Contractor shall implement a program and develop procedures to advise all of Contractor's and the Major Subcontractors' personnel that they are entitled and encouraged to raise safety concerns to Contractor's management, to Owner, and to the NRC, without fear of discharge or other discrimination.

24.5    Respirator Protection.    For any Work at the Site that shall expose any of Contractor's or any Subcontractor's employees or representatives to sources of radiation or require them to wear respiratory protection, Contractor shall require each of these employees or other representatives, prior to entering any radiation area or wearing respiratory protection, to undergo a physical examination to determine if occupational radiation exposure or the wearing of respiratory protection should be avoided because of any medical condition or other circumstance, and in addition, to undergo such physical examination as may be required by applicable Law or by any Government Authority having jurisdiction. Contractor shall keep a record of the physical examination available for inspection by Owner. Owner shall assist Contractor in defining the applicable requirements, if requested.

## ARTICLE 25 – RECORDS AND AUDIT

25.1    Technical Documentation.    Except to the extent applicable Laws require a longer retention, Contractor shall maintain and shall cause its Major Subcontractors to maintain all

Execution Version          Confidential Trade Secret Information—Subject to Restricted Procedures

technical documentation relative to the Equipment for a period of three (3) years after Final Completion.

25.2    <u>Accounting Records</u>.   Except to the extent applicable Laws require a longer retention, Contractor shall maintain and shall cause its Subcontractors to maintain complete accounting records relating to the Work performed or provided under this Agreement on a Time and Materials Basis or the Target Price, or other reimbursable basis in accordance with generally accepted accounting principles in the United States, as set forth in pronouncements of the Financial Accounting Standards Board (and its predecessors) and the American Institute of Certified Public Accountants, for a period of three (3) years after Final Completion of a Unit, except that records relating to Sales Taxes for such items must be retained for seven (7) years as specified in Section 25.5.

25.3    <u>Maintenance of Records Generally</u>.   Notwithstanding anything in Section 25.1 or 25.2 to the contrary, Contractor shall ensure that its maintenance of records complies with the applicable provisions of 10 C.F.R. § 50.71.

25.4    <u>Right to Audit</u>.   If Owner requests verification of Recoverable Costs claimed by Contractor for reimbursement or for any Work performed or provided on a Time and Materials Basis or the Target Price, Owner or its authorized representative shall be permitted to examine and audit Contractor's records and books, and Subcontractors' where permitted by contract, related to those costs.   The right to initiate any audit shall expire, with respect to any such cost, three (3) years after the cost was incurred. Such audit shall provide Owner with a reasonable opportunity to verify that all costs and charges have been properly invoiced in accordance with the terms of this Agreement. Owner shall not be entitled to any information that would enable Owner to determine the make-up of any agreed upon lump sum, or any fixed or established amounts, rates or multipliers, including the Firm Price or the Fixed Price, unless access to this information is needed to support a request made by Owner or Contractor for a change in indices in accordance with Article 7.  If any audit by the auditor reveals charges to or paid by Owner as charges or fees which are incorrectly charged, then Owner shall be entitled upon demand for a refund from Contractor of such amounts, together with interest at the Prime Rate plus one percent (1%) per annum, measured from the date of the incorrect invoice until the date the refund is paid.  Likewise, if any audit or if any examination by any state or local taxing agency reveals additional Sales Tax to be imposed upon Contractor for under collection of tax from Owner on a taxable sale, then Contractor shall be entitled, upon demand, to a payment from Owner of all such amounts, together with any interest and penalties imposed by any state or local taxing agency.   Notwithstanding anything in this Section 25.4 to the contrary, Owner shall not be restricted from any audit rights, including any right to conduct audits directly without any intermediary, which it is required to have in order to comply with applicable Laws, including the regulations of the NRC.

25.5    <u>Sales Tax Records</u>.   Contractor shall provide or provide access to the information, documents, receipts, invoices, and data to Owner on a monthly basis, or as Owner may from time to time reasonably request and as may be specifically required by the South Carolina state tax regulations for non-tax exempt items, and otherwise fully cooperate with Owner in connection with the reporting of (a) any Sales Taxes payable with respect to the Work and (b) any

Execution Version                              Confidential Trade Secret Information—Subject to Restricted Procedures

assessment, refund claim or proceeding relating to Taxes payable with respect to the Work.  This may include a monthly assessment visit from the South Carolina state tax department to review this information.  Contractor shall require its Major Subcontractors to provide to Contractor all information and data Contractor may reasonably request for purposes of complying with this Article and otherwise fully cooperate with Owner. Contractor shall retain, and shall require Major Subcontractors to retain, copies of such documentation and all documentation relating to purchases relating to the Work or the payment of Sales Taxes, if any, for a period of not less than seven (7) years.  Contractor shall ensure that its contracts with all Major Subcontractors effectuate the provision of this Section 25.5.  Contractor's obligations under this Section shall survive the termination, cancellation or expiration of this Agreement for any reason and shall last so long as is necessary to resolve any and all matters regarding Taxes attributable to the Work. This information is intended solely for the use of tax compliance.

## ARTICLE 26 – TAXES

26.1    <u>Employment Taxes</u>.  Contractor shall be responsible for payroll or employment compensation taxes, Social Security taxes, or for labor-related withholding taxes for Contractor and its Subcontractors or any of their employees ("Employment Taxes").

26.2    <u>Sales and Use Taxes on Contractor Tools</u>.  Contractor shall pay the taxes on Contractor's purchases of goods, tools, equipment, supplies and other consumables which are not permanently incorporated into the Facility and which remain the property of Contractor. Contractor shall also pay the taxes attributable to Contractor's Construction Equipment, temporary buildings and other property used by Contractor in its performance of this Agreement. Allowance for such taxes is included in the Firm Price and Fixed Price, and Contractor shall pay those taxes when assessed, without claim against Owner for reimbursement for Work under the Firm Price and Fixed Price, but shall be reimbursed for such charges for Work under the Target Price and for Work performed on a Time and Materials Basis.  Contractor shall impose a similar obligation on all Subcontractors and shall ensure that no Subcontractor providing Firm Price or Fixed Price Work shall have any claim against Owner for reimbursement of those taxes.

26.3    <u>Sales and Use Tax on Equipment</u>.  Notwithstanding the above, the Firm Price, Fixed Price and Target Price does not include monies for the payment of any sales and use taxes on Equipment incorporated into the Facility.  Contractor shall consult with Owner on Equipment purchases and work with Owner to obtain the most favorable sales and use tax benefits for Owner.

26.4    <u>State Property Taxes</u>.  Contractor and Owner agree that Owner shall be responsible for the filing requirements and payment obligations for all state and local taxes on the Site and the Equipment incorporated (and to be incorporated) into the Facility, provided that Contractor shall be responsible for the filing of property tax returns and the payment of state and local property taxes on Construction Equipment, tools and material which are not incorporated into the Facility and which are owned, used or leased by Contractor to perform the Work.

Execution Version                      Confidential Trade Secret Information—Subject to Restricted Procedures

26.5    Tax Indemnification.

(a)      Except in cases where the imposition of any Tax is the result of the negligence or willful or wanton misconduct by Contractor, Owner shall defend, reimburse, indemnify and hold Contractor harmless for the costs and expenses (including any resulting Taxes, interests and penalties) incurred by Contractor as a result of (i) Owner's formal protest to any Government Authority of any Employment Taxes or Sales Taxes paid or assessed or any property taxes paid or assessed by Government Authorities on the Site or the Equipment, or any other similar Tax, whether local, state or federal, including any litigation expenses in the event Owner decides to protest any such Taxes or (ii) an audit or other investigation by any Government Authority, including the defense and any resulting Tax liability in connection therewith. Owner shall not be responsible for any costs incurred by Contractor necessary to substantiate or verify information for any Tax audit conducted by any Government Authority in the normal course of business.

(b)      Except in cases where the imposition of any Tax is the result of the negligence or willful or wanton misconduct by Owner, Contractor shall defend, reimburse, indemnify and hold Owner harmless for the costs and expenses (including any resulting Taxes) incurred by Owner as a result of (i) Contractor's formal protest to any Government Authority of any Employment Taxes, or any Sales Tax or any property tax paid or assessed by any Government Authority on Contractor's Construction Equipment, tools and materials that are not incorporated into the Facility, or any other similar Tax, whether local, state or federal, including any litigation expenses in the event Contractor decides to protest any such Taxes or (ii) an audit or other investigation by any Government Authority, including the defense and any resulting Tax liability in connection therewith. Contractor shall not be responsible for any costs incurred by Owner necessary to substantiate or verify information for any Tax audit or investigation conducted by any Government Authority in the normal course of business.

26.6    Pollution Control Equipment Information.  Contractor shall supply Owner with all reasonable information requested by Owner for qualifying air, water or noise pollution control and other equipment for exemption from sales and use taxes, property taxes and any other tax credits, refunds or exemptions available to Owner.  Owner shall supply Contractor with all reasonable information and cost analyses requested by Contractor for qualifying air, water or noise pollution control equipment for exemption from sales and use taxes, property taxes and any other credits, refunds or exemptions available to Contractor.

26.7    Non-resident Contractor.  Contractor shall comply with Section 12-8-550 of the Code of Laws of South Carolina (1976), as amended, which requires any nonresident contractor providing labor in the State of South Carolina to register with the South Carolina Department of Revenue or Secretary of State to avoid the withholding of two percent (2%) of each payment made to the nonresident contractor.

## ARTICLE 27 – DISPUTE RESOLUTION

27.1    Claims.  A "Claim" is any claim, dispute or other controversy arising out of or relating to this Agreement, including Change Disputes.  Claims must be initiated by written notice.  The responsibility to substantiate Claims shall rest with the Party making the Claim. The

other Party shall provide reasonable cooperation in making available non privileged information in its possession or control that is relevant for purposes of substantiating the Claim.

27.2   <u>Change Dispute</u>.   A Party shall provide written notice to the other Party of any dispute or disagreement that such Party may have regarding a request for a Change or a notice of a Change given by either Party ("Change Dispute"), which notice shall contain such Party's position with respect to such Change Dispute (the "Change Dispute Notice").  Such Party shall provide the Change Dispute Notice to the other Party no earlier than fifteen (15) Days after such Party (a) submitted a notice of Change without having received either (i) a written response from the other Party or (ii) a response from the other Party regarding a notice of Change that is unsatisfactory to such Party or (b), in the case of Section 9.2, Contractor has received from Owner a request for a Change that Contractor does not believe conforms to the requirements of Section 9.2, or a dispute otherwise arises out of Section 9.2.

27.3   <u>Resolution by Negotiation</u>.

(a)   As an express condition precedent to commencement of any further proceedings with respect to a Claim (except as may be provided under any applicable lien statute), the Party making such Claim shall notify the other Party's Project Director in writing of such Claim.  The Contractor's Project Director and the Owner's Project Director shall meet within thirty (30) Days of receipt of the written notice of such Claim for the purpose of attempting to resolve the Claim.

(b)   If, after the Contractor's Project Director and the Owner's Project Director meet, the Claim remains unresolved or if no such meeting takes place for any reason within such thirty (30) Day period, then an executive vice president (or equivalent) of (i), in the case of Contractor, each Consortium Member (unless otherwise agreed by the Consortium Members) and (ii), in the case of Owner, each of SCE&G and Santee Cooper (unless otherwise agreed by them) shall meet to attempt to resolve such Claim, as applicable, within fifteen (15) Days from the end of such thirty (30) Day period.

(c)   If the Claim remains unresolved after the fifteen (15) Day period described in Section 27.3(b) and the Parties have not mutually agreed in writing to mediate such Claim, then:

(i)   with respect to a Claim that exceeds the Threshold Amount, either Party shall have the right to proceed to litigation of such Claim in a court of competent jurisdiction pursuant to Section 27.7; and

(ii)   with respect to a Claim that meets or falls below the Threshold Amount, such Claim shall be resolved pursuant to Section 27.5.

(d)   The Parties agree to make a diligent, good faith attempt to resolve a Claim as expeditiously as reasonably possible as provided in this Section 27.3.

Execution Version                      Confidential Trade Secret Information—Subject to Restricted Procedures

27.4    Mediation.

(a)     The Parties may mutually agree in writing to endeavor to resolve a Claim by mediation which, unless the Parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Procedures of the AAA in effect at the time of the mediation.  A request for mediation shall be mutually filed in writing by the Parties with the AAA.  If the mediation has not concluded within sixty (60) Days after its commencement, then, as applicable:

(i)     with respect to a Claim that exceeds the Threshold Amount, either Party shall have the right to proceed to litigation of such Claim in a court of competent jurisdiction pursuant to Section 27.7; and

(ii)     with respect to a Claim that meets or falls below the Threshold Amount, such Claim shall be resolved pursuant to Section 27.5.

(b)     The Parties shall share the mediator's fee and any AAA filing fees equally.  The mediation shall be held in Charlotte, North Carolina, unless another location is mutually agreed upon.  Agreements reached in mediation shall be enforceable as settlement agreements pursuant to Section 27.7.

27.5    Arbitration of Claims Falling Below the Threshold Amount.

(a)     The Parties agree that any Claim meeting or falling below the Threshold Amount ("Arbitrable Claim") that is not resolved pursuant to Section 27.3 or 27.4 shall be submitted to final and binding arbitration for resolution pursuant to this Section 27.5 and in accordance with the Construction Industry Arbitration Rules of the AAA in effect at the time of the arbitration, except as modified by this Section 27.5 or otherwise agreed by the Parties.

(b)     Unless the Parties otherwise mutually agree in writing, the arbitral panel ("Arbitral Panel") shall consist of three (3) people.  Within ten (10) Days after the expiration of the fifteen (15) Day period described in Section 27.3(b), each Party shall give written notice of its selection of a person to serve as a member of the Arbitral Panel ("Member"), who shall have no less than ten (10) years of experience in the litigation of complex disputes including preferably experience in the power plant construction industry.  If a Party fails to notify the other Party of the selection of its Member within such fifteen (15) Day period, then such Member shall be appointed by the AAA.  Within thirty (30) Days after the selection of the Members of the Arbitral Panel, the Members shall mutually agree in writing on their nomination of two (2) persons to serve as the chairman of the Arbitral Panel, who shall be practicing attorneys validly licensed to practice law in a jurisdiction in the United States and/or retired judges, and who shall have no less than twenty (20) years of experience in the litigation of complex disputes including preferably experience in the power plant construction industry (the "Chairman").  (References herein to "Member" shall include the Chairman unless the context otherwise requires.)  The Members shall then select one of such nominated persons to serve as the Chairman.  In the event that the Members do not mutually agree on the person to serve as the Chairman within such thirty (30) Day period, each Member shall submit its nominated person to AAA, and the AAA shall decide the nominee to serve as the Chairman.

(c)     It being imperative that all Members of the Arbitral Panel be neutral, act impartially, and be free from any conflict of interest, the Parties shall select such persons on the basis that the Members and the Chairman shall:

(i)     have no interest financial or otherwise in either Party nor any financial interest in this Agreement except for payment of its fees and expenses as provided herein;

(ii)     not previously have been employed as a consultant or otherwise by either Party, unless any such relationship has been disclosed in writing and approved by the Parties;

(iii)     have disclosed in writing to the Parties and each other Member and the Chairman as applicable, before being selected and to his or her best knowledge and recollection, any professional or personal relationships with any director, officer or employee of either Party;

(iv)     not, for the duration of the Arbitral Panel, be employed as a consultant or otherwise by either Party, except as may be agreed in writing by the Parties, the other Members and the Chairman;

(v)     not give advice to either Party or its Personnel concerning the conduct of this Agreement, other than in accordance with this Agreement;

(vi)     not have any ex-parte communications with either Party at any time after their selection pursuant to Section 27.5(b);

(vii)     not, while a Member or Chairman, as applicable, enter into discussions or make any agreement with either Party regarding employment by any of them, whether as a consultant or otherwise, after ceasing to act as a Member or Chairman, as applicable; and

(viii)     treat the details of this Agreement and all the Arbitral Panel's activities and hearings as private and confidential, and not publish or disclose them without the prior written consent of the Parties.

(d)     Each Party shall be responsible for one-half of the fees and expenses of the Arbitral Panel, unless the Arbitral Panel includes an award of fees and expenses in the award.  Contractor shall not include such fees and expenses in any amounts invoiced to Owner under this Agreement.

(e)     Either Party shall be entitled to have any third party join into any proceedings hereunder as a party thereto under this Section 27.5.  A Party may fully defend against any proceedings hereunder, provided that a Party shall not be entitled to make a counterclaim against the other Party unless the counterclaim arises out of the occurrence that is the subject of the pending Arbitrable Claim.

Execution Version                   Confidential Trade Secret Information—Subject to Restricted Procedures

(f)     The Arbitral Panel shall be governed by the provisions of this Agreement and the governing Law, and shall not be entitled to award any punitive, special, indirect, penal, incidental or consequential loss or damages.

(g)     The Parties shall promptly provide the Arbitral Panel with such additional information and access to such facilities and Personnel as the Arbitral Panel may require for purposes of resolving any submitted Arbitrable Claim.  The Arbitral Panel shall use reasonable efforts to resolve any submitted Arbitrable Claim as promptly as reasonably practicable and in any event within sixty (60) Days of the appointment of the Chairman of an Arbitral Panel where the amount in controversy is less than five million dollars ($5,000,000) (per claim for monetary relief) or where a schedule dispute (per Contractor claim for schedule relief) is less than thirty (30) Days, or within one hundred eighty (180) Days of the appointment of the Chairman of an Arbitral Panel (or such other number of Days as may be proposed by the Arbitral Panel and accepted by both Parties (which acceptance shall not be unreasonably withheld)) where the amount in controversy is five million dollars ($5,000,000) (per claim for monetary relief) or more or where the schedule dispute (per Contractor claim for schedule relief) is thirty (30) Days or more.  Notwithstanding the foregoing, if the Parties mutually agree to a deadline extension or the Chairman determines that it is not feasible to resolve the Arbitrable Claim within the above listed deadlines, then a deadline may be extended to provide additional time to resolve such Arbitrable Claim; provided, that the duration of any such extension shall be set taking into account the agreed upon principle that disputes are to be resolved as expeditiously as possible.  The Parties expressly agree that the Arbitral Panel shall have no power to consider or award any form of damages or remedies barred by this Agreement.

(h)     The decision of the Arbitral Panel shall be issued in a writing that sets forth the Arbitral Panel's reasoned decision.  The Arbitral Panel shall not be entitled to deviate from the construct, procedures or requirements of this Agreement. In the absence of bias, fraud, or willful misconduct by an arbitrator, any decision rendered by the Arbitral Panel in any arbitration shall be final and binding upon the Parties under the United States Arbitration Act 9 U.S.C. §§ 1 et seq., and judgment thereon may be entered in the court described in Section 27.7.

27.6   Exclusive Resolution Procedures; Equitable Remedies.  The procedures specified in this Article shall be the sole and exclusive procedures for the resolution of Claims (except for lien claims which are governed by statute); provided, however, that, notwithstanding anything in this Article to the contrary, a Party may file a complaint in the court described in Section 27.7 to seek injunctive relief, sequestration, garnishment, attachment, or an appointment of a receiver. Despite such actions, the Parties shall continue to participate in good faith in and be bound by the dispute resolution procedures specified in this Article.

27.7   Consent to Jurisdiction.  The Parties agree to the exclusive jurisdiction of the United States District Court for the Southern District of New York or, if such court does not have jurisdiction of the matter, the courts of the State of New York located in the City and County of New York, for any legal proceedings that may be brought by a Party arising out of or in connection with this Agreement or for recognition or enforcement of any judgment or settlement agreement.  By execution and delivery of this Agreement, each Party accepts, generally and

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

unconditionally, the jurisdiction of the aforesaid court for legal proceedings arising out of or in connection with this Agreement.  Each Party hereby waives any right to stay or dismiss any action or proceeding under or in connection with this Agreement brought before the foregoing court on the basis of forum non-conveniens or improper venue.

27.8    <u>Continuation of Work</u>.  Pending the final resolution of any Claim, Contractor shall proceed diligently with the performance or provision of the Work and its other duties and obligations and Owner shall continue to compensate Contractor as set forth under this Agreement without diminution of effort; provided that Contractor is being compensated for the Work pursuant to the terms of this Agreement, including but not limited to the provisions of Article 8 and provided that the Parties agree that such duties and obligations can be safely and prudently performed.

## ARTICLE 28 – NOTICES

All notices, communications, and approvals required or permitted to be given hereunder shall be in writing and shall be valid and sufficient if delivered in person or dispatched by certified mail (return receipt requested), postage prepaid, in any post office in the United States or by any national overnight express mail services (return receipt requested), and addressed as follows:

If to Owner:

>            South Carolina Electric & Gas Company
>            Attn: President
>            Mail Code 190
>            Columbia, SC 29218
>            Telephone No.: 803-217-8097
>            Facsimile No.: 803-217-9336
>
>            South Carolina Public Service Authority
>            Attn: Chief Operating Officer (M602)
>            One Riverwood Drive
>            P.O. Box 2946101
>            Moncks Corner, SC 29461-6101
>            Telephone No.: 843-761-4087
>            Facsimile No.: 843-761-7037

With a copy to:

>            South Carolina Electric & Gas Company
>            Attn: General Counsel
>            Mail Code 190
>            Columbia, SC 29218
>            Telephone No.: 803-217-8634
>            Facsimile No.: 803-217-9336

South Carolina Public Service Authority
Attn: General Counsel (M603)
One Riverwood Drive
P.O. Box 2946101
Moncks Corner, SC 29461-6101
Telephone No.: 843-761-7007
Facsimile No.: 843-761-7037

If to Westinghouse:

Westinghouse Electric Company, LLC
Attn:  Daniel Lipman
4350 Northern Pike
Monroeville, PA 15146
Telephone No.: (412) 374-6920
Facsimile No.: (412) 374-6677

With a copy to:

Westinghouse Electric Company, LLC
Attn:  General Counsel
4350 Northern Pike
Monroeville, PA 15146
Telephone No.: (412) 374-6177
Facsimile No.: (412) 374-6122

If to Stone & Webster:

Stone & Webster, Inc.
Attn:  Ed Hubner
3 Executive Campus
Cherry Hill, NJ 08002
Telephone No.: (856) 482-4178
Facsimile No.: (856) 482-3155

with a copy to:

Stone & Webster, Inc.
Attn:  E.K. Jenkins
E&C Division Counsel
100 Technology Center Drive
Stoughton, MA 02072
Facsimile No.: (617) 589-1322

or to such other address, attention or facsimile number as such Party to whom such notice is to be addressed shall have hereafter furnished to the other Party in writing as provided in this Article.

Notwithstanding the foregoing, any routine correspondence (as further defined in the Project Execution Plan) shall be sent to the appropriate project management and personnel that may be agreed upon by the Parties. Copies of such routine correspondence shall not be routed to the persons listed above.

## ARTICLE 29 – ASSIGNMENT

Neither Party shall assign this Agreement in whole or in part without the prior written consent of the other Party.  If any assignment by any Party of this Agreement or any right, interest or obligation therein requires the consent of, or notice to, any Government Authority, including the NRC, then such Party shall not effect such assignment without such consent of, or notice to, such Government Authority.

## ARTICLE 30 – WAIVER

The failure of either Party to enforce at any time any of the provisions of this Agreement shall not be construed as a waiver of such provision nor shall not in any way affect the validity of this Agreement or the right of either Party to enforce each and every provision.

## ARTICLE 31 – MODIFICATION

No waiver, modification, or amendment of any of the provisions of this Agreement shall be binding unless it is in writing and signed by duly authorized representatives of both Parties.

## ARTICLE 32 – SURVIVAL

The Parties agree that the provisions of Article 15 – Indemnity, Article 17 – Limitation of Liability, Article 19 – Proprietary Data, Article 27 – Dispute Resolution, Section 22.2(e) – Continuation of Work by a Qualified Entity, and Section 25.4 –Right to Audit, this Article and any other terms and conditions of this Agreement that are expressly stated to survive or limiting the liability of Contractor shall survive termination, cancellation or expiration of this Agreement. Any liability and insurance protections afforded a Party hereunder shall apply during the Work and thereafter, and shall survive termination, cancellation or expiration of this Agreement, subject to time limitations provided for in this Agreement.

## ARTICLE 33 – TRANSFER

Prior to the removal of any Equipment furnished hereunder from the Facility, except temporarily for repair or permanently for disposal, Owner shall provide Contractor with written assurances from the transferee of limitation of and protection against liability following the proposed removal or transfer at least equivalent to that afforded Contractor and Contractor Interests under the provisions of this Agreement. Removal or transfer contrary to the provisions of this Article shall, in addition to any other legal or equitable rights of Contractor, make Owner the indemnitor

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

of Contractor and Contractor Interests against any liabilities incurred by Contractor and Contractor Interests in excess of those that would have been incurred had no such transfer taken place.

## ARTICLE 34 – GOVERNING LAW; WAIVER OF JURY TRIAL; CERTAIN FEDERAL LAWS

34.1   <u>Governing Law</u>.  The validity, construction, and performance of this Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the principles thereof relating to conflicts of laws except Section 5-1401 of the New York General Obligations Law; provided, however, that nothing in this Agreement shall seek to alter the rights, responsibilities and limitations applicable to Santee Cooper under the laws of the State of South Carolina.

34.2   <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT.

34.3   <u>Certain Federal Laws</u>.  In the performance of Work under this Agreement, Contractor and its Subcontractors shall comply with applicable Law, including provisions of Executive Order 11246, as amended, relating to equal opportunity and nonsegregated facilities, the Fair Labor Standards Act of 1933, the Occupational Safety and Health Act of 1970, and the requirements of the rules, regulations, orders, bulletins and interpretations of the NRC, and with the Laws as set forth in <u>Exhibit S</u>, to the extent applicable to Contractor or Subcontractors. Contractor further agrees to comply with, and agrees to require Subcontractors that are subject to such requirements to comply with, Owner's Government Contracting Programs requirements as specified in 13 CFR 125, 48 CFR 52.219-8, and 48 CFR 52.219-9.

## ARTICLE 35 – RELATIONSHIP OF OWNER AND CONTRACTOR

Contractor is an independent contractor and nothing contained herein shall be construed as creating (i) any relationship between Owner and Contractor other than that of owner and independent contractor, (ii) any relationship whatsoever between Owner and Contractor's employees or Subcontractors or (iii) a fiduciary relationship between Contractor and Owner. Neither Contractor, nor any of its employees, are or shall be deemed to be employees of Owner.

## ARTICLE 36 – THIRD PARTY BENEFICIARIES

Except as expressly set forth in this Agreement, the provisions of this Agreement are intended for the sole benefit of Owner and Contractor and each Consortium Member, and the Parties do not intend to create any other third party beneficiaries or otherwise create privity of contract with any other Person.

Execution Version                          Confidential Trade Secret Information—Subject to Restricted Procedures

## ARTICLE 37 – REPRESENTATIONS AND WARRANTIES

37.1    <u>Representations and Warranties of Contractor</u>.  Each Consortium Member hereby represents and warrants to Owner as follows:

(a)    <u>Due Organization of Consortium Member</u>.

(i)    Stone & Webster represents and warrants that it is duly organized, validly existing and in good standing under the laws of the State of Louisiana and has the requisite power and authority to own and operate its business and properties and to carry on its business as such business is now being conducted and is duly qualified to do business in the State of South Carolina and in any other jurisdiction in which the transaction of its business makes such qualification necessary.

(ii)    Westinghouse represents and warrants that it is duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite power and authority to own and operate its business and properties and to carry on its business as such business is now being conducted and is duly qualified to do business in the State of South Carolina and in any other jurisdiction in which the transaction of its business makes such qualification necessary.

(b)    <u>Due Authorization of Consortium Member; Binding Obligation</u>. Consortium Member has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and the execution, delivery and performance of this Agreement by Consortium Member has been duly authorized by the necessary action on the part of such Consortium Member; this Agreement has been duly executed and delivered by such Consortium Member and is the valid and binding obligation of such Consortium Member enforceable in accordance with its terms.

(c)    <u>Non-Contravention</u>.  The execution, delivery and performance of this Agreement by Consortium Member and the consummation of the transactions contemplated hereby do not and shall not contravene any applicable Law or the organizational documents of such Consortium Member and do not and shall not conflict with or result in a breach of or default under any indenture, mortgage, lease, agreement, instrument, judgment, decree, order or ruling to which such Consortium Member is a party or by which it or any of its properties is bound or affected.

(d)    <u>Consortium Agreement</u>. The Consortium Members have entered into an agreement setting forth their consortium arrangements for the performance of this Agreement and their sharing of liabilities with respect thereto.

37.2    <u>Representations and Warranties of SCE&G and Santee Cooper</u>.  Each of SCE&G and Santee Cooper hereby represents, warrants and covenants to Contractor as follows:

(a)    <u>Due Organization of Owner</u>.  It is duly organized, validly existing and in good standing under the laws of the State of South Carolina and has the requisite power and authority to own and operate its business and properties and to carry on its business as such

-103-

Confidential Trade Secret Information—Subject to Restricted Procedures

business is now being conducted and is duly qualified to do business in State of South Carolina and in any other jurisdiction in which the transaction of its business makes such qualification necessary.

(b)    Due Authorization of Owner; Binding Obligation.  Its execution, delivery and performance of this Agreement has been duly and effectively authorized by the requisite action on the part of its governing board.  This Agreement constitutes its legal, valid and binding obligations, enforceable against it in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting the rights of creditors generally and by general principles of equity.

(c)    Non-Contravention.  Its execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not and shall not contravene any applicable Law or organizational documents or do not and shall not conflict with or result in a breach of or default under any indenture, mortgage, lease, agreement, instrument, judgment, decree, order or ruling to which it is a party or by which it or any of its properties is bound or affected.

On the Effective Date, Santee Cooper shall provide a letter to Contractor making each of the representations set forth in this Section 37.2 on its own behalf as well as a representation that Santee Cooper has appointed SCE&G as its agent pursuant to the Limited Agency Agreement, which is attached hereto Exhibit V, for all purposes under this Agreement, with the power and authority to bind Santee Cooper to its obligations herein, subject to the limitations specifically set forth in the Limited Agency Agreement.  In such letter, Santee Cooper shall also agree to notify Contractor promptly in writing if there is any change in the limits of SCE&G's authority set forth in such Limited Agency Agreement.

## ARTICLE 38 – MISCELLANEOUS PROVISIONS

38.1    Rights Exclusive.  The rights and remedies of Owner or Contractor as set forth in this Agreement shall be the exclusive rights or remedies of the Parties. The limitations of liability, waivers, indemnities, extension of insurances and other liability protection provided herein for the benefit of Contractor shall also apply for the benefit of Contractor Interests and shall apply irrespective of the basis of such claim, whether arising at contract (including breach warranty, indemnity, etc.), tort or otherwise, and regardless of fault, negligence or strict liability.

38.2    Severability.  If any provision of this Agreement or the application of this Agreement to any Person or circumstance shall to any extent be held invalid or unenforceable by a court of competent jurisdiction or arbitrator under Article 27, then (i) the remainder of this Agreement and the application of that provision to Persons or circumstances other than those as to which it is specifically held invalid or unenforceable shall not be affected, and every remaining provision of this Agreement shall be valid and binding to the fullest extent permitted by Laws, and (ii) a suitable and equitable provision shall be substituted for such invalid or unenforceable provision in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision.

Execution Version Confidential Trade Secret Information—Subject to Restricted Procedures

38.3    <u>Entire Agreement</u>.    This Agreement contains the entire agreement and understanding between the parties as to the subject matter of this Agreement, and merges and supersedes all prior agreements, commitments, representations, writings and discussions between them other than the Existing Confidentiality Agreement, which shall remain in effect for the purposes set forth in Section 19.2(c)(i). Neither of the Parties shall be bound by any prior obligations, conditions, warranties, or representations with respect to the subject matter of this Agreement.

38.4    <u>Counterparts</u>.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first above written.

SOUTH CAROLINA ELECTRIC & GAS
COMPANY, for itself and as agent for South
Carolina Public Service Authority
By: _____
Name: William B. Timmerman
Title: Chairman and CEO


STONE & WEBSTER, INC.                    WESTINGHOUSE ELECTRIC COMPANY LLC

By: _____      By: _____
Name: David P. Barry                      Name: Aris Candris
Title: Executive Vice President           Title: Senior Vice President

Execution Version

Confidential Trade Secret Information – Subject to Restricted Procedures

**Execution Version**

**ENGINEERING, PROCUREMENT AND CONSTRUCTION
AGREEMENT**

**BETWEEN**

**SOUTH CAROLINA ELECTRIC & GAS COMPANY, FOR ITSELF AND
AS AGENT FOR THE SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY, AS OWNER**

**AND**

**A CONSORTIUM CONSISTING OF WESTINGHOUSE ELECTRIC
COMPANY LLC AND STONE & WEBSTER, INC., AS CONTRACTOR**

**FOR**

**AP1000 NUCLEAR POWER PLANTS**

**DATED AS OF MAY 23, 2008**

# EXHIBITS

**BOOK 2**

For Professionals' Eyes Only

Westinghouse_00001193

Execution Version Confidential Trade Secret Information—Subject to Restricted Procedures

## EXHIBITS

| Exhibit | Description of Exhibit |
| --- | --- |
| A | Scope of Work/Supply and Division of Responsibilities |
| B | Contractor Organization Chart |
| C | Owner and Contractor Permits |
| D | Project Execution Plan Processes |
| E | Project Schedule |
| F-1 | Milestone Payment Schedule |
| F-2 | Payment Plan |
| G | Time and Materials Rates and Charges |
| H | Pricing |
| I-1 | Toshiba Parent Guaranty |
| I-2 | Shaw Parent Guaranty |
| J | Price Adjustment Provisions |
| K | Costs |
| L | Net Electric Guarantee Conditions and Load List |
| M-1 | Software License |
| M-2 | AP1000 Intellectual Property License (WEC) |
| M-3 | AP1000 Intellectual Property License (S&W) |
| N | Industry Codes and Standards |
| O-1 | Proprietary Data Agreement |
| O-2 | List of Intellectual Property Subject to Third Party License Terms |

For Professionals' Eyes Only                                    Westinghouse_00001194

Execution Version                 Confidential Trade Secret Information—Subject to Restricted Procedures

| Exhibit | Description of Exhibit |
|---------|----------------------|
| P-1 | Major Subcontractors |
| P-2 | Subcontractors for Site Construction and Related Field Services |
| Q | Equipment with Owner-Designated Witness and Hold Points |
| R | Description of Site |
| S | EEO and Small Business Regulations |
| T | [Not Used] |
| U | OCIP Description |
| V | Limited Agency Agreement |
| W | Extended Equipment Warranty Special Terms |
| | |

For Professionals' Eyes Only

Confidential Trade Secret Information—Subject to Restricted Procedures

# EXHIBIT F-1
## Milestone Payment Schedule

This <u>Exhibit F-1</u> provides the Payment Schedules for the Fixed Price and the Firm Price portions of the Agreement.  These payments will be invoiced in accordance with the provisions of <u>Article 8 – Payments</u>, <u>Exhibit H - Pricing</u> and <u>Exhibit J- Price Adjustment Provisions</u>.

Capitalized terms used herein and not defined herein have the meaning assigned in the Agreement.

The Westinghouse Phase 1A work with a value of $1.1 million and the Stone & Webster Phase 1A Work with a value of $9 million were paid under separate agreements.  These amounts are included in Exhibit H - Pricing but are not included in any of the below payment schedule tables.

Milestone Payment Schedules will be revisited, once the Project Schedule is completed, to set the payments to the appropriate set of Milestones reflecting the Work associated with the payments, by November 30, 2008.

Page 1 of 46

For Professionals' Eyes Only

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

F.1    Fixed Price and Firm Price Payments

F.1.1    Westinghouse Equipment Milestone Payments

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Apr-08 | RCP | Issue LLM PO to Fabricator - Units 2 and 3 | $6,680,000 | $6,680,000 | Handy |
| Apr-08 | S/G | Issue LLM PO To Fabricator  for Unit 2 & 3 | $6,177,618 | $6,177,618 | Fixed 0%/year |
| Apr-08 | RVI | Issue LLM PO To Fabricator - Units 2 and 3 | $3,521,991 | | Fixed 0%/year |
| Apr-08 | RV | Issue LLM PO To Fabricator - Units 2 and 3 | $1,212,714 | $1,212,714 | Fixed 0%/year |
| Apr-08 | Squib Valves | Issue PO to Fabricator - Units 2 and 3 - first payment | $611,904 | $611,904 | Fixed 0%/year |
| Apr-08 | Passive RHR Hx | Issue PO to Fabricator - Units 2 & 3 first payment | $246,870 | $246,870 | Fixed 0%/year |
| Apr-08 | CMT | Issue PO to Fabricator - Units 2 & 3 | $1,637,100 | $1,637,100 | Handy |
| Apr-08 | ACT | Issue PO to Fabricator - Units 2 and 3 | $958,100 | $958,100 | Handy |
| Apr-08 | RCL Pipe | Issue PO to Fabricator - Units 2 and 3 - first payment | $2,725,000 | $2,725,000 | Fixed 0%/year |
| Apr-08 | IHP | Issue PO to Fabricator - Units 2 and 3 - first payment | $675,000 | $675,000 | Fixed 0%/year |
| Apr-08 | Pressurizer | Issue PO to Fabricator - Units 2 and 3 | $308,000 | $308,000 | Fixed 0%/year |
| Apr-08 | CRDMs | Issue PO for LLM to Fabricator - Units 2 and 3 - first payment | $677,450 | $677,450 | Fixed 0%/year |
| Jul-08 | RCP | Issue RCP Casing PO by Fabricator - Units 2 and 3 | $6,816,765 | $6,816,765 | Handy |
| Jul-08 | VFD | Issue PO to Fabricator - Units 2 and 3 | $552,862 | $552,862 | Handy |
| Jul-08 | I&C/Simulator | Place Notice to Proceed  - Units 2 and 3 | $13,360,627 | $13,360,627 | Fixed 6.5%/year |
| Jul-08 | I&C/Simulator | Issue PO - Simulator | $4,088,027 | | Fixed 6.5%/year |
| Jul-08 | Project | Design Finalization Payment 1 | $3,281,250 | | Fixed 0%/year |
| Aug-08 | VFD | Issue Transformer PO by Fabricator  - Units 2 and 3 | $1,382,156 | $1,382,156 | Handy |
| Sep-08 | S/G | Issue Final PO To Fabricator for Unit 2 & 3 | $10,486,734 | $10,486,734 | Fixed 0%/year |
| Sep-08 | RVI | Issue Final PO To Fabricator - Units 2 and 3 | $2,391,145 | $2,391,145 | Fixed 0%/year |
| Sep-08 | RV | Issue Final PO To Fabricator - Units 2 and 3 | $3,705,520 | $3,705,520 | Fixed 0%/year |
| Oct-08 | CMT | Material PO Issue - Units 2 & Unit 3 | $3,851,370 | $3,851,370 | Handy |
| Oct-08 | ACT | Issue Material PO  - Units 2 & Unit 3 | $979,695 | $979,695 | Handy |
| Oct-08 | Pressurizer | Issue LLM PO - Units 2 and 3 | $1,254,819 | $1,254,819 | Fixed 0%/year |
| Oct-08 | RCL Pipe | Issue PO to Fabricator - Units 2 and 3 - second payment | $3,055,567 | $3,055,567 | Fixed 0%/year |
| Oct-08 | IHP | Issue PO to Fabricator - Units 2 and 3 - second payment | $687,503 | $687,503 | Fixed 0%/year |

Westinghouse_0001325

For Professionals' Eyes Only

Execution Version                                   Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Oct-08 | Project | Design Finalization Payment 2 | $3,281,250 | | Fixed 0%/year |
| Oct-08 | CRDMs | Issue PO for LLM to Fabricator - Units 2 and 3 - second payment | $690,049 | $690,049 | Fixed 0%/year |
| Oct-08 | Passive RHR Hx | Issue PO to Fabricator - Units 2 & 3 second payment | $483,268 | $483,268 | Fixed 0%/year |
| Nov-08 | S/G | Issue SG Tubing PO for Unit 2 & 3 | $16,778,776 | $16,778,776 | Fixed 0%/year |
| Jan-09 | RCP | Issue Final PO to Fabricator - Units 2 and 3 | $3,408,382 | $3,408,382 | Handy |
| Jan-09 | IHP | Issue PO for LLM - Units 2 and 3 | $458,335 | $458,335 | Fixed 0%/year |
| Jan-09 | Project | Design Finalization Payment 3 | $3,281,250 | | Fixed 0%/year |
| Feb-09 | RCP | Issue LLM Lot 1 PO by Fabricator - Units 2 and 3 | $3,408,382 | $3,408,382 | Handy |
| Mar-09 | ACT | Receipt of First Lot of LLM Material - Unit 2 | $732,700 | | Handy |
| Mar-09 | ACT | Receipt of First Lot of LLM Material - Unit 3 | | $732,700 | Handy |
| Apr-09 | T/G | Issue PO to Fabricator - Units 2 and 3 | $35,000,000 | $35,000,000 | Fixed 5.2%/year |
| Apr-09 | Main Transformers | Issue PO to Fabricator - Units 2 & 3 | $1,600,000 | $1,600,000 | Handy |
| Apr-09 | Project | Design Finalization Payment 4 | $3,281,250 | | Fixed 0%/year |
| May-09 | Squib Valves | Issue PO to Fabricator - Units 2 and 3 - second payment | $1,913,290 | $1,913,290 | Fixed 0%/year |
| Jun-09 | RCP | Initiate Casing Manufacturing - Units 2 and 3 | $1,360,716 | $1,360,716 | Handy |
| Jun-09 | CMT | Receipt of Material  - Lower Head - Unit 2 | $1,429,378 | | Handy |
| Jun-09 | CMT | Receipt of Material - Lower Head - Unit 3 | | $1,429,378 | Handy |
| Jul-09 | Project | Design Finalization Payment 5 | $3,281,250 | | Fixed 0%/year |
| Aug-09 | RCP | Issue LLM Lot 2 PO by Fabricator - Units 2 and 3 | $3,401,790 | $3,401,790 | Handy |
| Aug-09 | Passive RHR Hx | Issue Forgings PO - Unit 2 & Unit 3 | $1,224,518 | $1,224,518 | Fixed 0%/year |
| Sep-09 | Royalties | Non NuStart Royalties | $9,450,000 | | Fixed 0%/year |
| Sep-09 | T/G | Issue PO for Condenser Material - Unit 2 | $45,000,000 | | Fixed 5.2%/year |
| Oct-09 | Project | Design Finalization Payment 6 | $3,281,250 | | Fixed 0%/year |
| Dec-09 | RV | Receipt at Fabricator - Flange Nozzle Shell Forging Unit 2 | $3,705,439 | | Fixed 0%/year |
| Dec-09 | I&C/Simulator | Issue PO to Subvendors for Unit 2 Rad Monitor Sys | $4,317,542 | | Fixed 6.5%/year |
| Dec-09 | I&C/Simulator | Issue PO to Subvendor for Unit 3 Rad Monitor Sys | | $3,085,322 | Fixed 6.5%/year |
| Jan-10 | RVI | Receipt of Core Shroud Material - Unit 2 | $2,391,145 | $2,391,145 | Fixed 0%/year |
| Jan-10 | IHP | Receipt of Insulation Support and Seismic Support Plate - Unit 2 | $916,670 | | Fixed 0%/year |
| Jan-10 | Project | Design Finalization Payment 7 | $3,281,250 | | Fixed 0%/year |

Westinghouse_00001326

Execution Version                                    Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Feb-10 | RCP | Receipt of LLM - Lot 1 | $6,816,765 | | Handy |
| Feb-10 | T/G | Issue PO for MSR/FWH Material - Unit 2 | $30,000,000 | | Fixed 5.2%/year |
| Mar-10 | CMT | Completion of Lower Head Fabrication - Unit 2 | $408,904 | | Handy |
| Mar-10 | RCL Pipe | Acceptance of Raw Material - Unit 2 | $3,055,567 | | Fixed 0%/year |
| Mar-10 | RCL Pipe | Acceptance of Raw Material - Unit 3 | | $3,055,567 | Fixed 0%/year |
| Mar-10 | Pressurizer | Receipt of LLM - Bottom Head - Unit 2 | $1,568,524 | | Fixed 0%/year |
| Mar-10 | Pressurizer | Receipt of LLM - Bottom Head -Unit 3 | | $1,568,524 | Fixed 0%/year |
| Apr-10 | Project | Design Finalization Payment 8 | $3,281,250 | | Fixed 0%/year |
| May-10 | RVI | Receipt of Upper Guide Tube Material - Unit 2 | $3,586,718 | | Fixed 0%/year |
| May-10 | CMT | Completion of Upper Head Fabrication - Unit 2 | $204,452 | | Handy |
| May-10 | Pressurizer | Perform Cladding on Bottom Head - Unit 2 | $627,410 | | Fixed 0%/year |
| May-10 | CRDMs | Receipt of LLM for Latch Housings and Rod Travel Housings - Unit 2 | $4,140,140 | | Fixed 0%/year |
| Jun-10 | RVI | Receipt of Lower Guide Tube Material - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Jun-10 | Passive RHR Hx | Receipt of Initial Forging | $979,615 | $979,615 | Fixed 0%/year |
| Jun-10 | IHP | Receipt of Shroud Materials - Unit 2 | $1,100,004 | | Fixed 0%/year |
| Jun-10 | CRDMs | Start Machining of Latch Housings - Unit 2 | $1,380,047 | | Fixed 0%/year |
| Jun-10 | I&C/Simulator | Issue MWO for Unit 2 PMS Long-lead items | $10,570,543 | | Fixed 6.5%/year |
| Jun-10 | I&C/Simulator | Issue MWO for Unit 3 PMS Long-lead items | | $7,598,383 | Fixed 6.5%/year |
| Jul-10 | Project | Design Finalization Payment 9 | $3,281,250 | | Fixed 0%/year |
| Aug-10 | RCP | Receipt of LLM - Lot 2 | | $6,816,765 | Handy |
| Aug-10 | S/G | Receipt at Fabricator - 2nd SG Tubesheet Forging Unit 2 | $4,194,694 | | Fixed 0%/year |
| Aug-10 | RV | Completion of Outlet Nozzle Welding to Flange Nozzle Shell- Unit 2 | $2,470,347 | | Fixed 0%/year |
| Aug-10 | ACT | Completion of Upper Head Fabrication Complete - Unit 2 | $488,858 | | Handy |
| Aug-10 | T/G | Start Condenser Fabrication - Unit 2 | $20,000,000 | | Fixed 5.2%/year |
| Aug-10 | T/G | Issue PO for Condenser Material - Unit 3 | | $45,000,000 | Fixed 5.2%/year |
| Sep-10 | RV | Completion of Closure Head Cladding - Unit 2 | $2,470,347 | | Fixed 0%/year |
| Sep-10 | Polar Crane | Issue PO to Fabricator - Unit 2 and 3 | $634,329 | $634,329 | Handy |
| Sep-10 | RCL Pipe | Completion of Initial Forging/Rough Machine to Hollow - Unit 2 | $5,169,000 | | Fixed 0%/year |

Page 4 of 46

For Professionals' Eyes Only

Execution Version                                      Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Sep-10 | CRDMs | Start Machining of Latch Assembly Components - Unit 2 | $1,380,047 | | Fixed 0%/year |
| Sep-10 | I&C/Simulator | Issue MWO for Unit 2 OCS Long-Lead items | $8,628,455 | | Fixed 6.5%/year |
| Sep-10 | I&C/Simulator | Issue MWO for Unit 3 OCS Long-Lead items | | $6,202,358 | Fixed 6.5%/year |
| Oct-10 | S/G | Receipt at Fabricator - 1st SG Transition Cone Forging Unit 2 | $4,194,694 | | Fixed 0%/year |
| Oct-10 | ACT | Completion of Lower Head Fabrication - Unit 2 | $488,858 | | Handy |
| Oct-10 | I&C/Simulator | Issue MWO for Unit 2 IIS (Cabinets) | $1,538,419 | | Fixed 6.5%/year |
| Oct-10 | I&C/Simulator | Issue MWO for Unit 3 IIS (Cabinets) | | $1,105,856 | Fixed 6.5%/year |
| Oct-10 | I&C/Simulator | Issue Simulator MWO | $6,822,728 | | Fixed 6.5%/year |
| Oct-10 | Project | Design Finalization Payment 10 | $3,281,250 | | Fixed 0%/year |
| Oct-10 | I&C/Simulator | Issue PO to Subvendors for Unit 2 PI Temperature Sensors | $6,527,711 | | Fixed 6.5%/year |
| Oct-10 | I&C/Simulator | Issue PO to Subvendors for Unit 3 PI Temperature Sensors | | $4,692,290 | Fixed 6.5%/year |
| Nov-10 | RCP | Completion of Manufacturing of Casing Unit 2 | $6,816,765 | | Handy |
| Nov-10 | RVI | Receipt of Core Support Plate Material - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Nov-10 | CRDMs | Start Machining of Travel Housing - Unit 2 | $1,380,047 | | Fixed 0%/year |
| Dec-10 | RV | Receipt at Fabricator - Flange Nozzle Shell Forging Unit 3 | | $3,705,520 | Fixed 0%/year |
| Dec-10 | RV | Receipt of Transition Ring Forging - Unit 2 | $2,470,347 | | Fixed 0%/year |
| Dec-10 | CMT | Completion of Lower Head to Upper Head Welding - Unit 2 | $204,452 | | Handy |
| Dec-10 | RCL Pipe | Completion of Machining, Heat Treatment and NDE - Unit 2 | $2,635,426 | | Fixed 0%/year |
| Dec-10 | I&C/Simulator | Issue PO to Subvendor for Unit 2 NIS Detectors | $2,339,128 | | Fixed 6.5%/year |
| Dec-10 | I&C/Simulator | Issue PO to Subvendor for Unit 3 NIS Detectors | | $1,681,426 | Fixed 6.5%/year |
| Jan-11 | RVI | Receipt of Core Shroud Material - Unit 3 | | $3,586,718 | Fixed 0%/year |
| Jan-11 | RVI | Completion of Machining of Core Shroud Panel - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Jan-11 | IHP | Receipt of Insulation Support and Seismic Support Plate - Unit 3 | | $916,670 | Fixed 0%/year |
| Jan-11 | Allowance | Mandatory Spares | $10,000,000 | | Fixed 0%/year |
| Jan-11 | Allowance | Extended Warranty | $10,000,000 | | Fixed 0%/year |
| Jan-11 | Project | Design Finalization Payment 11 | $3,281,250 | | Fixed 0%/year |
| Feb-11 | CMT | Satisfactory Completion of Hydrotest - Unit 2 | $204,452 | | Handy |
| Feb-11 | Polar Crane | Issue PO for Main Hoist Drum and Wire Rope - Unit 2 | $634,329 | | Handy |
| Feb-11 | Polar Crane | Issue PO  for Main Hoist Drum and Wire Rope - Unit 3 | | $634,329 | Handy |

Westinghouse_00001328

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Mar-11 | S/G | Receipt at Fabricator - 2nd CH Forging Unit 2 | $4,194,694 | | Fixed 0%/year |
| Mar-11 | CMT | Shipment of Equipment to Site - Unit 2 | $204,452 | | Handy |
| Mar-11 | CRDMs | Ship Latch Housings - Unit 2 | $1,380,047 | | Fixed 0%/year |
| Apr-11 | RV | Receipt of Core Shell Forging - Unit 2 | $2,470,347 | | Fixed 0%/year |
| Apr-11 | Squib Valves | Issue LLM PO to Sub-supplier - Unit 2 | $3,804,792 | | Fixed 0%/year |
| Apr-11 | ACT | Completion of Support Skirt Base Plate Fabrication - Unit 2 | $488,858 | | Handy |
| Apr-11 | Polar Crane | Issue PO for Motors and Controls - Unit 2 | $951,493 | | Handy |
| Apr-11 | Polar Crane | Issue PO for Motors and Controls - Unit 3 | | $951,493 | Handy |
| Apr-11 | Project | Design Finalization Payment 12 | $3,281,250 | | Fixed 0%/year |
| Apr-11 | T/G | Condenser Ready to Ship - Unit 2 | $26,000,000 | | Fixed 5.2%/year |
| Apr-11 | T/G | Issue PO for MSR/FWH Material - Unit 3 | | $20,000,000 | Fixed 5.2%/year |
| May-11 | VFD | Start VFD Manufacturing - Unit 2 | $1,658,588 | | Handy |
| May-11 | RVI | Receipt of Upper Guide Tube Material - Unit 3 | | $3,586,718 | Fixed 0%/year |
| May-11 | CRDMs | Receipt of LLM for Latch Housings and Rod Travel Housings - Unit 3 | | $4,140,140 | Fixed 0%/year |
| May-11 | I&C/Simulator | Issue MWO for Unit 2 Special Monitoring System | $994,326 | | Fixed 6.5%/year |
| May-11 | I&C/Simulator | Issue MWO for Unit 3 Special Monitoring System | | $714,748 | Fixed 6.5%/year |
| May-11 | Polar Crane | Issue PO for Steel Purchase - Unit 2 | $951,493 | | Handy |
| May-11 | Polar Crane | Issue PO for Steel Purchase - Unit 3 | | $951,493 | Handy |
| Jun-11 | RVI | Receipt of Lower Guide Tube Material - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Jun-11 | IHP | Receipt of Shroud Materials - Unit 3 | | $1,100,004 | Fixed 0%/year |
| Jun-11 | Fuel Hand'l Mch | Issue PO - Unit 2 & 3 | $508,236 | $508,236 | Handy |
| Jun-11 | Refueling Mach | PO Issue Unit 2 & 3 | $627,735 | $627,735 | Handy |
| Jun-11 | CRDMs | Start Machining of Latch Housings - Unit 3 | | $1,380,047 | Fixed 0%/year |
| Jul-11 | RCP | Completion of Manufacturing of Casing Unit 3 | | $6,816,765 | Handy |
| Jul-11 | VFD | Issue LLM Material PO by Fabricator - Units 2 and 3 | $276,431 | $276,431 | Handy |
| Jul-11 | S/G | Receipt at Fabricator - 1st SG Tubing Unit 2 | $4,194,694 | | Fixed 0%/year |
| Jul-11 | RVI | Completion of Welding of Core Shroud Panel and Flange - Unit 2 | $1,195,573 | | Fixed 0%/year |

For Professionals' Eyes Only

Westinghouse_00001329

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Jul-11 | RV | Completion of Bottom Head Welding To Core Shell - Unit 2 | $1,235,173 | | Fixed 0%/year |
| Jul-11 | ACT | Satisfactory Completion of Hydrotest - Unit 2 | $488,858 | | Handy |
| Jul-11 | Pressurizer | Completion of Welding of Upper Shell to Top Head - Unit 2 | $313,705 | | Fixed 0%/year |
| Jul-11 | Project | Design Finalization Payment 13 | $3,281,250 | | Fixed 0%/year |
| Aug-11 | S/G | Receipt at Fabricator - 2nd SG Tubesheet Forging Unit 3 | | $4,194,694 | Fixed 0%/year |
| Aug-11 | RV | Completion of Outlet Nozzle Welding to Flange Nozzle Shell- Unit 3 | | $2,470,347 | Fixed 0%/year |
| Aug-11 | ACT | Completion of Upper Head Fabrication - Unit 3 | | $488,858 | Handy |
| Sep-11 | RV | Completion of Closure Head Cladding - Unit 3 | | $2,470,347 | Fixed 0%/year |
| Sep-11 | RCL Pipe | Completion of Initial Forging/Rough Machine to Hollow - Unit 3 | | $5,169,000 | Fixed 0%/year |
| Sep-11 | Fuel Hand'l Mch | Issue PO for Single Failure Hoist - Units 2 & 3 | $508,236 | $508,236 | Handy |
| Sep-11 | CRDMs | Attach Latch Assembly to Travel Housings - Unit 2 | $1,380,047 | | Fixed 0%/year |
| Sep-11 | CRDMs | Start Machining of Latch Assembly Components - Unit 3 | | $1,380,047 | Fixed 0%/year |
| Sep-11 | T/G | Start Fabrication TG Unit 2 | $24,000,000 | | Fixed 5.2%/year |
| Sep-11 | T/G | Start Condenser Fabrication Unit 3 | | $30,000,000 | Fixed 5.2%/year |
| Sep-11 | Refueling Mach | Issue PO for Mast -  Units 2 & 3 | $627,735 | $627,735 | Handy |
| Oct-11 | RCP | Completion of Stator Core - Unit 2 | $8,861,794 | | Handy |
| Oct-11 | S/G | Receipt at Fabricator - 1st SG Transition Cone Forging Unit 3 | | $4,194,694 | Fixed 0%/year |
| Oct-11 | RVI | Start Welding of Core Shroud Panel Ring - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Oct-11 | ACT | Shipment of Equipment to Site - Unit 2 | $241,138 | | Handy |
| Oct-11 | ACT | Completion of Lower Head Fabrication - Unit 3 | | $488,858 | Handy |
| Oct-11 | IHP | Completion of Fabrication of Insulation Support Plate - Unit 2 | $1,100,004 | | Fixed 0%/year |
| Oct-11 | Pressurizer | Completion of Welding of Lower Shell to Bottom Head - Unit 2 | $313,705 | | Fixed 0%/year |
| Oct-11 | I&C/Simulator | Issue MWO for Unit 2 DAS | $748,001 | | Fixed 6.5%/year |
| Oct-11 | I&C/Simulator | Issue MWO for Unit 2 Rod Control System | $2,849,750 | | Fixed 6.5%/year |
| Oct-11 | I&C/Simulator | Issue MWO for Unit 3 DAS | | $537,682 | Fixed 6.5%/year |
| Oct-11 | I&C/Simulator | Issue MWO for Unit 3 Rod Control System | | $2,048,474 | Fixed 6.5%/year |

Westinghouse_00001330

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Oct-11 | Project | Design Finalization Payment 14 | $3,281,250 | | Fixed 0%/year |
| Nov-11 | S/G | Completion of 1st SG Tubing Installation Unit 2 | $4,194,694 | | Fixed 0%/year |
| Nov-11 | RVI | Receipt of Core Support Plate Material - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Nov-11 | Squib Valves | Receipt of LLMs by Sub-supplier - Unit 2 | $1,902,396 | | Fixed 0%/year |
| Nov-11 | Passive RHR Hx | Final Post Weld Heat Treatment of 1st Tubesheet - Unit 2 | $244,904 | | Fixed 0%/year |
| Nov-11 | CRDMs | Shipment of CRDM - Unit 2 | $1,380,047 | | Fixed 0%/year |
| Nov-11 | CRDMs | Start Machining of Travel Housing - Unit 3 | | $1,380,047 | Fixed 0%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 2 TOS (DEH I&C) | $811,664 | | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 2 DDS | $2,672,208 | | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 3 Rod Position Indication System | $2,943,079 | | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 2 Plant Control System (PLS-1) | $6,879,917 | | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 3 TOS (DEH I&C) Long-lead items | | $583,446 | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 3 DDS | | $1,920,853 | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 3 Rod Position Indication System | | $2,115,562 | Fixed 6.5%/year |
| Nov-11 | I&C/Simulator | Issue MWO for Unit 3 Plant Control System | | $4,963,704 | Fixed 6.5%/year |
| Nov-11 | Spt Fuel Strg Rack | PO Issue Unit 2 & 3 | $1,724,331 | $1,724,331 | Handy |
| Dec-11 | S/G | Completion of 2nd SG Tubing Installation Unit 2 | $4,194,694 | | Fixed 0%/year |
| Dec-11 | RV | Receipt of Transition Ring Forging - Unit 3 | | $2,470,347 | Fixed 0%/year |
| Dec-11 | RCL Pipe | Shipment of Equipment to Site - Unit 2 | $878,475 | | Fixed 0%/year |
| Dec-11 | RCL Pipe | Completion of Machining, Heat Treatment and NDE - Unit 3 | | $2,635,426 | Fixed 0%/year |
| Dec-11 | Pressurizer | Completion of Welding of Heater Sleeves - Unit 2 | $627,410 | | Fixed 0%/year |
| Jan-12 | RVI | Completion of Machining of Core Shroud Panel - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Jan-12 | Passive RHR Hx | Final Post Weld Heat Treatment of 2nd Tubesheet - Unit 2 | $244,904 | | Fixed 0%/year |
| Jan-12 | IHP | Completion of Fabrication of Seismic Support Plate - Unit 2 | $916,670 | | Fixed 0%/year |
| Jan-12 | Project | Design Finalization Payment 15 | $3,281,250 | | Fixed 0%/year |
| Feb-12 | Passive RHR Hx | Completion of 1st Tubesheet Drilling - Unit 2 | $244,904 | | Fixed 0%/year |
| Feb-12 | Polar Crane | Completion of Girder Fabrication - Unit 2 | $951,493 | | Handy |
| Mar-12 | VFD | Satisfactory Completion of FAT - Unit 2 | $1,105,725 | | Handy |
| Mar-12 | S/G | Receipt at Fabricator - 2nd CH Forging Unit 3 | | $4,194,694 | Fixed 0%/year |
| Mar-12 | S/G | Completion of 2nd SG Tube Expansion Unit 2 | $4,194,694 | | Fixed 0%/year |

Page 8 of 46

Westinghouse_00001331

For Professionals' Eyes Only

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Mar-12 | CMT | Completion of Lower Head Fabrication - Unit 3 | | $408,904 | Handy |
| Mar-12 | Pressurizer | Completion of Welding of Upper and Lower Assembly - Unit 2 | $627,410 | | Fixed 0%/year |
| Mar-12 | CRDMs | Ship Latch Housings - Unit 3 | | $1,380,047 | Fixed 0%/year |
| Mar-12 | T/G | MSR/FWH Ready to Ship Unit 2 | $15,000,000 | | Fixed 5.2%/year |
| Mar-12 | T/G | Condenser ready to ship Unit 3 | | $26,000,000 | Fixed 5.2%/year |
| Mar-12 | Aux-Res Xfmr | Issue PO - Units 2 & 3 | $1,296,567 | $1,296,567 | Handy |
| Mar-12 | Spt Fuel Strg Rack | Issue PO for Major Materials - Units 2 & 3 | $2,873,886 | $2,873,886 | Handy |
| Mar-12 | Spt Fuel Strg Rack | Completion of Fixture Manufacture- Unit 2 | $2,299,109 | $2,299,109 | Handy |
| Apr-12 | RCP | Delivery of Casings - Unit 2 | $2,726,706 | | Handy |
| Apr-12 | RCP | Completion of Shell & Flange Machining - Unit 2 | $4,771,735 | | Handy |
| Apr-12 | RCP | Completion of Wound Stator - Unit 2 | $3,408,382 | | Handy |
| Apr-12 | RVI | Completion of Welding of Core Shroud Panel Ring - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Apr-12 | RV | Receipt of Core Shell Forging - Unit 3 | | $2,470,347 | Fixed 0%/year |
| Apr-12 | RV | Completion of Core Shell Welding to Flange Shell  - Unit 2 | $1,235,173 | | Fixed 0%/year |
| Apr-12 | Squib Valves | Completion of Squib Valve Fabrication - Unit 2 | $1,268,264 | | Fixed 0%/year |
| Apr-12 | Squib Valves | Sub-supplier Order Long Lead Material - Unit 3 | | $3,804,792 | Fixed 0%/year |
| Apr-12 | Passive RHR Hx | Completion of the 2nd Tubesheet Drilling - Unit 2 | $244,904 | | Fixed 0%/year |
| Apr-12 | ACT | Completion of Support Skirt Base Plate Fabrication - Unit 3 | | $488,858 | Handy |
| Apr-12 | Polar Crane | Completion of Trolley Fabrication  Unit 2 | $951,493 | | Handy |
| Apr-12 | Pressurizer | Satisfactory Completion of Hydrotest - Unit 2 | $313,705 | | Fixed 0%/year |
| Apr-12 | I&C/Simulator | Complete Unit 2 PMS FAT procedures | $4,228,217 | | Fixed 6.5%/year |
| Apr-12 | Project | Design Finalization Payment 16 | $3,281,250 | | Fixed 0%/year |
| May-12 | VFD | Start VFD Manufacturing - Unit 3 | | $1,658,588 | Handy |
| May-12 | CMT | Completion of Upper Head Fabrication - Unit 3 | | $204,452 | Handy |
| May-12 | IHP | Completion of Manufacturing of the Upper Lifting Rig - Unit 2 | $916,670 | | Fixed 0%/year |
| May-12 | Pressurizer | Perform Cladding on Bottom Head - Unit 3 | | $627,410 | Fixed 0%/year |
| May-12 | Aux-Res Xfmr | Issue Material PO - Units 2 & 3 | $2,593,133 | $2,593,133 | Handy |
| Jun-12 | Squib Valves | Satisfactory Completion of Valve Hydrotest Unit 2 | $1,902,396 | | Fixed 0%/year |
| Jun-12 | IHP | Completion of Fabrication of Shroud - Unit 2 | $916,670 | | Fixed 0%/year |
| Jun-12 | Pressurizer | Shipment of Equipment to Site - Unit 2 | $313,705 | | Fixed 0%/year |

Westinghouse_00001332

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Jun-12 | VFD | Shipment of Equipment to Site - Unit 2 | $552,862 | | Handy |
| Jul-12 | RCP | Completion of Stator Core - Unit 3 | | $8,861,794 | Handy |
| Jul-12 | S/G | Receipt at Fabricator - 1st SG Tubing Unit 3 | | $4,194,694 | Fixed 0%/year |
| Jul-12 | S/G | Completion of 1st CH to Tubesheet Assy Welding Unit 2 | $4,194,694 | | Fixed 0%/year |
| Jul-12 | RVI | Completion of Welding of Core Shroud Panel and Flange - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Jul-12 | RV | Completion of Bottom Head Welding To Core Shell - Unit 3 | | $1,235,173 | Fixed 0%/year |
| Jul-12 | Passive RHR Hx | Completion of Tubing -Unit 2 | $244,904 | | Fixed 0%/year |
| Jul-12 | ACT | Satisfactory Completion of Hydrotest  - Unit 3 | | $488,858 | Handy |
| Jul-12 | Polar Crane | Completion of Electric Panel Assembly - Unit 2 | $634,329 | | Handy |
| Jul-12 | Pressurizer | Completion of Welding of Upper Shell to Top Head - Unit 3 | | $313,705 | Fixed 0%/year |
| Aug-12 | RVI | Completion of Final Machining of Core Shroud - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Aug-12 | RV | Satisfactory Completion of Hydrotest - Unit 2 | $1,235,173 | | Fixed 0%/year |
| Aug-12 | Squib Valves | Satisfactory Completion of Factory Operational Test of First Valve - Unit 2 | $1,268,264 | | Fixed 0%/year |
| Aug-12 | IHP | Completion of Assembly of IHP - Unit 2 | $916,670 | | Fixed 0%/year |
| Aug-12 | T/G | Start Fabrication TG Unit 3 | | $24,000,000 | Fixed 5.2%/year |
| Aug-12 | Main Transformers | Start Transformer Design | $1,600,000 | $1,600,000 | Handy |
| Sep-12 | S/G | Completion of 2nd CH to Tubesheet Assy Welding Unit 2 | $3,355,755 | | Fixed 0%/year |
| Sep-12 | CRDMs | Attach Latch Assembly to Travel Housings - Unit 3 | | $1,380,047 | Fixed 0%/year |
| Oct-12 | RVI | Start Welding of Core Shroud Panel Ring - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Oct-12 | ACT | Shipment of Equipment to Site - Unit 3 | | $241,138 | Handy |
| Oct-12 | IHP | Shipment of Equipment to Site - Unit 2 | $550,002 | | Fixed 0%/year |
| Oct-12 | IHP | Completion of Fabrication of Insulation Support Plate - Unit 3 | | $1,100,004 | Fixed 0%/year |
| Oct-12 | Pressurizer | Completion of Welding of Lower Shell to Bottom Head - Unit 3 | | $313,705 | Fixed 0%/year |
| Oct-12 | I&C/Simulator | Complete Unit 2 SMS FAT procedures | $397,730 | | Fixed 6.5%/year |
| Oct-12 | I&C/Simulator | Complete Unit 2 IIS (Cabinets) FAT procedures | $615,368 | | Fixed 6.5%/year |
| Oct-12 | I&C/Simulator | Complete Unit 2 RMS FAT | $1,727,016 | | Fixed 6.5%/year |

Page 10 of 46

For Professionals' Eyes Only

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Oct-12 | I&C/Simulator | Complete Unit 3 SMS FAT procedures | | $285,899 | Fixed 6.5%/year |
| Nov-12 | RCP | Completion of Final Stator Assembly - Unit 2 | $3,408,382 | | Handy |
| Nov-12 | RCP | Completion of Shell & Flange Machining - Unit 3 | | $4,090,059 | Handy |
| Nov-12 | RCP | Completion of Wound Stator - Unit 3 | | $3,408,382 | Handy |
| Nov-12 | S/G | Completion of 1st SG Tubing Installation Unit 3 | | $4,194,694 | Fixed 0%/year |
| Nov-12 | RV | Shipment of Equipment to Site - Unit 2 | $2,470,345 | | Fixed 0%/year |
| Nov-12 | Squib Valves | Sub-supplier Receipt of Long lead materials - Unit 3 | | $1,902,396 | Fixed 0%/year |
| Nov-12 | Passive RHR Hx | Satisfactory Completion of Hydrotest - Unit 2 | $244,904 | | Fixed 0%/year |
| Nov-12 | Passive RHR Hx | Final Post Weld Heat Treatment of 1st Tubesheet - Unit 3 | | $244,904 | Fixed 0%/year |
| Nov-12 | CRDMs | Shipment of CRDM - Unit 3 | | $1,380,047 | Fixed 0%/year |
| Dec-12 | S/G | Completion of 2nd SG Tubing Installation Unit 3 | | $4,194,694 | Fixed 0%/year |
| Dec-12 | S/G | Satisfactory Completion of 1st SG Hydrotest - Unit 2 | $5,033,633 | | Fixed 0%/year |
| Dec-12 | RVI | Trial Assembly of Upper/Lower Internals, Guide tubes - Unit 2 | $1,195,573 | | Fixed 0%/year |
| Dec-12 | CMT | Completion of Lower Head to Upper Head Welding- Unit 3 | | $204,452 | Handy |
| Dec-12 | Polar Crane | Satisfactory Completion of FAT - Unit 2 | $317,163 | | Handy |
| Dec-12 | RCL Pipe | Shipment of Equipment to Site - Unit 3 | | $878,475 | Fixed 0%/year |
| Dec-12 | Pressurizer | Completion of Welding of Heater Sleeves - Unit 3 | | $627,410 | Fixed 0%/year |
| Dec-12 | I&C/Simulator | Complete Unit 2 PI Temperature Sensor FAT | $2,611,085 | | Fixed 6.5%/year |
| Jan-13 | Passive RHR Hx | Final Post Weld Heat Treatment of 2nd Tubesheet - Unit 3 | | $244,904 | Fixed 0%/year |
| Jan-13 | Passive RHR Hx | Shipment of Equipment to Site - Unit 2 | $489,807 | | Fixed 0%/year |
| Jan-13 | IHP | Completion of Fabrication of Seismic Support Plate - Unit 3 | | $916,670 | Fixed 0%/year |
| Jan-13 | I&C/Simulator | Complete Unit 2 DDS FAT procedures | $1,068,883 | | Fixed 6.5%/year |
| Feb-13 | Passive RHR Hx | Completion of the 1st Tubesheet Drilling - Unit 3 | | $244,904 | Fixed 0%/year |
| Feb-13 | CMT | Satisfactory Completion of Hydrotest - Unit 3 | | $204,452 | Handy |
| Feb-13 | Polar Crane | Completion of Girder Fabrication - Unit 3 | | $951,493 | Handy |
| Feb-13 | Refueling Mach | Satisfactory Completion of FAT - Unit 2 | $753,283 | | Handy |
| Feb-13 | I&C/Simulator | Complete Unit 2 TOS (DEH I&C) FAT procedures | $324,666 | | Fixed 6.5%/year |
| Feb-13 | I&C/Simulator | Complete Unit 2 Plant Control System FAT procedures | $2,751,967 | | Fixed 6.5%/year |
| Feb-13 | I&C/Simulator | Complete Unit 2 NIS Detector FAT | $935,651 | | Fixed 6.5%/year |
| Mar-13 | VFD | Satisfactory Completion of FAT  - Unit 3 | | $1,105,725 | Handy |

Westinghouse_00001334

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Mar-13 | S/G | Completion of 2nd SG Tube Expansion Unit 3 | | $4,194,694 | Fixed 0%/year |
| Mar-13 | RVI | Shipment of Equipment to Site - Unit 2 | $2,391,145 | | Fixed 0%/year |
| Mar-13 | CMT | Shipment of Equipment to Site - Unit 3 | | $204,452 | Handy |
| Mar-13 | Pressurizer | Completion of Welding of Upper and Lower Assembly - Unit 3 | | $627,410 | Fixed 0%/year |
| Mar-13 | I&C/Simulator | Complete Unit 2 DAS FAT procedures | $299,200 | | Fixed 6.5%/year |
| Mar-13 | I&C/Simulator | Complete Unit 2 Rod Control System FAT procedures | $1,139,900 | | Fixed 6.5%/year |
| Mar-13 | I&C/Simulator | Complete Unit 2 Rod Pos Ind Sys FAT procedures | $1,177,232 | | Fixed 6.5%/year |
| Apr-13 | RCP | Delivery of Casings - Unit 3 | | $2,045,029 | Handy |
| Apr-13 | S/G | Shipment of Equipment to Site - Unit 2 | $8,389,389 | | Fixed 0%/year |
| Apr-13 | RVI | Completion of Welding of Core Shroud Panel Ring - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Apr-13 | RV | Completion of Core Shell welding to Flange Shell - Unit 3 | | $1,235,173 | Fixed 0%/year |
| Apr-13 | T/G | T/G Ready to Ship Unit 2 | $47,500,000 | | Fixed 5.2%/year |
| Apr-13 | Main Transformers | Issue PO for Material - Unit 2 | $8,000,000 | | Handy |
| Apr-13 | Squib Valves | Fabrication Completion - Unit 3 | | $1,268,264 | Fixed 0%/year |
| Apr-13 | Passive RHR Hx | Completion of the 2nd Tubesheet Drilling - Unit 3 | | $244,904 | Fixed 0%/year |
| Apr-13 | Polar Crane | Completion of Trolley Fabrication Unit 3 | | $951,493 | Handy |
| Apr-13 | Pressurizer | Satisfactory Completion of Hydrotest - Unit 3 | | $313,705 | Fixed 0%/year |
| Apr-13 | Fuel Hand'l Mch | Satisfactory Completion of FAT - Unit 2 | $609,882 | | Handy |
| Apr-13 | I&C/Simulator | Complete Unit 3 PMS FAT procedures | | $3,039,353 | Fixed 6.5%/year |
| May-13 | RCP | Satisfactory Completion of FAT - Unit 2 | $3,408,382 | | Handy |
| May-13 | Polar Crane | Shipment of Equipment to Site - Unit 2 | $317,163 | | Handy |
| May-13 | IHP | Completion of Manufacturing of Lifting Rig - Unit 3 | | $916,670 | Fixed 0%/year |
| May-13 | Fuel Hand'l Mch | Shipment of Equipment to Site - Unit 2 | $406,587 | | Handy |
| May-13 | Refueling Mach | Shipment of Equipment to Site - Unit 2 | $502,190 | | Handy |
| May-13 | I&C/Simulator | Simulator FAT | $4,785,728 | | Fixed 6.5%/year |
| May-13 | Spt Fuel Strg Rack | Completion of rack modules - Unit 2 | $2,299,109 | | Handy |
| Jun-13 | VFD | Shipment of Equipment to Site - Unit 3 | | $552,862 | Handy |
| Jun-13 | Squib Valves | Satisfactory Completion of Valve Hydrotest - Unit 3 | | $1,902,396 | Fixed 0%/year |
| Jun-13 | IHP | Completion of Fabrication of Shroud - Unit 3 | | $916,670 | Fixed 0%/year |
| Jun-13 | Pressurizer | Shipment of Equipment to Site - Unit 3 | | $313,705 | Fixed 0%/year |

Page 12 of 46

Westinghouse_0000 1335

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Jun-13 | I&C/Simulator | Complete Unit 2 OCS FAT | $3,451,382 | | Fixed 6.5%/year |
| Jun-13 | Spt Fuel Strg Rack | Shipment of first rack module - unit 2 | $1,149,554 | | Handy |
| Jul-13 | RCP | Shipment of Equipment to Site - Unit 2 | $3,408,382 | | Handy |
| Jul-13 | S/G | Completion of 1st CH to Tubesheet Assy Welding Unit 3 | | $4,194,694 | Fixed 0%/year |
| Jul-13 | Passive RHR Hx | Completion of Tubing - Unit 3 | | $244,904 | Fixed 0%/year |
| Jul-13 | Polar Crane | Completion of Electric Panel Assembly - Unit 3 | | $634,329 | Handy |
| Jul-13 | RCP | Completion of Final Stator Assembly - Unit 3 | | $3,408,382 | Handy |
| Aug-13 | RVI | Completion of Final Machining of Core Shroud - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Aug-13 | RV | Satisfactory Completion of Hydrotest - Unit 3 | | $1,235,173 | Fixed 0%/year |
| Aug-13 | Squib Valves | Satisfactory Completion of Factory Operational Test of First Valve - Unit 3 | | $1,268,264 | Fixed 0%/year |
| Aug-13 | IHP | Completion of Assembly of IHP - Unit 3 | | $916,670 | Fixed 0%/year |
| Aug-13 | Aux-Res Xfmr | Satisfactory Completion of FAT - Unit 2 | $3,025,321 | | Handy |
| Sep-13 | S/G | Completion of 2nd CH to Tubesheet Assy Welding Unit 3 | | $3,355,755 | Fixed 0%/year |
| Sep-13 | T/G | MSR/FWH Ready to Ship Unit 3 | | $15,000,000 | Fixed 5.2%/year |
| Sep-13 | Main Transformers | Main Transformers Ready to Ship - Unit 2 | $4,800,000 | | Handy |
| Sep-13 | Aux-Res Xfmr | Shipment of Equipment to Site Unit 2 | $1,728,755 | | Handy |
| Oct-13 | IHP | Shipment of Equipment to Site - Unit 3 | | $550,002 | Fixed 0%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 DAS Equipment to Site | $224,400 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 TOS (DEH I&C) Equipment to Site | $243,499 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 SMS Equipment to Site | $298,297 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 IIS (Cabinets) Equipment to Site | $461,526 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 NIS Detectors to Site | $701,738 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 DDS Equipment to Site | $801,662 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 Rod Control System Equipment to Site | $854,925 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 Rod Pos Ind Sys Equipment to Site | $882,923 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 RMS to Site | $1,295,262 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 PI Temperature Sensors to Site | $1,958,314 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 Plant Control System Equipment to Site | $2,063,975 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Unit 2 OCS Equipment to Site | $2,588,536 | | Fixed 6.5%/year |

Westinghouse_00001336

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Oct-13 | I&C/Simulator | Ship Unit 2 PMS Equipment to Site | $3,171,163 | | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Complete Unit 3 IIS FAT Cabinets) procedures | | $442,343 | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Complete Unit 3 RMS FAT | | $1,234,129 | Fixed 6.5%/year |
| Oct-13 | I&C/Simulator | Ship Simulator Equipment to Site | $2,051,027 | | Fixed 6.5%/year |
| Nov-13 | RV | Shipment of Equipment to Site - Unit 3 | | $2,470,341 | Fixed 0%/year |
| Nov-13 | Passive RHR Hx | Satisfactory Completion of Hydrotest - Unit 3 | | $244,904 | Fixed 0%/year |
| Dec-13 | S/G | Satisfactory Completion of 1st SG Hydrotest - Unit 3 | | $5,033,633 | Fixed 0%/year |
| Dec-13 | RVI | Trial Assembly of Upper/Lower Internals, Guide tubes - Unit 3 | | $1,195,573 | Fixed 0%/year |
| Dec-13 | Polar Crane | Satisfactory Completion of FAT - Unit 3 | | $317,163 | Handy |
| Dec-13 | I&C/Simulator | Complete Unit 3 PI Temperature Sensor FAT | | $1,876,915 | Fixed 6.5%/year |
| Dec-13 | Spt Fuel Strg Rack | Shipment of last rack module Unit 2 | $1,149,554 | | Handy |
| Jan-14 | RCP | Satisfactory Completion of FAT - Unit 3 | | $3,408,382 | Handy |
| Jan-14 | Passive RHR Hx | Shipment of Equipment to Site - Unit 3 | | $489,807 | Fixed 0%/year |
| Jan-14 | I&C/Simulator | Complete Unit 3 DDS FAT procedures | | $768,341 | Fixed 6.5%/year |
| Feb-14 | Refueling Mach | Satisfactory Completion of FAT - Unit 3 | | $753,283 | Handy |
| Feb-14 | I&C/Simulator | Complete Unit 3 PMS TOS (DEH I&C) FAT procedures | | $233,378 | Fixed 6.5%/year |
| Feb-14 | I&C/Simulator | Complete Unit 3 Plant Control System FAT procedures | | $1,985,481 | Fixed 6.5%/year |
| Feb-14 | I&C/Simulator | Complete Unit 3 NIS Detector FAT | | $672,571 | Fixed 6.5%/year |
| Mar-14 | RVI | Shipment of Equipment to Site - Unit 3 | | $2,390,638 | Fixed 0%/year |
| Mar-14 | I&C/Simulator | Complete Unit 3 DAS FAT procedures | | $215,073 | Fixed 6.5%/year |
| Mar-14 | I&C/Simulator | Complete Unit 3 Rod Control System FAT procedures | | $819,389 | Fixed 6.5%/year |
| Mar-14 | I&C/Simulator | Complete Unit 3 Rod Pos Ind Sys FAT procedures | | $846,225 | Fixed 6.5%/year |
| Apr-14 | S/G | Shipment of Equipment to Site - Unit 3 | | $8,389,388 | Fixed 0%/year |
| Apr-14 | T/G | T/G Ready to Ship Unit 3 | | $47,500,000 | Fixed 5.2%/year |
| Apr-14 | Main Transformers | Issue PO for Material - Unit 3 | | $8,000,000 | Handy |
| Apr-14 | Fuel Hand'l Mch | Satisfactory Completion of FAT - Unit 3 | | $609,882 | Handy |
| May-14 | Polar Crane | Shipment of Equipment to Site - Unit 3 | | $317,163 | Handy |
| May-14 | Fuel Hand'l Mch | Shipment of Equipment to Site - Unit 3 | | $406,587 | Handy |
| May-14 | Refueling Mach | Shipment of Equipment to Site - Unit 3 | | $502,190 | Handy |
| May-14 | Spt Fuel Strg Rack | Completion of rack modules - Unit 3 | | $2,299,109 | Handy |

Westinghouse_00001337

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

| Estimated Invoice Date | Component | Milestone | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Jun-14 | I&C/Simulator | Complete Unit 3 OCS FAT | | $2,480,944 | Fixed 6.5%/year |
| Jun-14 | Spt Fuel Strg Rack | Shipment of first rack module - unit 3 | | $1,149,554 | Handy |
| Jul-14 | RCP | Shipment of Equipment to Site - Unit 3 | | $3,408,382 | Handy |
| Aug-14 | Aux-Res Xfmr | Satisfactory Completion of FAT - Unit 3 | | $3,025,321 | Handy |
| Sep-14 | Main Transformers | Main Transformers Ready to Ship - Unit 3 | | $4,800,000 | Handy |
| Sep-14 | Aux-Res Xfmr | Shipment of Equipment to Site Unit 3 | | $1,728,754 | Handy |
| Oct-14 | I&C/Simulator | Ship Unit 3 DAS Equipment to Site | | $161,305 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 TOS (DEH) Equipment to Site | | $175,033 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 SMS Equipment to Site | | $215,724 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 IIS (Cabinets) Equipment to Site | | $331,757 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 NIS Detectors to Site | | $504,428 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 DDS Equipment to Site | | $576,256 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 Rod Control System Equipment to Site | | $614,543 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 Rod Pos Ind Sys Equipment to Site | | $634,669 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 RMS to Site | | $925,597 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 PI Temperature Sensors to Site | | $1,407,687 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 Plant Control System Equipment to Site | | $1,489,111 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 OCS Equipment to Site | | $1,867,208 | Fixed 6.5%/year |
| Oct-14 | I&C/Simulator | Ship Unit 3 PMS Equipment to Site | | $2,279,823 | Fixed 6.5%/year |
| Dec-14 | Spt Fuel Strg Rack | Shipment of last rack module Unit 3 | | $1,149,556 | Handy |
| Apr-16 | Project | Substantial Completion Unit 2 | $29,529,263 | | Handy |
| Jan-19 | Project | Substantial Completion Unit 3 | | $20,786,924 | Handy |

Westinghouse_00001338

Execution Version                                          Confidential Trade Secret Information—Subject to Restricted Procedures

### F.1.3    Westinghouse Milestone Payments

| Estimated Invoice Date | Component | Milestone Payment | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Apr-08 | RCP, SG, RV | Issue LLM PO to Fabricator - Units 2 and 3 for RCP, S/G and RV | 11,025,000 | 10,172,500 | Handy-Whitman |
| Jul-08 | VFD | Issue PO to VFD Fabricator - Units 2 and 3 | 583,676 | 236,966 | Handy-Whitman |
| Aug-08 | VFD | Issue Transformer PO by Fabricator  - Units 2 and 3 | 14,537,852 | 13,735,864 | Handy-Whitman |
| Sep-08 | S/G | Issue Final S/G PO To Fabricator for Unit 2 & 3 | 1,147,207 | 236,966 | Handy-Whitman |
| Oct-08 | CMT | Issue CMT Material PO - Units 2 & Unit 3 | 1,295,536 | 236,966 | Handy-Whitman |
| Nov-08 | S/G | Issue SG Tubing PO for Unit 2 & 3 | 3,307,439 | 357,418 | Handy-Whitman |
| Jan-09 | RCP | Issue Final RCP PO to Fabricator - Units 2 and 3 | 33,258,540 | 9,702,733 | Handy-Whitman |
| Apr-09 | T/G | Issue TG PO to Fabricator - Units 2 and 3 | 12,242,461 | 901,954 | Handy-Whitman |
| Jun-09 | CMT | Receipt of CMT Material  - Lower Head - Unit 2 | 53,804,601 | 2,262,140 | Handy-Whitman |
| Sep-09 | T/G | Vendor Issue PO for TG Condenser Material - Unit 2 | 34,096,852 | 3,264,585 | Handy-Whitman |
| Dec-09 | RV | Receipt at Fabricator - RV Flange Nozzle Shell Forging Unit 2 | 11,247,924 | 2,556,428 | Handy-Whitman |
| Jan-10 | RVI | Receipt of RVI Core Shroud Material - Unit 2 | 10,959,432 | 1,384,831 | Handy-Whitman |
| Feb-10 | T/G | Vendor Issue PO for TG MSR/FWH Material - Unit 2 | 12,498,226 | 1,502,445 | Handy-Whitman |
| Mar-10 | RCL Pipe | Acceptance of Raw Material - Unit 2 | 29,322,098 | 1,628,074 | Handy-Whitman |
| May-10 | Pressurizer | Perform Cladding on Bottom Head - Unit 2 PZR | 15,417,168 | 20,066,630 | Handy-Whitman |
| Jun-10 | I&C/Simulator | Issue MWO for Unit 2 PMS Long-lead items | 16,052,117 | 2,508,668 | Handy-Whitman |

Page 24 of 46

For Professionals' Eyes Only

Westinghouse_00001347

For Professionals' Eyes Only

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone Payment | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Aug-10 | T/G | Issue PO for TG Condenser Material - Unit 3 | 14,726,338 | 2,690,441 | Handy-Whitman |
| Sep-10 | Polar Crane | Issue PO to Polar Crane Fabricator - Unit 2 and 3 | 9,284,613 | 24,832,029 | Handy-Whitman |
| Oct-10 | I&C/Simulator | Issue MWO for Unit 2 IIS (Cabinets) | 15,561,847 | 8,639,905 | Handy-Whitman |
| Dec-10 | RV | Receipt at Fabricator - RV Flange Nozzle Shell Forging Unit 3 | 6,887,325 | 3,447,041 | Handy-Whitman |
| Jan-11 | RVI | Receipt of Core Shroud Material - Unit 3 | 8,787,347 | 3,011,772 | Handy-Whitman |
| Feb-11 | Polar Crane | Issue PO for Main Hoist Drum and Wire Rope - Unit 2 | 5,631,866 | 3,336,606 | Handy-Whitman |
| Mar-11 | S/G | Receipt at Fabricator - 2nd CH Forging Unit 2 | 5,815,668 | 3,122,328 | Handy-Whitman |
| Apr-11 | T/G | Condenser Ready to Ship - Unit 2 | 6,521,712 | 4,211,702 | Handy-Whitman |
| May-11 | I&C/Simulator | Issue MWO for Unit 2 Special Monitoring System | 6,830,994 | 13,192,561 | Handy-Whitman |
| Jun-11 | Fuel Hand'l Mch | Issue PO - Unit 2 & 3 | 5,367,008 | 4,340,803 | Handy-Whitman |
| Jul-11 | S/G | Receipt at Fabricator - 1st SG Tubing Unit 2 | 3,876,944 | 4,931,841 | Handy-Whitman |
| Aug-11 | RV | Completion of Outlet Nozzle Welding to Flange Nozzle Shell- Unit 3 | 3,408,666 | 4,364,875 | Handy-Whitman |
| Sep-11 | T/G | Start Fabrication TG Unit 2 | 4,098,004 | 5,339,531 | Handy-Whitman |
| Oct-11 | RCP | Completion of Stator Core - Unit 2 | 3,333,068 | 5,488,773 | Handy-Whitman |
| Nov-11 | S/G | Completion of 1st SG Tubing Installation Unit 2 | 3,098,184 | 6,643,612 | Handy-Whitman |
| Dec-11 | S/G | Completion of 2nd SG Tubing Installation Unit 2 | 2,967,518 | 6,053,316 | Handy-Whitman |
| Jan-12 | Passive RHR Hx | Final Post Weld Heat Treatment of 2nd Tubesheet - Unit 2 | 4,882,443 | 18,063,266 | Handy-Whitman |

Westinghouse_00001348

Execution Version

Confidential Trade Secret Information—Subject to Restricted Procedures

For Professionals' Eyes Only

Westinghouse_00001349

| Estimated Invoice Date | Component | Milestone Payment | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Mar-12 | VFD | Satisfactory Completion of FAT  - Unit 2 | 2,206,954 | 5,053,867 | Handy-Whitman |
| Apr-12 | RCP | Delivery of Casings - Unit 2 | 3,350,228 | 9,198,465 | Handy-Whitman |
| May-12 | VFD | Start VFD Manufacturing - Unit 3 | 3,027,825 | 5,678,192 | Handy-Whitman |
| Jun-12 | Pressurizer | Shipment of Equipment to Site - Unit 2 | 2,056,485 | 4,974,680 | Handy-Whitman |
| Jul-12 | ACT | Satisfactory Completion of Hydrotest  - Unit 3 | 2,106,421 | 4,553,575 | Handy-Whitman |
| Aug-12 | RV | Satisfactory Completion of Hydrotest - Unit 2 | 1,681,404 | 5,911,451 | Handy-Whitman |
| Sep-12 | S/G | Completion of 2nd CH to Tubesheet Assy Welding Unit 2 | 2,948,338 | 3,539,247 | Handy-Whitman |
| Oct-12 | IHP | Shipment of Equipment to Site - Unit 2 | 1,270,235 | 2,557,420 | Handy-Whitman |
| Nov-12 | RCP | Completion of Final Stator Assembly - Unit 2 | 2,837,346 | 2,471,869 | Handy-Whitman |
| Dec-12 | S/G | Satisfactory Completion of 1st SG Hydrotest - Unit 2 | 3,155,567 | 2,406,796 | Handy-Whitman |
| Jan-13 | I&C/Simulator | Complete Unit 2 DDS FAT procedures | 5,583,962 | 2,193,908 | Handy-Whitman |
| Feb-13 | I&C/Simulator | Complete Unit 2 Plant Control System FAT procedures | 6,263,279 | 2,480,545 | Handy-Whitman |
| Mar-13 | RVI | Shipment of Equipment to Site - Unit 2 | 1,730,963 | 1,932,490 | Handy-Whitman |
| Apr-13 | S/G | Shipment of Equipment to Site - Unit 2 | 2,944,647 | 5,554,939 | Handy-Whitman |
| May-13 | RCP | Satisfactory Completion of FAT - Unit 2 | 1,299,749 | 1,040,699 | Handy-Whitman |
| Jun-13 | I&C/Simulator | Complete Unit 2 OCS FAT | 1,673,793 | 1,644,981 | Handy-Whitman |
| Jul-13 | RCP | Shipment of Equipment to Site - Unit 2 | 1,832,889 | 1,731,163 | Handy-Whitman |

Execution Version                                    Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone Payment | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Aug-13 | Aux-Res Xfmr | Satisfactory Completion of FAT - Unit 2 | 2,409,431 | 1,188,257 | Handy-Whitman |
| Sep-13 | Main Transformers | Main Transformers Ready to Ship - Unit 2 | 2,036,009 | 2,957,827 | Handy-Whitman |
| Oct-13 | I&C/Simulator | Ship Unit 2 DDS Equipment to Site | 1,593,463 | 931,531 | Handy-Whitman |
| Nov-13 | Passive RHR Hx | Satisfactory Completion of Hydrotest - Unit 3 | 1,888,636 | 1,716,017 | Handy-Whitman |
| Dec-13 | S/G | Satisfactory Completion of 1st SG Hydrotest - Unit 3 | 1,150,706 | 1,263,259 | Handy-Whitman |
| Jan-14 | RCP | Satisfactory Completion of FAT - Unit 3 | 1,356,979 | 2,098,417 | Handy-Whitman |
| Feb-14 | I&C/Simulator | Complete Unit 3 Plant Control System FAT procedures | 1,710,691 | 7,265,453 | Handy-Whitman |
| Mar-14 | RVI | Shipment of Equipment to Site - Unit 3 | 1,677,022 | 3,274,664 | Handy-Whitman |
| Apr-14 | S/G | Shipment  of Equipment to Site - Unit 3 | 693,355 | 4,869,949 | Handy-Whitman |
| May-14 | Polar Crane | Shipment of Equipment to Site - Unit 3 | 1,464,798 | 2,786,411 | Handy-Whitman |
| Jun-14 | I&C/Simulator | Complete Unit 3 OCS FAT | 636,891 | 1,793,910 | Handy-Whitman |
| Jul-14 | RCP | Shipment of Equipment to Site - Unit 3 | 624,622 | 2,014,584 | Handy-Whitman |
| Aug-14 | Aux-Res Xfmr | Satisfactory Completion of FAT - Unit 3 | 649,204 | 4,200,999 | Handy-Whitman |
| Oct-14 | I&C/Simulator | Ship Unit 3 DAS Equipment to Site | 134,675 | 2,891,474 | Handy-Whitman |
| Dec-14 | Spt Fuel Strg Rack | Shipment of last rack module Unit 3 | 233,862 | 5,393,878 | Handy-Whitman |
| Mar-15 | Rx Vessel | Begin Installation Unit 3 Rx Vessel | 119,400 | 4,682,401 | Handy-Whitman |
| Jul-15 | Project | Unit 2 Commence Fuel Load | 10,366 | 1,089,897 | Handy-Whitman |

For Professionals' Eyes Only

Westinghouse_00001350

For Professionals' Eyes Only

Execution Version                                          Confidential Trade Secret Information—Subject to Restricted Procedures

| Estimated Invoice Date | Component | Milestone Payment | Unit 2 Invoice Amount | Unit 3 Invoice Amount | Adjustment |
|---|---|---|---|---|---|
| Aug-15 | Containment Vessel | Install Containment Vessel Ring #3 - Unit 3 | 26,647 | 2,155,721 | Handy-Whitman |
| Jan-16 | Project | Unit 2 Commercial Operation | | 379,767 | Handy-Whitman |
| Mar-16 | Turbine Generator | Begin Installation Unit 3 High Pressure TG Rotor | | 1,230,978 | Handy-Whitman |
| Jul-16 | Turbine Generator | Begin Installation of Turbine Turning Gear EHC Valve Assembly | | 1,396,242 | Handy-Whitman |
| Dec-16 | TG Bldg | Install Gland Sealing Steam Condenser - Unit 3 | | 550,402 | Handy-Whitman |
| Dec-17 | Project | RCS - Pressurize to Cold Hydro - Unit 3 | | 54,380 | Handy-Whitman |
| Jul-18 | Project | Unit 3 Commence Fuel Load | | 51,964 | Handy-Whitman |

Westinghouse_00001351

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

F.1.5   Stone & Webster Firm Price Milestone Payment Schedule

**Stone & Webster Firm Price
Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| Apr-08 | | | | |
| | | U2 | | |
| | | U3 | | |
| May-08 | | | | |
| | U2 Contract Execution | U2 | 5/1/2008 | $1,316,942 |
| | U3 Contract Execution | U3 | 5/1/2008 | $0 |
| Jun-08 | | | | |
| | U2 Milestone TBD | U2 | 6/1/2008 | $1,316,941 |
| | U3 Milestone TBD | U3 | 6/1/2008 | $0 |
| Jul-08 | | | | |
| | U2 Milestone TBD | U2 | 7/1/2008 | $1,992,338 |
| | U3 Milestone TBD | U3 | 7/1/2008 | $0 |
| Aug-08 | | | | |
| | U2 Milestone TBD | U2 | 8/1/2008 | $1,992,338 |
| | U3 Milestone TBD | U3 | 8/1/2008 | $0 |
| Sep-08 | | | | |
| | U2 Milestone TBD | U2 | 9/1/2008 | $1,992,338 |
| | U3 Milestone TBD | U3 | 9/1/2008 | $0 |
| Oct-08 | | | | |
| | U2 Milestone TBD | U2 | 10/1/2008 | $2,761,499 |
| | U3 Milestone TBD | U3 | 10/1/2008 | $0 |
| Nov-08 | | | | |
| | U2 Milestone TBD | U2 | 11/1/2008 | $2,761,499 |
| | U3 Milestone TBD | U3 | 11/1/2008 | $0 |
| Dec-08 | | | | |
| | U2 Milestone TBD | U2 | 12/1/2008 | $2,761,499 |
| | U3 Milestone TBD | U3 | 12/1/2008 | $0 |
| Jan-09 | | | | |
| | U2 Milestone TBD | U2 | 1/1/2009 | $6,063,081 |
| | U3 Milestone TBD | U3 | 1/1/2009 | $0 |
| Feb-09 | | | | |
| | U2 Milestone TBD | U2 | 2/1/2009 | $6,063,081 |
| | U3 Milestone TBD | U3 | 2/1/2009 | $0 |
| Mar-09 | | | | |
| | U2 Milestone TBD | U2 | 3/1/2009 | $6,063,081 |
| | U3 Milestone TBD | U3 | 3/1/2009 | $0 |
| Apr-09 | | | | |
| | U2 Milestone TBD | U2 | 4/1/2009 | $25,741,621 |
| | U3 Milestone TBD | U3 | 4/1/2009 | $0 |
| May-09 | | | | |
| | U2 Milestone TBD | U2 | 5/1/2009 | $25,741,621 |
| | U3 Milestone TBD | U3 | 5/1/2009 | $0 |

For Professionals' Eyes Only
Westinghouse_00001353

Confidential Trade Secret Information—Subject to Restricted Procedures

### Stone & Webster Firm Price
### Milestone Payment Schedule

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| **Jun-09** | | | | |
| | U2 Milestone TBD | U2 | 6/1/2009 | $25,741,621 |
| | U3 Milestone TBD | U3 | 6/1/2009 | $0 |
| **Jul-09** | | | | |
| | U2 Milestone TBD | U2 | 7/1/2009 | $13,654,286 |
| | U3 Milestone TBD | U3 | 7/1/2009 | $0 |
| **Aug-09** | | | | |
| | U2 Milestone TBD | U2 | 8/1/2009 | $13,654,286 |
| | U3 Milestone TBD | U3 | 8/1/2009 | $0 |
| **Sep-09** | | | | |
| | U2 Milestone TBD | U2 | 9/1/2009 | $13,654,286 |
| | U3 Milestone TBD | U3 | 9/1/2009 | $0 |
| **Oct-09** | | | | |
| | U2 Milestone TBD | U2 | 10/1/2009 | $12,839,878 |
| | U3 Milestone TBD | U3 | 10/1/2009 | $156,431 |
| **Nov-09** | | | | |
| | U2 Milestone TBD | U2 | 11/1/2009 | $12,839,878 |
| | U3 Milestone TBD | U3 | 11/1/2009 | $156,431 |
| **Dec-09** | | | | |
| | U2 Milestone TBD | U2 | 12/1/2009 | $12,839,878 |
| | U3 Milestone TBD | U3 | 12/1/2009 | $156,427 |
| **Jan-10** | | | | |
| | U2 Milestone TBD | U2 | 1/1/2010 | $11,218,515 |
| | U3 Milestone TBD | U3 | 1/1/2010 | $2,840,809 |
| **Feb-10** | | | | |
| | U2 Milestone TBD | U2 | 2/1/2010 | $11,218,515 |
| | U3 Milestone TBD | U3 | 2/1/2010 | $2,840,809 |
| **Mar-10** | | | | |
| | U2 Milestone TBD | U2 | 3/1/2010 | $11,218,515 |
| | U3 Milestone TBD | U3 | 3/1/2010 | $2,840,809 |
| **Apr-10** | | | | |
| | U2 Milestone TBD | U2 | 4/1/2010 | $12,687,436 |
| | U3 Milestone TBD | U3 | 4/1/2010 | $2,882,174 |
| **May-10** | | | | |
| | U2 Milestone TBD | U2 | 5/1/2010 | $12,687,436 |
| | U3 Milestone TBD | U3 | 5/1/2010 | $2,882,174 |
| **Jun-10** | | | | |
| | U2 Milestone TBD | U2 | 6/1/2010 | $12,687,436 |
| | U3 Milestone TBD | U3 | 6/1/2010 | $2,882,174 |
| **Jul-10** | | | | |
| | U2 Milestone TBD | U2 | 7/1/2010 | $14,527,888 |
| | U3 Milestone TBD | U3 | 7/1/2010 | $2,005,930 |
| **Aug-10** | | | | |
| | U2 Milestone TBD | U2 | 8/1/2010 | $14,527,888 |

Page 31 of 46

For Professionals' Eyes Only                    Westinghouse_00001354

Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| | U3 Milestone TBD | U3 | 8/1/2010 | $2,005,930 |
| Sep-10 | | | | |
| | U2 Milestone TBD | U2 | 9/1/2010 | $14,527,888 |
| | U3 Milestone TBD | U3 | 9/1/2010 | $2,005,930 |
| Oct-10 | | | | |
| | U2 Milestone TBD | U2 | 10/1/2010 | $15,012,445 |
| | U3 Milestone TBD | U3 | 10/1/2010 | $2,271,864 |
| Nov-10 | | | | |
| | U2 Milestone TBD | U2 | 11/1/2010 | $15,012,445 |
| | U3 Milestone TBD | U3 | 11/1/2010 | $2,271,864 |
| Dec-10 | | | | |
| | U2 Milestone TBD | U2 | 12/1/2010 | $15,012,445 |
| | U3 Milestone TBD | U3 | 12/1/2010 | $2,271,864 |
| Jan-11 | | | | |
| | U2 Milestone TBD | U2 | 1/1/2011 | $13,870,453 |
| | U3 Milestone TBD | U3 | 1/1/2011 | $2,821,782 |
| Feb-11 | | | | |
| | U2 Milestone TBD | U2 | 2/1/2011 | $13,870,453 |
| | U3 Milestone TBD | U3 | 2/1/2011 | $2,821,782 |
| Mar-11 | | | | |
| | U2 Milestone TBD | U2 | 3/1/2011 | $13,870,453 |
| | U3 Milestone TBD | U3 | 3/1/2011 | $2,821,782 |
| Apr-11 | | | | |
| | U2 Milestone TBD | U2 | 4/1/2011 | $10,505,468 |
| | U3 Milestone TBD | U3 | 4/1/2011 | $2,831,912 |
| May-11 | | | | |
| | U2 Milestone TBD | U2 | 5/1/2011 | $10,505,468 |
| | U3 Milestone TBD | U3 | 5/1/2011 | $2,831,912 |
| Jun-11 | | | | |
| | U2 Milestone TBD | U2 | 6/1/2011 | $10,505,468 |
| | U3 Milestone TBD | U3 | 6/1/2011 | $2,831,912 |
| Jul-11 | | | | |
| | U2 Milestone TBD | U2 | 7/1/2011 | $10,012,667 |
| | U3 Milestone TBD | U3 | 7/1/2011 | $3,218,475 |
| Aug-11 | | | | |
| | U2 Milestone TBD | U2 | 8/1/2011 | $10,012,667 |
| | U3 Milestone TBD | U3 | 8/1/2011 | $3,218,475 |
| Sep-11 | | | | |
| | U2 Milestone TBD | U2 | 9/1/2011 | $10,012,667 |
| | U3 Milestone TBD | U3 | 9/1/2011 | $3,218,475 |
| Oct-11 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Oct-11 | $3,599,002 |
| N0003CC001 | Cure Time for Nuclear Island Basemat | U2 | 7-Oct-11 | $3,166,294 |

Page 32 of 46

For Professionals' Eyes Only                                    Westinghouse_00001355

Execution Version                                    Confidential Trade Secret Information—Subject to Restricted Procedures

## Stone & Webster Firm Price
## Milestone Payment Schedule

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| C2103CR000 | Aux Bldg - Begin Concrete Rebar Installation (Does Not Include CA20), EL 66'6 | U2 | 17-Oct-11 | $3,166,294 |
| N0003CC000 | Place Concrete for Unit 2 Nuclear Island Basemat | U2 | 3-Oct-11 | $3,166,294 |
| **Nov-11** | | | | |
| | Unit 3 milestone TBD | U3 | 1-Nov-11 | $3,599,002 |
| C2153MH100 | Aux Bldg - Begin Installation of Aux Bldg Elevator, Clean & Dirty Sides, EL 66'6 | U2 | 10-Nov-11 | $3,166,294 |
| C2103EF000 | Aux Bldg - Begin Electrical Equipment Installation, EL 66'6  All Areas | U2 | 10-Nov-11 | $3,166,294 |
| C2153PL000 | Aux Bldg - Begin Installation of Large Bore Piping , EL 66'6 | U2 | 4-Nov-11 | $3,166,294 |
| **Dec-11** | | | | |
| | Unit 3 milestone TBD | U3 | 1-Dec-11 | $3,599,002 |
| C2103CCCA000 | Aux Bldg - Begin Concrete Fill of CA20 Structural Module, EL 66'6 | U2 | 16-Dec-11 | $3,166,294 |
| C1103CC003 | Containment - Place Concrete to EL 71'-6 & Containment Sump Curbs (KQ11) | U2 | 12-Dec-11 | $3,166,294 |
| C2213CC000 | Aux Bldg - Begin Placement of Concrete, EL 82'6 | U2 | 2-Dec-11 | $3,166,294 |
| **Jan-12** | | | | |
| | Unit 3 milestone TBD | U3 | 1-Jan-12 | $3,594,868 |
| C2253R251000 | Aux Bldg - Begin Installation of R251 SFS/WLS Commodity Module  EL 82'6 | U2 | 13-Jan-12 | $3,068,461 |
| C2253ME0100 | Aux Bldg - Begin Installation of Spent Fuel Pool Heat Exchangers, EL 82'-6 | U2 | 11-Jan-12 | $3,068,461 |
| C2233CC101 | Aux Bldg - Place Concrete Floor at Column Line 1-2,  EL 82'6   Area 5 & 6 | U2 | 30-Dec-11 | $3,068,461 |
| **Feb-12** | | | | |
| | Unit 3 milestone TBD | U3 | 1-Feb-12 | $3,594,868 |
| C100ITAC01 | ITAAC  3.3.11 - Concrete Over Soft Soil @ 84' | U2 | 7-Feb-12 | $3,068,461 |
| C2213CC101 | Aux Bldg - Place Concrete Floor Slabs, EL 82'6  Area 1 | U2 | 3-Feb-12 | $3,068,461 |
| C2173CC002 | Aux Building - Place Concrete Under Containment Vessel (CV),  EL 74'6 to 82'6  Areas 7 & 8 | U2 | 31-Jan-12 | $3,068,461 |
| **Mar-12** | | | | |
| | Unit 3 milestone TBD | U3 | 1-Mar-12 | $3,594,868 |
| C2413CA000 | Aux Bldg - Begin Installation of CA22 Floor Module, EL 82'6 | U2 | 8-Mar-12 | $3,068,461 |
| C2133MX000 | Aux Bldg - Begin Installation of Duct, EL 66'6 | U2 | 5-Mar-12 | $3,068,461 |
| C2103KU000 | Aux Bldg - Begin Installation of Standard Service Modules (KU), EL 66'6 Corridor Areas 3, 4 & 5 | U2 | 2-Mar-12 | $3,068,461 |

Page 33 of 46

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| Apr-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Apr-12 | $5,167,905 |
| T2203CC033 | Turbine Bldg - Concrete Cure for Condensate Trench Bottom Mat, EL 89'  Area  0 | U2 | 27-Mar-12 | $2,703,564 |
| A4243CC002 | Annex Bldg - Place Slab On Grade, Rooms 40311 & 40325 Column Lines 7.8 - 13 & A - E, EL 100'  Area 4 | U2 | 2-Apr-12 | $2,703,564 |
| A4243PP004 | Annex Bldg - Install Underground Plumbing Piping, Rooms 40326 - 40327& 40350 - 40357 EL 89'  Area 4 | U2 | 23-Mar-12 | $2,703,564 |
| May-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-May-12 | $5,167,905 |
| T2203CR012 | Turbine Bldg - Install Rebar for Circ Water (CWS) Trench Turbine Bldg - West Wall, EL 89'  Area 0 | U2 | 3-May-12 | $2,703,564 |
| C2203AF110 | Aux Bldg - Install Fire Protection Equipment, EL 82'6 - 100' | U2 | 17-Apr-12 | $2,703,564 |
| T2203CR011 | Turbine Bldg - Install Rebar for Circ Water (CWS) Trench North and South Walls, EL 89' Area 0 | U2 | 23-Apr-12 | $2,703,564 |
| Jun-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Jun-12 | $5,167,905 |
| A4213PP002 | Annex Bldg - Install Floor Drains, Piping & Embeds in Basemat, EL 89'  Areas 1, 2 & 3 | U2 | 25-May-12 | $2,703,564 |
| C1203CR112 | Containment -  Install & Connect Rebar Adjacent to Containment Vessel to 107'2, West Side | U2 | 24-May-12 | $2,703,564 |
| T2203CC010 | Turbine Bldg - Place Concrete  (CWS) Trench Walls 89' to 100' | U2 | 30-May-12 | $2,703,564 |
| Jul-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Jul-12 | $5,878,558 |
| A4313CR002 | Annex Bldg - Install & Connect Rebar For 2' Wall at Col 9, E-H.03/6.5, EL 100' - 118'2 Areas 1 & 2 | U2 | 5-Jul-12 | $2,577,833 |
| C1233MT000 | Containment - Begin Installation of PXS Accumulator Tanks, EL 84'6 | U2 | 6-Jul-12 | $2,577,833 |
| A4323CR014 | Annex Bldg - Install & Connect Rebar for North Grade Wall at Column Line 4.1, EL 100' to 107'2  Areas 2 & 3 | U2 | 22-Jun-12 | $2,577,833 |
| Aug-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Aug-12 | $5,878,558 |
| T2203CR042 | Turbine Bldg - #1 Install and Connect Rebar for Turbine Bldg Basemat at Column Lines 18-20, EL 100', Area 3 | U2 | 1-Aug-12 | $2,577,833 |

Page 34 of 46

Execution Version                                       Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| T2203CR052 | Turbine Bldg - #4 Install and Connect Rebar for Turbine Bldg Basemat at Column Line 14-17 & Column Line I.2 - R, EL 100' | U2 | 1-Aug-12 | $2,577,833 |
| A4323CC011 | Annex Bldg - Place East Grade Wall at Column Line E, EL 100'-107'2  Areas 2 & 3 | U2 | 3-Aug-12 | $2,577,833 |
| Sep-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Sep-12 | $5,878,558 |
| C1203KQ2301 | Containment - Install KQ23 Upper Chemical Volume Control System (CVS) Module, EL 84'6  Room 11209   Area 2 | U2 | 28-Aug-12 | $2,577,833 |
| A4443MSV02 | Annex Bldg - Install Roof Ventilator VXS-MY-V02, EL 118'6  Area 4 | U2 | 30-Aug-12 | $2,577,833 |
| C1203CC007 | Containment - Place Mass Concrete to EL 107'2 with Curbs 108'-2 Northeast | U2 | 31-Aug-12 | $2,577,833 |
| Oct-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Oct-12 | $7,020,140 |
| C1443AX021 | Containment - Prepare & Prime Floors and Walls, EL 107'2 to 118'6 | U2 | 24-Sep-12 | $2,318,645 |
| T2313CH81A | Turbine Bldg - Install T/G Support Module 2031-CH-81A | U2 | 1-Oct-12 | $2,318,645 |
| T2203ER010 | Turbine Bldg - Install Cable Trays & Supports EL 89' to 100' 0" | U2 | 7-Sep-12 | $2,318,645 |
| Nov-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Nov-12 | $7,020,140 |
| T2343SS001 | Turbine Bldg - Erect Structural Steel at Column Line I.2-L.1 12.1-14, EL 116'9 -134'6 Area 4 | U2 | 29-Oct-12 | $2,318,645 |
| A4343PP002 | Annex Bldg - Install & Finish Plumbing Fixtures, EL 100'  Area 4 | U2 | 22-Oct-12 | $2,318,645 |
| T2403C3010 | TURBINE BLDG - SET & INSTALL MONORAILS  EL 117' 6" to 135' 3" | U2 | 29-Oct-12 | $2,318,645 |
| Dec-12 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Dec-12 | $7,020,140 |
| A4343EL002 | Annex Bldg - Install Lighting & Complete Electrical, EL 100'  Area 4 | U2 | 14-Nov-12 | $2,318,645 |
| A4343PX100 | Annex Bldg - Paint Piping, EL 100'   Area 4 | U2 | 19-Nov-12 | $2,318,645 |
| C2353AX000 | Aux Bldg - Begin Preparation & Priming of Surfaces, EL 100' to 117'6 | U2 | 3-Dec-12 | $2,318,645 |
| Jan-13 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Jan-13 | $6,543,977 |
| Y0223MT500 | ERECT - HYDROGEN STORAGE TANK AREA | U2 | 26-Dec-12 | $2,281,490 |
| C2353AX001 | Aux Bldg - Prepare & Prime Surfaces, EL 100' to 117'6   Areas 5 & 6 | U2 | 19-Dec-12 | $2,281,490 |

Page 35 of 46

Execution Version                                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| A4323TX000 | Annex Bldg - Perform Piping Integrity Check, EL 100' Area 2 | U2 | 19-Dec-12 | $2,281,490 |
| Feb-13 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Feb-13 | $6,543,977 |
| T2503EV010 | Turbine Bldg - Set & Install VFD's EL 135' 3" to 161' 0" | U2 | 7-Feb-13 | $2,281,490 |
| T2303CC101 | Turbine Bldg - Place Concrete Slab above Grade (SAG) at Column Line K.1-P.1 & 12.1-14, EL 117'6 Area 0 | U2 | 31-Jan-13 | $2,281,490 |
| C2453CC100 | Aux Bldg - Place Concrete Floor, EL 117'-6 Areas 5 & 6 | U2 | 31-Jan-13 | $2,281,490 |
| Mar-13 | | | | |
| | Unit 3 milestone TBD | U3 | 1-Mar-13 | $6,543,977 |
| C1403CF001 | Containment - Install Concrete Reinforcing Slab at EL 135'3 | U2 | 21-Feb-13 | $2,281,490 |
| T2383EG001 | Turbine Bldg - Ground Structural Steel at Heater Bay, EL 100' | U2 | 27-Feb-13 | $2,281,490 |
| C2173TX005 | Aux Bldg - Perform Piping Integrity Check, EL 66'-6 Areas 7 & 8 | U2 | 18-Feb-13 | $2,281,490 |
| Apr-13 | | | | |
| STEDS35000 | (EDS) TEST SWITCH BOARDS | U2 | 8-Apr-13 | $2,443,631 |
| STTCS45000 | (TCS) TEST PUMPS | U2 | 4-Apr-13 | $2,443,631 |
| C2773CM000 | Aux Bldg - Begin Installation of Reinforcing Assemblies , EL 262'9 to 333'9 | U2 | 8-Apr-13 | $2,443,631 |
| May-13 | | | | |
| A4513MA001 | Annex Bldg - Install Battery Room Exhaust Fan VXS-MA-09A & B, EL 135"3 Area 1 | U2 | 2-May-13 | $2,443,631 |
| T2313PL001 | Turbine Bldg - Install High Pressure Turbine Cross Under Exhaust East & West Pipe Spool, EL 100' Area 1 | U2 | 15-Apr-13 | $2,443,631 |
| C2653CF101 | Aux Bldg - Form Deck Roof Slab at Column Line I-J1 & 2-4, EL 153' Area 5 | U2 | 26-Apr-13 | $2,443,631 |
| Jun-13 | | | | |
| T2513MG001 | Turbine Bldg - Install Turbine Lower casings, EL 161'-2 Area 1 | U2 | 16-May-13 | $2,443,631 |
| C2103CR131 | Aux Bldg - Install Grounding | U3 | 7-Jun-13 | $10,173,013 |
| N0003CR500 | Install Nuclear Island Basemat Lower Rebar & Embeds | U3 | 30-Apr-13 | $10,173,013 |
| Jul-13 | | | | |
| C2353CM900 | Aux Bldg - Assemble Wall Rebar for EL 100'-135'3 Areas 1 - 8 | U3 | 29-Apr-13 | $3,548,315 |
| T2323PL035 | Turbine Bldg - Install Piping Make Up Pieces to Auxiliary Boiler Equipment & Modules, El 100' Area 2 | U2 | 11-Jun-13 | $5,397,370 |
| STIDS65000 | (IDS) TEST SWITCH BOARDS | U2 | 25-Jun-13 | $5,397,370 |

Page 36 of 46

For Professionals' Eyes Only

Execution Version                                 Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| **Aug-13** | | | | |
| C2153CF005 | Aux Bldg - Install Forms for Butting Wall  J-2 & K-2  EL 66'-84'  Area 6 | U3 | 14-Aug-13 | $3,548,315 |
| C2103CF000 | Aux Bldg - Begin Installation of Concrete Forms, EL 66'6 | U3 | 12-Aug-13 | $3,548,315 |
| N0003CC000 | Place Concrete for Unit 3 Nuclear Island Basemat | U3 | 1-Aug-13 | $3,548,315 |
| **Sep-13** | | | | |
| C2153AX030 | Aux Bldg - Prepare & Prime Surfaces, EL 66'6 Area 4 | U3 | 5-Sep-13 | $3,548,315 |
| C2103EF000 | Aux Bldg - Begin Electrical Equipment Installation, EL 66'6  All Areas | U3 | 11-Sep-13 | $3,548,315 |
| T2303TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 89' & 100'    Area 0 | U2 | 22-Aug-13 | $5,397,370 |
| **Oct-13** | | | | |
| STASS15000 | (ASS) TEST CIRCUIT BREAKERS | U2 | 23-Sep-13 | $3,103,228 |
| C2123CF011 | Aux Bldg - Install Wall Form at Column Line 9.5 From I to K, EL 66'6 - 84'6  Area 2 | U3 | 3-Oct-13 | $6,985,199 |
| STCCS20000 | (CCS) TEST CIRCUIT BREAKERS | U2 | 16-Sep-13 | $3,103,228 |
| **Nov-13** | | | | |
| C2343CF000 | Aux Bldg - Begin Installation of Wall Forms, EL 100' | U3 | 7-Nov-13 | $6,985,199 |
| T2393EW000 | Turbine Bldg - Pull & Terminate Cable, EL89' & 100'  Area 9 | U2 | 14-Oct-13 | $3,103,228 |
| C2123JE011 | Aux Bldg - Install Instruments to Support Hydro Test,  EL 66'6 to 82'6  Areas 1 & 2 | U2 | 1-Nov-13 | $3,103,228 |
| **Dec-13** | | | | |
| STRNS15000 | (RNS) TEST CIRCUIT BREAKERS | U2 | 22-Nov-13 | $3,103,228 |
| C1103CR010 | Containment - Install Rebar for Steam Generator Floors, EL 83' | U3 | 3-Dec-13 | $6,985,199 |
| C1243CB510 | Containment - Install CB51 Steam Gen #1 Room Wall Panel Module (A), EL 80'-83' Room 11201  Areas 1 & 2 | U3 | 25-Nov-13 | $6,985,199 |
| **Jan-14** | | | | |
| S0EC9TE021 | ECS ENERGIZE 4160V SWGEAR TURB EL 135' A 7   14. | U2 | 6-Jan-14 | $2,086,526 |
| C1203CC087 | Containment - Place Concrete to EL 87' 6 | U3 | 3-Jan-14 | $9,070,776 |
| C1203CC000 | Containment - Begin Concrete Placement, EL 84'6 - 108'2 | U3 | 3-Jan-14 | $9,070,776 |
| **Feb-14** | | | | |
| S0CW3TX000 | CWS - SYSTEM HYDRO TURB & YARD | U2 | 17-Feb-14 | $2,086,526 |
| S0CV3TX011 | CVS FLUSH P 1 W/TMP PMP THRU CVS SKID TO SF POOL | U2 | 10-Feb-14 | $2,086,526 |
| C1133CA045 | Containment - Remove Bracing from CA04 Reactor Vessel Cavity / RCDT Structural | U3 | 30-Jan-14 | $9,070,776 |

Page 37 of 46

Execution Version                                        Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| | Module, EL 87'6 | | | |
| **Mar-14** | | | | |
| S0CC3TX005 | CCS HYDRO PKG A IN AUX BUILDING FROM 100' to 135'3 | U2 | 6-Mar-14 | $2,086,526 |
| S0FP3TX009 | FPS HYDRO PKG H AUX 3,4,5,6 ABOVE 135' & Above | U2 | 6-Mar-14 | $2,086,526 |
| STMSS35000 | (MSS) TEST RELIEF VALVES | U2 | 12-Feb-14 | $2,086,526 |
| **Apr-14** | | | | |
| C2403CF000 | Aux Bldg - Begin Installation of Concrete Wall Forms,  EL 118'6 - 133' | U3 | 25-Apr-14 | $3,817,178 |
| C2173PL001 | Aux Bldg - Install Make Up Piping for Cradle Reinforcement South, EL 66'6  Area 7 | U3 | 14-Apr-14 | $3,817,178 |
| C2263CC002 | Aux Bldg - Place Concrete at Column Line North Wall Column Line 2 - 4, EL 89' thru 98'1 Area 6 | U3 | 15-Apr-14 | $3,817,178 |
| STCDS25000 | (CDS) TEST MOTOR HEATERS | U2 | 3-Apr-14 | $3,113,903 |
| T2203PL050 | Turbine Bldg - Flush & Hydro all Large Bore Pipe, By System, El All | U2 | 11-Feb-14 | $3,113,903 |
| **May-14** | | | | |
| C2223CC100 | Aux Bldg - Place Concrete Floor Slabs, EL 82'6  Area 2 | U3 | 14-May-14 | $3,817,178 |
| C2123CC021 | Aux Bldg - Place Concrete Beams at Column Line 9.1 - 9.5,  J & K to 81'-6 | U3 | 14-May-14 | $3,817,178 |
| **Jun-14** | | | | |
| C2233MV000 | Aux Bldg - Begin Installation of Degasifier Column, EL 74'6 | U3 | 17-Jun-14 | $3,817,178 |
| A4213XE002 | Annex Bldg - Excavate for Basemat (Check Soil Conductivity), EL 89'  Area 1A | U3 | 9-Jun-14 | $3,817,178 |
| **Jul-14** | | | | |
| A4213EG001 | Annex Bldg - Install Basemat Grounding Grid, Column Lines 2 - 13 & A - I1,  EL 89'  Areas 1, 2, 3 & 4 | U3 | 26-Jun-14 | $4,131,950 |
| A4343AM001 | Annex Bldg - Install Masonry Wall Column Line C.5 Corridor Wall, Rooms 40311 & 40319, EL 100' - 118'  Area  4 | U3 | 25-Jun-14 | $4,131,950 |
| **Aug-14** | | | | |
| C2343CC000 | Aux Bldg - Begin Concrete Placement, EL 107'2 | U3 | 21-Aug-14 | $4,131,950 |
| C2343CP013 | Aux Bldg - Install Precast Panels, EL 100'  for Room 12351 Area 4 | U3 | 18-Aug-14 | $4,131,950 |

Page 38 of 46

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| Sep-14 | | | | |
| C2333PH000 | Aux Bldg - Begin Installation of Personnel Access Hatch from Aux Bldg to Containment, EL 107'2 | U3 | 12-Sep-14 | $4,131,950 |
| T2203CC020 | Turbine Bldg - Install 6" Work Mat below Turbine Bldg Basemat, EL 95'6  Area 0 | U3 | 9-Sep-14 | $4,131,950 |
| Oct-14 | | | | |
| A4313CY001 | Annex Bldg - Cure 2' Wall at Column Line 9,E-H.03/6.5 Room 40309, EL 100'  Area 1 | U3 | 9-Oct-14 | $1,819,340 |
| C2523CC005 | Aux Bldg - Place Concrete Wall at Column I 7.3-10, EL 133'- 149'  Area 2 | U3 | 14-Oct-14 | $1,819,340 |
| A4313CC003 | Annex Bldg - Place 2' Wall at Col 12-13 & G.2-H.03 (Room 40305), EL 100' - 117'2 Area 1 | U3 | 13-Oct-14 | $1,819,340 |
| Nov-14 | | | | |
| T2203CC032 | Turbine Bldg - #2 Place Turbine Bldg Basemat, Areas 8 & 9, EL  100'0 | U3 | 12-Nov-14 | $1,819,340 |
| C2473AX078 | Aux Bldg - Prepare & Prime Walls, EL 117'6 to 135'3  Areas 7 And 8 | U3 | 27-Oct-14 | $1,819,340 |
| C2673CF002 | Aux Bldg - Install Shield Wall Form at 5-N  EL 165'-181'  Areas 7 & 8 | U3 | 4-Nov-14 | $1,819,340 |
| Dec-14 | | | | |
| A4323CF013 | Annex Bldg - Install Forms East Grade Wall Col. Line E, Rooms 40326, 40353, 40357, 40340, EL 100' - 107'2   Areas 2 & 3 | U3 | 1-Dec-14 | $1,819,340 |
| T2203CC062 | Turbine Bldg - #5 Place Turbine Bldg Basemat at Column Line 11-12.1, EL 100' | U3 | 4-Dec-14 | $1,819,340 |
| A4443MSV02 | Annex Bldg - Install Roof Ventilator VXS-MY-V02, EL 118'6  Area 4 | U3 | 20-Nov-14 | $1,819,340 |
| Jan-15 | | | | |
| T2333CH81C | Turbine Bldg - Install CH81C North Turbine Turning Gear (TG)Support Module 2033-CH81C, EL 100'  Area 3 | U3 | 6-Jan-15 | $1,896,781 |
| A4313CF105 | Annex Bldg - Install Forms for Area 1, EL 117'6 | U3 | 22-Dec-14 | $1,896,781 |
| Feb-15 | | | | |
| C2673CC007 | Aux Bldg - Place Concrete Shield Wall at Column 5-Q  EL 179' - 213'  Areas 7 & 8 | U3 | 2-Feb-15 | $1,896,781 |
| A4433CF006 | Annex Bldg - Install Forms for 1' Wall at Column Line 4 E-H, EL 120' To 134'   Areas 2 & 3 | U3 | 23-Jan-15 | $1,896,781 |
| T2403CT010 | Turbine Bldg - Install Cable Trays & Supports EL 117' 6" to 135' 3" | U3 | 9-Jan-15 | $1,896,781 |
| Mar-15 | | | | |
| T2303EG001 | Turbine Bldg - Ground Structural Steel at Column Line 12-14, EL 100' | U3 | 9-Mar-15 | $1,896,781 |

Page 39 of 46

For Professionals' Eyes Only

Execution Version                                Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| S0EC3TE116 | ECS ENERGIZE MCC'S 132/232 TEMP POW AUX 100' | U3 | 11-Mar-15 | $1,896,781 |
| C1503MV502 | Containment - Install Ring #2 Including Walkway, Horizontal CircularTray and Piping, EL 135'3 | U3 | 11-Mar-15 | $1,896,781 |
| **Apr-15** | | | | |
| A4433MH002 | Annex Bldg - Install 5 Ton Crane and Hook Column Line 2 - 4 & G - H  Room 40358,  EL 107'2  Area 3 | U3 | 13-Apr-15 | $1,525,128 |
| T2343CC101 | Turbine Bldg - Place  Concrete Slab above Grade (Slab above Grade (SAG)) at  I.2-K.1 & 12.1-14, EL 117'-6  Area 4 | U3 | 10-Apr-15 | $1,525,128 |
| A4613CY001 | Annex Bldg - 1D, Cure 2' Wall at Column Line 9, E-H.03/6.5 | U3 | 6-Apr-15 | $1,525,128 |
| **May-15** | | | | |
| A4513MA009 | Annex Bldg - Install Exhaust Fans (VBS/VXS-MA-09/13), EL 135'3   Area 1 | U3 | 6-May-15 | $1,525,128 |
| T2303ET100 | Turbine Bldg - Install Lighting Transformers, EL 100'  Area 0 | U3 | 23-Apr-15 | $1,525,128 |
| C2533SS001 | Aux Bldg - Install Structural  Steel Roof Framing & Deck, EL 160'  Areas 3 & 4 | U3 | 22-Apr-15 | $1,525,128 |
| **Jun-15** | | | | |
| C1203CA026 | Containment - Align & Tack Structural Modules CA02, CA03, & CA56, EL 84'6 - 135'3 | U3 | 15-Jun-15 | $1,525,128 |
| T2323ME011 | Turbine Bldg - Install Lower (CDS) Condenser Shell C, El 100'  Area 2 | U3 | 12-Jun-15 | $1,525,128 |
| C2703CH6701 | Aux Bldg - Install CH67 Upper Annulus Stair/Lift Platform, EL 243' to 261 | U3 | 12-Jun-15 | $1,525,128 |
| **Jul-15** | | | | |
| T2303KT040 | Turbine Bldg - Install KT04 Service Water System (SWS) Strainer Module,  EL 100'  Area 0 | U3 | 15-Jul-15 | $1,658,275 |
| C2503ER100 | Aux Bldg - Install Conduit, EL 153' to 264'-6" | U3 | 18-Jun-15 | $1,658,275 |
| **Aug-15** | | | | |
| C2113PLV035 | Aux Bldg - Install Valves, EL 117'6 to 135'3 | U3 | 28-Jul-15 | $1,658,275 |
| A4723AR001 | Annex Bldg - Install Elevator Mechanical Equipment, EL 180'   Areas 2 & 3 | U3 | 6-Aug-15 | $1,658,275 |
| T2213ER101 | Turbine Bldg - Install Cable Tray Along Column Line R   13.1-17,  EL 99'  Area 1 | U3 | 21-Jul-15 | $1,658,275 |
| **Sep-15** | | | | |
| T2483W4800 | Turbine Bldg - Install W480 Feedwater (FWS)Booster Pump Suction Pipe Module, EL 117'6  Area 8 | U3 | 4-Sep-15 | $1,658,275 |

Page 40 of 46

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| A4323TE000 | Annex Bldg - Perform Construction Pre - Turnover Electrical Check Out, EL 107'-2 Area 2 | U3 | 3-Sep-15 | $1,658,275 |
| T2323PL010 | Turbine Bldg - Fitup Circ Water System (CWS) Supply & Return Piping to the Condenser, EL 100'  Area 2 | U3 | 26-Aug-15 | $1,658,275 |
| **Oct-15** | | | | |
| TW581048 | Turbine Building-INSTALL MODULE W581-South Heater Bay Vertical Pipe Chase | U3 | 7-Oct-15 | $1,410,675 |
| T2363PL025 | Turbine Bldg - Install Piping from Condensate Pump Discharge to CPS Equipment Package, EL 100'  Area 6 | U3 | 28-Sep-15 | $1,410,675 |
| **Nov-15** | | | | |
| T2483KT480 | Turbine Bldg - Install KT48 VYS Module, EL 117'-6 Area 8 | U3 | 17-Nov-15 | $1,410,675 |
| TKT34021 | Turbine Building-INSTALL MODULE KT34-LOS Clean Oil Transfer Pump Module | U3 | 12-Nov-15 | $1,410,675 |
| T2683W6800 | Turbine Bldg - Install W680 Feedwater (FWS) Min-Flow Pipe Module, EL 135  Area 8 | U3 | 11-Nov-15 | $1,410,675 |
| C2113TE000 | Aux Bldg - Begin Construction Testing (Hot & Cold Checks) of Electrical Components, EL 66'-6 | U3 | 16-Nov-15 | $1,410,675 |
| **Dec-15** | | | | |
| T2403CC450 | Turbine Bldg - Install Dike Wall at Column Lines 12.1-13.1 & P.1-R in LOS Room, EL 117'-6 | U3 | 4-Dec-15 | $1,410,675 |
| **Jan-16** | | | | |
| T2693TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 161'    Area 9 | U3 | 31-Dec-15 | $824,163 |
| S2213DC011 | Aux Bldg - Install EDS Batteries in Division B Battery Room 12204, EL 82'-6  Area 1 | U3 | 6-Jan-16 | $824,163 |
| T2393EW101 | Turbine Bldg - Pull Cable from MCC'S on  EL 117'6 to all Areas, EL 100' | U3 | 19-Oct-15 | $824,163 |
| C2513TX000 | Aux Bldg - Begin Piping Integrity Checks, EL 135'-3 | U3 | 5-Jan-16 | $824,163 |
| **Feb-16** | | | | |
| S0ED9TE011 | Aux Bldg - Charge EDS  Batteries | U3 | 29-Jan-16 | $824,163 |
| STRWS25000 | (RWS) TEST CIRCUIT BREAKERS | U3 | 25-Jan-16 | $824,163 |
| S0RN3TX001 | RNS HYDRO PKG B FROM PUMP DISC TO ISO VALVE | U3 | 22-Jan-16 | $824,163 |
| **Mar-16** | | | | |
| S0EC3TE125 | ECS ELECTR CHECK OUT MCC'S 312/313 TURB 117' | U3 | 16-Mar-16 | $824,163 |
| Y0213PF000 | Yard - Excavate & Install Underground Diesel Fuel Lines | U3 | 8-Jan-16 | $824,163 |

Page 41 of 46

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| **Apr-16** | | | | |
| STIDS65000 | (IDS) TEST SWITCH BOARDS | U3 | 12-Apr-16 | $749,012 |
| STIDS50000 | (IDS) TEST FUSE PANELS | U3 | 5-Apr-16 | $749,012 |
| S0EC9TE040 | ECS ENERGIZE LOAD CENTRS TURB 135' A 7 | U3 | 5-Apr-16 | $749,012 |
| C1009TN072 | UNIT 2 Substantial Completion | U2 | 1-Apr-16 | $13,630,690 |
| **May-16** | | | | |
| T2553TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 135'-3   Area 5 | U3 | 6-May-16 | $749,012 |
| T2503TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 135'-3   Area 0 | U3 | 6-May-16 | $749,012 |
| C1203CA310 | Containment - Install CA31 Steel Floor, EL 107'2 Reactor Vessel Cavity Floor Module (11105 Ceiling, Floor 11504) | U3 | 11-May-16 | $749,012 |
| **Jun-16** | | | | |
| S0RN3TX002 | RNS - HYDRO PKG B FM IRWST/CVS  7&8 TO RNS PUMPS | U3 | 6-Jun-16 | $749,012 |
| STVWS20000 | (VWS) TEST PUMP MOTORS | U3 | 8-Jun-16 | $749,012 |
| T2503AF100 | Turbine Bldg - Install Fire Protection Equipment, EL 135'3 | U3 | 27-Apr-16 | $749,012 |
| **Jul-16** | | | | |
| C214PDT160 | Aux Bldg - Install  WLS PDT-160 Waste After Filter Differential Pressure Transmitter, EL 66'6  Room 12151 Area 4 | U3 | 19-Jul-16 | $666,387 |
| C2113JE000 | Aux Bldg - Begin Installation of Instrumentation in all  Rooms,  EL 66'6 to 82'6 | U3 | 19-Jul-16 | $666,387 |
| C1403TX100 | Containment - Perform Piping Integrity Check, EL 118'6 - 135'3 | U3 | 8-Jul-16 | $666,387 |
| **Aug-16** | | | | |
| A4413DR002 | Annex Bldg - Pull Cable & Terminate, EL 117' Area 1 | U3 | 22-Jul-16 | $666,387 |
| T2433TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 117'-6   Area 3 | U3 | 2-Aug-16 | $666,387 |
| STDWS15000 | (DWS) TEST CIRCUIT BREAKERS | U3 | 1-Aug-16 | $666,387 |
| **Sep-16** | | | | |
| R5333EW070 | Radwaste Bldg - Pull Cable,  Room 50353, EL 100'   Area 3 | U3 | 8-Sep-16 | $666,387 |
| STRNS25000 | (RNS) TEST PUMP MOTORS | U3 | 6-Sep-16 | $666,387 |
| T2413EW000 | Turbine Bldg - Pull Cable & Terminate ,EL 117'6   Area 1 | U3 | 22-Aug-16 | $666,387 |
| **Oct-16** | | | | |
| T2433TE000 | Turbine Bldg - Perform Pre - Turnover Construction Electrical Check Out, EL 117'-6 Area 3 | U3 | 6-Oct-16 | $547,179 |

Page 42 of 46

Execution Version                              Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| C2323ES005 | Aux Bldg - Activate Class 1E DC and UPS System (IDS) A/B/D DK-1 to RNS Isolation Valve Control Power | U3 | 13-Oct-16 | $547,179 |
| T2573EW001 | Turbine Bldg - Pull Cable from MCC'S on EL 117' to all Areas  EL 135'3 | U3 | 29-Jul-16 | $547,179 |
| Nov-16 | | | | |
| S0FP9TP003 | FPS HYDRANT FLUSH & PRESSURE TEST | U3 | 16-Nov-16 | $547,179 |
| C1703MH011 | Containment - Perform Testing of Polar Crane (MHS-MH-01), EL 135'3  Area 1 | U3 | 10-Nov-16 | $547,179 |
| T2543EW000 | Turbine Bldg - Pull & Terminate Cable, EL 135'-3  Area 4 | U3 | 18-Oct-16 | $547,179 |
| Dec-16 | | | | |
| D6323EW120 | Diesel Gen Bldg - Pull Cable & Terminate - Drain Sump Pump (WWS-MP-B), EL 100  Area  2 | U3 | 12-Dec-16 | $547,179 |
| C1203TE040 | Containment - Perform Construction Testing (Hot & Cold Checks) of Electrical Components, EL 84'6 to 107'2 | U3 | 16-Nov-16 | $547,179 |
| C1603TX110 | Containment - Perform Piping Integrity Check, EL 162'1 & above | U3 | 10-Nov-16 | $547,179 |
| Jan-17 | | | | |
| C1103PN011 | Containment - Install Balance of Piping Insulation (as required), EL 66'6 to 71'6  All Areas | U3 | 13-Jan-17 | $551,508 |
| C2513PN000 | Aux Bldg - Begin  Installation ofl Balance of Piping Insulation after Hydro, EL EL 135'3 to 153' | U3 | 16-Jan-17 | $551,508 |
| T2523TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 135'-3   Area 2 | U3 | 4-Jan-17 | $551,508 |
| Feb-17 | | | | |
| T2503AR010 | Turbine Bldg - Activate Switchgear & Electrical Rooms,  EL 135'-3 | U3 | 2-Feb-17 | $551,508 |
| C1503KU05AZ | Containment - Install KU05AZ Standard Service Module South, EL 135'3  Room 11500  Area 1 | U3 | 14-Feb-17 | $551,508 |
| T2743TX000 | Turbine Bldg - Perform Piping Integrity Check, EL 226'    Area 4 | U3 | 7-Feb-17 | $551,508 |
| Mar-17 | | | | |
| S0VY3TX003 | VYS HYDRO PKG D TURB PIPING ABOVE 117' TO 161' | U3 | 17-Mar-17 | $551,508 |
| C1503PN110 | Containment - Install Piping & Equipment Insulation  (as required), EL 135'3 to 162'1  All Areas | U3 | 8-Feb-17 | $551,508 |
| C1503TE000 | Containment - Perform Construction Testing (Hot & Cold Checks) of Electrical Components, EL 135'3 | U3 | 2-Mar-17 | $551,508 |

Page 43 of 46

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| **Apr-17** | | | | |
| C2773PL100 | Aux Bldg - Complete Make Up Piping, EL 298'9 Room 12703 Areas 7 & 8 | U3 | 31-Mar-17 | $556,125 |
| STMTS40000 | (MTS) TEST MAIN TURBINES | U3 | 15-Mar-17 | $556,125 |
| C2873TX100 | Aux Bldg - Perform Piping Integrity Check, EL 258' Area 7 Annulus | U3 | 31-Mar-17 | $556,125 |
| **May-17** | | | | |
| T2523TE000 | Turbine Bldg - Perform Pre - Turnover Construction Electrical Check Out, EL 135'-3 Area 2 | U3 | 9-May-17 | $556,125 |
| STPSS30000 | (PSS) TEST PUMP MOTORS | U3 | 10-May-17 | $556,125 |
| R5203PL090 | Radwaste Bldg - Flush & Hydro all Large Bore Pipe, By System, El All | U3 | 6-Mar-17 | $556,125 |
| **Jun-17** | | | | |
| C2373TE078 | Aux Bldg - Perform Construction Testing (Hot & Cold Checks) of Electrical Components, EL 100' Areas 7 and 8 | U3 | 2-Jun-17 | $556,125 |
| C2523ES000 | Aux Bldg - Begin Activation of AC & DC Power to Plant Equipment, EL 135'3 | U3 | 2-Jun-17 | $556,125 |
| C2433TE000 | Aux Bldg - Begin Construction Testing (Hot & Cold Checks) of Electrical Components, EL 117'6 | U3 | 2-Jun-17 | $556,125 |
| **Jul-17** | | | | |
| S0RX9TP001 | RXS VERIFY ROD CONTROL INTERLOCK AND SIGNAL | U3 | 5-Jul-17 | $0 |
| S0RX9TP012 | RXS COMP FILL & VENT RV & PRESSURIZE PIPE | U3 | 3-Jul-17 | $0 |
| S0RN3TE000 | Aux Bldg - Perform Normal Residual Heat Removal (RNS) Electrical System Checkout | U3 | 22-Jun-17 | $0 |
| **Aug-17** | | | | |
| T2673EW000 | Turbine Bldg - Pull & Terminate Cable, EL 135'-3  Area 7 | U3 | 7-Aug-17 | $0 |
| C1009TE110 | Containment - Perform Communication System (Paging Only) Phase I Testing | U3 | 20-Jul-17 | $0 |
| S0LO9TP003 | LOS - VERIFY PERFORMANCE TURBINE ON TURNING GEAR | U3 | 2-Aug-17 | $0 |
| **Sep-17** | | | | |
| T2TEMP0004 | Turbine Bldg - Perform Construction Electrical Checkout (Hot & Cold Checks), EL 100' Areas 3 & 7 | U3 | 29-Aug-17 | $0 |
| C1543MV001 | Containment - Install Reactor Vessel (RV) Head to Support Cold Hydro | U3 | 7-Sep-17 | $0 |
| STTDS20000 | (TDS) TEST CIRCUIT BREAKERS | U3 | 31-Aug-17 | $0 |
| **Oct-17** | | | | |
| STVES25000 | (VES) TEST RELIEF VALVES | U3 | 16-Oct-17 | $0 |

Page 44 of 46

Execution Version                    Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| S0CD3TX002 | CDS FLUSH PKG 1 TURBINE BUILDING BELOW 135' | U3 | 10-Oct-17 | $0 |
| STPGS45000 | (PGS) TEST PUMP | U3 | 10-Oct-17 | $0 |
| Nov-17 | | | | |
| STDRS15000 | (DRS) TEST STORM DRAIN SYSTEM (MECH) | U3 | 21-Nov-17 | $0 |
| STRDS15000 | (RDS) TEST GRAVITY & ROOF DRAINAGE SYSTEM | U3 | 17-Nov-17 | $0 |
| S0CD3TX000 | CDS - HYDRO PKG B TURB BUILDING ABOVE 135' | U3 | 27-Oct-17 | $0 |
| Dec-17 | | | | |
| S0BD3TX021 | Align Primary & Secondary Systems for Cold Hyro/Establish Pre-requisites | U3 | 6-Dec-17 | $0 |
| Jan-18 | | | | |
| C153TE121A | Containment - Install TE121A RCS Cold Leg 1A Narrow Range RTD 1, EL 104' Room 11201 | U3 | 1-Jan-18 | $0 |
| S0BD9TP002 | BDS-14.2.8.1.54 DRN SG S AFTER 2NDRY HYDRO | U3 | 2-Jan-18 | $0 |
| C122FT000 | Containment - Begin Installation of RCS Main Loop Instrumentation, EL 84'6 | U3 | 1-Jan-18 | $0 |
| Feb-18 | | | | |
| S0TURBROLL | MTS TURBINE ROLL | U3 | 15-Feb-18 | $0 |
| S0RC9TP200 | RCS 14.2.8.1.67 VER OPERATION RCS 240 HRS  (HFT) | U3 | 2-Feb-18 | $0 |
| C1403PN081 | Containment - Install Balance of Piping & Equipment Insulation  after Hydro, EL 118'6 to 135'3 | U3 | 2-Jan-18 | $0 |
| Mar-18 | | | | |
| S0VU9TI004 | VUS ISO VALVE ALIGNMENT COMPLETE | U3 | 19-Mar-18 | $0 |
| S0VU9TI001 | VUS 14.2.8.1.102 ILRT - CONTAINMENT VESSEL | U3 | 6-Mar-18 | $0 |
| S0VU9TI002 | VUS 14.2.8.1.93 SIT - CONTAINMENT VESSEL | U3 | 22-Feb-18 | $0 |
| Apr-18 | | | | |
| | No Milestones available | | | |
| May-18 | | | | |
| | No Milestones available | | | |
| Jun-18 | | | | |
| | No Milestones available | | | |
| Jul-18 | | | | |
| S0RX9ZA999 | READY FOR FUEL LOAD - UNIT 3 | U3 | | |
| Aug-18 | | | | |
| S0RX9FT009 | INITIAL CRITICALITY & LPPT Unit 3 | U3 | 22-Aug-18 | $0 |
| S0RX9FT005 | RCS HEATUP & RESOLVE HFT PUNCH LIST ITEMS | U3 | 2-Aug-18 | $0 |

Page 45 of 46

Execution Version                              Confidential Trade Secret Information—Subject to Restricted Procedures

**Stone & Webster Firm Price**
**Milestone Payment Schedule**

| Activity ID | Activity Name | Unit | Start | Payment Due |
|---|---|---|---|---|
| Sep-18 | | | | |
| S0RX9FT019 | ESCALATE TO 10% SYNCH ON GRID | U3 | 11-Sep-18 | $0 |
| S0RX9FT015 | POWER ASCENSION TO 5%-SECONDARY SIDE WORK | U3 | 3-Sep-18 | $0 |
| Oct-18 | | | | |
| S0RX9FT031 | MAINTENANCE OUTAGE | U3 | 11-Oct-18 | $0 |
| S0RX9FT029 | 50% POWER TESTING | U3 | 5-Oct-18 | $0 |
| S0RX9FT025 | POWER ASCENSION TO 30% POWER | U3 | 27-Sep-18 | $0 |
| Nov-18 | | | | |
| S0RX9FT045 | LOSS OF OFFSITE POWER TEST | U3 | 22-Nov-18 | $0 |
| S0RX9FT037 | LOAD SWING TESTING | U3 | 2-Nov-18 | $0 |
| S0RX9FT035 | 100% POWER TESTING | U3 | 29-Oct-18 | $0 |
| Dec-18 | | | | |
| S0RX9FT053 | 100 HOUR PERFORMANCE TEST Unit 3 | U3 | 14-Dec-18 | $0 |
| Jan-19 | | | | |
| C1009TN072 | UNIT 3 Substantial Completion | U3 | 1-Jan-19 | $8,250,351 |

For Professionals' Eyes Only

Westinghouse_00001369

# EXHIBIT 2

Confidential Trade Secret Information - Subject to Restricted Procedures

AGREEMENT

AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION
AGREEMENT BETWEEN SOUTH CAROLINA ELECTRIC & GAS COMPANY, FOR
ITSELF AND AS AGENT FOR THE SOUTH CAROLINA PUBLIC SERVICE AUTHORITY
AND A CONSORTIUM CONSISTING OF WESTINGHOUSE ELECTRIC COMPANY LLC
AND STONE & WEBSTER, INC., FOR AP1000® NUCLEAR POWER PLANTS

THIS AMENDMENT ("October 2015 Amendment") to the Engineering, Procurement
and Construction Agreement dated May 23, 2008 ("EPC Agreement") for the AP1000 Power
Plants at the Virgil C. Summer Nuclear Generating Station ("Project") is entered into this 27th
day of October 2015, by and between South Carolina Electric & Gas Company ("SCE&G"), for
itself and as agent for the South Carolina Public Service Authority ("SCPSA") (collectively
"Owner") and a consortium consisting of Westinghouse Electric Company LLC
("Westinghouse") and CB&I Stone & Webster, Inc. ("Stone & Webster") (collectively
"Contractor").  Owner and Contractor may be referred to individually as a "Party" and
collectively as the "Parties."

WHEREAS, Westinghouse has represented to Owner that it intends to acquire the stock
of Stone & Webster from Chicago Bridge & Iron ("CB&I") (the "Transaction"); that CB&I will
have no further involvement in the Project except for certain supply agreements; and that
Westinghouse intends to hire Fluor Corporation ("Fluor") or its affiliate(s) as a subcontracted
construction manager;

In consideration of the mutual promises herein and other good and valuable
consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties,
intending to be legally bound, stipulate and agree as follows:

1.      The Parties agree that this October 2015 Amendment will be a binding obligation
between Owner and Westinghouse upon the approval of the boards of directors of both Owners
and the authorization of the board of SCPSA for its management to execute the necessary
documentation and the execution of those documents, which shall become effective upon the
consummation of the Transaction ("Effective Time"), and in the event the Transaction is not
consummated by March 31, 2016, this October 2015 Amendment shall be null and void in all
respects.  Westinghouse shall cause its wholly owned subsidiary, Stone & Webster, to execute
this October 2015 Amendment.

2.      Contractor hereby grants Owner until November 1, 2016 ("Option Deadline"), the
irrevocable option to exercise an agreement, subject to regulatory approvals, to amend the EPC
Agreement by revising the Contract Price and other specific aspects of the EPC Agreement, as
stated in the amendment that is attached as Exhibit D ("Option Amendment").
Contemporaneously with the execution of this October 2015 Amendment, Contractor will
execute the Option Amendment. Thereafter, Owner may, in its sole discretion, implement the
Option Amendment by executing it at any time on or before the Option Deadline. The Option
Amendment will not take effect unless and until Owner executes the Option Amendment, before

1

Confidential Trade Secret Information - Subject to Restricted Procedures

the Option Deadline, and all conditions precedent to effectiveness stated in the Option Amendment are satisfied or waived by Owner.

3.      Owner agrees to pay Contractor the total sum of $300,000,000 (current year U.S. Dollars) and increase the Fixed Price Contract Price by said amount. Further, Contractor agrees to provide Owner with a credit to the Target Price in the amount of $50,000,000 (current year U.S. Dollars). The net $250,000,000 will be paid in twelve equal monthly installments beginning five days after the Effective Time. In exchange, Owner and Contractor agree to a full resolution by settlement and release of any and all disputes outstanding under the EPC Agreement or otherwise concerning the Project as of the Effective Time, including the following:

        a.      Contractor claims for additional payments for any of the items on Exhibit A, as well as claims for additional payment for cyber security and the site layout phase 2 Change Order (Change Order 26).

        b.      Contractor claims for amounts referenced in letters no. VSP _ VSG_003111, VSP _ VSG_003115, VSP _ VSG_ 3145, VSP _ VSG_3502 and VSP _ VSG_3522, which totaled approximately $83,518,046 as of August 21, 2015, as set forth on Exhibit B.

        c.      Contractor claims for amounts in other cases in which the entitlement is in dispute, which totaled approximately $29,729,785 as of August 31, 2015, as set forth on Exhibit B.

        d.      Contractor claims for amounts in dispute due to billings that have been held because a Change Order has not been executed, which totaled approximately $5,565,845 as of August 31, 2015, as set forth on Exhibit B.

        e.      Contractor claims for all amounts in dispute in cases in which only the timing is disputed, which totaled approximately $110,190,504 as of August 31, 2015, as set forth on Exhibit B.

        f.      Contractor claims for the balance of 10% withheld by Owner in connection with certain invoices for which the Owner has only paid 90% because the Owner disputed the invoice

        g.      Owner claims for refunds in connection with invoiced amounts for which Owner has paid 90% of the invoiced amount and for which Owner had previously intended to seek a refund.

        h.      Owner claims arising out of the employee fuel expense audit and procurement irregularities.

Subparagraphs a through h do not provide an exhaustive list of all claims, disputes, and amounts that are satisfied by this October 2015 Amendment, it being the Parties' intent that all disputes outstanding under the EPC Agreement or concerning the Project as of the Effective Time are settled and resolved. By way of further clarifications, under this October 2015 Amendment, the Parties waive and settle any and all claims currently pending or threatened by either Party against the other Party and of any and all claims currently known or reasonably foreseeable by either Party against the other Party. Whether or not the Option Amendment becomes effective, all pending Change Orders, and formal and informal notices of potential Change Orders, including but not limited to those arising from Uncontrollable Circumstances and Changes in Law, are

2

Confidential Trade Secret Information - Subject to Restricted Procedures

hereby settled and resolved. Each Party represents and warrants to the other Party that it is not aware of the basis for any other claim against the other, including but not limited to those arising from Uncontrollable Circumstances and Changes in Law, and that it is not aware of any facts or circumstances that could be expected to give rise to a claim, the sole exceptions being those claims addressed in paragraph 4. For the avoidance of doubt, in the event that the Option Amendment becomes effective, the $300,000,000 payment and the $50,000,000 credit to the Target Price set forth in this paragraph 3 will be part of (and not in addition to) the total Fixed Price amount of $6.082 billion set forth in the Option Amendment.

The Parties shall execute a mutual release effectuating the provisions of this paragraph 3.

4.      Notwithstanding the foregoing, the Parties have identified on Exhibit C to this Amendment all work items that they contend are required or contemplated for the Project but that are not included within the release contained in paragraph 3. Said work items are not resolved, settled or released under this October 2015 Amendment. The Parties shall cooperate in good faith to resolve all such work items expeditiously so as to not impact the Project. In the event a work item cannot be resolved, it shall be submitted to the Dispute Resolution Board as referenced in paragraphs 13 and 16. Similarly, with respect to the cyber security item listed in Exhibit A, the Parties shall cooperate in good faith to resolve all issues relating to scope expeditiously. Contractor acknowledges its obligation to commence and continue work in compliance with current NRC regulations on cyber security, pending issuance of a Change Order, so as not to impact the Project schedule, and its obligation to complete the Cyber Security work within the GSCDs stated in paragraph 6In the event a scope item cannot be resolved, it shall be submitted to the Dispute Resolution Board as referenced in paragraphs 13 and 16. Except for the items on Exhibit C and the Time and Material Work set forth in paragraph 2 of the Option Agreement, the cyber security item listed in Exhibit A and without waiving its rights concerning unknown Changes under Article 9 of the EPC Agreement, Contractor is not aware of any additions to the Scope of Work that will be required for the Project to reach Substantial Completion.

5.      The Contractor acknowledges and agrees that its Scope of Work includes providing Owner with a Facility that meets the standards of DCD Rev. 19.

6.      The Guaranteed Substantial Completion Dates ("GSCDs") are revised, as follows: August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3. The Standard Equipment Warranty Period(s) and the Services Warranty Period(s) shall commence upon Substantial Completion of each Unit at no additional cost to Owner. To the extent a Change under Article 9 of the EPC Agreement adversely affects Contractor's ability to achieve Substantial Completion as provided in this paragraph 6, Contractor shall be entitled to equitable adjustment of the EPC Agreement as appropriate.

7.      Section 13.1 of the EPC Agreement is revised to state that Delay Liquidated Damages for each Unit will commence on the applicable GSCDs stated in paragraph7, and will be computed as follows:

        a.      For the first thirty (30) days following the GSCD: $200,000/day; and

3

Confidential Trade Secret Information - Subject to Restricted Procedures

b.    For the next thirty-one (31) to ninety (90) days: $300,000/day; and

c.    For the next ninety-one (91) to one hundred fifty (150) days: $ 400,000/day; and

d.    For the next one hundred fifty-one (151) to seven hundred thirty (730) days: $500,000/day; and

e.    Seven hundred thirty-one (731) days or beyond: $0/day.

8.    The Parties agree to share the loss if either or both Units do not qualify for production tax credits under Federal law.  If a Unit is not "placed in service," as that term is used in Section 45J of the Internal Revenue Code, before January 1, 2021, Contractor agrees to reimburse Owner by February 1, 2021, the sum of $250 million per Unit, expressed as a one-time lump sum payment. For purposes of this paragraph, the January 1, 2021 date can only be extended for the following reasons (i) material actions or omissions of Owner that cause a Unit not to qualify for tax credits; or (ii) extension of the tax credit date by the U.S. government.  If Contractor becomes aware of any actions or omissions of Owner that Contractor believes may cause a Unit not to qualify for tax credits, Contractor shall provide Owner with reasonable notice of such actions or omissions.

9.    The maximum amount paid by Contractor to Owner under paragraphs 7 and 8 above will be limited to $338 million per Unit, if the Option Amendment becomes effective.  In the event the Option Amendment does not become effective, the maximum amount paid by Contractor to Owner under paragraphs 7 and 8 above will be limited to $463 million per Unit.

10.    Owner will pay Contractor an early completion bonus consisting of $150,000,000 per Unit for each Unit that is "placed in service," as that term is used in Section 45J of the Internal Revenue Code, in advance of January 1, 2021, if the Option Amendment becomes effective.  In the event the Option Amendment does not become effective, Owner will pay Contractor an early completion bonus consisting of $275,000,000 per Unit for each Unit that is "placed in service," as that term is used in Section 45J of the Internal Revenue Code, in advance of January 1, 2021. For purposes of this paragraph, the January 1, 2021 date can only be extended for the following reasons (i) material actions or omissions of Owner that cause a Unit not to qualify for tax credits; or (ii) extension of the tax credit date by the U.S. government.  If Contractor become aware of any actions or omissions of Owner that Contractor believes may cause a Unit not to qualify for tax credits, Contractor shall provide Owner with reasonable notice of such actions or omissions.

11.    The Parties agree that no new Inspection, Tests, Analyses and Acceptance Criteria ("ITAACs") have been issued or proposed as of the Effective Time that would affect the GCSDs or entitle the Contractor to a Change Order.

12.    The Parties shall cooperate in good faith to develop a new milestone payment schedule ("Construction Milestone Payment Schedule") to include all unpaid or overpaid amounts.  While such good faith efforts are ongoing, Owner agrees to make payments to Contractor in the amount of $100,000,000 per month for the first five (5) months following the Effective Time.  Said payments shall be in lieu of all payments for Fixed Price, Firm Price, Target Price and Time and Material Work.  Once developed, Contractor agrees that Owner is to make such payments to Contractor according to the Construction Milestone Payment Schedule, instead of the existing Payment Schedules.  If the Parties fail to agree to a Construction Milestone Payment Schedule by the date that is six months from the Effective Time, the matter shall be referred to the Dispute

Confidential Trade Secret Information - Subject to Restricted Procedures

Resolution Board ("DRB") process for resolution.  Unless otherwise agreed by the Parties, the DRB shall issue its report on the Construction Milestone Payment Schedule within sixty (60) days.  For the 60 day period during which the DRB is reviewing the Construction Milestone Payment Schedule, Owner shall pay the sum of $100,000,000 per month in lieu of all other payments, and such payments will be treated in the same manner as the payments referenced in paragraph 3.

Contractor will continue to invoice Owner according to previous procedures (i.e. Contractor  will provide parallel invoices for Target, T&M, and Firm and Fixed Price categories) to enable calculation of the amount by which the payments described in paragraphs 3 and 12 exceed what would otherwise be due Contractor. After these advance payments cease, the excess or deficit portion of such advance payments shall be adjusted against future invoices submitted by Contractor to Owner under the EPC Agreement, at the Owner's sole discretion.  Actual payments will be trued up to parallel invoices in months 6, 12 or when the Option Amendment becomes effective.

In the event that the Option Amendment is exercised and takes effect, the actual payments made under paragraphs 3 and 12 will be deducted from the amount referenced in section 1 of the Option Amendment.  If the Option Amendment does not take effect, billing procedures for Target and T&M Work scopes will revert back to the EPC Agreement terms, as amended, incorporating the adjusted terms in paragraph 3 above, and Firm Price and Fixed Price scopes will continue to be billed based on the Construction Milestone Payment Schedule.  For the avoidance of doubt, the cash flows of the Construction Milestone Payment Schedule will be reduced to reflect the lower amounts remaining in the Fixed Price and Firm Price categories as defined in Exhibit H of the EPC Agreement.

13.    Within ten (10) days of establishing the Construction Milestone Payment Schedule, Owner shall advance a deposit of seventy-five million dollars ($75,000,000) with the Contractor.

  a.  After the deposit is made, Owners will not be obligated to pay to Contractor the disputed portion of any invoiced amounts submitted by Contractor to Owners.
  b.  The Parties shall revise the dispute resolution procedures in Article 27 of the EPC Agreement to eliminate the requirement or ability to institute litigation during the course of the Project absent a suspension or termination of the EPC Agreement.
  c.  The Parties shall establish a DRB process for the interim, non-final resolution of disputes, as described more fully in paragraph 16 below and Exhibit E.
  d.  Owner agrees to make payment to Contractor within thirty (30) days of any award entered in favor of Contractor by the DRB.
  e.  At Project completion, the deposit amount of $75,000,000 shall be credited against Owner's final milestone payment owed Contractor.

14.    The definition of "Change in Law" in the EPC Agreement is modified so that a Change in Law occurs only in case of (a) the formal written adoption by a Government Authority of a new statute, regulation, requirement or code that did not exist as of the date of the October 2015 Amendment; or (b) where the NRC is the involved Government Authority, the NRC's official issuance or promulgation, after the date of the October 2015 Amendment, of a final and official

Confidential Trade Secret Information - Subject to Restricted Procedures

version of Regulatory Guides (NUREGs), Branch Technical Positions, Standard Review Plans, Interim Staff Guidance, Bulletins, Orders, or written directives, in which NRC acknowledges a new regulatory requirement or a change to an existing requirement that did not apply before the date of the October 2015 Amendment. Where Contractor cannot demonstrate a Change in Law under this paragraph, Contractor shall also be precluded from claiming that the purported Change in Law is an Uncontrollable Circumstance.

15.    The Parties agree to participate in meetings with the Nuclear Regulatory Commission ("NRC") and develop strategies in an effort to alleviate issues that have arisen due to the NRC's inspections at the Project, while still affording the NRC the ability to conduct appropriate inspections. Owner cannot agree in advance to adopt the Contractor's position on every issue, but Owner will work with Contractor in good faith.  In the event the Option becomes effective, Owner shall have no obligation to pay Contractor for regulatory support associated with License Amendment Requests or ITAACs, except those that arise due to a Change.  In the event the Option Amendment does not become effective, such matters shall be submitted to the DRB process established pursuant to this October 2015 Amendment.  For the period of time between the Effective Time and the Option Deadline, the Parties agree to suspend the DRB process for matters relating to regulatory support associated with License Amendment Requests and ITAACs. In the event the Option Amendment does not become effective, the suspended DRB matters will be administered.  If the Option becomes effective, those matters suspended by the preceding sentence shall be deemed to be included in the Fixed Price.

16.    Consistent with paragraph 13 above, Article 27 of the EPC Agreement is revised to eliminate the requirement or ability to bring suit during the course of the Project. The Parties agree to empanel a DRB for the interim, non-final resolution of disputes in accordance with the Dispute Resolution Agreement that is attached as Exhibit E.

17.    Owner hereby waives and cancels the Chicago Bridge & Iron Parent Company Guaranty. Owner agrees that Contractor shall be relieved of any obligation to furnish a parent company guaranty on behalf of S&W under the EPC Agreement. Owner and CB&I shall execute a mutual release of all claims relating to the EPC Agreement, the Project, the S&W Parent Guarantee and the CB&I Guarantee.

18.    The Parties agree to hold a face-to-face meeting among Owner, Westinghouse, the President and Chief Executive Officer of Power Systems Company, and Mr. Shiga Shigenori, the Representative Executive Officer and Corporate Senior Executive Vice President of Toshiba Corporation (or his successor) to allow Owner to describe its concerns with the Project to date and to discuss Toshiba's commitment to completing the Project and to the terms of this Agreement.  In addition, at Owner's option, Toshiba, Owner, Contractor, and Fluor will hold quarterly meetings to discuss Project progress.

19.    Contractor's profit on any future Change Orders under the EPC Agreement shall be capped at 7 ¾%.

20.    The Parties agree that Article 13.3 is deleted from the EPC Agreement.

Confidential Trade Secret Information - Subject to Restricted Procedures

21.    The provisions of Section 8.6(d) of the EPC Agreement are revised to provide that SCE&G or Santee Cooper shall not be required to furnish Contractor with an irrevocable, standby letter of credit, provided the Credit Rating of SCE&G or Santee Cooper, as applicable, remains at or above investment grade (Standard and Poor's BBB-; Moody's Baa3). If the Credit Rating of SCE&G or Santee Cooper falls below investment grade, Contractor may request the letter of credit, and SCE&G or Santee Cooper must furnish the letter of credit at no expense to Contractor.

22.    The Parties agree to cooperate with respect to the involvement of Owner's Project consultant and/or Owner's Engineer with the work scheduled to be done by Owner's consultant.

      a.    Contractor shall carefully consider all matters raised by the consultant, however the consultant shall have no authority to direct the Work of Contactor.
      b.    Contractor agrees to provide the consultant with access to relevant documents reasonably requested by the consultant, provided such documents are necessary for the consultant to complete its work for Owners.
      c.    For relevant documents provided under subparagraph (b) above, Contractor may provide confidential and proprietary documents in redacted form, including redaction of any pricing information. Contractor will provide unredacted documents to the consultant, provided Contractor determines in its reasonable discretion that it is given suitable protections from Owners and/or the consultant against misuse or further disclosure of such documents.

23.    Contractor acknowledges Owner's right to discuss any and all operational and project execution issues with the Vogtle owners. Owner is not permitted to disclose to the Vogtle owners information relating to any disputes, commercial issues or the terms and conditions of this agreement and any related documents or agreements.

24.    All capitalized terms in this October 2015 Amendment, except for those defined in this October 2015 Amendment, shall have the meanings given to them in the EPC Agreement.

25.    All provisions of the EPC Agreement not modified, expressly or by necessary implication, remain in full force and effect. All Exhibit references are to this October 2015 Amendment.

26.    While the Parties acknowledge the existence of various confidentiality agreements between themselves, they also recognize that certain disclosures must be made to satisfy various securities laws and for regulatory purposes. Each Party is free to make such disclosures as it deems prudent, but the disclosing Party must provide a copy of any intended written disclosure to the other Parties before such disclosure is made.

27.    Upon execution of this October 2015 Amendment, Contractor will provide written details of its relationship and structure with Fluor, including a scope of work description, sufficient to allow the Owner to understand the roles and responsibilities of Fluor on the Project. In the event of a material change in the relationship, structure, or scope, Contractor will provide details of the

Confidential Trade Secret Information - Subject to Restricted Procedures

change. In the event the Option Amendment does not become effective, Contractor shall submit construction related billings consistent with the existing provisions of the EPC Agreement.

28.    To the extent not prohibited by its existing contracts, Contractor agrees to afford Owner and Owner's consultant access to its facilities and those of its suppliers and subcontractors at any tier, for the purpose of completing Owner's consultant's assessment and monitoring of the Project and the Project Schedule.

29.    In the form of Exhibit F, Contractors will provide written consent of Toshiba Corporation to this October 2015 Agreement, affirming that the corporate guaranty of Toshiba remains in place, notwithstanding  this October 2015 Agreement.  This signed exhibit must be provided to Owner's prior to the Effective Time.

[Balance of Page Intentionally Blank]

Confidential Trade Secret Information - Subject to Restricted Procedures

**IN WITNESS WHEREOF,** the Parties have duly executed this October 2015 Amendment to the EPC Agreement as of the date first above written, with Toshiba Corporation, as the parent corporation of Westinghouse, indicating its express consent hereto.

SOUTH CAROLINA ELECTRIC & GAS
COMPANY, for itself and as agent for South
Carolina Public Service Authority
By:
Name: _____
Title: Chairman + CEO _____

WESTINGHOUSE ELECTRIC COMPANY LLC
By:
Name: _____
Title: _____

STONE & WEBSTER, INC.
By:
Name: _____
Title: _____

9

Confidential Trade Secret Information - Subject to Restricted Procedures

**IN WITNESS WHEREOF**, the Parties have duly executed this October 2015 Amendment to the EPC Agreement as of the date first above written, with Toshiba Corporation, as the parent corporation of Westinghouse, indicating its express consent hereto.

SOUTH CAROLINA ELECTRIC & GAS
COMPANY, for itself and as agent for South
Carolina Public Service Authority
By:
Name: _____
Title: _____

WESTINGHOUSE ELECTRIC COMPANY LLC          STONE & WEBSTER, INC.
By: _____                By:
Name: _____              Name: _____
Title:  President & Chief Executive Officer  Title: _____

# Exhibit D

.

Confidential Trade Secret Information - Subject to Restricted Procedures

## AGREEMENT

AMENDMENT TO THE ENGINEERING, PROCUREMENT AND CONSTRUCTION
AGREEMENT BETWEEN SOUTH CAROLINA ELECTRIC & GAS COMPANY, FOR
ITSELF AND AS AGENT FOR THE SOUTH CAROLINA PUBLIC SERVICE AUTHORITY
AND A CONSORTIUM CONSISTING OF WESTINGHOUSE ELECTRIC COMPANY LLC
AND STONE & WEBSTER, INC., FOR AP1000® NUCLEAR POWER PLANTS

THIS AMENDMENT to the Engineering, Procurement and Construction Agreement
dated May 23, 2008 ("EPC Agreement") for the AP1000 Power Plants at the Virgil C. Summer
Nuclear Generating Station ("Project") by and between South Carolina Electric & Gas Company,
for itself and as agent for the South Carolina Public Service Authority ("Owner") and a
consortium consisting of Westinghouse Electric Company LLC ("Westinghouse") and CB&I
Stone & Webster, Inc. ("S&W"), (collectively "Contractor") is executed on behalf of
Westinghouse, shall be executed on behalf S&W upon the consummation of the Transaction (as
defined in the October 2015 Amendment) and shall become effective upon execution by Owner
and approval of the Public Service Commission of South Carolina, so long as execution occurs
by the 1st day of November 2016, unless such approval is waived by the Owner or the date is
waived by the Contractor ("Option Amendment"). If execution does not occur by November 1,
2016, this Option Amendment shall be null and void in all respects. Owner and Contractor may
be referred to individually as a "Party" or collectively as the "Parties."

In consideration of the mutual promises herein and other good and valuable
consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties,
intending to be legally bound, stipulate and agree as follows:

1.      Except as provided in paragraph 2, all remaining Work under the EPC Agreement as of
the Effective Time (defined in the October 2015 Amendment referenced below) shall be
converted to a Fixed Price in exchange for the remaining Contract Price being adjusted to $6.082
billion in current U.S. Dollars. The remaining Contract Price adjustment represents the cost to
complete the Project beyond what has been paid through June 30, 2015. Payments made after
June 30, 2015 will be credited against the $6.082 billion amount.

2.      The following Time and Material Work is not included in the Fixed Price described in
paragraph 1: sales tax, performance bond and insurance premiums, import duties, Mandatory
Spare Parts and Extended Equipment Warranty costs (other than the costs associated with the
warranty extensions provided for in paragraph 7 of the October 2015 Amendment, because those
warranty extensions are at no cost to Owner). This Work will be billed under the existing terms
of the EPC Agreement.

3.      The categories of Target Price and Firm Price are eliminated.

4.      The capitalized terms in this Amendment, except for those defined in this Amendment,
shall have the meanings given to them in the EPC Agreement.

5.      All provisions of the EPC Agreement not modified, expressly or by necessary
implication, remain in full force and effect.

1

Confidential Trade Secret Information - Subject to Restricted Procedures

**IN WITNESS WHEREOF**, the Parties have duly executed this Amendment as of the date first above written.

SOUTH CAROLINA ELECTRIC & GAS
COMPANY, for itself and as agent for South
Carolina Public Service Authority
By:
Name: _____
Title: _____

WESTINGHOUSE ELECTRIC COMPANY LLC
By:
Name: _____
Title:  President & Chief Executive Officer


STONE & WEBSTER, INC.
By:
Name: _____
Title: _____

2